UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GEORGIA-PACIFIC,

         Plaintiff,

v.

OFFICEMAX INCORPORATED, et al.,

         Defendants.

Case No. 12-cv-02797-WHO

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 95

## INTRODUCTION

Georgia-Pacific LLC ("Georgia-Pacific") brings suit against OfficeMax Incorporated ("OfficeMax"), Louisiana-Pacific Corporation ("Louisiana-Pacific"), and the City of Fort Bragg, seeking damages, indemnification, contribution, and declaratory relief under state and federal law for alleged contamination of a lumber mill site at 90 West Redwood Avenue, Fort Bragg, California (the "Union Lumber Region" or "lumber mill"). OfficeMax now moves for summary judgment on all eight of Georgia-Pacific's causes of actions against it. For the following reasons, the Motion for Summary Judgment is DENIED.

## FACTS

The following facts are undisputed: Until November 1, 2004, OfficeMax was known as Boise Cascade Corporation ("Boise"). SAC ¶ 16; Br. 5; Dkt. No. 86 at 5. On October 7, 1968, Boise merged with the Union Lumber Company and assumed all its "debts, liabilities, obligations, and duties," which included the lumber mill site at issue here. Reck Decl. Ex. 4 at 1, 7-8; Dkt. No. 86 at 5.

On February 5, 1973, Georgia-Pacific signed a contract to purchase from Boise most of the assets of the Union Lumber Region: timber and timberland, most of the lumber mill, equity

United States District Court
Northern District of California

United States District Court
Northern District of California

1  interests in the California Western Railroad, and related assets.  Reck Decl. Ex. 3.  Because the

2  purchase was subject to the approval of the Federal Trade Commission and the Interstate

3  Commerce Commission, Ritti Decl. Ex. B ("Trust") at 1-2, the parties voided that contract on

4  February 15, 1973, and entered two new contracts structured so that the transaction could proceed

5  while the approvals were pending.  Reck Decl. Ex. 5; Opp'n 3; Reply 9.  One contract covered

6  timber and timberland assets (the "Timberland Agreement"), and conveyed those assets to

7  Georgia-Pacific immediately at closing because no regulatory approval was needed.  Reck Decl.

8  Ex. 2.  The other contract (the "Lumber Mill Trust Agreement") covered the lumber mill and

9  railroad stock, sales of which required the approval of the Federal Trade Commission and

10 Interstate Commerce Commission, respectively.  Ritti Decl. Ex. A ("LMTA").  Around the same

11 time, Boise also sold a plywood and veneer plant located in the Union Lumber Region to

12 Louisiana-Pacific.  Reck Decl. Ex. 10.

13      The Lumber Mill Trust Agreement placed the lumber mill and railroad stock assets in a

14 trust pending the regulatory approvals, after which the assets would be transferred to Georgia-

15 Pacific.  LMTA § 3; Opp'n 3.  On February 15, 1973 (the "closing date"), Boise executed a

16 Declaration of Trust, naming itself the trustee to hold the assets under the Lumber Mill Trust

17 Agreement in trust for Georgia-Pacific.  Trust at 1.  On the same day, the Board of Directors of

18 Georgia-Pacific passed a resolution to purchase the assets under the Lumber Mill Trust Agreement

19 and stated that it would "hold Boise Cascade Corporation harmless from any and all expense, cost

20 and liability that it may incur in holding such assets in trust during a 90-day period subsequent to

21 closing, substantially on the basis set forth in the Purchase Agreement."  Reck Decl. Ex. 9.

22      The parties intended that the trust under the Lumber Mill Trust Agreement last no more

23 than six months until the necessary regulatory approvals were obtained.  LMTA § 3; Reply 1.

24 During that period, Georgia-Pacific was required to operate the lumber business it was purchasing

25 from Boise, using Boise employees.  LMTA § 4(b)-(c); Ritti Decl. Ex. D. § 3.

26      Under section 1 of the Lumber Mill Trust Agreement, titled "Sales of Assets," subsection

27 (a) states that Boise was selling to Georgia-Pacific "all the assets and properties of the Union

28 Lumber Region of every kind and nature, wherever located, as the same shall exist on the Closing

2

Date, including, but not limited to . . . (i) All real property (other than timber and timberlands) owned by the Union Lumber Region, and all manufacturing plants (except the plywood plant and its immediate plant site) located on such real property . . . (ii) All inventories of particleboard and other inventories . . . and materials connected with the manufacture of such items; (iii) All the Sea Fair Store and the Fort Bragg retail lumber yard receivables . . . (iv) The stock of the California Western Railroad owned by Boise; [and] (v) All operating records and customer lists . . . and the rights of Boise in and to all trademarks . . . ." LMTA § 1(a).

Under subsection (b), "the following assets, liabilities and properties shall be retained by Boise and shall not be sold or transferred to [Georgia-Pacific] . . . (i) All cash . . . (ii) The plywood plant . . . with the underlying real estate parcel . . . (iii) All trade and other receivables of the Union Lumber Region owned by such region as of the Closing Date . . . [and] (iv) All paybles, contract and other liabilities of the Union Lumber Region as of the Closing Date, excepting those . . . set forth in paragraph (c) hereunder." LMTA § 1(b)(iv).

Under subsection (c), "It is expressly agreed that [Georgia-Pacific] shall assume and be liable for *only* the following liabilities and obligations of Boise's Union Lumber Region as of the Closing Date":  (i) all attached purchase and lease obligations; (ii) all attached capital improvement obligations that extend past the closing date; and (iii) labor contracts and liabilities. LMTA § 1(c) (emphasis added).

Under section 4 of the Lumber Mill Trust Agreement, titled "Operations Between the Date of Closing and Termination of the Trust," the Lumber Mill Trust Agreement states the following:

- (a) The parties hereto clearly contemplate and agree that . . . the sale of the Purchased Assets to [Georgia-Pacific] on and as of the Closing Date shall be final, and the risk of loss to the Purchased Assets or from the business of the Union Lumber Region after the Closing Date hereof shall be [Georgia-Pacific's].

- (b) [Georgia-Pacific] shall assume operation and control of the Union Lumber Region for its own account as of the Closing Date and all profits, losses, liabilities (including taxes), obligations, claims and demands of every kind and description, other than those in existence prior to the Closing Date, shall be for the account of and the obligation of

3

[Georgia-Pacific].  Such operation and control shall be assumed by [Georgia-Pacific] pursuant to [the] Operational Agreement . . . .

- During the term of the Trust, the employees of Boise's Union Lumber Regional shall remain the employees of Boise and shall continue to operate the Purchased Assets conveyed to [Georgia-Pacific] hereunder for the benefit of [Georgia-Pacific] pursuant to the above-mentioned Operational Agreement.  The costs, salaries, and expenses related to such employees shall be paid by Boise during the term of the Trust Agreement, and [Georgia-Pacific] shall promptly reimburse Boise . . . .

- [Georgia-Pacific] agrees to indemnify and hold Boise harmless from any and all claims, losses, liabilities and obligations as a result of the ownership of the Union Lumber Region after the Closing Date, or as a result of any acts or omissions of [Georgia-Pacific], its employees . . . [and] its agents . . . after the closing of this transaction, regardless of whether such claims, demands, liabilities or obligations arise as a result of [Georgia-Pacific's] operations after the Closing Date and during the term of the Trust or as a result of the termination of the Trust . . . .

LMTA § 4.

On May 8, 1973, the Federal Trade Commission approved the transfer of the lumber mill to Georgia-Pacific, clearing the way for the conveyance of the lumber mill assets.  Reck Decl. Ex. 7; Opp'n 3 n.3.  On September 15, 1973, Boise, in its individual capacity and as the trustee of the Trust, passed title of the Union Lumber Mill to Georgia-Pacific through a Grant Deed.  Ritti Decl. Ex. C.

On February 16, 2007, the California Environmental Protection Agency's Department of Toxic Substances Control issued a Site Investigation and Remediation Order, which found "actual or threatened release of hazardous substances" at the lumber mill.  Reck Decl. Ex. 1 § 3.4; Opp'n 4.  Georgia-Pacific alleges that the defendants or their predecessors contributed to the contamination over many decades and are therefore liable for the pollution and the incurred and future response costs.

4

United States District Court
Northern District of California

## PROCEDURAL HISTORY

This case involves multiple rounds of claims, counterclaims, and cross-claims.  Most relevant here is that on May 21, 2013, Georgia-Pacific filed its Second Amended Complaint ("SAC") against OfficeMax, Louisiana-Pacific, and the City of Fort Bragg.  Dkt. No. 90.  OfficeMax moved for summary judgment on June 24, 2013.  Dkt. No. 95.  Georgia-Pacific filed its Opposition Brief on July 24, 2013, Dkt. No. 100, and OfficeMax filed its Reply Brief on August 6, 2013, Dkt. No. 111.

The First Cause of Action seeks reimbursement for response costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a).  To the extent that OfficeMax is not liable under the First Cause of Action, the Second Cause of Action seeks contribution for past and future response costs under CERCLA, 42 U.S.C. § 9613(f).  The Third Cause of Action seeks a declaration that OfficeMax is liable for contribution to Georgia-Pacific's past and future response costs under CERCLA, 42 U.S.C. § 9613(g)(2).  The Fourth Cause of Action seeks a declaration that OfficeMax is liable to indemnify, or contribute to and reimburse, Georgia-Pacific for all future response costs under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  The Fifth Cause of Action seeks a declaration that OfficeMax is liable to indemnify Georgia-Pacific for future damages and costs under California Code of Civil Procedure Section 1060.  The Sixth Cause of Action seeks implied equitable indemnity from OfficeMax for any counterclaim liability Georgia-Pacific may have.  The Seventh Cause of Action seeks damages from OfficeMax for continuing nuisance.  The Eighth Cause of Action seeks damages from OfficeMax for continuing trespass.  The remaining causes of action in the SAC are against Louisiana-Pacific and the City of Fort Bragg.[1]

OfficeMax moves for summary judgment on all eight of Georgia-Pacific's causes of actions against it in the SAC.

---

[1] Because Boise never sold the plywood plant to Georgia-Pacific, but sold it to Louisiana-Pacific, which later sold the plant to Georgia-Pacific, OfficeMax withdrew its motion for summary judgment on Georgia-Pacific's claims that relate to response costs incurred at the plywood plant.  Reply 1 n.1; *see also* Opp'n 23.

**LEGAL STANDARD**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the court "that there is an absence of evidence to support the non[-]moving party's case." *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "designate specific facts showing a genuine issue for trial." *Id.* at 324 (quotation marks omitted). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory or speculative testimony in affidavits is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**I.     FIRST, SECOND, AND THIRD CAUSES OF ACTION:  CERCLA**

The First, Second, and Third Causes of Action allege that OfficeMax is liable to Georgia-Pacific for reimbursement for or contribution towards response costs under CERCLA, and that Georgia-Pacific is entitled to a declaration that OfficeMax is liable for accrued and future response costs. As explained below, liability under CERCLA may be contractually allocated, and neither

6

party disputes that the contracts at issue allocate the CERCLA liability here.  Thus, to address these causes of action, the Court first reviews the relevant CERCLA and contract laws.

## A.  CERCLA

CERCLA provides that "the owner or operator of a facility . . . from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for . . . any [] necessary costs of response incurred by any other person." 42 U.S.C. § 9607(a).  In addition, any person who has incurred response costs "may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title. . . . In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."  42 U.S.C. § 9613(f).

In a Section 9607 action, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  42 U.S.C. § 9613(g)(2).  CERCLA also states,

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section.  Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1).

In interpreting that provision, the Ninth Circuit has held, "Contractual arrangements apportioning CERCLA liabilities between private 'responsible parties' are essentially tangential to the enforcement of CERCLA's liability provisions.  Such agreements cannot alter or excuse the underlying liability, but can only change who ultimately *pays* that liability."  *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1459 (9th Cir. 1986) (emphasis added); *see also Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 692 (9th Cir. 1992) ("enforcement of indemnification clauses does not frustrate public policy as expressed in CERCLA. . . . because all responsible parties would remain fully liable to the government, although they would be free to

United States District Court
Northern District of California

enter into private contractual arrangements").

The Court takes judicial notice of the fact that CERCLA was signed into law on December 11, 1980.  Although the Ninth Circuit has not discussed at length whether CERCLA creates liability for actions that occurred prior to CERCLA's enactment, it has very recently called the statute a "retroactive [] regime" and found liability for pre-enactment conduct.  *Anderson Bros., Inc. v. St. Paul Fire & Marine Ins. Co.*, Nos. 12-35346, 12-35454, 2013 WL 4615055, at \*1 (9th Cir. August 30, 2013).  A number of district courts in this circuit have explicitly held that CERCLA liability may apply retroactively to conduct that occurred before CERCLA's enactment,[2] as have a number of other circuit courts[3].  Similarly, contracts that pre-date CERCLA's enactment may allocate liability under that statute.  As one court in this circuit noted, "[t]here are many precedents for the proposition that CERCLA liability can be assumed by a pre-CERCLA agreement so long as the agreement contains language broad enough [] to say that the parties intended to transfer either contingent environmental liability, or all liability."  *United States v. Iron Mountain Mines, Inc.*, 987 F. Supp. 1233, 1241 (E.D. Cal. 1997) (citations and quotation marks omitted); *see also* Br. 10-11; Reply 2.

---

[2] *See, e.g., United States v. Sterling Centrecorp Inc.*, 2:08-CV-02556-MCE, 2013 WL 3214384, at \*7 (E.D. Cal. June 24, 2013) ("Numerous other courts have also recognized CERCLA liability retroactively in pre-CERCLA agreements."); *United States v. Asarco Inc.*, CV 96-0122-N-EJL, 1999 WL 33313132, at \*11 (D. Idaho Sept. 30, 1999) ("The Defendants can be held liable for damages occurring post-enactment, whether those damages derive from either pre-enactment or post-enactment releases or both."); *State of Nev. ex rel. Dep't of Transp. v. United States*, 925 F. Supp. 691, 704 (D. Nev. 1996) ("the Court is convinced Congress clearly intended CERCLA to reach backward and impose liability upon those who are responsible for ongoing environmental deterioration resulting from wastes which had been dumped in the past [pre-enactment]"); *United States v. Iron Mountain Mines, Inc.*, 812 F. Supp. 1528, 1544 (E.D. Cal. 1992).

[3] *See, e.g., United States v. Vertac Chem. Corp.*, 453 F.3d 1031, 1048 (8th Cir. 2006); *United States v. Gen. Battery Corp.*, 423 F.3d 294, 309 (3d Cir. 2005); *Franklin Cnty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 553 (6th Cir. 2001); *United States v. Olin Corp.*, 107 F.3d 1506, 1511-12 (11th Cir. 1997) (stating, "The district court also based its dismissal order on its conclusion that CERCLA's response cost liability scheme applies only to disposals after the statute's enactment.  This ruling not only conflicts with this court's recent description of CERCLA, but also runs contrary to all other decisions on point," and citing *United States v. Olin Corp.*, 927 F.Supp. 1502, 1507 & n. 25 (S.D. Ala. 1996) (recognizing that of the 22 federal courts "which have directly addressed the issue of CERCLA's retroactivity, none have declined to apply CERCLA on retroactivity grounds")); *United States v. Ne. Pharm. & Chem. Co.*, 810 F.2d 726, 732-33 (8th Cir. 1986) ("In order to be effective, CERCLA must reach past conduct.").

United States District Court
Northern District of California

**B. California Contract Law**

California law governs the interpretation of the contracts in this case. Although the contracts do not contain a choice-of-law provision, "California law . . . governs the agreement[s] because it is the state most closely connected to the contract." *Nikko Materials USA, Inc. v. NavCom Def. Elecs., Inc.*, 291 Fed. App'x 67, 69 n.1 (9th Cir. 2008) (interpreting an indemnification contract under CERCLA). Neither party disputes this.

When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible. CAL. CIV. CODE § 1639. "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." CAL. CIV. CODE § 1641; *see also Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 872 (9th Cir. 1979) ("We seek to interpret the contract in a manner that makes the contract internally consistent."). "The mutual intention of the contracting parties at the time the contract was formed governs," and that intention must be ascertained "solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates." *Am. Alt. Ins. Corp. v. Super. Ct. of Los Angeles Cnty.*, 135 Cal. App. 4th 1239, 1245 (2006). California courts only "look to objective, not subjective, criteria in ascertaining the intent of the parties." *See Meyer v. Benko*, 55 Cal. App. 3d 937, 942 (1976). However, "[i]f contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs." *Am. Alt. Ins. Corp.*, 135 Cal. App. 4th at 1245.

"Under California law, whether a contract is ambiguous is a question of law." *Jones-Hamilton Co.*, 973 F.2d at 692. "When interpreting a contract, even when the document is unambiguous on its face, a judge is required to give at least a preliminary consideration to all credible evidence offered to prove the intention of the parties." *Id.* (quotation marks and brackets omitted). If a contract "is not reasonably susceptible of interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract." *Brobeck, Phleger & Harrison*, 602 F.2d at 871 (citations omitted). "The case may then be disposed of by summary judgment because interpretation of the unambiguous contract is solely a question of law." *Id.*

Where a contract is ambiguous, however, California courts engage in a two-step process to analyze it:

> First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract.

*SCC Alameda Point LLC v. City of Alameda*, 897 F. Supp. 2d 886, 893 (N.D. Cal. 2012) (citations omitted). "If the Court concludes, after completing this process, that the parties' competing interpretations are equally plausible, it cannot grant summary judgment." *Id.* Given that "[w]hether a contract provision is ambiguous is a question of law," if it is ambiguous, "ordinarily summary judgment is improper because differing views of the intent of parties will raise genuine issues of material fact." *Maffei v. N. Ins. Co. of N.Y.*, 12 F.3d 892, 898 (9th Cir. 1993).

**C. Analysis**

With regard to the CERCLA claims, OfficeMax has not shown that "there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Nor has it demonstrated "that there is an absence of evidence to support the non[-]moving party's case." *Celotex*, 477 U.S. at 325. Thus, it is not entitled to summary judgment.

**1. Section 1 of the Lumber Mill Trust Agreement**

The language of section 1 of the Lumber Mill Trust Agreement, titled "Sale of Assets," does not clearly show that OfficeMax cannot be responsible for the lumber mill's contamination under CERCLA and is therefore entitled to judgment as a matter of law. Section 1 specifies the assets to be transferred from Boise to Georgia-Pacific and the assets and liabilities to be retained by each. Subsection (a) conveys from Boise to Georgia-Pacific the purchased assets "as the same shall exist on the Closing Date." LMTA § 1(a). Subsection (b) lists the "assets, liabilities and properties [that] shall be retained by Boise," which includes all cash, the plywood plant; all receivables as of the closing date, and "[a]ll payables, contract and other liabilities as of the

1    Closing Date, excepting those . . . set forth in paragraph (c) hereunder." LMTA § 1(b).  Most

2    critically, however, subsection (c) states, "It is expressly agreed that [Georgia-Pacific] shall

3    assume *and be liable only for the following liabilities and obligations of Boise's Union Lumber*

4    *Region as of the Closing Date*." *Id.* § 1(c).  The subsection proceeds to list all purchase and lease

5    obligations attached to the agreement; capital improvement obligations that extend past the closing

6    date; and labor contracts and liabilities, LMTA § 1(c).  However, subsection (c) is silent as to any

7    other liabilities Georgia-Pacific would assume, including any existing liability that would have

8    risen under CERCLA.[4]  Section 1 shows that Georgia-Pacific did not assume liability for the pre-

9    closing date contamination at the lumber mill, as OfficeMax argues.

10       By its terms, subsection (c) limits Georgia-Pacific's assumed liabilities to the items listed.

11    It therefore excludes any liabilities which could arise under CERCLA that, by implication, remain

12    with Boise.  As discussed earlier and further explained below, liability for contamination that

13    occurred prior to the closing date can attach to Boise despite the fact that the statute was not

14    enacted until 1980.  Since the CERCLA liabilities are "liabilities and obligations of Boise's Union

15    Lumber Region as of the Closing Date," and were not included in subsection (c)'s list, there is no

16    indication that Georgia-Pacific assumed them.  Thus, OfficeMax fails to show that there is no

17    evidence to support Georgia-Pacific's claims.

18       OfficeMax disputes this characterization of section 1.  OfficeMax argues that section 1

19    only describes the assets being sold and the liabilities that were in existence on the closing date

20    because Section 1(c) only references "liabilities and obligations of Boise's Union Lumber Region

21    as of the Closing Date," not after.  Reply 6 (citing LMTA § 1(c)).  Because OfficeMax argues that

22    conduct that occurred prior to CERCLA's enactment does not give rise to liability until after the

23    enactment, the lumber mill's contamination does not constitute a liability of Boise "as of the

United States District Court
Northern District of California

---

[4] The parties cite to extrinsic evidence—the voided original contract, related contracts, and
Georgia-Pacific's board resolution—to interpret the Lumber Mill Trust Agreement.  Opp'n 13-17;
Reply 9-11.  The Court has preliminarily considered those materials.  While the parties make
conflicting arguments about the meaning of the voided and related contracts, the Georgia-Pacific
board resolution from February, 1973 provides support for Georgia-Pacific's consistent
interpretation of the agreement. However, because the Court finds that the Lumber Mill Trust
Agreement is sufficiently clear on its face, there is no need to address the extrinsic evidence.  *See
Am. Alt. Ins. Corp.*, 135 Cal. App. 4th at 1245.

United States District Court
Northern District of California

1    Closing Date"—that liability belongs to Georgia-Pacific, the owner of the lumber mill when

2    CERCLA was enacted.  In addition, since OfficeMax argues that Georgia-Pacific assumed a wide

3    array of post-closing date liabilities in section 4 of the Lumber Mill Trust Agreement, "Section

4    1"—which lists the assets Georgia-Pacific was purchasing—"therefore is not inconsistent with the

5    allocation of future liabilities and risks of loss in sections 4(a) and 4(b)."  Reply 6.  The Court now

6    turns to section 4 to address these arguments.

7                    **2.  Section 4 of the Lumber Mill Trust Agreement**

8                    **i.       Section 4 Is Limited To The Term Of The Trust.**

9            The language of section 4 of the Lumber Mill Trust Agreement does not clearly show that

10   Georgia-Pacific assumed liability for the contamination under CERCLA and that OfficeMax is

11   therefore entitled to judgment as a matter of law.  The section makes Georgia-Pacific responsible

12   for the operation of the lumber mill only during the trust period as if the assets had already been

13   conveyed to Georgia-Pacific even though Boise continued to hold legal title as trustee.  Section 4,

14   by its terms, is a limited assumption of "all claims, losses, liabilities and obligations" by Georgia-

15   Pacific.  LMTA § 4(d).  Its title, "Operations Between the Date of Closing and Termination of the

16   Trust," shows that the terms thereunder only apply to the trust's duration.  Thus, the assumptions

17   of liability in section 4 are not as broad as certain portions may appear if read in isolation.

18           Indeed, many of the terms in section 4 explicitly limit their applicability to the term of the

19   trust:  subsection (b) states that Georgia-Pacific "shall assume operation and control" of the

20   lumber mill "pursuant to [the] Operational Agreement," which is limited to the trust's term, Ritti

21   Decl. Ex. D § 2; subsection (c) is prefaced by the phrase "[d]uring the term of the Trust"; and

22   subsection (d) requires Georgia-Pacific to indemnify and hold Boise harmless for any "claims,

23   losses, liabilities and obligations as a result of the ownership of the Union Lumber Region after

24   the Closing Date," regardless of whether they "arise as a result of [Georgia-Pacific's] operations

25   after the Closing Date and during the term of the Trust. . . ."  LMTA § 4.  Nowhere does section 4

26   indicate that the assumption of responsibilities and liabilities therein include liability for

27   contamination of the mill, which did not occur during the trust's term.  The evidence therefore

28   does not show that Georgia-Pacific assumed any pre-closing date CERCLA liability.

1        OfficeMax argues that section 4 is not limited in time to the term of the trust.  It cites to

2   *Hervey v. Mercury Casualty Co.* for the proposition that a "section title 'is not an operative term or

3   provision itself' and cannot inject ambiguity into an unambiguous contractual text."  Reply 6

4   (quoting 110 Cal Rptr. 3d 890, 898 (Ct. App. 2010)).  Reading section 4 without its heading,

5   OfficeMax argues, shows that the section is a general assumption of liability.  However,

6   OfficeMax takes the quote from *Hervey* out of context.  While *Hervey* supports the proposition

7   that a party may not "construct an ambiguity" by using a heading, it does not stand for the

8   proposition that a heading or title cannot assist in interpreting a contract.  Here, the text of section

9   4 does not appear to be ambiguous on the issue of its duration—as discussed above, section 4's

10   body refers to the term of the trust multiple times.  But far from "inject[ing] ambiguity into an

11   unambiguous contractual text," section 4's heading appears to *confirm* the scope of the text itself,

12   which limits the provisions therein to the term of the trust.

13        OfficeMax's citation to *Coit v. Jefferson Standard Life Ins. Co.* for the proposition that

14   "the caption [in a contract is not] an operative provision" does not help it.  168 P.2d 163, 168 (Cal.

15   1946).  OfficeMax ignores the principle stated two sentences before, which says that a contract

16   should "be read and construed as a whole and, more particularly, that the caption of the [contract]

17   is to be read and construed with the language of the [contract] itself."  *Id.*  It is only when a

18   contract has no ambiguity that an otherwise contradictory heading should not be understood to

19   create any.  *Id.*  Here, the heading does not contradict the language within section 4; on the

20   contrary, reading and construing section 4 as a coherent whole shows that that part of the Lumber

21   Mill Trust Agreement only applies to the trust.

22        OfficeMax's citation to *Westrec Marina Mgmt. v. Arrowood Indem Co.*, 78 Cal. Rptr. 3d

23   264, 270 (Ct. App. 2008), for the proposition that "the absence of a full descriptive heading does

24   not restrict the plain meaning of a provision" is similarly unavailing because the court there cites

25   to *People v. Garfield*, 40 Cal. 3d 192, 199-200 (1985), for the proposition that a chapter heading,

26   while not controlling, is a "useful guide" for interpretation.  As discussed above, the heading in

27   section 4 is "useful" in interpreting the section, but does not alter its plain meaning.  Georgia-

28   Pacific's argument that the provisions in section 4 are limited to the duration of the trust does not

United States District Court
Northern District of California

1    stand on one foot because, in addition to the heading, the body of Section 4 of the Lumber Mill

2    Trust Agreement consistently refers to the term of the trust.

3         OfficeMax argues that because certain portions of Section 4 of the Lumber Mill Trust

4    Agreement refers to the duration of the trust and others do not, "the parties demonstrated that they

5    *knew how* to limit section 4's provisions to the trust period in each respect they so intended."

6    Reply 8 (original emphasis).  OfficeMax then cites to a number of cases that purportedly show that

7    express limitations in certain places in a contract, but not others, are to be regarded as intentional.

8    Reply 8 n.5.  That principle is not inconsistent, however, with the statutory canon that "words

9    must be construed in context, and provisions relating to the same subject matter must be

10   harmonized to the extent possible."  *Woodland Park Mgmt., LLC v. City of E. Palo Alto Rent*

11   *Stabilization Bd.*, 181 Cal. App. 4th 915, 923 (2010).  The United States Supreme Court has

12   explained that while "the heading of a section cannot limit the plain meaning of the text,"

13   "headings and titles can [] indicate the provisions in a most general manner."  *Bhd. of R.R.*

14   *Trainmen v. Baltimore & O. R. Co.*, 331 U.S. 519, 528-29 (1947).  In other words, headings can

15   clarify the meaning of the text below.

16        To constantly refer back to the trust in the Lumber Mill Trust Agreement, as OfficeMax

17   suggests Georgia-Pacific should have done, "would often be ungainly as well as useless," *id.*, and

18   principles of interpretation do not demand that.  The heading is sufficient to indicate that Section 4

19   deals with the trust since a "heading is but a short-hand reference to the general subject matter

20   involved."  *Id.*  Indeed, California courts have explained that "chapter and section headings [] may

21   properly be considered in determining [] intent, and are entitled to considerable weight."  *Am.*

22   *Fed'n of Teachers, Local No. 1050 v. Bd. of Educ.*, 107 Cal. App. 3d 829, 836 (Ct. App. 1980)

23   (discussing interpretive principles in legislative context) (citations and quotation marks omitted).

24   Those principles apply here and show that the assumptions of liability in section 4 only apply to

25   the term of the trust.

26              **ii.    CERCLA Liability Can Attach Prior To The Closing Date.**

27        The language of section 4 of the Lumber Mill Trust Agreement does not clearly show that

28   OfficeMax is not liable for Boise's contamination prior to the closing date and that it is therefore

United States District Court
Northern District of California

entitled to judgment as a matter of law.  Section 4 limits Georgia-Pacific's liability to those that arose after the closing date, while reserving liability that arose before the closing date for Boise. For example, subsection (a) places the "risk of loss . . . *after* the Closing Date" on Georgia-Pacific; subsection (b) states that all "liabilities (including taxes), obligations, claims and demands of every kind and description, other than those in existence *prior* to the Closing Date," belong to Georgia-Pacific; and subsection (d) provides that Georgia-Pacific "agrees to indemnify and hold Boise harmless from any and all claims, losses, liabilities and obligations as a result of the ownership of the Union Lumber Region *after* the Closing Date."  LMTA § 4 (emphases added). Under the terms of the Lumber Mill Trust Agreement, because the contamination that occurred on the lumber mill site prior to the closing date is a liability that was "in existence prior to the Closing Date," the CERCLA liability would belong to Boise and thus OfficeMax.

OfficeMax argues that Sections 4(a) and 4(b) of the Lumber Mill Trust Agreement makes Georgia-Pacific responsible for "*all* future liabilities and obligations related to the Lumber Mill property," and Section 4(d) makes it responsible for "a subset of future liabilities and obligations (those arising during the trust period)."  Br. 11.  In particular, OfficeMax reads the subsections more broadly and argues that Section 4(a) allocates the risk of loss from *CERCLA liability*.  Br. 13.  With regard to Subsection (d), OfficeMax asserts, "Georgia-Pacific's CERCLA claims fail as a matter of law because the [Lumber Mill Trust Agreement] unambiguously allocates to Georgia-Pacific all future liabilities . . . including the alleged CERCLA liability."  Br. 14.

Here, although the Lumber Mill Trust Agreement predates CERCLA's enactment in 1980, neither party disputes that CERCLA applies.  Br. 10; Opp'n 6; Reply 2-3.  However, OfficeMax argues that because "at the time of the 1973 closing, no one had any CERCLA liability related to the Lumber Mill property because CERCLA, enacted in 1980, was not yet in effect," there could not be CERCLA liability on the closing date in 1973.  Br. 12.

OfficeMax cites *Levin Metals Corp. v. Parr-Richmond Terminal Co.*, 817 F.2d 1448, 1450 (9th Cir. 1987), for the proposition that liability under CERCLA cannot accrue before the statute was enacted.  Br. 12.  In that case, the Ninth Circuit held that a CERCLA claim could not be sustained against a corporation that dissolved prior to CERCLA's enactment because "the cause of

action was not created until after its dissolution." *Levin Metals Corp.*, 817 F.2d at 1450.  Thus, OfficeMax reasons, any response cost must be borne by Georgia-Pacific since "[n]o CERCLA liability existed before its enactment in 1980."  Reply 3-4.

OfficeMax's argument is flawed.  While *Levin* does stand for the proposition that a *cause of action* does not arise until after the enactment of a statute, it is not true that *liability* cannot attach prior to CERCLA's enactment.  OfficeMax conflates a cause of action with the underlying liability.  Br. 12.  Indeed, *Levin Metal Corp.*'s language makes this distinction clearly:  "Assuming *arguendo* that CERCLA imposes *liability* for acts committed before its enactment, the effect of such retroactivity is that a *cause of action* may arise after CERCLA's enactment, based on pre-enactment conduct."[5]  *Levin Metals*, 817 F.2d at 1450-51 (citations omitted and emphases added).  The plain language of CERCLA is consistent with this understanding:  "the owner or operator of a facility . . . from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for . . . any [] necessary costs of response incurred by any other person."  42 U.S.C. § 9607(a).  CERCLA makes no distinction between contamination before or after its enactment; rather, it simply says that an "owner or operater . . . shall be liable" for response costs incurred by pollution without regard to any timeframe.

Indeed, as discussed earlier, courts consistently hold parties liable for pre-CERCLA contamination, including the Ninth Circuit.  In *City of Los Angeles v. San Pedro Boat Works*, the Ninth Circuit examined whether pollution that occurred in 1969 to 1970 can give rise to CERCLA liability.  635 F.3d 440, 446 (9th Cir. 2011).  Although the court ultimately held that the defendant was not liable because it was not the liable party under CERCLA, nowhere did the court question whether pre-CERCLA liability could apply to pre-enactment conduct.  Similarly, the Ninth Circuit affirmed denial of a motion to dismiss on CERCLA claims for contamination that occurred from 1906 to 1995.  *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066 (9th Cir 2006).  Thus, while Georgia-Pacific clearly did not have a cause of action against OfficeMax prior to 1980, OfficeMax

United States District Court
Northern District of California

---

[5] As noted throughout this Order, the Ninth Circuit has accepted that CERCLA imposes liability for acts committed before its enactment—*Levin*, a 1987 case, predates those cases, which likely explains the court's "arguendo."

1    could have liability due to the retroactive application of CERCLA to conduct that predates its

2    enactment.[6]

3            The language in both sections 1 and 4 of the Lumber Mill Trust Agreement providing that

4    Georgia-Pacific only assumed a subset of liabilities and is not responsible for any liability prior to

5    the closing date means that any CERCLA liability that accrued before that date belongs to Boise

6    and OfficeMax even if the contract does not explicitly say so.  As one court in this circuit recently

7    explained in a CERCLA case, language effecting a transfer or assumption of "all liabilities" or

8    "substantially all of the assets and liabilities" is sufficiently broad to include environmental

9    liabilities, even if such exact language is not used.  *United States v. Sterling Centrecorp Inc.*, 2:08-

10   CV-02556-MCE, 2013 WL 3214384, at *3-4 (E.D. Cal. June 24, 2013); *see also United States v.*

11   *Iron Mountain Mines, Inc.*, 812 F. Supp. 1528 (E.D. Cal. 1992) ("Courts universally have held that

12   language transferring 'all liabilities' is sufficiently broad to include environmental liability.").

13   Similarly, citing to a Third Circuit case, the court found that a broad "assumption of liability did

14   not *exclude* liabilities that were unknown or contingent."  *Id.* (citing *Philadelphia Elec. Co. v.*

15   *Hercules, Inc.*, 762 F.2d 303, 309 (3d Cir. 1985)).  In particular, that Third Circuit held that where

16   a party "broadly assumed *all* liabilities incurred [] as of the closing date, subject to a few limited

17   exceptions. . . . it is of no consequence that the specific liability at issue is not enumerated."

18   *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 309 (3d Cir. 1985).  Such is the case here.

19           The Ninth Circuit accords with the principle that broad allocations of liability mean what

20   they say.  In *Jones-Hamilton Co. v. Beazer Materials & Services, Inc.*, the Ninth Circuit held that

21

22   ───────────────

     [6] OfficeMax cites to *Georgia-Pacific Consumer Products, LP v. International Paper
23   Co.*, 566 F. Supp. 2d 246 (S.D.N.Y. 2008), as support for its proposition that pre-CERCLA
     liability cannot attach before enactment of the statute.  There, Georgia-Pacific assumed all
24   "liabilities" "as the same exist on the [closing] date," as opposed to the more limited assumption
     here.  *Id.* at 249.  Based on the court's holding that pre-CERCLA liability could not attach until
25   the statute's enactment, it did not find Georgia-Pacific liable for pre-CERCLA contamination.
     That decision conflates liabilities with causes of action—a distinction that the Ninth Circuit
26   recognizes and the Court follows.  Nor does *Halliburton Energy Servs. Inc. v. NL Indus.*, 648 F.
     Supp. 2d 840, 883-84 (S.D. Tex. 2009) support OfficeMax.  There, the court denied summary
27   judgment for Georgia-Pacific based on its conclusion that the contractual language at issue did not
     reflect intent to include environmental cleanup liability.  Here, Georgia-Pacific's liabilities are
28   limited to those detailed in section 1, and the liabilities assumed in section 4 only include those
     that arise during the term of the trust.

a broad indemnification clause should not be understood to be limited to a smaller subset of covered subjects. There, the court reasoned that an indemnification agreement covering "all applicable Federal, State and local laws, ordinances, codes, rules and regulations" cannot be understood to actually refer to "workman's compensation laws, overtime laws, labor laws, and industrial health and safety laws." *Jones-Hamilton Co.*, 973 F.2d at 693. "[H]ad the parties chosen to limit the scope of the indemnification clause in the manner [] suggest[ed], they would surely have made this clear in the Agreement." *Id.* Because the parties here allocated their liabilities based on when they accrued relative to the closing date, and the CERCLA liabilities accrued before the closing date, the evidence shows that those liabilities belong to OfficeMax. Therefore, because OfficeMax cannot show that Georgia-Pacific is unable to sustain a claim against it, OfficeMax is not entitled to judgment as a matter of law on the CERCLA claims.

## II.     SIXTH CAUSE OF ACTION:  IMPLIED EQUITABLE INDEMNITY

Implied equitable indemnity applies in situations "where each of two persons is made responsible by law to an injured party[, and] the one to whom the right of indemnity inures is entitled to shift the entire liability for the loss to the other party." *Prince v. Pac. Gas & Elec. Co.*, 45 Cal. 4th 1151, 1163 (2009). It is restitutionary in nature. *Id.* at 1165. Under California Law, a claim for indemnity may arise in two situations: (1) "by virtue of express contractual language establishing a duty in one party to save another harmless upon the occurrence of specified circumstances"; and (2) "equitable considerations brought into play either by contractual language not specifically dealing with indemnification or by the equities of the particular case." *E. L. White, Inc. v. City of Huntington Beach*, 21 Cal. 3d 497, 506-07 (1978). "[W]hen parties by express contractual provision establish a duty in one party to indemnify another, the extent of that duty must be determined from the contract and not from the independent doctrine of equitable indemnity." *Id.* (citing *Markley v. Beagle*, 429 P.2d 129, 136 (Cal. 1967)). "When, however, the duty established by contract is by the terms and conditions of its creation inapplicable to the particular factual setting before the court, the equitable principles of implied indemnity may come into play." *Id.* at 508. In particular, "a party's liability for equitable indemnity is based on its proportional share of responsibility for the damages to the injured party," but "there can be no

18

1  indemnity without liability." *Prince*, 45 Cal. 4th at 1165 (citations omitted).

2       As discussed above, although section 4(d) of the Lumber Mill Trust Agreement provides

3  that Georgia-Pacific will indemnify and hold Boise harmless from "all claims, losses, liabilities

4  and obligations as a result of the ownership of the Union Lumber Region after the Closing Date,"

5  that obligation is limited to the term of the trust.  Section 4(d), however, does not address

6  indemnification with regard to pre-closing date CERCLA liability.  Thus, consistent with *Prince*,

7  Georgia-Pacific's claim for implied equitable indemnity from OfficeMax for any counterclaims to

8  which Georgia-Pacific may be subject must be determined by OfficeMax's proportional share of

9  responsibility for contaminating the lumber mill site.  And as discussed above, because OfficeMax

10  has not shown that it cannot be liable to Georgia-Pacific for any pre-closing date CERCLA

11  liability, it also cannot show that it is entitled to implied equitable indemnity and summary

12  judgment on that claim.

III.   **SEVENTH AND EIGHTH CAUSES OF ACTION:  CONTINUING NUISANCE**
       **AND TRESPASS**

14  

15       **A.  Continuing Nuisance**

16       Under California law, a nuisance is "[a]nything which is injurious to health, or is indecent

17  or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the

18  comfortable enjoyment of life or property."  CAL. CIV. CODE § 3479 (West 1970).  "A nuisance is

19  generally considered to be continuing if it can be discontinued or abated." *Bartleson v. United*

20  *States*, 96 F.3d 1270, 1275 (9th Cir. 1996) (citation omitted).  "[C]ontinuing 'activity' is not

21  necessary to establish a continuing nuisance." *Arcade Water Dist. v. United States*, 940 F.2d

22  1265, 1268 (9th Cir. 1991) (citation omitted).  A "plaintiff['s] land may be subject to a continuing

23  nuisance even though defendant's offensive conduct ended years ago.  That is because the

24  'continuing' nature of the nuisance refers to the continuing damage caused by the offensive

25  condition, not to the acts causing the offensive condition to occur." *Mangini*, 230 Cal. App. 3d

26  1125, 1147 (Ct. App. 1991).

27       Here, OfficeMax has not shown that it cannot be liable to Georgia-Pacific for a continuing

28  nuisance.  As discussed above, pre-closing date contamination of the lumber mill site could have

19

1    created liability for Boise, and thus OfficeMax.  And as discussed above, the Lumber Mill Trust

2    Agreement did not transfer any liability that attached to Boise before the closing date to Georgia-

3    Pacific.  Thus, summary judgment is not warranted.

### B.  Continuing Trespass

5    "Trespass is an unlawful interference with possession of property," which may include the

6    "disposal of the hazardous waste" on the land.  *Mangini*, 230 Cal. App. 3d at 1141.  "[A]

7    continuing trespass is an intrusion under circumstances that indicate the trespass may be

8    discontinued or abated."  *Starrh & Starrh Cotton Growers v. Aera Energy LLC*, 153 Cal. App. 4th

9    583, 592 (2007).  For the same reasons OfficeMax is not entitled to summary judgment for

10   continuing nuisance, it is not entitled to summary judgment for continuing trespass.

11   OfficeMax argues that it is entitled to summary judgment on the continuing nuisance and

12   continuing trespass causes of action because the Lumber Mill Trust Agreement does not include

13   any warranty regarding the lumber mill's condition.  Despite a number of other warranties,

14   OfficeMax maintains that Georgia-Pacific did not bargain for a non-contamination warranty but,

15   instead, assumed all future liabilities.  Br. 17.  OfficeMax cites to *Shapiro v. Hu* for the

16   proposition that "[t]here are no warranties of quality or condition implied in the sale of real

17   property," 188 Cal. App. 3d 324, 332 (1986), and that nuisance and trespass claims "are not viable

18   substitutes for bargaining for warranties of condition."  Br. 17.  Allowing Georgia-Pacific to

19   recover, OfficeMax argues, "would impose a *de facto* implied warranty of condition in violation of

20   California law."  Reply 13.

21   *Shapiro* does not apply here because that case neither discusses nuisance nor trespass.  The

22   Court is unaware of, and OfficeMax does not point to, any controlling case that states that causes

23   of action for nuisance and trespass cannot be sustained due to a lack of warranties.  But even if

24   *Shapiro* is relevant, the court there found that the seller of real property was not liable for defects

25   because the parties there signed an "as is" clause, which states that the buyer takes on the property

26   in its exact condition.  Such a provision is not present in the Lumber Mill Trust Agreement.

27   Whereas the court there found that the "as is clause" put the buyers on notice that the property did

28   not come with any warranties, 188 Cal. App. 3d at 333, here, there is no evidence that Georgia-

20

United States District Court
Northern District of California

1    Pacific was on notice that it was purchasing the lumber mill site "as is."[7]  Nor did Georgia-Pacific

2    "specifically assume[] all future liabilities" for the site, Br. 17, as explained above.  Thus,

3    OfficeMax may be liable for nuisance and trespass, and summary judgment is not warranted.

4    **IV.     FOURTH AND FIFTH CAUSES OF ACTION:  DECLARATORY RELIEF**

5            **A.  Fourth Cause of Action:  Declaratory Judgment Act**

6            OfficeMax is not entitled to summary judgment on Georgia-Pacific's claims for

7    declaratory relief under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  Under

8    the Declaratory Judgment Act, a court "may declare the rights and other legal relations of any

9    interested party seeking such declaration, whether or not further relief is or could be sought."  28

10   U.S.C. § 2201(a).  Here, as discussed above, OfficeMax fails to show that it cannot be liable to

11   Georgia-Pacific for its future response costs.  It is not sufficient, as OfficeMax argues, that

12   "Georgia-Pacific presents no opposing argument" against OfficeMax's motion.  Reply 14.  As the

13   moving party, OfficeMax must show that it is entitled to judgment as a matter of law.  Without

14   demonstrating "that there is an absence of evidence to support [Georgia-Pacific's] case," *Celotex*,

15   477 U.S. at 323, as OfficeMax fails to do, summary judgment cannot be granted in its favor.

16           **B.  Fifth Cause of Action:  California Code of Civil Procedure § 1060**

17           Under California Code of Civil Procedure § 1060, "Any person interested . . . under a

18   contract, or who desires a declaration of his or her rights or duties with respect to another, or in

19   respect to, in, over or upon property . . . may [seek] a declaration of his or her rights and duties

20   . . . ."  CAL. CIV. PROC. § 1060.  For the same reasons OfficeMax is not entitled to summary

21   judgment under the Declaratory Judgment Act, it is not entitled to summary judgment under

22   California Code of Civil Procedure § 1060.

23                                  **CONCLUSION**

24           Based on the undisputed facts, OfficeMax is unable to show that it and its predecessor,

25   Boise, are not liable for contamination of the lumber mill site for conduct that occurred prior to the

26   closing date of the Lumber Mill Trust Agreement.  OfficeMax is also unable to show that Georgia-

27   _____

28   [7] On the contrary, as discussed above, the Lumber Mill Trust Agreement validly allocated
     liabilities, even as to matters not explicitly mentioned.

Pacific assumed any of those liabilities and that Georgia-Pacific has no evidence to support its claims.  Because OfficeMax is not entitled to judgment as a matter of law, its Motion for Summary Judgment on the eight causes of action Georgia-Pacific asserted against it is DENIED.

      **IT IS SO ORDERED.**

Dated: September 18, 2013



_____
WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California

22