NOEL EDLIN, ESQ. (SBN 107796)
nedlin@behblaw.com
FRED M. BLUM, ESQ. (SBN 101586)
fblum@behblaw.com
PAGE C. PERRY, ESQ. (SBN 246266)
pperry@behblaw.com
BASSI, EDLIN, HUIE & BLUM LLP
500 Washington Street, Suite 700
San Francisco, CA 94111
Telephone:    (415) 397-9006
Facsimile:    (415) 397-1339

Attorneys for Defendant
THE CITY OF FORT BRAGG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GEORGIA-PACIFIC LLC,

              Plaintiffs,

       vs.

OFFICEMAX INCORPORATED,
LOUISIANA-PACIFIC CORPORATION,
AND THE CITY OF FORT BRAGG,

              Defendants.

_____

AND RELATED COUNTERCLAIMS
AND CROSSCLAIMS
_____

Case No. 3:12-cv-02797-WHO

**DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER TO THE SECOND AMENDED COMPLAINT BY GEORGIA-PACIFIC LLC, AND FIRST AMENDED COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL**

**Judge: Hon. William H. Orrick**

**Complaint Filed: May 31, 2012**
**Amd. Complaint Filed: June 4, 2012**
**Second Amended Complaint Filed: May 21, 2013**

822857

1

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

Defendant THE CITY OF FORT BRAGG ("the City") hereby responds to the Second Amended Complaint ("SAC") filed by Plaintiff GEORGIA-PACIFIC, LLC ("Georgia-Pacific") as follows:

## NATURE OF ACTION

1.     In response to the averments of paragraph 1, the City admits that Georgia-Pacific seeks recovery under the legal theories that Georgia-Pacific therein generally describes.  The City denies that Georgia-Pacific is entitled to relief under any of its claims.  The City also denies that Georgia-Pacific has incurred or will continue to incur any response costs.  The term Georgia-Pacific shall hereinafter include any predecessor of Georgia-Pacific or other entity for whose liabilities or conduct Georgia-Pacific is legally responsible.

## JURISDICTION AND VENUE

2.     The City admits the averments contained in paragraph 2.

3.     The City admits the averments contained in paragraph 3.

## PARTIES

4.     The City admits the averments contained in paragraph 4.

5.     The City admits the averments contained in paragraph 5.

6.     The City admits the averments contained in paragraph 6.

7.     The City generally admits the averments contained in paragraph 7, with the clarification that the City is a duly organized municipal corporation.

## FACTUAL BACKGROUND

8.     The City admits the averments contained in paragraph 8.

9.     In response to the averments of paragraph 9, the City admits on the basis of information and belief that Georgia-Pacific ceased operations on the Site in 2002, that some of the structures and equipment associated with lumber production have been removed, and that the Site is currently unoccupied and unused except for a small office maintained by Georgia-Pacific and a wastewater treatment plant.  However, the City denies that the wastewater treatment plant is or was ever owned or operated by the City.

10.     The City generally admits the averments contained in paragraph 10, with the

822857

2

clarification that the City had no involvement in the lumber production during the course of the "117 years of lumber production" that Georgia-Pacific describes therein.

11.    In response to the averments contained in paragraph 11, the City admits that operations by Georgia-Pacific and Defendants, except the City, on the Site led to releases of hazardous substances, including but not limited to, metals, dioxins, polycyclic aromatic hydrocarbons and total petroleum hydrocarbons to the soil and groundwater underlying the Site and the surrounding soils and groundwater.  The City denies that operations by the City led to releases of hazardous substances, or that the City ever operated on the Site.

12.    The City admits the averments contained in paragraph 12 on the basis of information and belief.

13.    The City admits the averments contained in paragraph 13.

14.    The City denies the averments contained in paragraph 14 for lack of sufficient information and belief.

### OfficeMax's Ownership and Operations at the Site

15.    The City admits the averments contained in paragraph 15 on the basis of information and belief.

16.    The City admits the averments contained in paragraph 16 on the basis of information and belief.

### Louisiana-Pacific's Ownership and Operations at the Site

17.    The City admits the averments contained in paragraph 17 on the basis of information and belief.

18.    In response to the averments of paragraph 18, the City denies for lack of sufficient information and belief, that the plywood facility is included in OU-E.  The City admits the remaining averments of paragraph 18 on the basis of information and belief.

19.    The City admits the averments contained in paragraph 19 on the basis of information and belief.

20.    The City admits the averments contained in paragraph 20 on the basis of information and belief.

822857

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

21.    The City admits the averments contained in paragraph 21 on the basis of information and belief.

22.    The City admits the averments contained in paragraph 22 on the basis of information and belief.

23.    The City admits the averments contained in paragraph 23 on the basis of information and belief.

24.    The City admits the averments contained in paragraph 24 on the basis of information and belief.

### City of Fort Bragg's Contamination of the Site

25.    In response to the averments of paragraph 25, the City admits that OfficeMax made the allegations described.  The City admits that stormwater from the City flows to the Georgia-Pacific Mill site.  The City denies it owned or operated, or currently owns or operates, a stormwater system which conveys stormwater onto the Georgia Pacific Mill Site.  Moreover, the City stormwater that was conveyed to the Mill Site was part of a system, including the building and maintenance of a dam to impound said stormwater that was developed by OfficeMax and continued in use by Georgia-Pacific and that was used in the operation of the activities conducted at the mill site by, among others, OfficeMax and Georgia-Pacific.  Except as just expressly admitted, the City denies the averments of paragraph 25, including the averment that the City is liable for arranging for the treatment and disposal of stormwater at the Site.

26.    In response to the averments contained in paragraph 26, the City admits that OfficeMax made the allegations described.  The City admits Noyo River and Pudding Creek were and are natural waterways surrounding Fort Bragg and that Alder Creek was altered by OfficeMax in the formation of Pond 8 and by being enclosed east of Pond 8.  The City did not control or originate any changes or modifications to any waterways, which took place prior to the City's existence.  The original decision to alter the waterways, to construct a dam, and create Pond 8, was made by OfficeMax in order to impound stormwater, which was utilized by the milling operations on the site.  Any decision as to how the system operated was exclusively controlled by OfficeMax and/or Georgia-Pacific.  Except as specifically admitted, the City

822857

4

denies the allegations contained in paragraph 26, including the allegation that Alder Creek "historically drained almost the entire Fort Bragg area" and that the City owned the stormwater system.

27.     In response to the averments contained in paragraph 27, the City admits that OfficeMax made the allegations described.  The City denies all other averments contained in paragraph 27.

28.     In response to the averments contained in paragraph 28, the City admits that OfficeMax made the allegations described.  The City denies all other averments contained in paragraph 28.

29.     In response to the averments contained in paragraph 29, the City admits that OfficeMax made the allegations described.  The City denies the averments contained in paragraph 29.

## FIRST CLAIM FOR RELIEF AGAINST OFFICEMAX

## (Recovery for Response Costs Pursuant to Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(a))

30.     In response to the averments contained in paragraph 30, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 29, *supra*, inclusive.

31.     The City admits the averments contained in paragraph 31 on the basis of information and belief.

32.     The City admits the averments contained in paragraph 32 on the basis of information and belief.

33.     In response to the averments of paragraph 33, the City admits that some contaminants located in the soil and groundwater at the Site are "hazardous substance[s]" as that term is defined in 42 U.S.C. § 9601(14).  Except as just expressly admitted, the City denies the averments of paragraph 33 for lack of sufficient information and belief.

34.     The City admits the averments contained in paragraph 34 on the basis of information and belief.

35.     In response to the averments contained in paragraph 35, the City denies that it was

822857

5

an "owner or operator" of the Site, as that term is defined in 42 U.S.C. § 9601(20). The City admits on the basis of information and belief that each Defendant, apart from the City, was an "owner or operator" of the Site, and admits the remaining averments of paragraph 35.

36. In response to the averments contained in paragraph 36, the City admits on the basis of information and belief that OfficeMax is a liable person pursuant to 42 U.S.C. § 9607(a). Except as just expressly admitted, the City denies the averments contained in paragraph 36. Specifically, the City denies that it is a liable person pursuant to 42 U.S.C. § 9607(a).

37. The City denies the averments contained in paragraph 37 for lack of sufficient information and belief.

38. In response to the averments contained in paragraph 38, the City admits on the basis of information and belief that, to the extent Georgia-Pacific has actually incurred any damages or costs, Georgia-Pacific is entitled to reimbursement from OfficeMax and Louisiana-Pacific, who are liable under 42 U.S.C. § 9607. Except as expressly admitted, the City denies the averments contained in paragraph 38. Specifically, the City denies that Georgia-Pacific is entitled to reimbursement from the City under 42 U.S.C. § 9613(1).

39. In response to the averments contained in paragraph 39, the City has no information regarding the same upon which to admit or deny.

## SECOND CLAIM FOR RELIEF AGAINST OFFICEMAX

### (Claim for Contribution Pursuant to Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9613(f))

40. In response to the averments contained in paragraph 40, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 39, *supra*, inclusive.

41. In response to the averments contained in paragraph 41, the City admits on the basis of information and belief that OfficeMax and Louisiana-Pacific are liable under 42 U.S.C. 9613(f) for contribution to response costs to Georgia-Pacific, if any have actually been incurred, or will be incurred, in connection to the release and threatened release of hazardous substances at the Site. Except as just expressly admitted, the City denies the averments contained in paragraph 41. Specifically, the City denies that the City is liable under 42 U.S.C. 9613(f) for contribution

822857

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

to response costs in connection to the release and threatened release of hazardous substances at the Site.

42. The City denies the averments contained in paragraph 42 for lack of sufficient information and belief.

### THIRD CLAIM FOR RELIEF AGAINST OFFICEMAX

### (Declaratory Relief Under CERCLA)

43. In response to the averments contained in paragraph 43, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 42, *supra*, inclusive.

44. In response to the averments contained in paragraph 44, the City denies that the City is jointly and severally liable or responsible under 42 U.S.C. § 9607(a). The City also denies that the City is liable under 42 U.S.C. § 9613(f). The City, therefore, denies that Georgia-Pacific is entitled to any such declaration of City's liability. In response to the remaining averments contained in paragraph 44, the City admits there is an actual controversy between Georgia-Pacific and the Defendants. The City admits on the basis of information and belief that Georgia-Pacific is entitled to a declaration that (a) OfficeMax and Louisiana-Pacific are liable and responsible under 42 U.S.C. § 9607(a) to the extent Georgia-Pacific has incurred and will continue to incur response costs at the Site; or (b) OfficeMax and Louisiana-Pacific are liable under 42 U.S.C. § 9613(f) for contribution to the extent that Georgia-Pacific has incurred or will incur response costs at the Site. Except as just expressly admitted, the City denies the averments contained in paragraph 44.

45. The City admits the averments contained in paragraph 45.

### FOURTH CLAIM FOR RELIEF AGAINST OFFICEMAX

### (Declaratory Relief Pursuant to the Declaratory Judgment Act)

### (28 U.S.C. §§ 2201, 2202)

46. In response to the averments contained in paragraph 46, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 45, *supra*, inclusive.

47. The City admits the averments contained in paragraph 47. However, this admission responds to the fact that Georgia-Pacific seeks declaratory relief, and not to the truth

822857

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

of the allegations upon which Georgia-Pacific bases its claim.

48. The City admits the averments contained in paragraph 48 on the basis of information and belief.

## FIFTH CLAIM FOR RELIEF AGAINST OFFICEMAX

### (Declaratory Relief Under State Law)

### (Cal Code Civ. Proc. §1060)

49. In response to the averments contained in paragraph 49, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 48, *supra*, inclusive.

50. The City admits the averments contained in paragraph 50 on the basis of information and belief.

## SIXTH CLAIM FOR RELIEF AGAINST OFFICEMAX

### (Implied Equitable Indemnity)

51. In response to the averments contained in paragraph 51, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 50, *supra*, inclusive.

52. In response to the averments contained in paragraph 52, the City denies Georgia-Pacific's denial of all liability. The City further denies that Georgia-Pacific's liability is purely secondary, imputed, vicarious or technical. However, if Georgia-Pacific's allegations in paragraph 52 are true, then City admits that primary liability would attach to OfficeMax and is attributable to OfficeMax's acts and omissions.

## SEVENTH CLAIM FOR RELIEF AGAINST OFFICEMAX

### (Continuing Nuisance)

53. In response to the averments contained in paragraph 53, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 52, *supra*, inclusive.

54. In response to the averments contained in paragraph 54, the City denies that the City created conditions at the Site which constitute a continuing nuisance. The City further denies that the City violated California Civil Code § 3479. To the extent that a continuing nuisance exists, it is attributable to parties other than the City.

55. In response to the averments contained in paragraph 55 the City lacks sufficient

822857

information and belief to admit or deny the allegations, particularly the final costs of remediation of the site and based thereon, denies the allegations contained therein.

56. In response to the averments contained in paragraph 56 the City lacks sufficient information and belief to admit or deny, and on that basis denies the allegations contained therein.

57. In response to the averments contained in paragraph 57 the City lacks sufficient information and belief to admit or deny, and on that basis denies the allegations contained therein.

## EIGHTH CLAIM FOR RELIEF AGAINST OFFICEMAX

### (Continuing Trespass)

58. In response to the averments contained in paragraph 58, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 57, *supra*, inclusive.

59. In response to the averments contained in paragraph 59, the City admits that as a result of the control, maintenance, use and/or occupation of the Site by Defendants, except the City, the contamination at the Site was caused to remain at, on or under the Site. The City denies that it had any control, maintenance, use and/or occupation of the Site. In response to the remaining averments contained in paragraph 59, the City lacks sufficient information and belief to admit or deny, and on that basis denies the allegations contained therein

60. In response to the averments contained in paragraph 60, the City admits that contamination has been released at, on, and under the Site as a result of Defendants', except the City's, actions or failure to act, causing the contamination to remain at, on, and beneath the Site. Except as just expressly admitted, the City denies the averments of paragraph 60. Specifically, the City denies that contamination which has been released or continues to be released, at, on and under the Site is a result of any of City's actions or failure to act.

61. In response to the averments contained in paragraph 61 the City lacks sufficient information to admit or deny the allegations, particularly the final costs of remediation of the site, and based thereon, denies the allegations contained therein.

62. In response to the averments contained in paragraph 62, the City denies that the

822857

9

City committed a trespass. The City also denies, for lack of sufficient information and belief, that Georgia-Pacific has incurred or will incur damages. The City admits to the remaining averments contained in paragraph 62. Specifically, the City admits that OfficeMax and Louisiana-Pacific are responsible for continuing trespass.

## NINTH CLAIM FOR RELIEF AGAINST

## LOUISIANA-PACIFIC

### (Liability for Cost Recovery and Contribution

### Pursuant to CERCLA, 42 U.S.C. §§ 9607 and 9613)

63. In response to the averments contained in paragraph 63, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 62, *supra*, inclusive.

64. The City admits the averments contained in paragraph 64 on the basis of information and belief.

65. In response to the averments contained in paragraph 65, the City admits that Georgia-Pacific, Louisiana-Pacific, and OfficeMax released hazardous substances on the soil and into the surface and groundwater of the Site. In response to the remaining averments contained in paragraph 65, the City lacks sufficient information and belief to admit or deny, and on that basis denies the allegations contained therein.

66. The City admits the averments contained in paragraph 66. However, this admission responds to the fact that Georgia-Pacific seeks recovery, reimbursement and/or contribution from Louisiana-Pacific, and not to the truth of the allegations upon which Georgia-Pacific bases its claim.

## TENTH CLAIM FOR RELIEF AGAINST

## LOUISIANA-PACIFIC

### (Declaratory Relief Pursuant to CERCLA, 42 U.S.C. §§ 9607 and 9613)

67. In response to the averments contained in paragraph 67, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 66, *supra*, inclusive.

68. In response to the averments contained in paragraph 68, the City lacks sufficient information and belief to admit or deny, and on that basis denies the allegations contained

822857

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

therein.

69.    In response to the averments contained in paragraph 69, the City admits that OfficeMax made the allegations as described therein.  The City further admits on the basis of information and belief that Louisiana-Pacific is liable under CERCLA, 42 U.S.C. §§ 9607(a) and 9613(f).  In response to the remaining averments contained in paragraph 69, the City lacks sufficient information and belief to admit or deny, and on that basis denies the allegations contained therein.

70.    The City admits the averments contained in paragraph 70.  However, this admission responds to the fact that Georgia-Pacific seeks for the court to retain jurisdiction over this action, and not to the truth of the allegations upon which Georgia-Pacific bases its claim.

## ELEVENTH CLAIM FOR RELIEF AGAINST

## LOUISIANA-PACIFIC

### (Declaratory Relief Pursuant to the Declaratory Judgment Act)

### (28 U.S.C. §§ 2201, 2202)

71.    In response to the averments contained in paragraph 71, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 70, *supra*, inclusive.

72.    The City admits the averments contained in paragraph 72.  However, this admission answers to the fact that Georgia-Pacific seeks declaratory relief, and not to the truth of the allegations upon which Georgia-Pacific bases its claim.

73.    The City admits the averments contained in paragraph 73 on the basis of information and belief.

## TWELFTH CLAIM FOR RELIEF AGAINST

## LOUISIANA-PACIFIC

### (Declaratory Relief Under State Law)

### (Cal. Code Civ. Proc., § 1060)

74.    In response to the averments contained in paragraph 74, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 73, *supra*, inclusive.

75.    The City admits the averments contained in paragraph 75 on the basis of

822857

11

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

information and belief.

## THIRTEENTH CLAIM FOR RELIEF AGAINST

## LOUISIANA-PACIFIC

### (Implied Equitable Indemnity)

76.     In response to the averments contained in paragraph 76, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 75, *supra*, inclusive.

77.     In response to the averments contained in paragraph 77, the City denies Georgia-Pacific's denial of all liability.  The City further denies that Georgia-Pacific's liability is purely secondary, imputed, vicarious or technical.  However, if Georgia-Pacific's allegations in paragraph 77 are true, then City admits that significant liability would attach to Louisiana-Pacific and is attributable to Louisiana-Pacific's acts and omissions.  The City admits the remaining averments contained in paragraph 77.

## FOURTEENTH CLAIM FOR RELIEF AGAINST

## LOUISIANA-PACIFIC

### (Continuing Public Nuisance pursuant to

### California Civil Code §§ 3479 and 3480)

78.     In response to the averments contained in paragraph 78, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 77, *supra*, inclusive.

79.     The City admits the averments contained in paragraph 79 on the basis of information and belief.

80.     In response to the averments contained in paragraph 80, the City lacks sufficient information and belief to admit or deny, and on that basis denies the allegations contained therein.

81.     The City admits the averments contained in paragraph 81 on the basis of information and belief.

82.     The City admits the averments contained in paragraph 82 on the basis of information and belief.

822857

12

## FIFTEENTH CLAIM FOR RELIEF AGAINST

## THE CITY OF FORT BRAGG

### (Liability for Cost Recovery and Contribution)

83.     In response to the averments contained in paragraph 83, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 82, *supra*, inclusive.

84.     In response to the averments contained in paragraph 84, the City admits that OfficeMax made the allegations described.  The City also admits hazardous substances have been found at the Georgia-Pacific Mill site.  Except as just expressly admitted, the City denies the averments of paragraph 84.

85.     In response to the averments contained in paragraph 85, the City admits that OfficeMax made the allegations described.  The City denies all other averments contained in paragraph 85.

86.     The City denies the averments contained in paragraph 86.

87.     In response to the averments contained in paragraph 87, the City admits that Georgia-Pacific seeks recovery, reimbursement, and/or contribution from the City of Fort Bragg, but denies that it is entitled to any.  The City denies all other averments contained in paragraph.

## SIXTEENTH CLAIM FOR RELIEF AGAINST

## THE CITY OF FORT BRAGG

### (Declaratory Relief Pursuant to CERCLA, 42 U.S.C. §§ 9607 and 9613)

88.     In response to the averments contained in paragraph 88, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 87, *supra*, inclusive.

89.     The City denies the averments contained in paragraph 89.

90.     In response to the averments contained in paragraph 90, the City admits that OfficeMax made the allegations described.  The City denies all other averments contained in paragraph 90.

91.     The City admits Georgia-Pacific seeks the relief described in paragraph 91.

822857

13

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

## SEVENTEENTH CLAIM FOR RELIEF AGAINST

## THE CITY OF FORT BRAGG

### (Declaratory Relief Pursuant to the Declaratory Judgment Act)

### (28 U.S.C. §§ 2201, 2202)

92. In response to the averments contained in paragraph 92, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 91, *supra*, inclusive.

93. The City admits Georgia-Pacific seeks the relief described in paragraph 93.

94. In response to the averments contained in paragraph 94, the City admits that OfficeMax made the allegations described. The City denies all other averments contained in paragraph 94.

## EIGHTEENTH CLAIM FOR RELIEF

### (Declaratory Relief Pursuant to the Declaratory Judgment Act)

### (Cal. Code Civ. Proc., § 1060)

### (Against City of Fort Bragg)

95. In response to the averments contained in paragraph 95, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 94, *supra*, inclusive.

96. In response to the averments contained in paragraph 96, the City admits that OfficeMax made the allegations described. The City denies all other averments contained in paragraph 96.

## NINTEENTH CLAIM FOR RELIEF AGAINST

## THE CITY OF FORT BRAGG

## (Implied Equitable Indemnity)

97. In response to the averments contained in paragraph 97, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 96, *supra*, inclusive.

98. The City denies the averments contained in paragraph 98.

822857

14

## TWENTIETH CLAIM FOR RELIEF AGAINST

## THE CITY OF FORT BRAGG

## (Continuing Public Nuisance pursuant to

## California Civil Code §§ 3479 and 3480)

99.    In response to the averments contained in paragraph 99, the City incorporates by reference, as though fully set forth herein, paragraphs 1 through 98, *supra*, inclusive.

100.    In response to the averments contained in paragraph 100, the City admits that OfficeMax made the allegations described.  The City denies all other averments contained in paragraph 100.

101.    The City denies the averments contained in paragraph 101.

102.    In response to the averments contained in paragraph 102, the City admits that OfficeMax made the allegations described.  The City denies all other averments contained in paragraph 102.

103.    In response to the averments contained in paragraph 103, the City admits that OfficeMax made the allegations described.  The City denies all other averments contained in paragraph 103.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

## (Failure to State a Claim)

1.    The Second Amended Complaint ("SAC") and each claim therein fail to state a claim upon which relief can be granted against the City.

## SECOND AFFIRMATIVE DEFENSE

## (Standing)

2.    Georgia-Pacific lacks standing to bring this action.

## THIRD AFFIRMATIVE DEFENSE

## (Uncertainty)

3.    The SAC and each claim therein are uncertain.

822857

## FOURTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

4.    The SAC and each claim therein are barred by the applicable statute of limitations, including, but not limited to, California Government Code sections 901, 911.2, 945.6, and California Code of Civil Procedure sections 335 through 349.4.

## FIFTH AFFIRMATIVE DEFENSE

### (Laches)

5.    The SAC and each claim therein are barred by the doctrine of laches.

## SIXTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

6.    Georgia-Pacific conducted it's activities with unclean hands in the operation of the Mill Site, by inter alia, doing the following:  (1) Georgia-Pacific knew about, and actively concealed and misrepresented its knowledge of contamination at the Site; (2) failing to take reasonable remediation and investigation steps; and (3) burning wastes in its boilers which were unpermitted and for which Georgia-Pacific knew would create increased contamination.  For these reason, among others asserted, the SAC and each claim therein are barred by the doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE

### (Waiver)

7.    Georgia-Pacific waived each and every claim.

## EIGHTH AFFIRMATIVE DEFENSE

### (Estoppel)

8.    By virtue of the acts, conduct and omissions of Georgia-Pacific, Georgia-Pacific is estopped from asserting the claims alleged in the SAC.

## NINTH AFFIRMATIVE DEFENSE

### (Contributory or Comparative Fault)

9.    The City is informed and believes and on such basis alleges that persons or entities other than the City caused or contributed to damages, if any, allegedly suffered by

822857

16

Georgia-Pacific by negligence or other wrongful conduct and said acts or omissions eliminate or comparatively reduce the percentage of liability, if any, of the City by virtue of the doctrine of comparative negligence.

## TENTH AFFIRMATIVE DEFENSE

### (Assumption of Risk)

10.    The City is informed and believes and on such basis alleges that Georgia-Pacific knowingly and voluntarily assumed the risk, if any, of the damages alleged in the SAC.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Intervening Acts)

11.    The City is not liable to Georgia-Pacific because of the subsequent and intervening acts of Georgia-Pacific, other defendants, other third parties and/or acts of God, all of which caused the damages, if any, alleged in the SAC.

## TWELFTH AFFIRMATIVE DEFENSE

### (Cause in Fact)

12.    Georgia-Pacific cannot prove any facts showing that the conduct of the City was the cause in fact of any threatened or actual releases of hazardous substances or hazardous wastes as alleged in the SAC.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Proximate Cause/Substantial Factor)

13.    Georgia-Pacific cannot prove any facts showing that the conduct of the City was the proximate cause of, or a substantial factor in, any threatened or actual releases of hazardous substances or hazardous wastes as alleged in the SAC.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Equitable Estoppel/Equitable Indemnity)

14.    The SAC and each claim are barred by the doctrines of equitable estoppel and equitable indemnity.

822857

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Failure to Join Indispensable or Necessary Parties)

15.     Georgia-Pacific has failed to join all necessary and/or indispensable parties needed for a just adjudication of the subject matter of this action.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate Damages)

16.     Georgia-Pacific has failed to mitigate their damages, if any, in connection with the matter referred to in the SAC, which failure to mitigate bars and/or diminishes Georgia-Pacific's recovery, if any, against the City.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Due Care - Conformance With Laws)

17.     At all times relevant herein, the City acted reasonably and with due care, complied with all statutory, regulatory, and common law requirements in connection with activities that are the subject matter of this action.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Response Costs)

18.     The costs incurred or to be incurred do not constitute recoverable response, remedial, or removal costs within the meaning of CERCLA, and are unreasonable, unnecessary, and inconsistent with the National Contingency Plan.  Therefore, such costs are not recoverable.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Act of God, War or Third Party)

19.     The release or threatened release of hazardous substances was caused solely by one or more acts of God, an act of war, by the acts or omissions of a third party or parties, other than the City, or an agent of the City, and with whom the City had no contractual agreements.

## TWENTIETH AFFIRMATIVE DEFENSE

### (No Liability for Future Costs)

20.     Georgia-Pacific cannot recover future costs as this is inconsistent with CERCLA 42 U.S.C. §9607(a)(4).

822857

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (No Joint and Several Liability)

21.    The City is not jointly and severally liable for any damage alleged in the SAC because any effect of any act or omission of the City or any other defendant is divisible and distinct from any compensable damage, if any, incurred by Georgia-Pacific.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Joint and Several Liability Improper)

22.    The SAC and each claim therein are barred because they failed to state a claim or set forth facts sufficient to support a finding of joint and several liability against the City.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

23.    The City did not cause any damage to Georgia-Pacific. As such, any recovery by Georgia-Pacific is barred, in whole or in part, under the principles of setoff, recoupment, and or/unjust enrichment.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Offset)

24.    If Georgia-Pacific is held entitled to recover any costs or damages against the City, which entitlement the City denies, such recovery must be reduced and offset by: (1) any amount previously obtained for any damages alleged in the SAC, by Georgia-Pacific, from any person and; (2) the equitable share of the liability of any person or entity from which Georgia-Pacific previously received payment, whether by direct payment, or by offset, or a release from contribution or covenant not to sue with respect to any of the damages alleged in the SAC.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (Failure to Incur Response Costs)

25.    Georgia-Pacific has failed to incur necessary and recoverable response costs before filing suit.

822857

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (Preemption of State Claims)

26.     Georgia-Pacific's state law claims are preempted by federal law.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

### (Violation of Regulatory Standards)

27.     The SAC and each claim therein are barred to the extent their costs, if any, were incurred as a violation of regulatory standards or failure to cooperate with public officials.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

### (Failure to Meet Prerequisites)

28.     The SAC and each cause of action therein are barred in whole or in part to the extent that Georgia-Pacific failed to meet the statutory and legislative prerequisites for filing and maintaining a lawsuit under CERCLA.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

### (Substantial Compliance)

29.     The City has substantially complied with the requirements of state law as they pertain to this lawsuit and such substantial compliance bars Georgia-Pacific's claims.

## THIRTIETH AFFIRMATIVE DEFENSE

### (Substantial Factor)

30.     Any acts or omissions, if any, of the City were not substantial factors in bringing about the alleged damages and were not a contributing cause thereof, but were superseded by the acts or omissions of third parties, which were independent intervening and the proximate cause of any damages suffered by Georgia-Pacific.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

### (Failure to Perform Obligations)

31.     The claims for relief alleged in the SAC are barred, in whole or in part, by Georgia-Pacific's failure to perform their obligations owed to the City or to other third parties and such obligations were not excused, prevented or waived.

822857

20

## THIRTY-SECOND AFFIRMATIVE DEFENSE

### (Due Care)

32. The City exercised due care with respect to all matters alleged in the SAC.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

### (Speculative Damages)

33. Georgia-Pacific's damages, if any, are speculative and may not be recovered.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

### (Attorneys' Fees)

34. Georgia-Pacific is not entitled to recover attorneys' fees with respect to any of Georgia-Pacific's claims against the City.

## THIRTY-FIFTH AFFIRMATIVE DEFENSE

### (Offset of Voluntary Investigation/Remediation)

35. If the City is adjudged liable to Georgia-Pacific, which liability is expressly denied, the City is entitled to offset any damages awarded by the amount of costs and fees incurred by the City in its voluntary investigation and remediation of the property at issue here.

## THIRTY-SIXTH AFFIRMATIVE DEFENSE

### (Obligations Satisfied)

36. Any obligations the City owed to Georgia-Pacific have been satisfied, released or otherwise discharged. Therefore, Georgia-Pacific has suffered no damages and is not entitled to bring this action.

## THIRTY-SEVENTH AFFIRMATIVE DEFENSE

### (No Cost Recovery Under CERCLA)

37. Georgia-Pacific is not entitled to the cost recovery sought under Section 107 of CERCLA, 42 U.S.C., § 9607, because it is not an innocent party.

## THIRTY-EIGHTH AFFIRMATIVE DEFENSE

### (Causation – Not Fairly Traceable)

38. The conditions described in Georgia-Pacific's SAC are not "fairly traceable" to the City's acts or omissions.

822857

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

## THIRTY-NINTH AFFIRMATIVE DEFENSE

### (Full Performance under Permits, Standards, Regulations)

39.    The City alleges that it has fully performed each and every obligation arising under each of the permits, standards, regulations, conditions, requirements, prohibitions, or orders required by law, or any implementing regulations, or judicial interpretations thereof, thus the complaint fails to state a claim against the City premised upon violation of any such law.

## FORTIETH AFFIRMATIVE DEFENSE

### (Abstention)

40.    The matters alleged in the SAC are subject to ongoing agency enforcement, thus the Court should abstain from exercising primary jurisdiction over such matters.

## FORTY-FIRST AFFIRMATIVE DEFENSE

### (Adequate Remedy at Law)

41.    With respect to declaration or equitable relief requested by Georgia-Pacific, Georgia-Pacific has adequate remedies at law and is therefore not entitled to any such relief whatsoever.

## FORTY-SECOND AFFIRMATIVE DEFENSE

### (Necessity)

42.    With respect to matters which are the subject of the SAC, the City's actions were reasonably necessary for the accomplishment of an important public interest.

## FORTY-THIRD AFFIRMATIVE DEFENSE

### (De Minimis Harm)

43.    The SAC and each claim therein is barred on the ground that the contribution of the City to the alleged contamination, if any, is de minimis.

## FORTY-FOURTH AFFIRMATIVE DEFENSE

### (Conditions Precedent)

44.    Georgia-Pacific has failed to perform conditions precedent necessary to commence this action against the City.

822857

## FORTY-FIFTH AFFIRMATIVE DEFENSE

### (Mistake)

45.    Georgia-Pacific's claims are barred by their mistake of fact and/or by third party mistake of fact.

## FORTY-SIXTH AFFIRMATIVE DEFENSE

### (Substantial Compliance)

46.    The City has substantially complied with the requirements of state law as they pertain to this lawsuit and such substantial compliance bars Georgia-Pacific's claims.

## FORTY-SEVENTH AFFIRMATIVE DEFENSE

### (Remedial Actions Not Cost Effective)

47.    Georgia-Pacific is not entitled to recovery of remedial costs from the City because Georgia-Pacific's alleged remedial actions were not and are not "cost effective" pursuant to CERCLA, 42 U.S.C. §9621.

## FORTY-EIGHTH AFFIRMATIVE DEFENSE

### (Useful Product Defense)

48.    The stormwater allegedly contributed to the Site by the City was used in the manufacturing process at the Georgia-Pacific Lumber Mill and therefore is subject to the Useful Product Defense and is otherwise not subject to the liability alleged in the SAC.

## FORTY-NINTH AFFIRMATIVE DEFENSE

### (California Government Claims Act)

49.    Georgia-Pacific's claims are barred to the extent they do not comply with the provisions of the California Government Claims Act, California Government Code Section 810 et seq.

## FIFTHIETH AFFIRMATIVE DEFENSE

### (Government Immunities)

50.    The City is statutorily immune from liability under Article 1, Chapter 2, Division 3.6, Title 1, of the California Government Code, including, but not limited to, Government Code sections 830; 830.2; 830.6; 835; 835.2; 835.4, and 840.6.  Pursuant to Government Code section

822857

23

820.2, the City is not liable for any alleged injuries that result from its employees' discretionary acts or omissions. Pursuant to Government Code section 830.6, the City is not liable for any alleged injury that was caused by a condition of public property, because the condition was created by reasonable plans and designs that received discretionary approval. Pursuant to Government Code section 835.4, the City is not liable for any alleged injury that was caused by a dangerous condition of public property, because the City's actions or omissions to protect against the risk of injury created by the condition were reasonable, given the time and opportunity available for taking action, and because the probably and gravity of potential injury to persons and property foreseeably exposed to the risk of injury was weighed against the practicability and cost of protecting against the risk of such injury.

## FIFTY-FIRST AFFIRMATIVE DEFENSE

### (Failure to Inspect)

51. To the extent Georgia-Pacific alleges an injury that was caused by the failure of the City to make an inspection, or by reason of making an inadequate inspection of public property; the City is immune from liability pursuant to the provisions of the Government Code Section 818.6.

## FIFTY-SECOND AFFIRMATIVE DEFENSE

### (Federally Permitted Release)

52. The City is informed and believes, and on that basis alleges, that the SAC and each claim contained therein is barred on the ground that, to the extent that the alleged releases of hazardous substances, if any, were in whole or part federally permitted releases, they are exempt from liability under Section 107(j) of CERCLA, 42 U.S.C. § 9607(j).

## FIFTY-THIRD AFFIRMATIVE DEFENSE

### (Action Authorized by Statute)

53. The City alleges that the actions and conditions complained of by Georgia-Pacific are expressly authorized by statute, ordinance, or administrative regulation, and may not be judged a nuisance under Civil Code section 3482.

822857

## FIFTY-FOURTH AFFIRMATIVE DEFENSE

### (Offset of Costs Associated with Misrepresentations)

54.     Georgia-Pacific solicited the City's cooperation in selling the Site, and in so doing made a series of false representations to the City and numerous parties regarding contamination at the Site. These representations were made with the intent to induce prospective purchasers to buy the Site and obtain the City's cooperation and assistance in selling the Site. If the City is adjudged liable to Georgia-Pacific, which liability is expressly denied, the City is entitled to offset any damages awarded by the amount of costs and fees incurred by the City in their cooperative efforts with Georgia-Pacific, which were based on the false representations.

## FIFTY-FIFTH AFFIRMATIVE DEFENSE

### (Statutory Violations)

55.     Georgia-Pacific's conduct in burning unpermitted urban waste from approximately 2000 to 2002 violated its permit and numerous environmental laws. Moreover, treatment of the wastes created by the unpermitted burning of the urban waste was also in violation of numerous environmental laws. Any damages that Georgia-Pacific has suffered result from its own conduct and its violation of applicable laws.

## FIFTY-SIXTH AFFIRMATIVE DEFENSE

### (2009 Agreement)

56.     By virtue of the 2009 Agreement between Georgia-Pacific and The City, Georgia-Pacific relating to the sale of portions of the Property Georgia-Pacific was contractually obligated to remediate the properties covered by the Agreement, and was paid monies for said remediation, Georgia-Pacific is barred by the Agreement, and specifically the implied covenant of good faith and fair dealing, from asserting the claims alleged in the SAC relating to the areas covered by the 2009 Agreement.

## FIFTY-SEVENTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment as to 2009 Agreement)

57.     Georgia-Pacific is seeking to recover costs which it has already obtained as part of the purchase price during the 2009 sale of portions of the Property. As such, any recovery by

822857

Georgia-Pacific is barred, in whole or in part, under the principles barring double recovery and/or unjust enrichment.

## FIFTY-EIGHTH AFFIRMATIVE DEFENSE

### (Incorporation of Counterclaim)

58.     The City incorporates each and every allegation contained in its counterclaim that is served and filed herewith.

## FIFTY-NINTH AFFIRMATIVE DEFENSE

### (Reservation of Additional Affirmative Defenses)

59.     The City presently has insufficient knowledge or information upon which to form a belief as to whether it may have additional affirmative defenses.  The City reserves the right to assert and rely on any additional affirmative defenses that may become available or apparent during discovery proceedings and/or trial.

WHEREFORE, the City prays as follows:

1.     That the relief sought by way of the prayer for relief in Georgia-Pacific's Second Amended Complaint is denied in its entirety;

2.     That Georgia-Pacific takes nothing by its action;

3.     That the Second Amended Complaint be dismissed in its entirety;

4.     That the City be awarded its costs, expert consultants' fees, witness fees, and reasonable attorneys' fees incurred in defense of this action; and

5.     For such other relief as the Court deems just and proper.

## AMENDED COUNTERCLAIM AGAINST GEORGIA-PACIFIC, LLC.

Third-Party Defendant THE CITY OF FORT BRAGG ("the City") brings this amended counterclaim against Plaintiff GEORGIA-PACIFIC, LLC ("Georgia-Pacific") pursuant to Rule 13 of the Federal Rules of Civil Procedure, as follows:

### DESCRIPTION OF ACTION

1.     On May 31, 2012, Plaintiff Georgia-Pacific filed in the United States District Court for the Northern District of California, Case No. 12-02797-RS, a complaint against

822857

26

OfficeMax Incorporated and Boise Cascade, L.L.C. seeking recovery, pursuant to the Federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq., and related state actions.

2.    On May 21, 2013, Georgia-Pacific filed its Second Amended Complaint ("SAC"), naming the City and Louisiana-Pacific Corporation and alleging that the City is liable for the release and threatened release of hazardous substances to the Site.

3.    The City denies that it is liable to Georgia-Pacific and denies that Georgia-Pacific is entitled to any relief against the City as requested or otherwise.

4.    Georgia-Pacific, since at least 1989 and continuing to about the end of 2006, has engaged in deliberate and systematic acts to cover-up and misrepresent the extent of known and/or expected dioxin/furan ("dioxin") contamination at the Mill site that it operated until 2002 in the City of Fort Bragg.  At all relevant times, Georgia-Pacific has misrepresented the extent of the dioxin contamination, sought to place blame for the contamination on others, including but not limited to the residents of Fort Bragg, and refused to conduct the testing necessary to confirm the true nature and extent of the dioxin contamination.   As a result of these fraudulent misrepresentations, the City detrimentally relied on the erroneous belief that significant dioxin contamination did not exist at the Mill Site and thereby suffered damages.

5.    Georgia-Pacific and the City entered into an agreement in 2009 ("the 2009 Agreement") in which Georgia-Pacific sold to the City a portion of the Mill Site that included areas called Glass Beach 1, 2 and 3 ("Glass Beach").  A true and correct copy of the 2009 Agreement, without the attachments and exhibits, is attached hereto as Exhibit A.  The effect of the 2009 Agreement is to bar any liability asserted by Georgia-Pacific in this matter relating to the property conveyed in the 2009 Agreement, including Glass Beach.

## PARTIES

6.    Defendant the City of Fort Bragg is an incorporated city and a duly organized municipal corporation.

7.    Plaintiff Georgia-Pacific is a Delaware limited liability company headquartered in Atlanta, Georgia.

822857

## JURISDICTION

8.      Jurisdiction over this action is based on 28 U.S.C. Section 1331 and on 42 U.S.C. section 9613(b).  This suit is brought under CERCLA and arises out of contamination at, and emanating from, the Property located in Fort Bragg, California.  Jurisdiction of state law claims is based upon 28 U.S.C. Section 1367(a).  These state law claims are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

## VENUE

9.      Venue is proper in this Court pursuant to 28 U.S.C. section 1391(b) and 42 U.S.C. section 9613(b) because the alleged acts and omissions relate to hazardous waste and hazardous substances in the environment and emanating from property located in Mendocino County, California, which is part of this District.

## FACTUAL ALLEGATIONS RELVANT TO ALL CAUSES OF ACTION

### A.      ALLEGATIONS RELATING TO CERCLA CLAIMS.

10.      The property at issue in this litigation (the "Site") consists of approximately 415 acres of real property located in the city of Fort Bragg, Mendocino County, California.

11.      Upon information and belief, Union Lumber Company, which was formed as the result of a merger between Fort Bragg Redwood Company and the Noyo River Lumber Company, operated a sawmill ("the Mill") at the Site beginning in 1885.

12.      Upon information and belief, in 1968 Union Lumber Company merged with Boise Cascade Corporation ("Boise"), which assumed liabilities, obligations and duties associated with the Site in connection with the foregoing transaction.  Boise owned and operated the Mill at the Site until 1974.

13.      In or about 1973, Georgia-Pacific purchased the Site from Boise.  Georgia-Pacific thereafter owned and operated the Mill at the Site until 2002.  Georgia-Pacific remains the owner of the Site.

14.      In 2003, Boise acquired all of the securities of OfficeMax Incorporated ("OfficeMax").

822857

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

15.    In 2004, Boise changed its name to OfficeMax.

16.    Upon information and belief, Union Lumber Company, predecessor-in-interest to Georgia-Pacific, constructed a dam on the Site prior to the creation of the City.

17.    The dam impounded water from naturally occurring waterways. The purpose of the impoundment was to use the water in the lumber mill operations. Prior to construction of the dam, the water flowed naturally through Alder Creek and other surface waterways to the ocean. After the City was created, portions of City Stormwater flowed into the impoundment. At no time did the City have any control over the use of the water in the impoundment, including its movement or release, to the beach or the Pacific Ocean. Such actions were exclusively controlled by Union Lumber Company, predecessor to OfficeMax, and predecessor-in-interest to Georgia-Pacific, through a dam system under their exclusive control.

18.    Georgia-Pacific continued to use the impounded Stormwater to operate the Mill. The Stormwater was critical to the overall operation of the Mill, including its energy producing boilers and ovens. Georgia-Pacific sold the energy produced by the Stormwater to PG&E and other electricity providers.

19.    Upon information and belief, the Stormwater released by the City did not contain hazardous materials in any concentrations that necessitated response costs at the Site.

20.    Upon information and belief, Georgia-Pacific has undertaken environmental investigations at the Site.

21.    Georgia-Pacific alleges that the Site is a "facility" as defined by CERCLA. Therefore, on information and belief, the City also alleges that the Site is a "facility" as defined by CERCLA.

22.    Georgia-Pacific is a "person," as that term is defined in 42 U.S.C. § 9601(21).

23.    Georgia-Pacific is an "owner and operator" as that term is defined in 42 U.S.C. § 9601(20), of the Site and that hazardous substances have been disposed at the Site during Georgia-Pacific's ownership.

822857

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

24.    Georgia-Pacific's operations at the Site led to the "release" or threatened "release," as that term is defined in 42 U.S.C. § 9601(22), of "hazardous substances," as that term is defined in 42 U.S.C. § 9601(14), to the soil and groundwater underlying the Site.

25.    During its operations at the Site, Georgia-Pacific arranged for the disposal of hazardous substances to the soil, groundwater, and surface water of the Site.

26.    As a result of this release or threatened release, the City may incur response costs for remediation at the Site.

**B.    ALLEGATIONS RELATING TO MISREPRESENTATION CLAIMS.**

27.    By the mid-1980s, Georgia-Pacific knew that Site effluent contained excessive levels of cyanide caused by incomplete combustion of the wood fuel in its ovens and boilers. Although Georgia-Pacific learned that complete combustion required wood fuel with a moisture content below 20%, it used wood fuel with a moisture content of 56%. Georgia-Pacific admitted it knew the moisture content of the wood fuel in its permit application.   A copy of the permit application is attached as Exhibit B.

28.    By the early 1980's Georgia-Pacific knew that incomplete combustion of fuels led to the production of dioxins. Georgia-Pacific was also aware that dioxin exposure causes cancer and other serious human and environmental harm.

29.    Because of its involvement in the Leaf River and Rice Creek actions at its other plants, Georgia-Pacific knew that the existence of dioxins at a site led to legal and/or regulatory action by government regulators and/or citizens.

30.    In 1983, Georgia-Pacific knew that the same conditions that produced cyanide also produced dioxin. In 1986 and 1987, Georgia-Pacific tested fly ash produced at the Site. Fly ash is the residue Georgia-Pacific created when it used its ovens and boilers to burn wood and other fuels to power the Site. This testing revealed the presence of dioxins, including the types of dioxins that were known to be the most toxic.

31.    In or about 1986, Georgia-Pacific attempted to dispose of the fly ash by transferring some of it to nurseries in the City. The nurseries used the fly ash as a soil amendment. Georgia-Pacific failed to place any warnings on the fly ash that it contained

822857

30

dioxins. Two residents of the City obtained and independently tested samples of the fly ash ("Resident Fly Ash Samples"). The test results confirmed the presence of dioxins in the Resident Fly Ash Samples. Georgia-Pacific reacted by stating that this problem is "even bigger than [they] had thought . . ." A true and correct copy of the intracompany memo relating to same is attached hereto as Exhibit C.

32.    Prompted by the Resident Fly Ash Samples, the California Water Quality Control Board ("Board") ordered Georgia-Pacific to conduct more extensive dioxin testing of its fly ash. The additional testing confirmed the presence of dioxins and the Board ordered Georgia-Pacific to stop disposing of the fly ash by transferring it to nurseries.

33.    In or about 1989, the City learned of problems relating to Georgia-Pacific production of dioxins because inter alia, of concerns expressed by City residents that Georgia-Pacific's had caused harmful dioxin exposures. The City held an open meeting to discuss the issues relating to Georgia-Pacific dioxin production and to decide if dioxin testing in the City should take place.

34.    Georgia-Pacific publicly opposed any general dioxin testing, stating the boilers used at the Site achieved "complete combustion" and "[i]t thus stands to reason that any dioxins that might show up in the environment in and around Fort Bragg did not come from Georgia-Pacific's boilers." Georgia-Pacific asserted that the residents of the City were responsible for the dioxins because of automobile operation and back yard burning. A copy of a letter from Georgia- Pacific to the City is attached hereto as Exhibit D.

35.    The representations contained in Exhibit D were false, and Georgia-Pacific knew them to be so because of its own dioxin testing, excessive cyanide levels in Site effluent and Resident Fly Ash Samples. However, the City accepted Georgia-Pacific's representations as true and did not require general testing.

36.    Georgia-Pacific constructed a series of ponds allegedly designed to reduce the level of cyanide in its ocean discharge. But it took no steps to limit the amount of dioxins or test for their presence.

822857

31

37.    In or about 2000, Georgia-Pacific decided to close the Mill and limited further lumber production at the Site. This led to a shortage of wood fuel to run the boilers.

38.    In or about 2001, the California energy crisis occurred and energy prices in California soared. Georgia-Pacific sought to profit by selling energy, but was thwarted by the shortage of permitted fuels at what it considered a reasonable price. Georgia-Pacific decided, therefore, to operate its boilers by burning unpermitted fuel. This fuel contained plastics and other materials that created elevated levels of dioxins. It was called urban wood waste. Georgia-Pacific burned the urban wood waste for approximately a year, knowing full well it created elevated dioxin levels. The practice continued until it was stopped by regulators. Georgia-Pacific nonetheless earned approximately $1.5 million in profits from selling the energy created by burning the urban wood waste.

39.    In 2002, Georgia-Pacific announced that it would close the Mill. Yet, it took no actions to control or mitigate the dioxin contamination that it knowingly created at the Site.

40.    After the Mill closed, Georgia-Pacific determined that it wanted to sell the Site. Georgia-Pacific knew that the Site, including the ponds was contaminated with dioxins. It further knew further testing would disclose the contamination and lead it to expend considerable sums of money to investigate and potentially remediate the contamination. The existence of the dioxins and the associated costs relating to the investigation and remediation would make the Site practically unsalable. Georgia-Pacific therefore decided to sell the Site before such testing occurred.

41.    Pursuant to this plan, Georgia-Pacific contracted with TRC for the preparation of a Phase I and Phase 2 Report ("the Report") on the Site. The purpose of such a report is to investigate possible contamination and delineate further necessary investigation. Julie Raming, assigned by Georgia-Pacific to oversee Site environmental issues, instructed TRC not to consider or investigate the presence of dioxins or pond contamination. TRC complied with these instructions.

42.    According to the Report, it was prepared in accordance with the procedures established by the ASTM. According to the ASTM, the Report should have specifically

822857

32

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

referenced contaminants, or areas where contamination was expected. This would include dioxins and the ponds. Since dioxins and the ponds were excluded from consideration due to the instructions of Georgia-Pacific, the ASTM requires that the Report state in detail that the Report had deviated from the ASTM. However, there was no such statement that dioxins or the ponds were not considered. The Report nonetheless represented that it was prepared in compliance with the ASTM.

43. Georgia-Pacific was aware that in order to sell the Site that it would need the cooperation of the City. Georgia-Pacific thereafter solicited the City's cooperation and in so doing represented to numerous parties that the Report accurately reflected Site conditions. These representations were made with the intent to induce prospective purchasers to buy the Site and obtain the City's cooperation and assistance in selling the Site. These representations included, inter alia:

A. In or about 2004, TRC prepared a Memorandum – purportedly based on the Report - entitled "Georgia-Pacific Fort Bragg Facility Opportunities and Constraints Environmental Considerations Technical Memoranda ["the Memoranda"]." The purpose of the Memoranda was to "determine how [impacts of the operations at the Site] . . . might pose opportunities or constraints to development and reuse of the . . ." Site. Without mentioning that it had excluded dioxins and pond contamination from the Report, the Memoranda concluded that "hazardous materials do not appear to be a constraint to future site development." The Memoranda was distributed to prospective purchasers and to the City.

B. In or about October, 2005, Georgia-Pacific prepared a promotional video for the sale of the Site. As part of the video, Julie Raming represented that the Reports had demonstrated that any contamination at the Site was minor. The video was intended to be seen by and was in fact viewed by the City.

C. Georgia-Pacific prepared standard talking points that were to be used by Georgia-Pacific employees in discussing environmental contamination at the Site. A true and correct copy of the talking points are attached as Exhibit E ("Talking Points"). As part of the

822857

Talking Points, Georgia-Pacific represented that TRC had conducted a comprehensive investigation and only discovered hydrocarbon contamination. These Talking Points were used on multiple occasions to make various representations to the City consistent with their contents.

D.    Georgia-Pacific appointed Carol Stephens to be in charge of selling the Site. From 2002 through 2005, Stephens met numerous times with the City, including City Manager Linda Ruffing. Often relying on the Talking Points, Stephens made multiple representations that Site contamination was insufficient to impair its sale.

44.    At the time that the above representations were made, Georgia-Pacific was aware that in order to sell the property that the assistance of the City was critical. A substantial number of the Fort Bragg community vocally supported rezoning the Site to control its future use. When it first appeared the Site would close, the City commenced a review of it zoning. Georgia-Pacific believed that rezoning could limit the Site's salability, especially if the rezoning had the effect of making Georgia-Pacific's use of the property a nonconforming use. It therefore set about to "obstruct and delay" any rezoning and continued to do so until it was clear that the City would not make Georgia-Pacific's use of the property a nonconforming use. The memorandum from the General Manager of the Site, with express instructions to "obstruct and delay" rezoning, is attached hereto as Exhibit F. If the public knew of the dioxin contamination at the Site, Georgia-Pacific feared that support for rezoning would be strengthened.

45.    Georgia-Pacific was also aware when it made the above representations that if the existence of dioxin contamination was found at the Site that it would be almost impossible to find any prospective buyers. Dioxins are highly toxic; experts say they are the most dangerous man-made chemicals. Disclosure of wide-spread dioxin Site contamination would lead to a complicated and expensive investigation and remediation. Georgia-Pacific knew that public disclosure of the true extent of the dioxin contamination would make finding a buyer very difficult. It also knew that such a disclosure would severely impair its credibility and the City's cooperation. In light of the years of representations by Georgia-Pacific that the Site did not produce dioxins, the presence of dioxins would inhibit the City's ability to work with Georgia-

822857

34

Pacific and also critically injure any credibility that Georgia-Pacific may have. Georgia-Pacific made the above representations to avoid these consequences.

46.    Notwithstanding these representations, and due in part to actions by regulatory agencies, Georgia-Pacific conducted testing that disclosed the presence of dioxins. This testing occurred in 2006, prior to which the City did not know, and did not have reason to know, that dioxin contamination existed at the Site. Once Georgia-Pacific was forced to disclose that dioxin contamination existed, it suspended its efforts to sell the property.

47.    Prior to the City learning the true extent of Site's contamination it expended significant time, money and effort to assist Georgia-Pacific in selling the Site. In or about June of 2004, the City specifically offered to perform significant tasks in order to assist Georgia-Pacific in selling the Site. The offer was memorialized in a memorandum sent to Georgia-Pacific and attached hereto as Exhibit G. Georgia-Pacific agreed to accept the City's assistance and the City performed the items contained in Exhibit G.

48.    Had the City known that the Site had significant dioxin contamination it would not have offered to assist Georgia-Pacific in the manner that it did.

### C.    ALLEGATIONS RELATING TO CONTRACT CLAIM.

49.    The Agreement that was entered into by the Parties contained an implied covenant of good faith and fair dealing in which each party agreed not to take any action to deprive the other party of the benefits of the Agreement.

50.    As part of the Agreement, Georgia-Pacific received monies which were to pay for the investigation and remediation of Glass Beach. Georgia-Pacific utilized the funds to complete said investigation and remediation and to obtain a No Further Action Letter from DTSC.

51.    The City has performed each and every covenant, promise or condition under the Agreement.

### FIRST CLAIM FOR RELIEF

### (Contribution pursuant to CERCLA § 113(f))

52.    The City refers to and realleges paragraphs 1 through 51 of this Counterclaim and incorporates them herein by reference.

822857

53.    The City did not contribute to the alleged contamination at the Site.

54.    The City is informed and believes and thereon alleges that the alleged contamination to the Site was contributed to or caused by the acts or omissions of Georgia-Pacific.

55.    To the extent any party has incurred recoverable response costs pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), and asserts liability for some or all of those costs against the City pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), or asserts a contribution claim against the City for such costs incurred by another party pursuant to CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), the City is entitled to one hundred percent (100%) contribution, or contribution in such other percentage as this Court deems appropriate, pursuant to CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), from Georgia-Pacific.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief under Federal Law For Contamination of Site)

56.    The City refers to and realleges paragraphs 1 through 55 of this Counterclaim and incorporates them herein by reference.

57.    A dispute has arisen and an actual controversy exists between the City and Georgia-Pacific in that Georgia-Pacific claims that the City is obligated to indemnify Georgia-Pacific for all future damages and costs that may be suffered by it as a result of the contamination of the Site or, in the alternative, to contribute and reimburse Georgia-Pacific for such damages and costs, including costs or damages awarded in legal or administrative actions, costs of compliance with any judicial or administrative order, and costs of litigation including attorneys' fees.

58.    Substantial costs will be incurred by the City over time and after conclusion of this action. Unless declaratory relief is granted, it will be necessary for the City to commence many successive actions against Georgia-Pacific in order to secure compensation for the costs incurred and damages sustained, thus requiring a multiplicity of suits.

59.    The City is entitled to and hereby seeks a declaratory judgment, pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), of Georgia-Pacific's liability to the City for all

822857

36

Response Costs incurred or to be incurred by the City for the Site and for responding to the Releases and threatened Releases of wastes and adverse environmental consequences at issue herein.

60.    The City is entitled to, and hereby seeks, a judicial determination pursuant to the Federal Declaratory Relief Act, 28 U.S.C. § 2201, of the City's right to reimbursement from and indemnification by Georgia-Pacific for all costs, jointly and severally, which the City may incur resulting from Georgia-Pacific's contribution to Release of wastes into the environment.

## THIRD CLAIM FOR RELIEF

### (Fraud)

61.    The City refers to and realleges paragraphs 1 through 60 of this Counterclaim and incorporates them herein by reference.

62.    Through discovery process in the action filed by Georgia-Pacific, and specifically the deposition of Mohammad Bazargani of TRC, on January 15, 2014, the City was made aware of the facts herein and particularly the instructions by Raming not to investigate dioxins or the ponds. Until that date the City was not aware of the fraudulent scheme alleged herein.

63.    The City was unaware of the falsity of Georgia-Pacific's representations, acted in reliance upon the truth of the representations, and was justified in relying upon them.

64.    When Georgia-Pacific made the representations, and took the actions alleged herein, they did so with the intent to deceive the City and to induce them to cooperate with Georgia-Pacific and to act in the manner alleged herein.

65.    As a direct and proximate cause of Georgia-Pacific's representations and actions herein alleged, the City expended significant time, money and resources to cooperate with Georgia-Pacific and to act in the manner alleged herein, all to its damage according to proof.

66.    The conduct of Georgia-Pacific was fraudulent, malicious, oppressive and/or done with the conscious disregard for the rights of the City and how Georgia-Pacific's conduct would affect the City. As presented in Exhibit F, Georgia-Pacific was aware that the City had very limited financial resources and that the City's commitment to assist and act as herein

822857

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

alleged would put a severe financial strain on the City.  As a result, Georgia-Pacific is liable for punitive and exemplary damages according to proof.

## FOURTH CLAIM FOR RELIEF

### (Negligent Misrepresentation)

67.    The City refers to and realleges paragraphs 1 through 66 of this Counterclaim and incorporates them herein by reference.

68.    When Georgia-Pacific made the representation and took the actions alleged herein, they did so without a sufficient basis for believing them to be true.

## FIFTH CLAIM FOR RELIEF

### (Declaratory Relief on 2009 Purchase Agreement)

69.    The City refers to and realleges paragraphs 1 through 68 of this Counterclaim and incorporates them herein by reference.

70.    An actual controversy has arisen and now exists between the City and Georgia-Pacific concerning their respective rights and duties under the Agreement.  The City contends and Georgia-Pacific denies that

A.    The Agreement prevents Georgia-Pacific form seeking response costs or any reimbursement for any costs that Georgia-Pacific was obligated and did expend to comply with the Agreement; and

B.    That Georgia-Pacific has already been paid for the response costs relating to Glass Beach, and any further recovery would be an impermissible double recovery under CERCLA.

71.    The City desires a judicial determination of the rights and responsibilities of the parties as governed by the Agreement. A judicial declaration is necessary and appropriate at this time pursuant to Code of Civil Procedure § 1060 in order that the City may ascertain the rights and duties of the parties under the Purchase Agreement.

822857

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

# SIXTH CLAIM FOR RELIEF

## (Equitable Indemnification)

72.    The City realleges paragraphs 1 through 71 of this Counterclaim and incorporates them herein by reference.

73.    As a direct and proximate result of Georgia-Pacific's acts or omissions, the City has been required to act in the protection of its own interests by defending against the SAC filed in this action and bringing this Counterclaim.  Additionally, as a direct and proximate result of Georgia-Pacific's acts or omissions, the City has been required to act in the protection of its own interests by defending against a Third Party Complaint filed by defendant OfficeMax ("TPC") and a Cross-Claim filed by defendant Louisiana-Pacific ("Cross-Claim").

74.    The City is without fault with respect to the matters alleged in the SAC, the TPC, the Cross-Claim filed by Louisiana-Pacific, and any other claim or action arising directly or indirectly from the alleged contamination of the soil and/or groundwater in, at, around, and underlying the Site.  To the extent the City has any liability for any relief sought in any judicial or administrative proceedings brought against them by any persons or entities with regard to the alleged contamination of the soil and/or groundwater in, at, around, and underlying the Site, including without limitation, the pending SAC, the TPC, and Cross-Claim in this action, such liability is purely secondary, imputed, vicarious or technical, and primary liability attaches to Georgia-Pacific and is attributable to Georgia-Pacific's acts or omissions.

75.    The City is informed and believes and thereon further alleges that Georgia-Pacific is responsible to indemnify the City for any liability arising from Georgia-Pacific's acts or omissions.  The City further alleges that the liability of Georgia-Pacific is either total or partial. If total, the City is entitled to total indemnity from Georgia-Pacific for any liability that may be assessed against the City arising directly or indirectly from contamination of the soil and/or groundwater in, at, around, and underlying the Site.  If partial, Georgia-Pacific is in some manner partially responsible for said liability and in equity must reimburse the City for any liability assessed by the Court, based on Georgia-Pacific's own fault for alleged liability arising directly

822857

39

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

or indirectly from contamination of the soil and/or groundwater in, at, around, and underlying the Site.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Contract)

76.     The City realleges paragraphs 1 through 75 of this Counterclaim and incorporates them herein by reference.

77.     The above described conduct of Georgia-Pacific constitutes a breach of the Agreement, all to the City's damages. These damages include, but are not limited to the defense of this action.

## EIGHTH CLAIM FOR RELIEF

### (Contribution)

78.     The City realleges paragraphs 1 through 77 of this Counterclaim and incorporates them herein by reference.

79.     The City denies all liability with respect to the alleged contamination of the soil and/or groundwater in, at, around, and underlying the Site. However, Georgia-Pacific has alleged that the City is liable under a variety of legal theories. To the extent that the City may have any liability for any relief sought in any judicial or administrative proceedings brought against it in by any persons or entities with regard to contamination of the soil and/or groundwater in, at, around and underlying the Site, including without limitation, Georgia-Pacific's SAC, Georgia-Pacific is liable to the City for contribution for all costs, expenses or damages incurred or awarded in legal or administrative actions, clean-up costs, attorneys' fees and consultants' fees, and costs of litigation.

WHEREFORE, the City prays as follows:

1.     For recovery from Georgia-Pacific for all response costs that will be incurred by the City in response to the release and threatened release of hazardous substances at the Site and in the enforcement of CERCLA's statutory liability scheme, according to proof at trial;

822857

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL

2.    For a declaration that Georgia-Pacific is obligated to pay to the City all future response costs and any other costs incurred by the City hereafter in response, removal or remediation efforts incurred;

3.    For a declaration that Georgia-Pacific: (1) acted in bad faith and breached the conditions of the 2009 Purchase Agreement; and (2) is obligated to protect, indemnify and hold harmless Buyer from all damages relating to the Glass Beaches pursuant to the 2009 Purchase Agreement.

4.    For damages according to proof.

5.    For punitive damages according to proof.

6.    For incidental and consequential damages according to proof;

7.    For pre-judgment interest at the legal rate;

8.    For all costs of suit incurred herein;

9.    For injunctive relief, as appropriate;

10.    For such other and further relief as this Court deems just and proper.

Date:    June 23, 2014                    BASSI, EDLIN, HUIE & BLUM LLP

By: _____
FRED M. BLUM
Attorneys for Defendant
THE CITY OF FORT BRAGG

## DEMAND FOR JURY TRIAL

The City demands a jury trial on all applicable issues.

Date:    June 23, 2014                    BASSI, EDLIN, HUIE & BLUM LLP

By: _____
FRED M. BLUM
Attorneys for Defendant
THE CITY OF FORT BRAGG

822857

41

# EXHIBIT A

## PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS

THIS PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (this "Agreement") is made as of ᴶᵃₙ. 26, 2009 (the "Effective Date"), by and among GEORGIA PACIFIC LLC, a Delaware limited liability company ("Seller"), on the one hand, and CITY OF FORT BRAGG, a municipal corporation ("Buyer"), on the other hand, as follows:

### R E C I T A L S

A.    Seller is the fee owner of certain real property more particularly described in Exhibit "A" in the City of Fort Bragg ("Property").

B.    Buyer desires to purchase portions of the Property for public access, passive recreational use, open space and natural resource and scenic protection only consisting of three (3) parcels as follows (i) an approximately 1.7-acre parcel located at the northern boundary of the Property as depicted in Exhibit "B-1" and as more particularly described in Exhibit "B-2" ('Parcel 1"), (ii) an approximately 4.2-acre parcel consisting of a headland located north of Soldier Bay as depicted in Exhibit "C-1" and more particularly described in Exhibit "C-2" (Parcel 2") and (iii) an approximately 28.9-acre parcel located on the southwesterly end of the Property as depicted in Exhibit "D-1" and more particularly described in Exhibit "D-2" ("Parcel 3"). Parcels 1, 2 and 3 are hereinafter collectively referred to as the "Parcels." The remainder of the Property which Seller is not selling to Buyer or dedicating to Buyer for public access as described in Recital "C", below, is hereinafter referred to as the "Retained Property."

C.    Concurrently with the conveyance of title to the Parcels, Seller has agreed to dedicate for public access, open space, passive recreational and natural resource and scenic protection purposes only land extending from the coastal bluff inland extending from the northern boundary of the Property to a point in the southerly portion of the Property as depicted in Exhibit "E-1" ("Public Trail Area"). In connection with the conveyance of title to Buyer of the Parcels, Seller will convey that portion of the Public Trail Area described and depicted in Exhibit "E-2" ("Trail Conveyance Area"). In connection with the conveyance of title to Buyer of the Parcels, Seller will offer to dedicate the remaining portion of the Public Trail Area consisting of that area depicted and described in Exhibit "E-3" ("Future Trail Dedication Area"). The Parties contemplate that the Future Trail Dedication Area may be relocated in connection with Buyer's approval of a Specific Plan for the Property and subject to Seller's agreement and consent of the California State Coastal Conservancy. The area within which the Future Trail Dedication Area may be relocated is depicted in Exhibit "E-4" ("Alternate Future Trail Location").

D.    Buyer's purchase of the Parcels is being funded by the California State Coastal Conservancy ("Conservancy"), which will require certain conditions in connection with Buyer's acquisition of the Parcels set forth in this Agreement. Buyer's acquisition of the Parcels is contingent on the availability of grant funds from the Conservancy ("Conservancy Grant") and recordation of an offer to dedicate the Parcels and Public Trail Area to the Conservancy on terms specified by the Conservancy.

E.      Seller is in the process of investigating and remediating contaminants on and under the Property, including on the Parcels and the Public Trail Dedication Area, to satisfy the requirements of the California Department of Toxic Substances Control ("**DTSC**"), the public agency with oversight responsibility.  The Parties contemplate that the Parcels and the Trail Conveyance Area will be conveyed after DTSC issues a "no further action" letter, a "certificate of completion" under any statute allowing for or contemplating such certificate, or other documentation confirming that the remedial action plan for the Parcels and the Trail Conveyance Area (other than long-term monitoring, operations and maintenance, and/or recordation of deed restrictions or other land use controls) has been completed to DTSC's satisfaction.

## A G R E E M E N T

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, Buyer and Seller hereby agree that the above recitals are true and correct and further agree as follows:

1.      Purchase and Sale of Property.  Seller agrees to sell and Buyer agrees to purchase the Parcels under the terms and conditions of this Agreement.

2.      Purchase Price.  The purchase price for the Parcels (the "**Purchase Price**") is Four Million, One Hundred Forty Five Thousand Dollars ($4,145,000).

3.      Opening of Escrow.  Upon the execution of this Agreement, Seller and Buyer shall open an escrow (the "**Escrow**") with Redwood Empire Title Company of Mendocino County ("**Escrow Holder**"), located at P.O Box 238, 376 East Gobbi Street, Ukiah, CA 95482, Attn: Peggy Fimbres, by delivering a fully executed copy of this Agreement to Escrow Holder.  Escrow Holder will execute copies of this Agreement and return fully executed copies hereof to Buyer and Seller when Escrow has opened.  Escrow shall be deemed open upon Escrow Holder's execution hereof.  The parties agree to be bound by the standard escrow General Provisions attached hereto as Exhibit "F" and incorporated herein by this reference.  In the event of any discrepancy between this Agreement and such General Provisions, the provisions of this Agreement shall prevail.

4.      Closing Contingencies.  Buyer's obligation to purchase the Parcels and Seller's obligation to sell the Parcels and to dedicate and convey the Public Trail Area are contingent on the following, which are conditions on the close of escrow ("Closing").

(a)      Site Remediation.

(i)      The close of escrow is contingent on and shall not occur until after the deposit in escrow of a "no further action" letter, a "certificate of completion" under any statute allowing for or contemplating such certificates, or other documentation confirming that the remedial action plan (other than long-term monitoring, operations and maintenance, and/or recordation of deed restrictions or other land use controls) has been completed to DTSC's satisfaction (a "**Completion Notification**") for each Parcel and the Trail Conveyance Area.  The Completion Notification(s) for the Parcels and the Trail Conveyance Area shall collectively be referred to in this Agreement as the "**OU-A Completion Notification**".

2

(ii)    Buyer shall reasonably cooperate with Seller with respect to the performance of the work necessary to obtain the OU-A Completion Notification. Seller shall have no obligation under this Agreement to undertake or complete work necessary to obtain the OU-A Completion Notification and Seller's failure to perform such work or obtain the OU-A Completion Notification shall not constitute a breach of this Agreement. Seller, in Seller's sole discretion may decline to perform the work to obtain the OU-A Completion Notification for any reason, including, without limitation, if Seller determines that the estimated cost to perform the work to obtain the OU-A Completion Notification is more than half of the amount of the Purchase Price.

(iii)    The Parcels and Trail Conveyance Area shall be subject to any required land use restrictions or controls imposed by DTSC or other public agency with regulatory authority over the environmental remediation of those properties (collectively, **"Remediation Agencies"**). The close of escrow is contingent on and shall not occur until Buyer's deposit in escrow of all duly executed and notarized instruments that are either (A) required by Remediation Agencies to effect such restrictions and controls or (B) otherwise necessary (as determined by Remediation Agencies) to assure that Buyer and Buyer's successors in interest are bound by such land use restrictions or controls as DTSC may require after the Closing.

(b)    Availability of Funds. Buyer and Seller acknowledge that the funds for payment of the Purchase Price will be provided through the Conservancy Grant. Buyer shall have no obligation to Purchase the Parcels if the Conservancy Grant expires or if the full amount of the Conservancy Grant is not deposited in escrow before close of escrow. The close of escrow is contingent on the deposit of separate escrow instructions from the Conservancy regarding the deposit and disbursement of funds and the approval of such instructions by Buyer and Seller.

(c)    Removal of Structures. The close of escrow is contingent on and shall not occur until after Seller has removed structures in accordance with Section 6 below.

(d)    Conservancy Offer to Dedicate. The close of escrow is contingent on and shall not close until Buyer's deposit in Escrow of a duly executed and notarized Offer to Dedicate in favor of the Conservancy in the form attached as Exhibit "G" (**"Conservancy OTD"**).

(e)    Easement Agreement. The close of escrow is contingent on and shall not close until Buyer's deposit of a duly executed and notarized easement agreement in the form attached as Exhibit "K" ("Easement Agreement").

(f)    Condition of Title. The close of escrow is contingent upon Buyer's written acceptance of the condition of title , including acceptance of any exceptions noted in a preliminary title report and property conditions reflected in an ALTA survey, both of which shall be provided to Buyer by Seller not more than 3 months prior to the close of escrow.

5.    Public Trail Conveyance and Dedication. At the close of escrow, the following shall occur:

3

(a)     In connection with the conveyance of title to Parcels to Buyer, Seller shall concurrently convey the Trail Conveyance Area.

(b)     Following the conveyance of title to Buyer of the Parcels and the Trail Conveyance Area, the Escrow Holder shall record an irrevocable offer to dedicate the Future Trail Dedication Area in the form attached as Exhibit "H" ("**Future Trail OTD**"). Buyer shall have no obligation to accept the Future Trail OTD until after both of the following occur:

(i)     Issuance of a Completion Notification for all of the land within the Future Trail Dedication Area (or, for all of the land within the Alternate Future Trail Dedication Area, if the Future Trail OTD is amended under the process described in subsection 5(e), below). The Completion Notification for the Future Trail Dedication Area (or Alternate Future Trail Dedication Area) shall be referred to in this Agreement as the **"Future Trail Completion Notification"**; and

(ii)     Seller has notified Buyer that all known buildings, foundations and transite and asbestos pipes have been removed from that land in accordance with "Structure Removal" as defined in Section 6 below.

(c)     Nothing in this Section 5 creates an obligation on the part of Buyer to accept the Future Trail OTD.

(d)     Seller shall, in good faith and in a reasonable time frame and manner, endeavor to undertake activities that result in the issuance of the Future Trail Completion Notification and in the Structure Removal.

(e)     The purpose of the Future Trail OTD is to dedicate land that will be used to construct a segment of a public trail that will connect to two other segments of the public trail that will exist or be constructed on the Trail Conveyance Area immediately to the north and south of the Future Trail Dedication Area. In the event that it is not reasonably practicable for Buyer to construct and maintain a public trail within the Future Trail Dedication Area that accomplishes this purpose, the Future Trail OTD specifies a process by which Seller and Buyer will identify an alternate location for the Future Trail Dedication Area and for amending the Future Trail OTD once that alternate location is determined. Under that process, Buyer and Seller (or successors) shall meet and confer to reach an agreement on an alternative location ("**Alternate Future Trail Dedication Area**"). The Alternate Future Trail Dedication Area shall accomplish the purpose of the Future Trail OTD, as specified above, shall comply with such reasonable criteria as the Conservancy may provide, shall be located within the Alternate Future Trail Location and shall be placed so that construction of the public trail is reasonably practicable for Buyer. In the event that Buyer and Seller are unable to reach an agreement, Buyer and Seller agree to engage in a mediation with a mediator acceptable to both Buyer and Seller for the purpose of finalizing an agreement regarding the actual location and boundaries of the Alternate Future Trail Dedication Area. The Conservancy shall be notified of the mediation and may elect to participate in the mediation. Buyer and Seller shall each pay one-

4

half (1/2) of the cost of the mediation. If Buyer and Seller are unable to reach agreement through mediation, the Buyer and Seller agree that the mediator shall render a decision, consistent with the criteria specified above, as to the Alternate Future Trail Dedication Area, which decision shall be binding on the Buyer and Seller. Upon agreement of the parties or conclusion of the mediation, the Seller shall amend the Future Trail OTD to reflect the Alternate Future Trail Dedication Area as the land dedicated by the Future Trail OTD.

(f) In the event Buyer accepts the Future Trail OTD, whether as originally described or as subsequently amended, Buyer shall take title to the Future Trail Dedication Area upon recordation of a Certificate of Acceptance in substantially the form attached as Exhibit "I" ("**Acceptance**").

(g)     The acceptance by Buyer of the Trail Conveyance Area and the dedication by Seller of the Future Trail Dedication Area and subsequent remediation by Seller of the Future Trail Dedication Area (or Alternate Future Trail Dedication Area) shall satisfy all of Seller's obligations for land dedication for a coastal trail. Further, Buyer shall not impose any land use restrictions, set back requirements or other land use or regulatory conditions on the development of the adjacent Retained Property, except as in accordance with the City's normal land use regulations and a Specific Plan that will be developed and adopted for the Property. Seller acknowledges that setbacks, "buffers" or other land use restrictions may be imposed on the Property by other regulatory agencies.

(h)     The provisions of subsections 5(b) through 5(g) above shall expressly survive the Closing.

6.     Removal of Structures. Prior to the close of escrow, Seller shall remove all known buildings and foundations (except those that Buyer informs Seller in writing shall not be removed) and any known transite or asbestos containing piping ("**Structure Removal**") on the Parcels and on the Trail Conveyance Area. Seller shall have no obligation to commence or complete any Structure Removal on the Future Trail Dedication Area if the Future Trail OTD is amended as described in Sections 5(b) and 5(e). Seller shall have no obligation to complete any Structure Removal on the Future Trail Dedication Area (or Alternate Future Trail Dedication Area) until 60-days after receipt of the Future Trail Completion Notification for the entire Future Trail Dedication Area (or Alternate Future Trail Dedication Area) or such additional time as is necessary to complete such removal not to exceed 6 months.

7.     Closing.

(a)     Time and Place. Escrow will close 60-days after Seller deposits in Escrow the OU-A Completion Notification as to each of the Parcels or such additional time as is necessary to satisfy the closing contingencies described in Section 4 herein ("Closing"). Subject to those closing contingencies in Section 4 being satisfied, Closing shall occur no later than June 30, 2010.

(b)     Notification of Conservancy. Escrow shall provide to the Conservancy copies of all documents executed by Buyer and all notices, instruments recorded at Closing and other documents sent or delivered by Escrow to Buyer.

(c)    Title Policy. As a condition to the Closing for Buyer's benefit, Seller shall cause the Title Company to prepare or commit to deliver to Buyer a CLTA Owner's Policy of Title Insurance insuring the Parcels, the Public Trail Area and the Alternate Future Trail Location with a policy limit in the amount of the Purchase Price with regional exceptions. Seller shall provide to Buyer an ALTA Survey as previously commissioned and obtained by Seller. If Buyer requires an extended coverage ALTA Owner's Policy of Title Insurance or endorsements for either policy, Buyer shall notify Escrow Holder of such requirement and deliver to Escrow Holder, at Buyer's sole cost and expense and in a timely manner so as to not delay the Closing, an updated ALTA survey adequate for the issuance of such ALTA extended coverage policy, and Buyer shall bear any other additional costs required for the ALTA upgrade. The title policy for the Parcels, the Public Trail Area and the Alternate Future Trail Location shall show title vested in Buyer subject only to:

(i)    The usual printed Title Company exceptions;

(ii)    All land use restrictions or controls imposed by the Remediation Agencies.

(iii)    All other exceptions approved in writing by Buyer or caused by Buyer.

(iv)    Any easements, rights-of-way, servitudes, permits, licenses, surface leases, covenants and other restrictions, encroachments, defects, claims or other matters of record or which would be ascertainable by a thorough physical inspection of the Parcels, the Public Trail Area and the Alternate Future Trail Location or an accurate ALTA/ACSM survey(s).

(d)    Seller's Obligations. At or prior to the Closing, Seller shall deliver, or cause to be delivered, to Buyer through Escrow:

(i)    A duly executed and notarized grant deed in the form attached hereto as Exhibit "J" conveying to Buyer the Parcels and the Trail Conveyance Area ("Grant Deed");

(ii)    A duly executed and notarized Future Trail OTD in the form attached as Exhibit "H." ;

(iii)    A FIRPTA certificate along with any applicable State or local law equivalent in the forms customarily used by the Title Company duly executed by Seller; and

(iv)    Such additional documents and instruments as may be reasonably and customarily required to consummate the transaction contemplated by this Agreement provided that Seller shall not be required to make any representations or warranties or undertake any obligations except as otherwise already expressly provided for herein.

(e)    Buyer's Obligations. At or prior to the Closing, Buyer shall deliver to Seller through Escrow:

6

(i)     The Purchase Price, plus Buyer's share of closing costs, pursuant to Section 8;

(ii)    A duly executed and notarized certificate of acceptance of the Grant Deed attached is Exhibit "J.";

(iii)   All duly executed and notarized instruments required by Remediation Agencies, if any, in accordance with the terms of Section 4(a)(iii) herein;

(iv)    A duly executed and notarized Easement Agreement in the form of Exhibit "K".;

(v)     A duly executed and notarized Conservancy OTD in the form of Exhibit "G".;

(vi)    Such additional documents and instruments as may be reasonably and customarily required to consummate the transaction contemplated by this Agreement;

(f)     Order of Recording at Closing. At the Closing, Escrow is instructed to record the instruments deposited by the Parties in Escrow in the following order:

(i)     The Grant Deed.

(ii)    The Future Trail OTD.

(iii)   All instruments deposited by Buyer as set forth in Section 7(e).

(iv)    The Easement Agreement.

(v)     The Conservancy OTD

8.     Costs and Prorations.

At the Closing, Buyer and Seller shall each pay one-half (1/2) of the Escrow fees. Seller shall bear the cost of (a) all documentary transfer taxes, (b) the premium required for the CLTA Owner's Policy of Title Insurance with regional exceptions issued by LandAmerica Commercial Services (the "Title Company"), insuring Buyer as set forth in Section 7(c) above and (c) recording the Deed, the Future Trail OTD, the Easement Agreement and the Conservancy OTD. Buyer shall bear the cost of (a) any increased premium attributable to endorsements requested by Buyer, (b) any increased premium attributable to the delivery of an extended coverage ALTA Owner's Policy of Title Insurance, and (c) the costs of any additional ALTA Survey(s).

9.     Termination/Failure to Close.

(a)     Termination of Agreement. Unless extended by the Parties, this Agreement shall terminate on July 1, 2010.

7

(b)      Indemnity of Seller. Buyer hereby agrees to defend (with counsel reasonably acceptable to Seller), protect, indemnify and hold harmless Seller and its affiliates, successors, predecessors, officers, directors, managers, members, employees, contractors, shareholders and agents, from and against any and all fees, losses, costs and expenses, including reasonable attorneys' fees and court costs, and all claims, damages, causes of actions, remedial actions, demands, liabilities, payments, suits, recoveries and judgments of every nature and description, made, filed, asserted, brought or recovered against or incurred by any of the aforementioned parties, arising out of, in connection with or in any way due to Buyer's breach of the terms, or conditions of this Agreement. This indemnity shall expressly survive Closing or delivery of any deed and is meant, without limiting the foregoing, to cover any failure by Buyer to comply with any post-Closing institutional controls applicable to the Parcels and the Public Trail Area, including the Future Trail Dedication Area or Alternate Future Trail Dedication Area, acquired by Buyer and included in an approved cleanup plan, except as to any such controls as are designated in an approved clean-up plan as being the responsibility of Seller.

(c)      Indemnity of Buyer. Seller hereby agrees to defend (with counsel reasonably acceptable to Buyer), protect, indemnify and hold harmless Buyer and its officers, officials, representatives, employees, contractors, and agents, from and against any and all losses, costs and expenses, including reasonable attorneys' fees and court costs, and all claims, damages, causes of actions, remedial actions, demands, liabilities, payments, suits, recoveries and judgments of every nature and description, made, filed, asserted, brought or recovered against or incurred by any of the aforementioned parties, arising out of, in connection with or in any way due to Seller's breach of the terms, or conditions of this Agreement. This indemnity shall expressly survive Closing or delivery of any deed and is meant, without limiting the foregoing, to cover any failure by Seller to comply with any institutional controls applicable to the Parcels and the Public Trail Area, including the Future Trail Dedication Area or Alternate Future Trail Dedication Area, for which responsibility for compliance with such controls has been assigned to Seller in an approved cleanup plan.

(d)      Cancellation Charges. If a Closing does not occur due to the default of one of the parties, the defaulting party shall bear the sole and full liability for paying any escrow and title cancellation fees and charges. If the failure to close is not due to the default of one of the parties, the parties shall split equally any escrow and title cancellation fees and charges.

10.      Buyer's Acceptance of Property Condition. Buyer is acquiring the Parcels and takes title to the Trail Conveyance Area and, upon acceptance of the Future Trail OTD, will take title to the Future Trail Dedication Area (or the Alternate Future Trail Dedication Area, if the Future Trail OTD is amended as contemplated in the Future Trail OTD and in Section 5(e) of this Agreement) "AS IS, WHERE IS" without any representation or warranty by Seller, except as set forth in Section 11. Seller hereby expressly disclaims and negates any and all representations and warranties of any kind, whether express or implied, relating to the condition, the presence of hazardous materials, suitability, merchantability or fitness for a particular use or purpose of the Parcels and the Public Trail Area. Seller will provide Buyer with information reasonably available to Seller relating to the investigation and remediation of hazardous materials at the Parcels and Public Trail Area to allow Buyer to conduct all appropriate inquiries and to accommodate Buyer's effort to minimize Buyer's potential liability as an owner of

8

property impacted by hazardous materials and qualify as a "bona fide purchaser" or a "bona fide prospective purchaser" under state or federal law, respectively. Seller makes no representations or warranties whatsoever that Buyer is or will qualify as a "bona fide purchaser" or a "bona fide prospective purchaser" under state or federal law.

11.   Limited Environmental Warranty.  Seller represents and warrants that as of the Closing the Parcels and the Trail Conveyance Area will have been remediated to a level consistent with passive recreational use as that level of remediation is described in the Final Operable Unit A Remedial Action Plan and Feasibility Study, Former GP Wood Products Facility, Fort Bragg, August 2008 ("DTSC Recreational Use Standards").  Seller further represents and warrants that upon the issuance of the Future Trail Completion Notification, the Future Trail Dedication Area (or the Alternate Future Trail Dedication Area, if the Future Trail OTD is amended as contemplated in the Future Trail OTD and in Section 5(e) of this Agreement) will have been remediated at least to a level consistent with the DTSC Recreational Use Standards and that allows for all of the permitted uses for the dedicated land, as specified in the Future Trail OTD ("Future Trail Recreational Use Standards").

(a)   Subject to all applicable terms and conditions of this Section 11, Seller hereby agrees to indemnify Buyer for any Environmental Expenses incurred by or any Environmental Claims brought against Buyer and resulting from any breach of this Limited Environmental Warranty by Seller; provided however, that Seller shall not have any obligation or liability hereunder for any such Environmental Expenses or Environmental Claims that Buyer reasonably could have avoided by asserting any available immunity or immunities, whether arising under the Polanco Redevelopment Act or any other provision of state or federal law, and provided further, that Seller's liability under this Section 11 shall not exceed $1 million.  Buyer acknowledges and agrees that its sole and exclusive remedy against Seller with respect to any Environmental Claims or Environmental Expenses shall be pursuant to the provisions of this Section 11.

(b)   Notwithstanding any other provision of this Agreement to the contrary, with respect to Environmental Expenses or Environmental Claims related to the Parcels and the Trail Conveyance Area, the obligations of Seller to Buyer pursuant to this Section 11 shall terminate one hundred twenty (120) months after the Closing and, with respect to Environmental Expenses or Environmental Claims related to the Future Trail Dedication Area (or the Alternate Future Trail Dedication Area, if the Future Trail OTD is amended as contemplated in the Future Trail OTD and in Section 5(e) of this Agreement), the obligations of Seller to Buyer pursuant to this Section 11 shall terminate one hundred twenty (120) months after the issuance of the Future Trail Completion Notification.

(c)   "Environmental Expenses" includes consulting and investigation fees, feasibility studies, repair, detoxification, closure or other clean-up costs, attorneys' fees actually incurred including, without limit, fees incurred in evaluating, reviewing and supervising the response, removal and remediation measures and in negotiating, litigating, satisfying or settling any Environmental Claims.

(d)   "Environmental Claim" means any actual or threatened complaint, demand for information, legal action or administrative proceeding, lien, order, directive, claim,

citation or notice by any federal, state or local governmental authority with respect to compliance with DTSC Recreational Use Standards on the Parcels and Trail Conveyance Area, or with respect to the Future Trail Recreational Use Standards on the Future Trail Dedication Area (or the Alternate Future Trail Dedication Area, if the Future Trail OTD is amended as contemplated in the Future Trail OTD and in Section 5(e) of this Agreement). The term "Environmental Claim" includes, without limitation, any and all enforcement, clean-up, remedial, removal or other governmental regulatory action initiated, completed, pending or threatened, or for any third party claim for property damage arising out of contamination on the Parcels, the Trail Conveyance Area, or the Future Trail Dedication Area (or the Alternate Future Trail Dedication Area, if the Future Trail OTD is amended as contemplated in the Future Trail OTD and in Section 5(e) of this Agreement), that resulted from industrial activities that occurred on said Parcels or Public Trail Area prior to Closing.

12.   Waiver of Subdivision Map. Pursuant to Government Code §66428(a)(2), conveyance of the Parcels and the Public Trail Area  does not require a subdivision map or other approval under the Subdivision Map Act. Buyer waives any requirement for a parcel map or other proceeding under the Subdivision Map Act as a condition of the Closing on the Parcels and Trail Conveyance Area or the acceptance of the Future Trail OTD.

13.   Miscellaneous.

(a)   Notices. Any notices or other communications to be given or other documents to be delivered by any party hereto may be delivered in person to such party, or may be deposited in the United States mail, duly certified or registered, return receipt requested, with postage prepaid or delivered by Express Mail of the U.S. Postal Service or Federal Express or any other courier guaranteeing overnight delivery, charges prepaid. Notices and other communications may also be transmitted by facsimile. All notices, communications and/or payments should be addressed to the party for whom intended, as follows:

| | |
|---|---|
| Seller: | Georgia-Pacific LLC<br>133 Peachtree Street NE<br>Atlanta, Georgia 30303<br>Facsimile: (404) 584-1461<br>Attention: Michael Davis, Esq. |
| Buyer: | City of Fort Bragg<br>416 North Franklin Street<br>Fort Bragg, CA 95437<br>Facsimile: (707) 961-2802<br>Attention: Linda Ruffing |
| Conservancy: | California State Coastal Conservancy<br>1330 Broadway, 13th Floor<br>Oakland, CA 94612-2530<br>Facsimile: (510) 286-0470<br>Attention: Matt Gerhart |

Escrow Holder:                    Redwood Empire Title Company of Mendocino
                                  County
                                  P.O. Box 238
                                  376 East Gobbi Street
                                  Ukiah, California 95482
                                  Facsimile: (707) 462-5010
                                  Attention: Peggy Fimbres

        Any party hereto may from time to time, by written notice to the other, designate a different address which shall be substituted for the one above specified. Any notice, document or payment sent by registered or certified mail shall be deemed served or delivered seventy-two (72) hours after the mailing thereof as above provided. Any notice, document or payment sent by overnight service shall be deemed delivered twenty-four (24) hours after delivery of the same, charges prepaid, to the carrier. If any notice is transmitted by facsimile transmission or similar means, the same shall be deemed served or delivered upon confirmation of transmission thereof. Any notice or other document sent by any other manner shall be effective only upon actual receipt thereof.

        (b)    Entire Agreement. This Agreement, including the exhibits hereto, contains the entire agreement between the parties hereto pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties pertaining to such subject matter.

        (c)    Further Assurances. Each party agrees that it will execute and deliver such other documents and take such other action, whether prior or subsequent to the Closings, as applicable, as may be reasonably requested by the other party to consummate the transactions contemplated by this Agreement. The provisions of this subsection shall survive Closings.

        (d)    Captions. The captions used herein are for convenience only and are not a part of this Agreement and do not in any way limit or amplify the terms and provisions hereof.

        (e)    Governing Law. This Agreement and the exhibits attached hereto have been negotiated and executed in the State of California and shall be governed by and construed under the laws of the State of California. Any litigation concerning this Agreement shall be venued in Alameda County or in the City and County of San Francisco.

        (f)    Severability. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect; provided that the invalidity or unenforceability of such provision does not materially adversely affect the benefits accruing to any party hereunder.

        (g)    Amendments. No addition to or modification of any provision contained in this Agreement shall be effective unless fully set forth in writing by both Buyer and Seller.

11

(h)    Counterparts; Facsimile Signatures. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument. In order to expedite the transaction contemplated herein, telecopied signatures may be used in place of original signatures on this Agreement or any document delivered pursuant hereto, and Seller and Buyer intend to be bound by the signatures on the telecopied document.

(i)    Binding Agreement. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.

(j)    No Assignment. Buyer shall not, without Seller's prior written consent, assign or transfer Buyer's rights or obligations hereunder to any person, firm, partnership, corporation or other entity, whether by operation of law or otherwise.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written and such date shall be deemed the date of this Agreement.

SELLER:

GEORGIA-PACIFIC LLC, a Delaware limited liability company

By:    David Park
Its:    SVP - Strategy & Business Development

BUYER:

CITY OF FORT BRAGG, a municipal corporation

By:    Linda Ruffing
Its:    City Manager

12

# EXHIBIT B

AIR POLLUTION CONTROL DISTRICT    COUNTY OF MENDOCINO

890 North Bush St.    Courthouse - Ukiah, California    PH. 468

## APPLICATION

Authority to Construct [X]    Permit to Operate [ ]

### INSTRUCTIONS

A. This application must be filled out completely WITH ALL STATEMENTS ANSWERED. Please type or print.
B. Applications are incomplete unless accompanied by DUPLICATE copies of all plans, specifications and drawings required. Additional information may be required of applicant by air pollution control officer.
C. This application must be signed by a responsible member of the organization that is to operate the equipment for which application is made. INCOMPLETE APPLICATIONS ARE NOT ACCEPTABLE.

## APPLICATION INFORMATION

PERMIT TO BE ISSUED TO (Business license name of corporation, company, individual owner or governmental agency that is to operate the equipment): **Georgia-Pacific Corporation**

MAILING ADDRESS:    95437
NUMBER 90    STREET West Redwood Avenue    CITY OR COMMUNITY Fort Bragg, CA    ZONE

ADDRESS OR LOCATION AT WHICH THE EQUIPMENT IS TO BE OPERATED:
NUMBER    STREET Same As Above    CITY OR COMMUNITY    ZONE

GENERAL NATURE OF EMITTING SOURCE:
fuel burning equipment    Hog Fuel Boiler

EQUIPMENT DESCRIPTION. Pursuant to the provisions of the State Health and Safety Code and the Rules and Regulations of the Air Pollution Control District, copies of pertinent sections of which have been furnished applicant.

Type:

| Fuel Used | Operation | | Use | |
|---|---|---|---|---|
| [X] hogged waste | amount fuel/hour | 24 T (wet) | [X] | steam generation |
| [ ] natural gas | hours used/day | 24 | [X] | elec. pwr. gen. |
| [ ] oil | days used/week | 7 | [X] | space heating |
| [ ] waste | weeks used/year | 51 | [X] | Water heating |
| (describe) | | | [ ] | other |

TSP...

If oil, give grade _____    BTU/HR INPUT 183,600,000 (as operated)
270 × 10⁶

Boiler hp _____    Lbs/hr output 98,000 (as operated)
140,000

PRESENT STATUS OF EQUIPMENT (Check and complete applicable items):

|  | ESTIMATE STARTING DATE | ESTIMATE COMPLETION DATE |
|---|---|---|
| [ ] Construction or installation not started. | 10/1980 | 4/1981 |
| [ ] Construction or installation partly completed. | | |
| [ ] Construction completed. | | |
| [ ] Equipment is to be altered. | | |
| [ ] Equipment is partly altered. | | |
| [ ] Equipment has been altered. | | |
| [ ] Transfer of operator, owner or lessee. | | |
| [ ] Transfer of location. | | |

DEFENDANT'S EXHIBIT 240 Hilarides

If this equipment had a previous written permit give name of corporation, company or individual owner that operated this equipment and state previous Air Pollution Control District permit number, if known.

NAME    PERMIT NUMBER

Signature of responsible member of firm:    Date of application:

NAME    Permit Granted _____ [ ]

TITLE NORTHERN CALIFORNIA DIVISION MANAGER    Not Granted _____ [ ]

Granted subject to established conditions __ [ ]

PHONE NO. 964-5651    Permit Number _____ Validation _____

MCAPCD 12/76    .211.0

RECEIVED FEB 12 1980

AOMD00009388

<u>WOOD FIRED BOILER PERMIT DATA</u>

Manufacturer  TO BE SELECTED BY COMPETITIVE BIDDING    2.  Model  SAME AS (1)

Design Capacity:___N/A____HP 270,000,000  BTU/HR Input  140,000    lbs./hr. stea

Boiler Use TO GENERATE 400+ PSIG STEAM FOR ELECTRICAL POWER GENERATION

Expected Operation (specify weekly operation, i.e. %capacity operation hours/
day, days/week).

24 HOURS PER DAY, 7 DAYS PER WEEK

Fuel Type (wood species, waste type and % by weight if mix and % moisture of
fuel).

REDWOOD BARK AND MILL RESIDUES

56% MOISTURE

Fuel Usage Rate:  70%  % capacity,  15,050  dry lbs./hr.

Particulate Control Equipment:

a.  Methods(s)  MULTICLONE COLLECTOR - WET SCRUBBER

b.  Expected removal efficiency  97.7%

Auxiliary Fuel Usage:  _____ Yes  X  No; If yes, continue.

a.  Fuel Type

b.  Usage Conditions

Project Location (include a sketch of on site placement of the boiler):

AQMD0009389

ATTACHMENT

I.   PERMIT CONDITIONS

A.   Notification of start-up shall be made in writing at least 10 days prior to the date of anticipated initial start-up of the #5 wood-fired boiler.

B.   Equipment, facilities, and systems installed to achieve compliance with the terms and conditions of this Authority to Construct shall at all times be maintained in good working order and be operated as efficiently as possible so as to minimize air pollutant emissions.

C.   The Mendocino County Air Pollution Control District shall be notified in accordance with the provisions of Rule 540 of Regulation I of the California North Coast Air Basin Regulations, in the event of any failure of air pollution control equipment, or other equipment which results in an increase in the allowable emissions stated in (II A).

D.   In the event of changes in control or ownership of the facilities to be constructed, the terms of this Authority to Construct shall be binding on all subsequent owners and operators.

II.   SPECIAL CONDITIONS

A.   Particulate Control Device

1.   Georgia-Pacific Corporation shall install a high efficiency control device capable of meeting the limit specified in Condition B, following, for the new #5 boiler.

2.   The exhaust gases therefrom, shall be ducted through the control device at all times during its operation.

B.   Emission Limitations

On or after the date of start-up, Georgia-Pacific Corporation shall not discharge into the atmosphere particulate matter in excess of 0.03 gr/dscf @ 12% $CO_2$ (2 hour average) from the proposed #5 boiler.

Page 1 of 2

AQMD0009395

II.    SPECIAL CONDITIONS (continued)

    C.    Fuel Limitations

        A permanent record shall be kept for the #5 boiler that includes:

        1.    Amount of fuel oil burned each day;

        2.    Length of time fuel oil is burned;

        3.    Sulfur content of all fuel oils received.

        This record shall be available for periodic inspection by the Mendocino County Air Pollution Control District.

    D.    Performance Tests

        1.    Within 60 days after achieving the maximum production rate of the proposed facility, but not later than 180 days after initial start-up, and at such other times as specified by the Mendocino County Air Pollution Control District, Georgia-Pacific Corporation shall conduct performance tests for particulate matter, and furnish the Mendocino County Air Pollution Control District a written report of the results of such tests.  The tests for particulate matter shall be conducted at a steam production rate of 98,000 ± 5,000 lbs/hour and another at the maximum operating capacity of the facilities being tested.

        2.    Performance tests for particulate matter emissions shall be conducted and results reported in accordance with the methods set forth in Parts 60.8 and 60.46 of the Standards of Performance for New Sources on the equipment named in the foregoing sections. The Mendocino County Air Pollution Control District shall be notified in writing at least 10 days in advance of such tests.

AQMD0009396

# EXHIBIT C

GEORGIA-PACIFIC

intracompany memo

        J. A. Anderson                      location   Atlanta/9

from     S. Petrin                       location   Fort Bragg

subject   California Regulatory Activities         date   January 27, 1987

Enclosed are two items of concern to our facility and others in California. The first is a copy of correspondence forwarded to us by the Regional Water Quality Control Board (RWQCB) concerning allegations of chlorinated dibenzo-dioxins in our fly ash. This is even bigger than I had thought, though no regulatory agency has shown any great concern as yet. Also included was back-ground material and correspondence from when this problem first arose a couple of years ago. I have not included this material, but if you need more background I can send it along to you.

The other item is a packet of materials sent to local officials by the RWQCB. Their cover letter should make this self-explanatory. Note the two Georgia-Pacific facilities in Mendocino County, including Fort Bragg. This information came as a total surprise to us, as we first read about our inclusion on the list from the local newspaper! I immediately called the RWQCB to express my irritation at not being notified in advance on this and to have them send us these materials. My investigation of the matter leads me to believe that this is a regulatory over-action to a non-problem. It should be cleared up at our next inspection (March ?)

Call me if you have any questions.

S. Petrin

SP/hm

Attach

cc: D. G. Jacobszoon



DEFENDANT'S EXHIBIT

GPLA00133466

# EXHIBIT D



**Georgia-Pacific Corporation**

P.O. Box 1618
Eugene, Oregon 97440
(503) 689-1221 . . . . . . . QUALITY
CONTROL BOARD
REGION 1

MAY 23 '89

☐ CY ____  ☐ JG ____
☐ FR ___  ☐ KD ____
☐ RT ____  ☐ MK·U ____
☐ JH ____  ☐ A·L (AL)
☐ SW ____  ☐ ____
☐ RC ____  ☐ REPLY
☐ ALL STAFF ☑ FILE G-P FT.
BRAGG

May 16, 1989

Mr. Alder G. Thurman
Mayor
Mr. Gary Milliman
City Administrator
Fort Bragg City Hall
416 North Franklin Street
Fort Bragg, CA 95437

Dear Mayor Thurman and Mr. Milliman:

We appreciate your meeting with us April 28 to talk about the PCB spill
that occurred at our Fort Bragg mill in February.

During our discussion of the city's plan to test for dioxins in the community,
you expressed an interest in further information on the question of whether
dioxins can be formed in our boilers from PCBs or from any other source.
We are pleased to provide the following information. Again, let us emphasize
that we consider all this to have little significance as it relates to
our spill, since no PCB waste or contaminated cleanup materials of any
kind went into our boilers or onto our boiler conveyor.

The Environmental Protection Agency, in a National Dioxin Study of Combustion
Sources conducted at Research Triangle Park, North Carolina (September,
1987—excerpt from summary attached) outlines conditions important for
the formation of CDDs (dioxins). These include fuel, chlorinated chemicals
or chlorine (commonly found in marine environments in the form of salt)
and some very specific combustion temperatures.

The study shows that combustion temperatures must be in the range of 500
to 800 degrees centigrade (932 to 1472 degrees Fahrenheit) in order for
dioxins to form. Also necessary is a lack of adequate oxygen. Above 1245
degrees Fahrenheit, the level of dioxins that could be formed falls off
rapidly to near zero, according to EPA data printed in the Federal Register.

Georgia-Pacific operates its Fort Bragg boilers according to the manufacturer's
specifications at all times. These specifications indicate that normal
temperatures reach more than 1600 degrees Fahrenheit. And our boilers
operate at a very high oxygen rate (150%) to achieve complete combustion.
The EPA study clearly shows that dioxins would not form or survive at these
temperatures and oxygen levels. It thus stands to reason that any dioxins
that might show up in the environment in and around Fort Bragg did not
come from Georgia-Pacific's boilers.

GPLA00135523

It is our understanding that the consultant doing the dioxin testing for the city intends to investigate other possible sources if any dioxins are found.  Virtually any combustion device in the community that burns salt-laden wood, plastics, wet garbage or certain other wastes at lower temperatures would be a potential source.  Even automobiles that burn leaded gasoline are known to produce detectable amounts of dioxins.  ·

You have seen the information on the incident and on PCBs that our general manager, Lowell Ambrosini, sent to our Fort Bragg employees in late April. Lowell's letter covered most of the issues that have been raised as a result of the spill.  If you or any of those copied below have questions or concerns not covered in our communications to date, please get in touch with one of us at the above number or through our Fort Bragg office.

Sincerely,

David A. Odgers
Public Relations Director
Western Wood Products Manufacturing

Kent C. Mayer
Environmental Engineer
Western Operations

DAO/KCM:cdc

cc:  Members of the Fort Bragg City Council
     Members of the Mendocino County Board of Supervisors
     Mr. Randy Leach
     Mr. Edward L. Bridges
     Mr. Ronald H. Shock

GPLA00135524

# EXHIBIT E

**Stephens, Carol A.**

| | |
|---|---|
| **From:** | Ruse, Melodie S. |
| **Sent:** | Monday, April 14, 2003 2:25 PM |
| **To:** | 'Sedway-Lynn Sedway'; 'Wilson, Kay - PAM'; CALVIN CARLISLE; CAROL STEPHENS; CHARLES HOOD; DOUGLAS HEITMEYER; FRITZ MASON; GEORGE DANIEL; GREGORY THOMAS; JAMES BOSTIC JR; JULIE RAMING; KEITH BENTLEY; PEGGY SATO |
| **Subject:** | Last look at Talking Points for FB City Council Mtg |

These talking points include edits from Bostic, Bentley, Raming and Mason. If you have any other changes, please get them to me ASAP so I can get the final version to Doug.



4-11 Doug Talking
Points.doc

## 4/11/03 FORT BRAGG CITY COUNCIL MEETING
### TALKING POINTS
### DOUG HEITMEYER

- GP and Sedway, our land use planning group, had a kick-off meeting on Friday. We're just getting started, but we agreed that one of our first actions should be to come to this meeting tonight to hear what the City has to say. (The Sedway Group is made up of consultants that are experts in predevelopment planning, analysis and master planning; environmental engineering and evaluation of hazardous materials issues; civil and transportation engineering; and other disciplines.)

- We'll be setting up interviews very shortly with a variety of Fort Bragg stakeholders - the City, business people, NCA and other citizens groups, past employees, Native Americans, etc. - to listen to their ideas about the Fort Bragg mill site and hear their concerns.

- Then we'll set up a public meeting that will include a tour of the site. I would not commit to this at this point), a recap of what we learned from our initial interviews with stakeholders, and an opportunity for other members of the community to bring their ideas. The meeting date will be advertised in the local paper.

- All this should happen within the next month or two.

- IF ASKED, here are additional Q&A's.

**Q. We're concerned about environmental issues. What have you done to date to clean up the site? Are you following state and local regulations?**
**A.** TRC Environmental, Inc. was contracted by GP at the end of 2002 to perform a Phase I Environmental Assessment which was completed in the first week of February 2003. The purpose of the Phase I was to identify the presence or absence of any recognized environmental conditions (RECs) or areas of interest. It included site reconnaissance, interviews with current and past employees, a review of on-site, EPA, and state regulatory files related to the sawmill and surrounding properties, and researching historical information such as Sanborn Fire Maps and aerial photos. The findings of the assessment were consistent with what you would expect from a 100+-year old mill site - areas around transformers, oil storage and supply lines, hydraulic units that contained oil, solvents in the metal and mobile equipment shops and potential for buried debris.

1

Confidential                                                    GP000027235

Based on the Phase I results, a scope of work for the Phase II assessment was developed. Currently, the Phase II is being performed to confirm or negate the presence and extent of any contamination identified as a potential REC. This work should be completed by mid to late June 2003. Once the Phase II is completed, we will review our options with the North Coast District of the Department of Toxic Substance Control's (DTSC) Site Mitigation group and/or The Water Quality Control Board and determine what if any remediation will be required.

Concurrent with these assessments, we have been inventorying all of our hazardous and non-hazardous materials to determine proper disposition. Unused materials such as paints were given to the fire department, Holmes lumber, etc. Materials from the Nursery were generally given to other nurseries. Materials like used oil have been accumulated and will be picked up by an oil recycling company called Evergreen.

CUPA (Certified Unified Program Agency, a division of CAL EPA), supported by the Mendocino Health Department, requires GP to maintain a current chemical inventory and any disposition as required in our "Hazardous Materials Business Plan." An annual report the shows where the material is stored on site and disposition of all hazardous materials greater than 55 gallons, 500 pounds or 200 cubic feet (of gas) must be completed and submitted to the Mendocino Country Department of Environmental Health bi-monthly, acting as the local CUPA. An update is provided to the local fire department as well. In addition, CUPA continues to conduct periodic compliance inspections at the mill.

In addition to the Phase I and II environmental assessments, a specific plan will ultimately be prepared for the property that will be subject to further review according to the requirements of the California Environmental Quality Act (CEQA).

Q. **Do you intend to consider the ideas and visions of Fort Bragg citizens as you decide what to do with your property? Why haven't GP representatives attended any of the public meetings?**
A. From the time the mill closed, we have made sure that the City of Fort Bragg was kept apprised of our activities. As we move forward, we certainly want to make sure that the ideas and suggestions of the citizens of Fort Bragg are considered in planning for the property's eventual sale. It is our belief that obtaining the highest value and determining the best use for the property is in the best interest of Fort Bragg and GP.

We have not attended any meetings because, up to this point, we have not had any information to contribute. However, with the hiring of our land use planners, The Sedway Group, we will be working to incorporate input from community stakeholders through a series of interviews and community outreach meetings. We will run an ad in the Fort Bragg Advocate when the dates are determined for these meetings.

Q. **How long before the property is ready to be sold?**
A. One of the tasks Sedway will accomplish for us is to assess the property's value at a number of different stages in the development process. These include everything from meeting environmental requirements and selling the property "as is," to coming up with a development plan, to taking the property through entitlement (securing all plan and environmental approvals). We do not know when the property will be sold. As offers for the property are presented, we'll consider them. We see the process taking anywhere from two to five years.

Q. **Why so long?**
A. It takes time to do a thorough planning process, meet the requirements of a multitude of state and local regulatory agencies, and in troubled economic times such as those we're now facing, to find a buyer. We want to make sure we meet all the legal and governmental requirements, and we want to do what's

2

Confidential

best for GP and Fort Bragg. That's not a quick process.

Q. **Will you be taking down any buildings as part of your property cleanup?**
A. In January 2003, GP submitted a Coastal Development Permit application to begin the demolition process. This is a lengthy process and no decision has been made at this time as to exactly which buildings should be taken down. However, we wanted to have the permit in hand. The decision on which buildings to take down would be based on 1) the archeological survey, 2) future potential uses, and 3) structural integrity (i.e. construction shop).

The City's Community Development group has received a completed lead and asbestos survey, and we are in the process of completing an archeological survey.

3

Confidential

GP000027237

# EXHIBIT F



 **Georgia·Pacific Corporation**  *90 ⊮  .. Redwood Avenue*
*Fort Bragg, California 95437*
*Telephone (707) 964·5651*

CONFIDENTIAL

July 6, 1999

**To: Richard Benedetti – General Manager, GP-West**

**From: Ron Holen -  Plant Manager – Fort Bragg Lumber**

**Subject:  City of Fort Bragg General Land Use Plan Update**

RECEIVED

Project Name:
Project Number:

JUL 1 2 1999

RRM Design Group
3026 South Higuera Street
San Luis Obispo, CA 93401
Tel: 805-543/1794

The City of Fort Bragg is required every five years by State Law to update its General Land Use Plan. The process, which was started in 1994, gained renewed interest as a result of significant changes in the political make up of the City Council during the last Election.

The calls have intensified for detailed public planning, rezoning, and building moratoriums on GP's Mill Site Property west of Highway 1 in Fort Bragg . There is a deep interest in future development of this property in to a major attraction for the tourist industry and as a means of creating growth in the sectors of recreation, commercial, hotel, condo development, golf courses, and even an aquarium.  There is no public consensus and at this point it is in the hands of the City's Consultant Planner.  Their effort is directed at identifying how much of the property is currently employed by milling operations. That will be left zoned for now as Heavy Industrial. Then they will identify the new uses on the remainder and rezone for those uses.  Their plan would then go through a pre-zoning EIR, public comments and final approval.  The time line would have adoption by late spring of 2000.

Georgia-Pacific's position has steadfastly insisted that the entire property remain zoned Heavy Industrial, preserving historical Forest Products use.  This has not met with a great deal of resistance until now. However, the recent announcement by TTC to liquidate the Company's Northern California Land and Timber Assets has given new life to those who see a quick end to the Lumber Operation and desire to dictate the future land use of the Mill Site now. There is another contingent who are unhappy with Aquaculture and have sided with those who are against the Aquacultural Lease simply because it has pre-empted their plans for other uses for those portions of the GP properties.

Our goal is to insure that Georgia-Pacific Corporation is able to maintain maximum flexibility across it's ownership to build and conduct the on going business unencumbered and without having to define now what our future uses and needs might be.

Achieving our goal ensures that the maximum future developable acres and potential real estate value is preserved.  The alternate is to have the site carved up now for a host of other uses.  We view these uses to be largely incompatible if located contiguous to a lumber operation.  The bad

RRM003586

neighbor effect would soon make saw milling an untenable use, and in the end we would be faced with disposition of properties that have different zoning control that could well sub-optimize the value of the entire mill site.

We estimate an expense of $80m over the course of the next year to achieve our goal. This is for in-house staff and outside Council and Consulting. We will also spend a great deal of time building support and maintaining the goodwill of the Public, City and County political leadership, the Coastal Commission and even the Governor's Office.

The City's planning process has been stretched for a number of years, but is now reaching for a conclusion with relative speed. Even so, the process could last another year. During this time it is critical to our success that GP's public intentions for its business and properties on the site remain constant and unwaiving. If, during the planning process, there is evidence that GP has other plans for the properties, the political pressure on the planning entities to " exercise their fundamental right to determine the end use of the GP mill site" will be overwhelming. The risk of reduced value to GP in a real estate sale would be assured.

It is necessary to clearly point out this risk as we pursue our plan. Our plan follows: we have hired the law offices of Carter, Behnke, Oglesby, and Bacik and a land use planning consultant RRM Design Group, Inc. to work with our Corporate counsel as a team. We have and continue to obstruct and delay the planning process, to weaken the resolve of the Planning Commission and City Council. The process is costing the City a lot of money that they don't have. At an appropriate time we will offer compromise in the form of some small areas that in the long run do not add directly to the development value of the properties but are dear to the public wants. This will consist of public easement and controlled access to a narrow strip of headlands on both the north and south end of the property along with some financial aid to help develop the access. This will be in exchange for maintaining the current Industrial Zoning Classification on the entire plant site.

There are several other approaches to deal with these planning issues depending on the out come desired. Attached is a Report by RRM Design, which outlines several of these for our consideration. The report captures the essence of all of the issues with which we are dealing, as they impact the future value of this property. Having reviewed the various approaches and alternate outcomes, we maintain that our best course of action is one that leads to keeping the entire plant site intact and zoned for heavy industrial use for the foreseeable future.

I am recommending the plan as outlined above, and seek your concurrence, on behalf of Georgia-Pacific Corporation, that this course of action meets with Corporate approval.


Thank you.


Cc:  Jared Carter
     Keith Gurnee
     Doug Roberto


RRM003587

# EXHIBIT G



## CITY OF FORT BRAGG
416 NORTH FRANKLIN STREET, FORT BRAGG, CA 95437
PHONE 707/961-2827    FAX 707/961-2802

## MEMORANDUM

DATE:        June 2, 2004

TO:          Carol Stephens, Georgia Pacific, Senior Director of Corporate Real Estate

FROM:        Linda Ruffing, Community Development Director

SUBJECT:     Potential City Participation in Developer Solicitation for Georgia-Pacific Mill Site

As a follow-up to our conversation on May 19th regarding Georgia-Pacific's marketing of the Mill Site, and with considerable assistance from Walter Kieser of Economic & Planning Systems, we have identified a number of ways in which the City might be able to offer support to a developer solicitation process. A discussion item is included on the June 14th City Council agenda regarding possible City assistance in a developer solicitation, in order that the Council may provide direction regarding the scope and extent of the City's participation. Walter is trying to rearrange his schedule in order that he may attend the Council meeting and lend his insight and expertise to the discussion.

This memo identifies three general categories of cooperation that the City may be able to offer in a "joint" developer solicitation: initial supporting actions; assistance with preparation and evaluation of the developer solicitation; and commitment to a focused and intensive planning and entitlement process. I'm comfortable with the City's ability to deliver the various items listed below, and the list has been passed by our City Attorney.

I would like to receive any preliminary feedback that you might have, before submitting this list to the Council (in a staff report for the June 14th meeting). This is very much a "work in progress" and if there are other ways in which you think the City might be able to assist and/or if there are items that you would like to see reworded or stricken from the list—please let me know.   Thanks!

### INITIAL SUPPORTING ACTIONS

Initial Supporting Actions are activities that, if pursued diligently by the City, will help to facilitate reuse of the Mill Site, even in advance of any land use planning or development application being submitted. Initial Supporting Actions endorsed by the City Council could include:

CFB0140280

Re: G-P Mill Site Developer Solicitation
June 2, 2004
Page 2

- Preparation of Economic Development Strategy. The City is preparing an Economic Development Strategy that will help to establish economic development concepts and potential actions provide Plan is currently under preparation. It will be reviewed and refined by the City Council and the community.

- General Plan Amendment. The City is processing a General Plan Amendment that will expand the definition of allowable uses under the industrial designation applied to the Mill Site to include public open space and recreation uses.

- Redevelopment Plan Amendment. The City is evaluating potential amendments to its redevelopment plan which may increase funding capacity for the Fort Bragg Redevelopment Project Area which includes the Georgia-Pacific Mill Site.

- Facilitate Open Space Acquisition. The City will continue to support and facilitate a public acquisition of a portion of the Mill Site for open space and recreation purposes. This may include taking title to certain lands and assuming responsibility for management and maintenance.

- Consider redesign of the wastewater treatment facility. Changing the design or operation of the City's wastewater treatment facility may improve the utility or value of surrounding real estate. The City is considering its options in this regard and seeking grants that may be available to fund desired improvements.

- Facilitate transfer of G-P Water Rights. The City will continue to work with Georgia-Pacific and/or future property owner(s) to facilitate a change in ownership of Georgia-Pacific's water rights in an effort to ensure water availability for future development on the Mill Site.

- Establish and maintain liaison with regulating agencies. There are a number of other governmental agencies that will have jurisdiction over the reuse of the Mill Site including the Coastal Commission and the Regional Water Quality Control Board. The City will engage these agencies as a part of its efforts to promote desired reuse of the Mill Site.

## DEVELOPER SOLICITATION

The Developer Solicitation is the document and process used to attract a qualified developer (or developers) to the project. The City Council could offer to assist Georgia Pacific with a developer solicitation, including the following items:

- Prepare developer solicitation document copy. The City will provide information, data, text, and policy statements for inclusion in the developer solicitation document based on the documentation developed for the City's planning process. This

CFB0140281

Re: G-P Mill Site Developer Solicitation
June 2, 2004
Page 3

contribution could include a statement of the "development opportunity" that derives from the ongoing Community Planning Process.

- <u>Provide Letter of support and commitment</u>. The City Council will provide a letter of interest and support, consistent with the community objectives and development opportunities identified in the Community Planning Process, and mandated planning, environmental review, and entitlement procedures.

- <u>Assistance with distribution</u>. The City (and its consultants) will augment the distribution list for the solicitation with nationally based developers and builders.

- <u>Assistance with evaluation and screening</u>. The City is willing to assist with evaluation and screening of the developer responses. This will provide a public input to the developer selection and strengthen subsequent relationships between the selected developer(s) and the City.

## PLANNING PROCESS AND DECISIONS

If the City is assured that the selected developer will be responsive and supportive of adopted or expressed City policies and programs and will be fully cooperative, it will do everything in its authority to assure an efficient and effective planning process. In any case, the process will be complex and there are many aspects that are uncertain and difficult to control, including the actions of third party agencies and interests.

- <u>Assembly of Project Team and Provision of Integrated Planning Process</u>. The City will assemble a special team composed of City staff and selected consultants to manage the planning process. This effort will need to be funded by the selected developer. The Project Team will orchestrate a state-of-the-art integrated and efficient planning, environmental review, and entitlement process. This will include priority attention from City staff, the Planning Commission and the City Council for all hearings and major decisions, parallel preparation and processing of the Specific Plan and EIR, and bundling of other supporting actions such as approval of development agreements, tentative maps, etc.

- <u>Ongoing Planning Commission and City Council involvement</u>. The City Council and Planning Commission will provide ongoing attention to the project and continuously monitor progress, establish priorities, and make decisions that assure timely processing of the development applications and related implementing documents.

CFB0140282

Re:    <u>Georgia-Pacific, LLC v. OfficeMax Incorporated, et al.</u>
       <u>United States District Court, Northern District Case No. 3:12-cv-02797-RS</u>

## <u>PROOF OF SERVICE – ELECTRONIC TRANSMISSION</u>

STATE OF CALIFORNIA/COUNTY OF San Francisco

I am a citizen of the United States and an employee in the County of San Francisco. I am over the age of eighteen (18) years and not a party to the within action. My business address is BASSI, EDLIN, HUIE & BLUM LLP, 500 Washington Street, Suite 700, San Francisco, California 94111.

On the date executed below, I electronically served the document(s) via USDC Northern District ECF website, described below, on the recipients designated on the Transaction Receipt located on the USDC Northern District ECF website.

**DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER TO THE SECOND AMENDED COMPLAINT BY GEORGIA-PACIFIC, LLC, AND FIRST AMENDED COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL**

On the following parties:

PLEASE SEE SERVICE LIST PROVIDED BY USDC NORTHERN
DISTRICT ECF WEBSITE

I declare under penalty of perjury that the foregoing is true and correct and that this document is executed on June 23, 2014, at San Francisco, California.

KATRINA E. HARDY

822857

42

DEFENDANT THE CITY OF FORT BRAGG'S FIRST AMENDED ANSWER AND COUNTERCLAIM AGAINST GEORGIA-PACIFIC LLC, AND DEMAND FOR JURY TRIAL