UNITED STATES DISTRICT COURT

Northern District of California

San Francisco Division

| | |
|---|---|
| GEORGIA-PACIFIC LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>OFFICEMAX INC, et al.,<br><br>        Defendants.<br>_____/ | No. C 12-02797 WHO (LB)<br><br>**ORDER REGARDING DISCOVERY DISPUTE AT ECF NO. 195** |

    In the parties' discovery dispute at ECF No.195, OfficeMax wants ESI from five GP senior executives: (1) Jim Hannan, the CEO from 2006 to the present who received reports from GP's project manager at the Fort Bragg site and was "actively involved" in decision making about remediation at the mill site; (2) Stewart Hom, GP's chief toxicologist, who "consulted on dioxin issues at this site"; (3) Mike Rehwinkel and Tom Stephens, members of GP's "ad hoc 'Fort Bragg Executive Steering Committee'"; and (4) Sam Stephens, "identified as a member of the Fort Bragg 'Project Team' tasked with handling tax issues, including testimony before the Mendocino County tax assessor about the history of the mill, closure, and post closure use of the property.'" Joint Letter Brief, ECF No. 195 at 1.

    The ESI primarily at issue is executive emails. *Id.* OfficeMax proposes (1) production of all ESI of these five persons (servers, shared files, laptops, blackberries, and home computers) within five days to a qualified outside consultant, (2) a search by the consultant of all emails and

C 12-02797 WHO (LB)
ORDER

1  attachments that contain the word "Bragg" or are to or from TRC, Arcadis, and AME (all GP's
2  consultants) and the generation of a list of each document including metadata including to, from,
3  date, and subject, with five days thereafter for GP to provide a privilege log and production
4  thereafter by GP within 72 hours, and (3) production of all five persons for deposition within three
5  weeks of the ESI production. *Id.* at 2.

6      GP resists production on the ground that the email production will cost it $7,000 to $10,000 per
7  custodian, and – given what it characterizes as marginal relevance – it wants cost shifting. *Id.* at 3-4.
8  It notes the asymmetrical discovery costs so far in this litigation, points out that key documents
9  relating to these custodians have been produced through other custodians, and states that there is no
10 reason to think that any relevant documents relating to these custodians have not already been
11 produced. *Id.* It nevertheless offers to review and produce these custodians' ESI if costs are shifted.
12 *Id.* at 5.

13     At the hearing, GP offered the following additional information. First, it said that Mr. Hannan
14 had involvement regarding Fort Bragg on a handful of occasions. There was one meeting when
15 remediation was discussed, and he provided oversight only on a very high level and not day to day.
16 Similarly, the other custodians were not the key witnesses on the remediation issues. Second, it
17 reiterated that substantially all (if not all) of the ESI has been produced through other custodians.
18 Documents (such as spreadsheets, analyses, and reports) would have been produced. In response to
19 the question about whether emails from key custodians had been processed and produced, GP
20 suggested that they had.

21     There are tensions here with what the right answer is. On the one hand, GP's assertions of non-
22 relevance are all made by counsel and are not grounded in actual fact assertions (such as those
23 through declaration, deposition, or otherwise). (This is the same problem that attended GP's
24 assertions of privilege in the separate disputes starting at ECF No. 176.) On the other hand, when
25 OfficeMax's broad ESI requests are paired with its suggested single keyword to search the ESI, the
26 resulting production arguably would be unnecessarily vast. The court also notes that the ESI
27 requested for three of the custodians is not tied to a time period for any documents and emails
28 already produced. This is not the targeted and proportionate discovery required by Rule 26 and this

court's Guidelines For the Discovery of Electronically Stored Information (embodied most particularly in Guideline 1.03). The time frame that OfficeMax proposes does not engender confidence in its motives, either. The court also is concerned about the utility of a scrubbed search for emails of custodians that GP asserts are of marginal usefulness. Also, at this point in discovery, OfficeMax ought to be able to point to examples of discovery that show the importance of these custodians, and it has not.

The ordinary model for cost-shifting in ESI cases can involve shifting only when the discovery is not accessible, and otherwise, the producing party bears the costs. That being said, cost shifting can occur for disproportionate ESI production requests. *See* Model Order Regarding E-Discovery In Patent Cases. The point of the model order regarding e-discovery – which is not limited in its utility to patent cases and instead is persuasive in any complex litigation – is that a party may propound broad discovery requests (like the ones here) as long as the propounding party is willing to pay for it. *Id.* The model order also recognizes the utility of specific and targeted email requests and the importance of time frame and other limiting parameters. For example, waiting for emails until later in discovery allows counsel to understand the case and generate useful email searches (e.g., emails between these three persons in a three-week time period). The model order addresses the tension between overbroad and targeted email requests by allowing only targeted email requests to a limited number of custodians and shifting reasonable costs to the requesting party for email productions beyond the limits.

Balancing all of these considerations, and based on its discussions with the parties at the hearing (including GP's representations about what it has already produced), the court orders the following intermediate approach. One, if GP has processed and produced emails of its relevant custodians most responsible for the remediation issues at issue in this litigation, the parties should be able to verify this. Two, GP should be able to verify that, for example, its key custodians would necessarily be recipients of any emails regarding Fort Bragg that included the five executives and the consultants. That is how management hierarchy normally works. The main person responsible for an issue generally is on the emails. Sometimes the CEO or other executives are. Emails for managers up the chain sometimes are not produced in a key word search of the responsible

1  custodian's emails, but they generally always are if one includes recipient parameters (e.g., emails
2  between X and at least two of the following recipients). Assuming that this is true, then emails of
3  the executives ought to be retrievable without the expense of further processing.
4    The parties must meet and confer on these issues, include their technical/IT experts in that
5  discussion in accordance with the court's Guidelines for ESI, and include those experts in any
6  further hearing. The court observes that if emails from relevant custodians are processed, doing the
7  additional scrub described above to capture the executive emails should not be a big deal or
8  expensive (given the dollars at stake in the litigation).
9    This disposes of ECF No. 195.
10   **IT IS SO ORDERED.**
11   Dated: June 30, 2014                    _____
                                              LAUREL BEELER
12                                            United States Magistrate Judge