

HUNTON & WILLIAMS LLP
RIVERFRONT PLAZA, EAST TOWER
951 EAST BYRD STREET
RICHMOND, VIRGINIA 23219-4074


TEL    804 • 788 • 8200
FAX    804 • 788 • 8218


HARRY M. JOHNSON, III
DIRECT DIAL: 804.788.8784
EMAIL: pjohnson@hunton.com

FILE NO: 29073.398


August 12, 2014


Via Electronic Filing


Hon. Laurel Beeler
United States District Court for the
     Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102


Re:    *Georgia-Pacific LLC v. OfficeMax Incorporated, et al.*
        United States District Court, N.D. Cal. Case No. 12-02797-WHO


Dear Judge Beeler:

Counsel for all parties met and conferred on August 4, 2014, in an unsuccessful attempt to resolve a dispute over Defendants'[1] desire to take the deposition of James B. Hannan.  Mr. Hannan is the President and Chief Executive Officer ("CEO") of Georgia-Pacific LLC ("G-P").  On July 23, 2014, the City of Fort Bragg ("CFB") served its Notice of Taking Deposition of James Hannan.  On August 1, 2014, OfficeMax ("OMX") served its Joinder to the City of Fort Bragg's Notice of Taking Deposition of James Hannan and Request for Documents at Deposition.[2]  G-P seeks a protective order precluding the deposition pursuant to FRCP 26(c).


## GEORGIA-PACIFIC'S STATEMENT OF DISPUTE AND CONTENTIONS

As part of their continuing strategy to exploit the asymmetry of discovery in this case and to further harass G-P, Defendants now seek to take the deposition of the President and CEO of Georgia-Pacific.  To justify such an "apex" deposition, Defendants must show that Mr.

---

[1] Counsel for OMX has indicated to Georgia-Pacific that CFB wishes to join in its opposition.  At the time of filing, Georgia-Pacific has not received any confirmation directly from CFB regarding its wish to join in OMX's opposition.

[2] *See* Exhibits A and B to Declaration of Harry M. Johnson ("Johnson Decl.")  (CFB's Notice of Taking Deposition of James Hannan and OMX's Joinder to CFB's Notice of Taking Deposition of James Hannan, respectively).

ATLANTA   AUSTIN   BANGKOK   BEIJING   BRUSSELS   CHARLOTTE   DALLAS   HOUSTON   LONDON   LOS ANGELES
McLEAN   MIAMI   NEW YORK   NORFOLK   RALEIGH   RICHMOND   SAN FRANCISCO   TOKYO   WASHINGTON
www.hunton.com



Hon. Laurel Beeler
August 12, 2014
Page 2

Hannan's knowledge (i) is first-hand, (ii) is unique to him, (iii) is non-repetitive, and (iv) cannot be obtained via other discovery.  Defendants have not and cannot meet their burden.

Courts have long recognized the potential for abuse in depositions of the senior-most executives of large corporations.  "Virtually every court that has addressed deposition notices directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment."  *Celerity, Inc. v. Ultra Clean Holding, Inc.*, C 05-4374 MMC(JL), 2007 WL 205067, *3 (N.D. Cal. Jan. 25, 2007).  "Where a high-level decision maker 'removed from the daily subjects of the litigation' has no unique personal knowledge of the facts at issue, a deposition of the official is improper."  *Celerity*, 2007 WL 205067 at *3 (citations omitted).   "This is especially so where the information sought in the deposition can be obtained through less intrusive discovery methods (such as interrogatories) or from depositions of lower-level employees with more direct knowledge of the facts at issue."  *Id.* at *3.[3]  "'In determining whether to allow an apex deposition, courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods.'"  *Ellena*, Docket #48 at 3-4 (citing *Apple v. Samsung*, 282 F.R.D. 259, 262-63 (N.D. Cal. 2012)).

Mr. Hannan's knowledge is neither unique nor first–hand.  The Fort Bragg site is just one of countless issues over which the President and CEO has authority.  Mr. Hannan is responsible for the overall strategy and management of a company with over 35,000 employees at hundreds of locations worldwide.  Reporting to him directly are executives in charge of Sourcing, Human Resources, Legal, Packaging, Operations Excellence and Compliance, GP Foundation, Building Products, Strategy and Business Development, Consumer Products, Communications, and Finance.  Declaration of James B. Hannan ("Hannan Decl.") ¶¶ 3-4.  He has not directly overseen or managed Georgia-Pacific's operations at the Fort Bragg Site.  Nearly all his knowledge about the Fort Bragg Site is second-hand through reporting from

---

[3] The standard for "apex" depositions flows directly from FRCP 26(c), which states that the "court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including forbidding a deposition or limiting its scope.  Fed. R. Civ. P. 26(c)(1); *see Ellena v. Std. Ins. Co.*, Case No. C 12-05401 SC (LB), Docket #48, at 3 (Aug. 23, 2013).  Rule 26(b)(2)(C) provides that a court must limit discovery if: "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;  (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy , the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."



Hon. Laurel Beeler
August 12, 2014
Page 3

those individuals closer to the management of the Site.  He has only a general, high-level understanding of the activities there.  *Id.* ¶ 7.

Mr. Hannan did not even commence his tenure at G-P until after the key time periods in this action.  The CERCLA allocation claims involve contamination from activities at the Fort Bragg Mill Site from 1885 until its closure in 2002.  *See* G-P's Second Am. Comp., Docket #90, at ¶¶ 9-11.  The City of Fort Bragg's state law claims are based on alleged representations and damages up until June 2006.  *See* CFB's Second Suppl. Initial Discl., at 12-13 (Exhibit C to Johnson Decl.).  Mr. Hannan did not join G-P until 2006, and has held his position as CEO and President since 2007.  Hannan Decl. ¶ 1.  Since then, he has attended meetings during which the Fort Bragg Mill Site was a topic of discussion, but he has never directly overseen or managed any of G-P's operations in Fort Bragg.  *Id*. ¶ 11.

Because his knowledge about Fort Bragg derives from others (*id.* ¶ 9), Mr. Hannan is not the only source of information sought by Defendants.  Defendants have identified no Fort Bragg meeting or event that did not include other G-P employees.  Even when a senior executive does possess some personal knowledge of the issues in the case, courts will restrict efforts to depose him or her when others have the same knowledge or it is available through other means.  *See Celerity*, 2007 WL 205067, at *4-5 (granting protective order even though executives had personal knowledge of relevant facts because such knowledge was not unique to those executives).   For instance, Defendants assert that Mr. Hannan "made the call" on various issues, yet in reality this is an "exaggeration" of Mr. Hannan's role.  Hannan Decl. ¶ 16.  Mr. Hannan was just one of several executives who were kept apprised of activities through information passed to them from lower-level employees.  *Id.*[4]  Consequently, the desired information could be obtained through less intrusive means, including depositions of those lower-level employees.  *Celerity*, 2007 WL 205067 at *4 (party failed to meet its burden to show executive's personal knowledge was unavailable from less intrusive discovery).[5]

Likewise, given Mr. Hannan's "high-level" understanding of activities on the Fort Bragg Mill Site, any other discoverable information could have been obtained from other employees of G-P who are available or have been made available for deposition.  Hannan Decl. ¶ 10.  For example, Defendants' have already deposed Senior Vice President Roger Hilarides, a high-level executive who has had a more direct role in managing the remediation of the Fort Bragg

---

[4] Defendants are also incorrect that Mr. Hannan "was tasked with" addressing the concerns of a local Native American tribe in Fort Bragg.  Hannan Decl. ¶ 15.
[5] *See also Baine v. General Motors Corp,* 141 F.R.D. 332, 334 (M.D. Ala. 1991) (granting protective order for Vice President of General Motors where plaintiff had failed to obtain information from lower level employees).



Hon. Laurel Beeler
August 12, 2014
Page 4

Mill Site.[6]  Johnson Decl. ¶ 5.  They have also taken the depositions of Carol Stephens, Michael Davis, and Julie Raming (*id.*), all of whom were directly involved in the communications, meetings, and events on which Defendants base their claim to take Mr. Hannan's apex deposition.  As such, a deposition of Mr. Hannan would be "unreasonably cumulative or duplicative" under Rule 26(b)(2)(C).  *Cf. Nicholas v. Wyndham Int'l, Inc.*, 373 F.3d 537, 543 (4th Cir. 2004) (court issued a protective order because the deposition sought would have yielded the same information already acquired in discovery).

There can be no doubt that subjecting Mr. Hannan to a deposition will cause a significant disruption.  *See* Hannan Decl. ¶ 6.  It is unduly burdensome in light of the limited relevant information that Defendants could explore with him, all of which is readily available from others.  Indeed, Defendants have not specified any topics for Mr. Hannan's deposition nor have they offered to limit the deposition in any way, thereby magnifying the potential for abuse in this highly contentious case.

In sum, the Defendants have not established, nor even alleged, that Mr. Hannan possesses first-hand knowledge of the Fort Bragg Mill Site that is unique and cannot be obtained through less intrusive means.  Given Mr. Hannan's limited experience with the Fort Bragg Mill Site as a President and CEO, and the high potential for abuse in deposing an executive in his position, the Court should grant a protective order precluding the deposition.

## DEFENDANTS' STATEMENT IN OPPOSITION

James Hannan, the CEO of G-P, one of many companies privately owned by Koch Industries, has unique personal knowledge of the cleanup of the Fort Bragg mill site ("mill").   Hannan engaged himself in the mill project from the beginning after coming over to GP from Koch following Koch's acquisition of GP in late 2005.  Hannan made decisions both big and small regarding the cleanup, and continued to do so even after the filing of this case in 2012.  Hannan's personal knowledge is as great as or greater than the CEOs whose depositions have been ordered in recent cases in the Northern District.  See, e.g., *In Re Transpacific Passenger Air Transportation Antitrust Litigation, 2014 U.S. Dist. LEXIS* 29947 (N.D. Cal., Mar. 6,

---

[6] And, Plaintiffs may not argue that they failed to ask questions of these employees and, as a result, are entitled to explore those issues with Mr. Hannan.  Failure to ask relevant questions during other depositions does not provide a basis to assume the CEO may possess the answers to the questions not asked.  *See Reif v. CNA*, 248 F.R.D. 448, 453-54 (E.D. Pa. 2008) ("The depositions, thus far, have failed to demonstrate the deponents lack the information, especially when the pertinent questions have not been asked.").



Hon. Laurel Beeler
August 12, 2014
Page 5

2014) (Deposition of ANA CEO ordered); *The Apple IPOD ITUNES Antitrust Litigation*,
2011 U.S. Dist. LEXIS 33174 (N.D. Cal. Mar. 21, 2011) (Steve Jobs deposition ordered);
*Google Inc. v. American Blind & Wallpaper Factory*, 2006 U.S. Dist. LEXIS 67284 (N.D.
Cal., Sept. 6, 2006) (Larry Page deposition ordered); *In Re Google Litigation*, 2011 U.S.
Dist. LEXIS 120905 (N.D. Cal., Oct. 19, 2011) (Larry Page deposition ordered again); *In Re:
Chase Bank, N.A. "Check Loan" Contract Litigation,* 2011 U.S. Dist. LEXIS 127259 (N.D.
Cal., Nov. 3, 2011) (Chase Bank CEO ordered deposed).

G-P's efforts to block Hannan's deposition crossed the line of propriety when this Court was
mis-informed at the hearing on June 30, 2014 at pp. 33-34 that Hannan only "attended *one*
meeting where remediation . . . was discussed" and that he had no involvement in "day-to-day
decisions" about the cleanup.  (Ex. 1.)  The Court relied on those statements in its Order.
(ECF #199.)  The record shows these statements are false.

Hannan was actually in dozens of meetings, and drove the decision-making. Carol Stephens,
G-P's project manager, met with Hannan on March 13, 2006 (just after Hannan arrived from
Koch) to "discuss Fort Bragg" and in particular the project's timeline and estimated costs
through final closure.  (Ex. 2.)  Stephens reported *directly* to Hannan on the mill project.  (Ex.
3 at pp. 46, 52.)  Stephens wrote that in "this new 'Koch' world everything has to go to
Hannan for challenge and approval."  (Ex. 4.)  Stephens emailed Hannan on March 23, 2006
about a "too good to be true" meeting with regulators, with Hannan replying that he looks
forward to hearing the "details" at a meeting on Monday March 27, 2006. (Ex. 5.)  Stephens
wrote her team that she:  "Just talked to Hannan. He wants us to be prepared to discuss the
pro's and con's of the Water Board Board's order . . . You know Hannan, we need to have an
answer for any possible question he throws out."  (Ex. 6.)

Hannan was immersed in the dioxin problem at the mill ("Tom Butz and Jim Hannan have
been pretty specific as to what they want . . . we need to be prepared to discuss the dioxin data
and the implications.") (Ex. 7.)  Hannan made the arduous trip out to the mill at least once in
June 2006.  (Ex. 8.)  More "hands-on" management is displayed in Stephens' November 17,
2006 email to Hannan touting a "better than expected" meeting with DTSC, and reminding
him of "our presentation to you for next Wednesday" [11/22/2006]. (Ex. 9.)  On December 5,
2006 she met Hannan to discuss sale of the mill.  (Ex. 10.)

Hannan's hands-on approach to the cleanup is on display in his nine bullet point email of
12/7/2006 commenting on Arcadis' draft "Current Conditions Report."  (Ex. 11.)  Hannan
inquires whether the disposal at Glass Beach was by GP's "predecessor," and also takes a jab
at Arcadis, calling it "a consultant that makes money by doing more work for us defining the
data gap."  (*Id*.)  Arcadis knew Hannan was familiar with its work at the mill, blissfully

HUNTON&
WILLIAMS

Hon. Laurel Beeler
August 12, 2014
Page 6

thinking that its work "is very much respected and appreciated within GP – at the highest level, by CEO/president Jim Hannan." (Ex. 12)

Hannan had good reason to be critical of Arcadis' work when Arcadis bungled the remediation of OU-A by poorly designing a large onsite pit or "consolidation cell" to hold the excavated soil. Notes of Arcadis' May 25, 2011 "Team Call" state the consolidation cell "has failed and is accumulating water. . . The decision went up to the CEO [Hannan] and since it was our engineering error, we didn't look very good." (Ex. 13.) Arcadis' excessive costs – its invoices exceed $24 *million* - are an issue. (Ex. 14.) Hannan personally raised Arcadis' conflict of interest in reporting "data gaps" which Arcadis had a financial interest in filling. (Ex. 11.) Hannan's detailed comments on the 2006 "Current Conditions Report" are the epitome of a "hands on" CEO who was demanding but not always getting answers. (Ex. 11.)

Also on Hannan's watch was GP's failure to report high dioxin samples to regulators and the CFB, despite having promised to keep both informed. Stephens demanded a meeting in Atlanta in Hannan's office where "surprise and shock" were registered at Stephens' charge that Julie Raming, the environmental manager on the project, had failed to disclose dioxin results; Stephens demanded Raming's removal from the project. (Ex. 3 at pp. 48, 51.) The three versions of that meeting (Stephens', Davis' and Raming's) are not in agreement. Hannan's failure to reprimand Raming is a significant issue as to G-P's ratification of her misconduct.

After Stephens called the remediation project a "train wreck" in December 2007 (Ex. 15), Hannan informed her why she had been removed as project manager (Ex. 3 at pp. 172-173); Hannan personally asked Chip Hilarides to takeover the mill project from Stephens. (Ex. 16, at p. 32). Hannan attended meetings on the cleanup project in February and December of 2008. (Ex. 17,18.) There is evidence of meetings with Hannan on the mill cleanup on May 13, 2009 (Ex 19); August 26, 2009 (Ex 20); January 8, 2010 (Ex. 21); June 4, 2010 (Ex. 22); February 19, 2011 (Ex. 23); October 6, 2011 (Ex. 24); and May 15, 2012 (Ex. 25). Hannan made decisions as small as approving a $10,000 survey of community opinions in Fort Bragg. (Ex. 26.)

It is hardly unusual for the CEO of a large company to be involved in one of the largest cleanups in the company. (Ex. 27 p. 45-46). Even before Hannan, the President of GP Lee Thomas considered that mill project a high priority and personally was briefed by Julie Raming before he gave approval to spend the money (over $400,000) for a Phase II Report. (Ex 27. pp. 282-83.) Raming considered it "standard practice" that she had to get approval from Lee Thomas as President for such large expenditures, and that same standard practice carried forward for her on the mill project after Hannan took over as CEO. (Ex. 27 pp. 282.)



Hon. Laurel Beeler
August 12, 2014
Page 7

Where a CEO like Hannan takes the time to interject himself in the details of a project, he will be required to give deposition testimony regarding his conduct and decision-making. The depositions of G-P's lower level employees (Stephens, Raming, and the 30b6 witness Hilarides) amply show that the CEO "may have at least *some* relevant personal knowledge." *First National Mortgage v. Federal Realty Investment Trust,* 2007 U.S. Dist. LEXIS 88625 (N.D. Cal., November 19, 2007) (CEO deposition ordered). Where the testimony of "lower level employees indicates that the apex deponent may have some relevant personal knowledge, the party seeking protection will not likely meet the high burden necessary to warrant a protective order." *Kennedy v. Jackson National Life Ins.*, 2010 U.S. Dist. LEXIS 47866 (April 22, 2010) (CEO deposition ordered). Just because "another witness has testified regarding the same facts does not mean such testimony would be repetitive." (Id.)

OMX amply demonstrates Hannan was in the thick of decision-making. A deposition is needed because what he said at these meetings is largely undocumented. Furthermore, what were his directions on disclosing dioxin data? For investigating dioxin? For notifying OMX of the cleanup? For risking the imposition of lower clean up standards by changing the land use at the site? For controlling Arcadis' billing? For selling OU-A and OU-B? For directing cleanup strategy? For removing and installing new project managers? For loss reserve increases? For considering age-dating investigation before destroying the soil context at the site? For investigating cost-saving alternatives? What was said at all these meetings that GP misrepresented to the Court on June 30 had not occurred? What has Hannan told his bosses at Koch?

OMX tried to explain to GP the need for taking Hannan's deposition. (Ex. 28, 29.) GP peremptorily refused, announcing that "Hannan will not be deposed in this case." (Ex. 30.) The CFB served a deposition notice (Ex. 31), in which OMX joined. (Ex. 32). Defendants need at least seven hours given the number of years Hannan has been at the helm, the number and complexity of the issues, and GP's tendency to over-object . (On the over-objection point, see Ex. 27 at pp. 76-77.) GP obviously wishes to run out the clock on discovery in order to avoid producing Hannan and his emails. Both should be produced, and the emails should be produced two weeks before the deposition.

/ / /

/ / /

/ / /



Hon. Laurel Beeler
August 12, 2014
Page 8

Sincerely,


*/s/ Harry M. Johnson  III*

Harry M. Johnson, III
Hunton & Williams LLP


*/s/ R. Gaylord Smith*

R. Gaylord Smith
Lewis Brisbois Bisgaard & Smith LLP