NOEL EDLIN, ESQ. (SBN 107796)
nedlin@behblaw.com
FRED M. BLUM, ESQ. (SBN 101586)
fblum@behblaw.com
MY-LINH T. LE, ESQ. (SBN 287351)
mtle@behblaw.com
BASSI, EDLIN, HUIE & BLUM LLP
500 Washington Street, Suite 700
San Francisco, CA 94111
Telephone:    (415) 397-9006
Facsimile:    (415) 397-1339

Attorneys for Defendant and Counterclaimant
THE CITY OF FORT BRAGG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGIA-PACIFIC LLC, | Case No. 3:12-cv-02797-WHO |
| Plaintiffs, | **DECLARATION OF MY-LINH T. LE IN SUPPORT OF THE CITY OF FORT BRAGG'S CHALLENGES TO GEORGIA-PACIFIC'S RESPONSES TO THE CITY'S SECOND SET OF DISCOVERY REQUESTS** |
| vs. | |
| OFFICEMAX INCORPORATED AND THE CITY OF FORT BRAGG, | |
| Defendants. | |

I, My-Linh T. Le, declare as follows:

1.    I am an attorney at law, duly licensed to practice before all of the courts of the state of California and admitted to practice in the Northern District of California. I am an Associate at the law firm Bassi, Edlin, Huie & Blum LLP, attorneys of record for Defendant the City of Fort Bragg ("the City"). I make this declaration based upon my own personal knowledge. If called to testify, I could and would competently testify to each matter set forth herein.

2.    The documents Georgia-Pacific LLC ("GP") identifies, by bates range, as "potentially responsive and/or relevant" to RFP Nos. 65 and 66 are the following: ARCADIS

946282

1

May 2009 Power Point presentation on OU-E Remediation (GP00041729-59, GPLA00146079-109); Fort Bragg Ash Amendment History Timeline (GP00223213-14, GP00273397-98, GP00101940-41, GP00101943-44); page 2 of an August 23, 2010 e-mail from Nancy Philips to Melodie Ruse and Linda Ruffing concerning volunteer information  (GPLA00145034); page 1 of July 7, 2010 talking points for Julie Raming concerning an upcoming City Council Meeting (GPLA00145035); and December 2006 ARCADIS Report on Information Request for Off-Site Fly Ash (GPLA00122857-123085).  None of these documents reference GP's "beneficial reuse" program.

3.   Attached as Exhibit 1, and incorporated fully herein, is the meet and confer letter sent by the City to GP on July 21, 2014 ("City's July 21 letter").

4.   Because counsel for GP do not reside in the Bay Area, the parties participated in a teleconference on August 4, 2014 to meet and confer about the issues raised in the City's July 21 letter.

5.   Attached as Exhibit 2, and incorporated fully herein, is the June 23, 2014 Order by the Honorable William H. Orrick Granting City of Fort Bragg's Motion for Leave to Amend Answer and Denying Georgia-Pacific LLC's Motion for Leave to Amend and for Partial Dismissal.  (Dkt #191.)

6.   Attached as Exhibit 3, and incorporated fully herein, is a true and correct copy of the relevant portions of the deposition testimony of Michael Acton, taken June 16, 2014, at 27:10-31:21.  Michael Acton was the project manager for his firm's consulting work on GP's Fort Bragg mill site from January 2005 through August 2006.

7.   Attached as Exhibit 4, and incorporated fully herein, is a true and correct copy of the relevant portions of the deposition testimony of GP's 30(b)(6) witness, Roger Hilarides.

8.   Attached as Exhibit 5, and incorporated fully herein, are Exhibits K, N, O, P, and Q to the RFAs ("deposition summary sheets").  At GP's 30(b)(6) deposition, GP produced the deposition summary sheets and attached them to the deposition of Michael J. Davis, who testified as GP's 30(b)(6) witness.  Davis testified during his deposition that the deposition summary sheets were prepared by Hunton & Williams.

946282

9.    Attached as <u>Exhibit 6</u>, and incorporated fully herein, is a true and correct copy of the relevant portions of the deposition of Michael Davis taken on February 26, 2014.

10.    Attached as <u>Exhibit 7</u>, and incorporated fully herein, is a true and correct copy of the relevant portions of the Storm Water Sampling Report prepared by GP's consultant, ARCADIS.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on July 16, 2014, in San Francisco, California

Date:   August 21, 2014                    BASSI, EDLIN, HUIE & BLUM LLP

By:   _____

MY-LINH T. LE
Attorneys for Defendant
THE CITY OF FORT BRAGG

946282

3

# EXHIBIT 1



# BASSI EDLIN HUIE & BLUM LLP

www.behblaw.com

| | |
|---|---|
| 500 WASHINGTON STREET, SUITE 700 | 333 S. HOPE STREET, 35TH FLOOR |
| SAN FRANCISCO, CA 94111 | LOS ANGELES, CA 90071 |
| TEL 415-397-9006 | TEL 213-412-2661 |
| FAX 415-397-1339 | FAX 213-652-1992 |

MAIN OFFICE

July 21, 2014

<u>Via First Class Mail and Email</u>
Jeffrey N. Martin, Esq.
Ann Marie Mortimer, Esq.
Hunton & Williams LLP
2200 Pennsylvania Avenue, NW
Washington, DC 20037

> Re:   ***Georgia-Pacific, LLC v. OfficeMax Incorporated, Louisiana-Pacific Corporation, And The City Of Fort Bragg***
> United States District Court Northern District Case No. 3:12-cv-02797-WHO
> Our Client:   The City of Fort Bragg

Dear Counsel:

This is to initiate the meet and confer process between Georgia-Pacific, LLC ("GP") and the City of Fort Bragg ("City") with regard to GP's responses to the City's Special Interrogatories Set Two ("Interrogatories"), Requests for Production Set Two ("RFPs"), and Requests for Admissions Set Two ("RFAs").

This letter does not ask or require GP to submit any letter or writing in response, but rather outlines, for purposes of discussing by phone, the deficiencies of GP's answers. Please let us know by 5:00 p.m. EDT on Tuesday July 22 what times on Friday July 25 you are available to meet and confer by phone.  To streamline this process in light of the approaching discovery cut-off date, GP should be prepared to identify which responses it is willing to amend and which ones it is unwilling to amend so that the parties can brief the disputed responses for the Magistrate accordingly.

## GP'S RESPONSES TO THE CITY'S INTERROGATORIES

GP's response to Interrogatory No. 15 is incomplete.  The response states that GP "took various measures" to ensure that GP's burning of wood waste would not violate any permits or orders that were issued.  GP then identifies only some, but not all of these

922837

Hunton & Williams
July 21, 2014
Page 2

---

measures, which is implied by GP's phrase: "[s]uch measures included, but were not limited to…" If there are other measures GP took that were not listed in its response, GP must identify these fully in its response, If not, then the "[s]uch measures included, but were not limited to…" language needs to be removed.

GP's responses to Interrogatories Nos. 17 and 18 are inconsistent with GP's responses to RFA Nos. 146 and 147. In its Interrogatory responses, GP admits that it "lacks sufficient information and knowledge to opine as to when or whether the City had ownership, legal or otherwise," of PIPE 1 and PIPE 2; in its RFA responses, GP denied, unequivocally, both of the RFAs which ask GP to admit that the City does not have ownership in PIPE 1 or PIPE 2. If GP has knowledge or information to deny the RFAs, thereby contending that the City does have any ownership interest in Pipes 1 and 2, then GP must identify all facts supporting these contentions.

## GP's Responses to RFAs

As before, in GP's responses to the City's first set of requests for admissions, instead of admitting or denying the RFAs, GP picks whichever portions of the requests it wants to answer and then simply ignores the rest, often going so far as to interpose self-serving contentions and other extraneous information that are nonresponsive to the substance of the requests. For example, **RFA No. 24** asks GP to admit that its operations generated dioxins on the Site. If GP's operations generated dioxins on the Site, then GP must admit the RFA. Instead, GP provides various nonresponsive contentions regarding how dioxins may be created, and the various sources from which GP believes dioxins came to the Site. The same issue applies to **RFA Nos. 25, 28, and 29**.

**RFA No. 30** asks GP to admit that it was sued for dioxin contamination at another site in 1991. Rather than admit or deny, GP merely objects that RFA No. 30 is "not relevant to any claim or defense in this action, nor reasonably calculated to lead to the discovery of admissible evidence…" The fact that GP was sued in 1991 for dioxin contamination would go to the question of when GP became aware of the harmful effects of dioxins on human health and/or the environment. This is relevant to the issue of GP's intent for committing the fraud as alleged in the City's complaint as well as apportionment under CERCLA §113.

**RFA No. 33** refers to a correspondence from GP to the California Regional Water Quality Control Board ("RWQCB") and asks GP to admit the truth of the statements contained therein. The letter is dated June 28, 1990, and contains a report which "addresses various methods for disposal on use of the ash generated" at the Site. GP denies the truth of two statements pertaining to the rates of ash generation on the Site in 1990 because "current rates of ash generation . . . are not 1,400 cubic yards per month." First, the "current rates of ash generation" would have no bearing on the truth of statements that were made in 1990, especially since GP completely ceased operations at the time it provided its response to the RFA. Second, GP appears to ignore the rest of the

Hunton & Williams
July 21, 2014
Page 3

---

statements.  The entire Exhibit E consists of more than 10 pages of statements.  GP's failure to answer the RFA is itself deemed an admission.  Fed. R. Civ. P. 36.

**RFA Nos. 41, 42, and 43** asks GP to admit that the letter attached thereto as Exhibit I was written, signed, and sent by GP.  These RFAs are not compound, are straightforward, and allow for a simple "yes" or "no."  GP attempts to evade its obligations of simply admitting or denying these RFAs by, again, simply restating what the document says, rather than answering what was actually requested of GP.

**RFA No. 50** asks GP to admit that the samples analyzed and reported in the Phase II report were not analyzed for any dioxins.  GP answers that it does not have sufficient information to admit or deny the request.  The Phase II report was completed several years ago.  GP would only need to consult its own report or experts who prepared the report in order to obtain sufficient information to enable a "yes" or "no.

**RFA Nos. 65 and 66** asks GP to admit that Exhibit K was prepared by Hunton & Williams and that the statements contained therein are true.  Instead of admitting or denying the request No. 65, GP objects on the grounds that such information is privileged and irrelevant.  Exhibit K cannot be privileged as it was relied upon by GP's Rule 30(b)(6) witness in preparation for the deposition, and was furthermore attached to the deposition as an exhibit.  Exhibit K is obviously relevant to the litigation as it concerns GP's claims and the contamination of the Site; therefore, so is its preparation relevant.  GP's response to No. 66 only states that "at the time Exhibit K was prepared" GP "believed" the statements to be true.  GP's answer seems to imply that although the statements were believed to be true at the time they were made, at least some of the statements are no longer true – in which case GP needs to then specify which statements in Exhibit K are true, and which statements are not.  The same issue applies to **RFA Nos. 92 and 93**, as well as **RFA Nos. 123 through 142**.

**RFA Nos. 71, 72, 73, and 74** pertain to the fly ash stockpile located in Parcel 7 on the mill site from 2000 to 2006.  GP claims that it does not have sufficient information to enable it to respond to Nos. 71 and 72.  Given the fact that GP has records, which were produced to the parties, detailing the conditions in which the stockpile was stored, GP cannot claim that it made reasonable inquiry.  The records provide information sufficient to enable GP to admit or deny the request.  GP denies RFA Nos. 73 and 74 contrary to prior testimony and discovery, without any explanation.  A denial of all or any portion of the request must be specific.

GP's response to **RFA No. 98**, which asks GP to admit that the municipal wood it burned contained materials that GP was not permitted to burn, is vague and ambiguous as to the denial.  GP responds with only the admission that it burned demolition wood waste, "in addition to other fuel" and admits that the AQMD issued a violation due to unapproved combustibles, and then denies the rest of the request.  Such a response appears to mean that GP admits only that it was issued a violation, but denies that it burned any materials that GP was not permitted to burn.  If GP is indeed making such a denial, GP must state so plainly.

Hunton & Williams
July 21, 2014
Page 4

---

**RFA No. 99** asks GP to admit that it had knowledge that its burning of the municipal wood waste generated high concentrations of dioxins at the time it burned such wastes; GP claims it does not know what it knew at that time, and needs an expert in order to answer the request. Under the Rules, and given that the request goes to GP's knowledge, such an answer is unacceptable, especially when read in conjunction with GP's response to **RFA No. 103**, in which GP "ADMITS that there were elevated levels of dioxin in a fly ash pile that was generated on the Mill Site as a result of the burning of demolition wood waste . . .."

**RFA No. 102** asks GP to admit that it burned plastic material on the Site. GP copies and pastes the same response it gave to RFA No. 98, including the meaningless phrase "other fuel," which is not responsive to No. 102. GP again claims, disingenuously, that it does not have information to enable any further admission or denial. Again, GP did not make reasonable inquiry, as it should know whether or not it burned any plastic material on the Site.

**RFA Nos. 143 and 144** asks GP to admit that the location of PIPES 1 and 2, in relation to the mill pond, as depicted in Exhibit B are accurate. GP's answers completely evade the questions. The requests do not ask in any regard, at all, as to what GP believed was true at the time the Exhibit was prepared. Rather, the request asks GP to confirm that the locations of the two pipes are accurate.

**RFA No. 145** asks GP to admit that PIPES 1 and 2 are the only pipes that convey City stormwater directly into the mill pond. GP does not at all answer the question, and instead quotes nonresponsive portions of the Mill Pond Storm Water Sampling Report. Again, GP must state its denials specifically. If GP denies the request, thereby contending that there are other pipes which convey City stormwater directly into the mill pond, GP must state such denials clearly.

### GP'S RESPONSES TO THE CITY'S RFPS

#### City's General Objections to GP's Responses

GP broadly objects to each of the RFPs to the extent that it seeks privileged or protected information. As before, the City has made clear that if GP objects to any request, or any portion thereof, on the grounds of attorney-client privilege, work product doctrine, or any other protection or privilege, GP must provide a privilege log. For example, GP's response to **RFP No. 44**, which requests "[a]ll litigation hold letters relating to the above-captioned matter that [GP] sent to any custodian of records...," states that GP will produce only "non-privileged documents." Although the response was served on June 23, GP has not provided any litigation hold letters nor identified any such letters in a privilege log.

In nearly each of GP's responses to the RFPs, GP states that it "will continue to produce or make available on a rolling basis additional . . . documents . . . responsive to

Hunton & Williams
July 21, 2014
Page 5

---

this Request in its custody, possession, or control that have been . . . discovered." GP's response was provided a month ago, but still not a single one of the documents requested have been produced. Thus, for **each and every RFP** to which GP responded by stating that it will produce or make available responsive documents, GP must provide said documents by 5:00 p.m. August 1, 2014. Due to the upcoming discovery cut off, if GP does not complete production of all responsive documents by August 1, the City will be forced to move to compel.

In each of GP's responses, GP identifies various documents which have already been produced and "which are potentially responsive and/or relevant" to the respective request. After listing the documents by bates ranges (many of which are not at all responsive to the respective request) GP writes: "The foregoing specific listing is not intended to, and should not be construed to mean that the listed documents are the only documents which have been produced that are responsive or potentially responsive to this Request." For **each and every response** in which GP lists previously produced documents with said disclaimer, including but not limited to **RFP Nos. 49, 58, 64, 65, 75, 81, 82, and 83**, GP must identify and/or provide the remaining documents which are responsive, so that the response is complete.

**RFP No. 26** asks GP to produce all documents relating to GP's code of conduct referenced by Mr. Roger Hilarides during GP's 30(b)(6) deposition. Mr. Hilarides testified that GP publishes a code of conduct every so often, which encompasses the ethical decision making and ethical behaviors to which it holds its employees accountable to. He further testified that GP just issued an amendment a few months ago, and republished one two years ago. Although the code of conduct is clearly in GP's control and possession, GP, has not produced any versions of the code, or any of the amendments thereto. Furthermore, the code of conduct is relevant to the City's fraud and misrepresentation claims against GP, particularly the standard of care for GP's communications and presentations, regarding environmental or human health dangers posed by dioxins, to the regulators and to the City.

**RFP No. 30** requests all documents relating to any dioxin investigations performed at any facility owned or operated by GP from 1970 to 2002. GP argues that the request is not relevant or reasonably calculated to lead to the discovery of admissible evidence because it relates to facilities other than the Site. GP's investigations and findings of dioxins at any of its other facilities would go to the issue of GP's knowledge relating to dioxin generation and contamination, and would then go to the issue of GP's intent for committing the fraud as alleged in the City's complaint. For the same reasons, GP must either admit or deny **RFP Nos. 31, 32, 34, 37, 40, 41, 42, 43**, all of which bears upon the issue of GP's knowledge regarding environmental or human health dangers posed by dioxins, or which reasonably could lead to such relevant information, and which would therefore affect the relevant standard of care.

**RFP No. 44** asks GP to produce all litigation hold letters relating to the Site, which, despite GP's objections, would be relevant to the issue of when GP anticipated

Hunton & Williams
July 21, 2014
Page 6

litigation. GP's response indicates that GP is withholding the requested letters from production on the grounds of attorney-client privilege, work product, "or any other applicable privilege or protection." However, if GP is refusing to produce any of the requested documents on the grounds of any privilege, GP must identify *all* such documents in a privilege log with all of the required information pursuant to the parties' agreement and the Magistrate's Orders. Thus far, GP has identified only certain "emails" pertaining to litigation holds from 2011 and later. Unless those are the only litigation hold letters that GP sent to any custodian of records containing information relevant to the Site or the complaints, GP must provide the City with the proper privilege log entries.

**RFP Nos. 50 and 51**, pertaining to the value or potential sale price for the Mill Site property, is relevant to the City's defenses pertaining to allocation of costs, as it would relate to one of the Gore factors. Therefore, GP's objections as to the relevancy of the request is improper. GP must therefore produce all responsive documents.

**RFP Nos. 65 and 66** asks for documents relating to GP's beneficial reuse program and analyses that Mr. Roger Hilarides referenced during his deposition. According to Hilarides, these documents were created when the Mill was operational (prior to 2002). Hilarides further testified that "there was regular testing of [GP's] ash," which indicates that there is data and reports regarding the testing of the ash. In response to the requests, GP lists several documents by bates range, none of which are actually responsive to either request or related to the beneficial reuse program that Hilarides spoke of at his deposition. GP must produce all documents relating to the beneficial reuse program, including but not limited to the test results that Hilarides referenced.

**RFP No. 67** asks for documents relating to the dioxin concentrations of the fly ash collected for beneficial reuse. Although GP's 30(b)(6) witness Hilarides testified that he reviewed a number of documents pertaining to GP's "regular testing of [its] ash" for beneficial reuse, GP claims that it could not identify any such documents after performing diligent search. Either GP did not actually conduct a diligent search, or it is withholding documents.

**RFP Nos. 69 and 70** ask for all documents relating to the dredging of the Site ponds. Again, GP's claim that it performed a diligent search and could not identify any documents responsive to the request is disingenuous. Deposition testimony and discovery conducted thus far indicates that GP dredged several ponds on the Site. GP must therefore actually conduct the search pursuant to the Rules and produce the requested documents.

**RFP Nos. 71 and 72** pertain to the "environmental alerts" referenced by GP's 30(b)(6) witness, Mr. Hilarides. He testified that GP "used to have, and still do, what we call an environmental alert." The requests ask for all environmental alerts relating to the mill site; GP claims that it could not identify any. Again this is contrary to testimony given by GP's own corporate witness. GP must conduct an actual diligent search pursuant to the Rules and produce the requested documents or explain why it cannot.

Hunton & Williams
July 21, 2014
Page 7

### CONCLUSION

For the aforementioned reasons, GP's responses are improper and must be revised as described above.  Given the number of RFPs for which the City was able to locate responsive documents, and GP's dubious assertions that it conducted a "diligent search" for these requests and could not locate any responsive documents, the responses are violate the Rules and must be revised; and all responsive documents must be produced unless such documents are identified on GP's privilege log.

Furthermore, given GP's record of prolonging resolution of discovery disputes, the City will not afford time for gamesmanship and therefore expects the production of documents and amended responses to be provided no later than 5:00 p.m. on August 1, 2014.  Please let us know by no later than Wednesday July 23, which of the City's challenges GP disagrees with.

Very truly yours,

BASSI, EDLIN, HUIE & BLUM LLP

FRED M. BLUM

FMB/mtl

# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GEORGIA-PACIFIC,

              Plaintiff,

      v.

OFFICEMAX INCORPORATED, et al.,

              Defendants.

Case No. 12-cv-02797-WHO

**ORDER GRANTING CITY OF FORT BRAGG'S MOTION FOR LEAVE TO AMEND ANSWER AND DENYING GEORGIA-PACIFIC LLC'S MOTION FOR LEAVE TO AMEND AND FOR PARTIAL DISMISSAL**

Re: Dkt. Nos. 163, 164

Defendant City of Fort Bragg ("the City") asserts that it discovered in a deposition on January 15, 2014 that plaintiff Georgia-Pacific LLC ("GP") purposefully concealed high dioxin levels at the polluted site involved in this action brought under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et. seq*. in a report prepared by GP's environmental investigators. As a result of that testimony, and other facts the City claims it discovered recently, the City moves for leave to amend its Answer and Counterclaim to GP's Second Amended Complaint in order to modify and add affirmative defenses, and add counterclaims against GP alleging fraud, negligent misrepresentation, breach of contract, and declaratory relief.

GP opposes the City's motion because of undue delay, prejudice and futility. It also moves for leave to amend its Second Amended Complaint ("SAC") to eliminate its state-law claims and to urge me to dismiss the current and proposed state-law claims alleged by the City by declining to exercise supplemental jurisdiction under 28 U.S.C. § 1367.

If proven, the City's new allegations appear relevant to the allocation of damages under GP's CERCLA claims. They will not predominate over the CERCLA claims. It would be inefficient and expensive to require a second, state court trial by precluding the City from bringing

United States District Court
Northern District of California

its state-law claims here. The City's amendment is timely and not futile. GP is not prejudiced by the amendment. Having considered the arguments of counsel at the hearing on June 11, 2014, I GRANT the City's motion and DENY GP's motion.

**BACKGROUND**

GP seeks recovery under CERCLA for cleanup costs GP has incurred and will incur due to the contamination of certain real property located in Fort Bragg, California (the "Site") from defendants OfficeMax Incorporated, Louisiana-Pacific Corporation ("LP"), and the City. [1] SAC ¶ 1. The Site is contaminated with various hazardous substances, including "metals, dioxins, polycyclic aromatic hydrocarbons and petroleum hydrocarbons" in "the soil and groundwater underlying the Site and the surrounding soils and groundwater." SAC ¶ 11. In February, 2007, the California Environmental Protection Agency, Department of Toxic Substances and Control, ordered GP to conduct a response action at the Site. SAC ¶ 13. GP "has expended approximately $31,400,000 in response costs at the Site arising from releases and threatened releases of hazardous substances" and "anticipates incurring significant future response costs at the site." SAC ¶ 14.

GP's Second Amended Complaint alleges that OfficeMax is liable to contribute to the costs of remediation of the Site because operations by its predecessors in interest during their ownership of the land allegedly led to the release of hazardous materials into the soil and groundwater. [2] SAC ¶¶ 11, 15-16. It claims that the City is also liable for the Site's contamination due to its ownership and operation of a stormwater system which allegedly conveys toxic substances onto the Site. SAC ¶¶ 25-29. The remaining causes of action against OfficeMax and

---

[1] I have approved GP's Joint Motion for Settlement Agreement with LP, and the stipulation of OfficeMax, the City, and LP for dismissal of LP's claims. Dkt. Nos. 185, 186. I have also approved an agreement between GP and Office Max to dismiss the state law claims they had against each other.

[2] Until November 1, 2004, OfficeMax was known as Boise Cascade Corporation ("Boise"). SAC ¶ 16; Br. 5; Dkt. No. 86 at 5. On October 7, 1968, Boise merged with Union Lumber Company and assumed all its "debts, liabilities, obligations, and duties," which included the Site at issue here. Boise Cascade Corporation sold the Site to GP in 1973. SAC ¶ 1, 16. GP operated a lumber production facility on the Site until August 8, 2002. SAC ¶¶ 9-10. In 2009, GP sold a portion of the Site known as "Glass Beaches" to the City. Am. Countercl. (Dkt. No. 163-2) ¶ 5. The Site is currently unoccupied except for a GP office and a water treatment plant owned by the City. SAC ¶ 9.

United States District Court
Northern District of California

the City seek damages, indemnification, contribution, and declaratory relief.

The City's answer and counterclaims respond that it had no control over the use of stormwater at the Site, and that any movement of stormwater was exclusively controlled by OfficeMax's predecessor in interest, Union Lumber Company, through a dam system under its exclusive control. Dkt. No. 94, Countercl. ¶¶ 15-17. The City asserts fifty-four affirmative defenses, cross-claims against OfficeMax, and six counterclaims against GP.[3]

### A. The City's Proposed Amendments

According to the City, discovery taken after the filing of its answer and counterclaims has revealed that GP purposefully concealed high dioxin levels at the Site by failing to disclose dioxin levels in a report prepared by environmental investigators. The City asserts that it had no notice of GP's alleged concealment until the January 15, 2014 deposition of Mohammed Bazargani. Blum Decl. ¶ 4. Bazargani was an employee of TRC, the environmental consulting firm retained by GP to investigate the Site between 2002 and 2005. He testified that he was instructed by Julie Raming, a GP employee, to withhold testing for possible dioxin contamination because another company was tasked with dioxin investigation. Blum Decl. Ex. 3, Deposition of Mohammed Bazargani ("Bazargani Depo."), at 115:23-116:14, 118:10-18. These instructions came after he recommended that dioxins be part of the report. *Id*. at 191:18-192:7. Environmental testing protocols required that the report state whether dioxins were investigated. Blum Decl., at ¶ 4. The resulting report states that it was prepared according to these protocols, however, it does not mention dioxins. Bazargani Depo. at 199:21-200:2. The report concludes that contamination at the Site is limited to petroleum and is not substantial. Blum Decl., at ¶ 5, Ex. 4.

---

[3] The City's First Counterclaim against GP seeks contribution for response costs under CERCLA section 113(f)(1); the Second, a declaration that GP is liable to indemnify, or contribute to and reimburse, the City for all future response costs under the Declaratory Judgment Act, 28 U.S.C. § 2201; the Third, damages from GP for negligence in managing and maintaining the Site; the Fourth, a declaration that GP is liable to indemnify the City for future damages and costs under California Code of Civil Procedure Section 1060; the Fifth, equitable indemnity; and the Sixth, contribution from GP for any costs and expenses the City incurs in judicial and administrative proceedings brought against it with regard to contamination of the Site. Dkt. No. 94, Countercl. ¶¶ 25-46.

3

United States District Court
Northern District of California

The City alleges that the report was then used by GP to represent to the City that the Site was not contaminated, and to enlist the City's assistance in selling a portion of the Site, a lumber mill, sometime between 2002 to 2005. Blum Decl. Ex. 1, Am. Countercl. ¶¶ 37-43. The City's cooperation was necessary to lower GP's costs of selling the mill. Blum Decl. Ex. 2, Deposition of Carol Stephens ("Stephens Depo."), at 89:23-91:11, 114:11-115:9, 123:2-6 147:13-21. Carol Stephens, the GP executive in charge of selling the mill, testified that the allegedly misleading report was used to prepare talking points used in meetings with the City. *Id*. at 80:13-81:9.

In 2004 it became apparent that dioxins were present at the Site. On August 12, 2004, and November 17, 2004, the California Regional Quality Control Board sent letters to GP's Julie Raming that "[a] concern has been raised that dioxins may have been generated by the possible burning . . . of various wastes" and that "[t]he possible presence of dioxins on site due to on-site activities should be addressed." Dkt. No. 170, Exs. A and B.[4] The City was copied on these letters. The City assisted GP with selling the property until 2006, when GP conducted further environmental testing that disclosed the presence of dioxins. Blum Decl. Ex. 1, Am. Countercl. ¶ 46. GP then suspended its efforts to sell the property. *Id*.

The City also alleges that since its initial answer was served, it has reviewed a 2009 agreement between the City and GP relating to the sale by GP to the City of areas of the Site known as the Glass Beaches (the "2009 Agreement"). The City alleges that as part of the Agreement, GP received monies which were to pay for the remediation of the property to standards set by regulatory agencies. Blum Decl., Ex. 1, Amd. Countercl. ¶¶ 49-51, Ex. A. The City alleges that the land was not remediated as promised by the agreement.

Based on these facts, the City seeks to amend its counterclaim against GP to add factual allegations and four additional causes of action alleging fraud, negligent misrepresentation, breach of contract, and declaratory relief under California Code of Civil Procedure section 1060 barring GP from seeking reimbursement of remediation costs it was to expend under the 2009 agreement.

---

[4] GP requests that the Court take judicial notice of these documents, as well as the front page of the March 21, 2009, Fort Bragg Advocate-News which describes GP's dioxin containment efforts. Dkt. No. 164. The Court takes notice.

Blum Decl., Ex. 1, Amd. Countercl. ¶¶ 61-71, 76-77.

The City also seeks to amend its sixth affirmative defense for unclean hands, and add affirmative defenses numbers fifty-four through fifty-eight for: (i) offset of costs incurred by the City due to GP's alleged misrepresentations; (ii) statutory violations of unspecified environmental laws; (iii) a bar preventing GP from seeking response costs for remediation of the land sold in the 2009 Agreement; (iv) unjust enrichment as to the 2009 agreement; and (v) incorporation of its counterclaims. Blum. Decl. Ex. 1, Ans. ¶¶ 6, 54-58.

### B. GP's Proposed Amendments

GP's motion to amend seeks to eliminate its state-law claims against OfficeMax and the City for implied equitable indemnity, nuisance, and trespass. Dkt. No. 90 ¶¶ 51-62, 97-103. GP states that "as discovery has progressed, [GP] has determined that all of the costs it will seek at trial will be recoverable under CERCLA." Dkt. No. 164 at 3. GP also requests that I dismiss the current and proposed state-law claims alleged by the City by declining to exercise supplemental jurisdiction under 28 U.S.C. § 1367. Dkt. No. 164. GP asserts that the City's state-law claims will "substantially predominate" the litigation of this case and raise novel and complex issues regarding allocation of damages under CERCLA. *Id*.

### LEGAL STANDARD

Federal Rule of Civil Procedure 15(a) allows a party to amend its pleading once within: (1) 21 days after serving the pleading or (2) 21 days after the earlier of service of a responsive pleading or service of a Rule 12(b) motion. FED. R. CIV. P. 15(a). Outside of this timeframe, "a party may amend its pleading only with the opposing party's written consent or the court's leave." *Id*. A court "should freely give leave when justice so requires." *Id.* "Although the rule should be interpreted with 'extreme liberality,' leave to amend is not to be granted automatically." *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990) (citation omitted).

A court considers five factors in determining whether to grant leave to amend: "(1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment; and (5) whether plaintiff has previously amended his complaint." *In re Western States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 738 (9th Cir. 2013) (quoting *Allen v. City of Beverly Hills*, 911

United States District Court
Northern District of California

F. 2d 367, 373 (9th Cir. 1990)).  "Prejudice to the opposing party is the most important factor." *Jackson*, 902 F.2d at 1387.

## DISCUSSION

### I.   THE CITY'S MOTION FOR LEAVE TO AMEND

The City's motion for leave seeks to modify and add affirmative defenses, and to add counterclaims against GP alleging fraud, negligent misrepresentation, breach of contract, and declaratory relief.  Dkt. No. 163.  The City argues that these amendments (i) are based on newly-discovered information, (ii) are viable claims necessary to the underlying litigation, and (iii) will not prejudice any party because discovery is still open.  GP disagrees, claiming that the City unduly delayed in bringing the amendments because it has been aware of the underlying facts for several years and that the amendments are prejudicial and futile.  Dkt. No. 170 at 3-9.  It further asserts that I should decline to exercise supplemental jurisdiction over the state-law claims alleged by any party.

### A.  The Proposed Amendments Will Not Prejudice GP

GP argues that the City's proposed counterclaims "would require [GP] to take an entirely new course of defense" and increase the complexity and length of the trial because the state-law claims would be adjudicated alongside the CERCLA claims.  Dkt. No. 170 at 3-4.  It says that adding the City's proposed counterclaims at this stage of the litigation "deprived [GP] of several critical opportunities to elicit deposition testimony from persons with knowledge that could be used to defeat the City's claims" including Mohammad Bazargani, Carol Stephens, and the 30(b)(6) deposition of GP.  Dkt. No. 170 at 5.  It asserts that it is at a disadvantage because it "may only notice 10 depositions in comparison to the defendants' collective 30."  Dkt. No. 170 at 5.

"The party opposing amendment bears the burden of showing prejudice." *DCD Programs, Ltd. v. Leighton*, 833 F2d 183, 187 (9th Cir. 1987).  "A need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice from a delayed motion to amend the complaint."  *Lockheed Martin Corp.,* 194 F.3d at 986 (9th Cir. 1999) (citing *Solomon v. North Am. Life & Cas. Ins. Co*., 151 F.3d 1132, 1139 (9th Cir. 1998)).  However, "[n]either delay resulting from the proposed amendment nor the prospect of additional discovery needed by

United States District Court
Northern District of California

6

the non-moving party in itself constitutes a sufficient showing of prejudice." *Tyco Thermal Controls LLC v. Redwood Industrials*, No. 06-cv-07164 JF, 2009 WL 4907512, at \*3 (N.D. Cal. Dec. 14, 2009).

Granting the City leave to amend will not unduly prejudice GP. The City's claims involve the same parties and many of the same underlying facts as the claims asserted by GP in its SAC. GP still has more than three months remaining in discovery to depose witnesses related to the City's proposed amendments. Although the new causes of actions may require GP to do some additional discovery, to date GP has not yet taken a single deposition, and the depositions of several other important witnesses, such as the City's 30(b)(6) witness, have not yet occurred. Dkt. No. 174, Le Decl. at ¶¶ 3-4. This factor weighs in favor of the City.

### B. The Proposed Amendments Are Not Futile or Subject to Undue Delay

GP argues that the City has been aware of dioxin levels at the Site since at least 2004, when the California Regional Quality Control Board sent letters to GP's Julie Raming regarding its concerns. Dkt. No. 170 at 8-9. It notes that the City's proposed amended counterclaim states that it was aware of dioxin contamination since 2006. *Id*. at 7; Am. Countercl. ¶ 46. It asserts that bringing claims of fraud and negligent misrepresentation now constitutes undue delay. Dkt. No. 170 at 8-9. It also claims that the City's proposed counterclaims are futile because they are barred by the applicable two-year statute of limitations for tort claims, the three-year statute of limitations for fraud claims, and the four-year statute of limitations for breach of contract claims.[5]

The City responds that GP misunderstands the crux of the proposed amendments. It stresses that "the gravamen of the fraud claim is not the mere presence of dioxins on the Site, but the fact that GP intentionally lied to the City and regulators about the severity of the dioxin contamination and GP's operations on the Site that causes such contamination." Dkt. No. 174 at 6. It asserts that "it was not until after this litigation began that the City learned of GP's scheme to cover up the dioxin problem." Dkt. No. 174 at 7.

"[A] proposed amendment is futile only if no set of facts can be proved under the

---

[5] *See* CAL. CODE. CIV. PROC. §§ 337, 338.

United States District Court
Northern District of California

United States District Court
Northern District of California

amendment to the pleadings that would constitute a valid and sufficient claim [ ]." *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). "Because it is inequitable to bar someone who has no idea he has been harmed from seeking redress, the statute of limitations has generally been tolled by the 'discovery rule.'" *Bibeau v. Pac. N.W. Research Found. Inc.*, 188 F.3d 1105, 1108 (9th Cir.1999), amended by 208 F.3d 831 (9th Cir.2000). "Under both federal and California law, the discovery rule provides that a limitations period does not commence until a plaintiff discovers, or reasonably could have discovered, his claim…." *O'Connor*, 311 F.3d at 1147 (9th Cir. 2002) (citing *Bibeau*, 188 F.3d at 1108).

"[D]elay alone no matter how lengthy is an insufficient ground for denial of leave to amend." *United States v. Webb*, 655 F.2d 977, 980 (9th Cir. 1981). However, undue delay combined with other factors may warrant denial of leave to amend. *See, e.g.*, *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1387-89 (9th Cir. 1990) (holding that prejudice and undue delay are sufficient to deny leave to amend); *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990) ("delay of nearly two years, while not alone enough to support denial, is nevertheless relevant").

The City's proposed amendments do not appear to be futile. Even though the City admits that it knew about the extent of dioxin levels at the Site in 2006, the City's amendments relate to the alleged fact that it did not know that GP had intentionally attempted to conceal dioxin information and engaged in alleged fraud and negligent misrepresentation to do so. The City argues that it was unaware that GP purposely avoided dioxin assessment during environmental testing and knowingly used a misleading report to convince the City to expend time and resources to help sell the Site. It did not know the factual bases for these allegations until the 2014 depositions of Bazargani and Stephens. Blum Decl. at ¶¶ 3-4.

Although the parties do not directly address whether the statute of limitations has expired for the City's breach of contract claim, the City alleges that it discovered information pertaining to GP's breach of the 2009 Agreement after it was signed in 2009. Since the statute of limitations for breach of contract claims under CAL. CIV. PROC. CODE § 337 is four years, it is plausible that it has not expired and these claims are not futile.

8

The City did not unduly delay in seeking its amendments. It asserts that it discovered the facts to support its counterclaims in January, 2014. The City filed its motion for leave to amend in April, 2014, within the deadline for filing amendments to pleadings. GP argues that a court may determine that a party unduly delayed even if the motion was filed within the deadline for amendments to pleadings. Dkt. No. 170 at 8-9 (citing *AmerisourceBergen Corp. v. Dialysist West, Inc.,* 465 F.3d 946, 953-54 (9th Cir. 2006)). That case is distinguishable because the party seeking leave to amend knew of the facts supporting its claim fifteen months before seeking leave to amend, which was significant to the court's determination that the party had significantly delayed in bringing the claim. *Id.* In contrast, the City brought its motion roughly three and a half months after discovering the relevant facts.

Accordingly, the factors of futility and undue delay weigh in favor of the City.

### C. The Request to Dismiss the State-Law Claims is Denied

Important to my consideration of the City's motion to amend is whether I should grant GP's request in its Motion to Amend that I decline to exercise supplemental jurisdiction over the City's state-law claims. GP makes that motion even though it recognizes that "the facts necessary to confer supplemental jurisdiction are present." Dkt. No. 173 at 11. It contends that declining to exercise supplemental jurisdiction would serve the interests of judicial economy, because the City's state-law claims present novel and complex issues and will substantially predominate during litigation of this case by broadening the scope of litigation and relief. *Id.* It also contends that the City's state-law claims will lead to juror confusion and a longer and more cumbersome trial. I disagree.

Under 28 U.S.C. § 1367(a), "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ." 28 U.S.C. § 1367(a). A district court may decline to exercise supplemental jurisdiction if "the claim raises a novel or complex issue of State law" or "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction." 28 U.S.C. § 1367(c).

Where the parties, witnesses, experts, and the evidence overlap, keeping state-law claims

United States District Court
Northern District of California

together with CERCLA claims is preferable. *See e.g., Arkema Inc.v. Anderson Roofing Co. Inc.*, 719 F. Supp. 2d 1318, 1327 (D. Or. 2010) ("Although this case remains in the early stages, the number of parties and the interrelated nature of the claims favors keeping it in one piece."); *City of Merced v. Fields*, 997 F. Supp. 1326, 1336 (E.D. Cal. 1998) ("The court believes that it is better to resolve this lawsuit in a single forum, as complex a task as that may be"). The CERCLA claim remains at the heart of this suit, and the facts supporting the state-law claims relate to the CERCLA claim. [6] As an example, the facts supporting the negligent misrepresentation and fraud claims may shed light on GP's contamination of the Site. As the City notes, "[t]he gravamen of the causes of action for negligence and fraud are that GP mishandled the wastes products that were created as a result of the operations of the Site . . . GP knew that burning of the urban wastes created significant dioxin contamination." Dkt. No. 168 at 9. Whether this is true must be considered in the CERCLA claim as well. GP's transparency and cooperation with regulators, which relates to the City's negligence claim, may also be considered when determining if GP took appropriate steps to clean up the Site and how much liability to allocate to GP. The facts underlying the City's breach of contract claim may also affect CERCLA liability because if the City successfully proves the existence of the 2009 Agreement and its breach, the City may have a defense to at least part of GP's CERCLA claim.

GP also argues that the City's negligence, declaratory relief, and equitable indemnity claims should be dismissed because they are novel state-law claims but it provides little support for its argument. Dkt. No. 164 at 10-11. State-law claims such as these are commonly asserted in CERCLA cases. *See, e.g., Aggio v. Aggio*, No. 04-4357 PJH, 2005 WL 2277037, at *1 (N.D. Cal. Sept. 19, 2005) (denying a motion to dismiss a CERCLA claim and state-law claims for nuisance, equitable indemnity, and unjust enrichment); *Ferguson v. Arcata Redwood Co., LLC*, No. 03-

---

[6] The City and GP argue whether the state-law claims are related to the CERCLA claims according to the "Gore factors." Courts sometimes use "Gore factors" to determine liability under CERCLA, however, as the Ninth Circuit notes, "Congress rejected the amendment that would have listed the Gore factors as the basis for allocating liability. The trial court is therefore not limited to the Gore factors. The statutory language gives the trial court the discretion to consider 'such equitable factors as it finds appropriate'…." *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000) (citing 42 U.S.C. § 9613(f)(1)).

10

05632 SI, 2004 WL 2600471, at *7 (N.D. Cal. Nov. 12, 2004) (denying defendant's motion to dismiss plaintiff's public nuisance, private nuisance, equitable indemnity and declaratory relief claims in a CERCLA suit); *Wells Fargo Bank, N.A. v. Renz,* No. 08-02561 SBA, 2011 WL 97649, at *9 (N.D. Cal. Jan. 12, 2011) (denying a motion to dismiss plaintiff's negligence claims in a CERCLA suit). While the City's state-law claims are not exactly aligned to the CERCLA claim, the differences in the scope of issues and recovery are not sufficient to decline supplemental jurisdiction. *Kohler v. Rednap, Inc.*, 794 F. Supp. 2d 1091, 1096 (C.D. Cal. 2011) ("[T]he availability of damages under state law means that the state law claims present a slightly larger scope of issues and offer more comprehensive remedies. Nonetheless, the Court does not find that this causes the state-law claims to substantially predominate this litigation.") (emphasis omitted).

Even if some of the City's claims do present novel or complex questions or predominate, the interests of judicial economy outweighs these factors. *Arkema Inc.*, 719 F. Supp. 2d at 1327 ("Even if the Oregon Superfund Act claims pose a novel issue of state law, however, the values of economy and convenience weigh heavily in favor of retaining jurisdiction over the state law claims [ ]."); *Feezor v. Tesstab Operations Grp., Inc.*, 524 F. Supp. 2d 1222, 1225 (S.D. Cal. 2007) ("The predominance of the state law claims and the conflict in pertinent state law are such factual predicates. Once that factual predicate is identified, the exercise of discretion … still is informed by whether [dismissing] the pendent state claims comports with the underlying objective of most sensibly accommodating the values of economy, convenience, fairness and comity.") (internal citations and quotations omitted); *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) ("While discretion to decline to exercise supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in § 1367(c), it is informed by the [] values 'of economy, convenience, fairness, and comity.'"). Keeping the state-law claims and the CERCLA claim together in this case would promote judicial efficiency. If supplemental jurisdiction is not maintained over the state-law claims in this case, the likely result would be a second suit brought by the City against GP, based on the same underlying facts. This would create the type of duplicative and fragmented litigation that supplemental jurisdiction is meant to avoid.

Furthermore, the City has raised the concern that res judicata would bar the state-law

11

United States District Court
Northern District of California

claims in the event that I decline supplemental jurisdiction and GP decides to pursue its claims in state court. "Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action." *Western Radio Servs. Co. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir. 1997). Res judicata is applicable when there is: "(1) an identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties." *Id*. "The central criterion in determining whether there is an identity of claims between the first and second adjudications is 'whether the two suits arise out of the same transactional nucleus of facts.'" *Owens v. Kaiser Foundation Health Plan, Inc.*, 244 F.3d 708, 714 (9th Cir. 2001) (citation omitted).

It is unclear whether the City's fears are justified. The state-law claims and CERCLA claim are separate, but there is overlap in the evidence that will be used to support both sets of claims - for example, whether GP burned unpermitted wastes that generated dioxins at the Site from 2000 to 2002 will go to both CERCLA liability and the City's state-law claims of negligence and fraud. Whether the state-law claims would be precluded or not, either outcome weighs in favor of denying GP's request. If the claims are precluded, then dismissing the state-law claims would deprive the City of its right to a jury trial. If the claims are not precluded, then the claims might be litigated in a later case, which undermines judicial efficiency. *See Brady v. Brown*, 51 F.3d 810, 816 (9th Cir. 1995) ("The decision to retain jurisdiction over state law claims is within the district court's discretion, weighing factors such as economy, convenience, fairness, and comity."); *Union Station Associates, LLC. v. Puget Sound Energy, Inc.*, 238 F. Supp. 2d 1226, 1230 (W.D. Wash. 2002) ("In the interests of judicial economy, and to avoid undue prejudice to the parties in having to re-start this litigation at such a late date, this Court elects to retain its jurisdiction over [plaintiff's] state law claims."); *Arkema Inc. v. Anderson Roofing Co., Inc.*, 719 F. Supp. 2d 1318, 1327 (D. Or. 2010) (holding that state law claims "rely on the same allegations as the CERCLA claims against those defendants. A dismissal of the state law claims would waste judicial resources and inconvenience the parties.").

United States District Court
Northern District of California

12

## II. FOR ALL OF THESE REASONS, I WILL GRANT THE CITY'S MOTION AND I WILL MAINTAIN SUPPLEMENTAL JURISDICTION OVER THE STATE-LAW CLAIMS.

GP's motion to amend argues that "[a]s discovery has progressed, GP has determined that all of the costs it will seek at trial will be recoverable under CERCLA." Dkt. No. 164 at 3. As a result, GP moves to dismiss without prejudice its state-law claims against the City for declaratory relief under state law, implied equitable indemnity, nuisance, and trespass as part of its request that I not maintain supplemental jurisdiction over the City's claims against it. Of course, I would consider GP's motion to dismiss its own claims with prejudice, but for the reasons just given I will allow the City's proposed amendment and retain supplemental jurisdiction. Accordingly, I will DENY GP's motion to amend.

### CONCLUSION

For the reasons above, GP's Motion for Leave to Amend its Second Amended Complaint and Motion for Dismissal is DENIED and the City's Motion to Amend its Answer and Counterclaims is GRANTED. The City shall file its Amended Answer and Counterclaims by June 25, 2014.

**IT IS SO ORDERED**.

Dated: June 23, 2014



WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California

13

# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


GEORGIA PACIFIC, LLC,        )

               Plaintiff, )    Case No.

        vs.                  )    3:12-cv-02797-RS

OFFICEMAX, INC.,             )

               Defendant. )


_____

DEPOSITION OF MICHAEL ACTON

Sacramento, California

Monday, June 16, 2014

Volume I




Reported by:

LISA RICHARDSON

CSR No. 5883

Job No. 1850902


PAGES 1 - 260

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


GEORGIA PACIFIC, LLC,          )

                    Plaintiff, )    Case No.

        vs.                    )    3:12-cv-02797-RS

OFFICEMAX, INC.,               )

                    Defendant. )


_____

            Deposition of MICHAEL ACTON, Volume I, taken on behalf of City of Fort Bragg, at 555 Capitol Mall, Suite 280, Sacramento, California, beginning at 10:15 a.m., and ending at 5:23 p.m., on Monday, June 16, 2014, before Lisa Richardson, Certified Shorthand Reporter No. 5883.

                                        Page 2

APPEARANCES:

For Georgia Pacific LLC:

  HUNTON & WILLIAMS LLP

  By:  ANN MARIE MORTIMER, ESQ.

  550 South Hope Street, Suite 2000

  Los Angeles, California 90071-2627

  213-532-2103

  Amortimer@hunton.com

For OfficeMax, Incorporated:

  LEWIS BRISBOIS BISGAARD & SMITH LLP

  By:  MICHAEL JOHNSON, ESQ.

  701 B Street, Suite 1900

  San Diego, California 92101

  619-699-4909

  Michael.johnson@lewisbrisbois.com

For City of Fort Bragg:

  BASSI EDLIN HUIE & BLUM LLP

  By:  FRED BLUM, ESQ.

  500 Washington Street, Suite 700

  San Francisco, California 94111

  425-397-9006

  Fblum@behblaw.com

Also Present:   Gene Ritti, In House Counsel

                 OfficeMax, Incorporated (Telephonic)

Videographer:   John Macdonell

Page 3

emails between you and -- let me rephrase.

Was the person at GP that the emails was with Carol Stephens?

A    No.

Q    Julie Raming?    10:33:47

A    Yes.

Q    Did you review any emails between you and Carol Stephens?

A    No.

Q    Do you know who Carol Stephens is?    10:33:53

A    Yes.

Q    What's your understanding of who she is?

A    She was a real estate attorney at GP.

Q    Did you interact with her at all in the work that AME did at Fort Bragg?    10:34:05

A    Yes.

Q    How so?

MS. MORTIMER:  Vague and ambiguous.

BY MR. BLUM:

Q    What role was your understanding that she    10:34:12 played?

MS. MORTIMER:  Calls for speculation.

THE WITNESS:  I don't know what her specific role was.  She seemed to be involved with the real estate side, and Ms. Raming was involved in    10:34:24

Page 26

the environmental side.

BY MR. BLUM:

Q    Were your relations with Ms. Stephens friendly, or just were they -- were they friendly?

A    Yes.                                          10:34:36

Q    How about with Ms. Raming?

A    Generally.

Q    What do you mean "generally"?

A    Generally.

Q    Do you recall having any disagreements with   10:34:45 Ms. Raming?

A    Yes.

Q    What were those disagreements about?

A    Specifically on one occasion to transmit some data in a public meeting -- I should say a   10:34:58 project team meeting.

Q    Can you elaborate on that, please?

A    We had -- we were engaged in the field program sampling and analysis of soil, groundwater, pond samples, and service water samples that we were   10:35:18 collecting on the site, and we would typically meet on a monthly basis with the City of Fort Bragg, the Water Board, the Coastal Commission at times, the Coastal Conservancy, the county, and Fort Bragg -- all comprised the project team.  And on a roughly   10:35:38

Page 27

monthly basis we would have an update meeting where we would present the results of work that had been conducted in the past 30-day plus or minus time frame.

And for one of the meetings we were instructed by Ms. Raming that we weren't going to present some dioxin data that we had acquired during that previous time frame until confirmation samples were collected so that we could report both the primary and the confirmation samples instead of just the primary samples.  And so we did not report the dioxin results at that meeting, but we conducted confirmation samples and then reported the results of both sets of sampling at a later date that followed, I think it was a month or two later, plus or minus.

Q    And the -- what was the disagreement?

A    I thought that we had been -- we had not, to coin the term, cherry picked data during past meetings, we had just -- all the data that came in was presented in the project team meeting, and this was, this was an aberration, I believed, to exclude some of the data in that monthly presentation.

Q    Now, do you recall that the first dioxin sampling took place in late October of 2005?

Page 28

MS. MORTIMER:  Lacks foundation.

THE WITNESS:  I, I don't recall the specific dates.

BY MR. BLUM:

Q   Okay.  We are going to go through some of       10:37:11
that data.

But if I -- if you assume that they took place in late October and you got the results in November of 2005, does that help you delineate when that conversation with Ms. Raming took place?       10:37:25

MS. MORTIMER:  Lacks foundation.

THE WITNESS:  It would have been some point after that.

BY MR. BLUM:

Q   Do you know how long after that?       10:37:32

A   No.

Q   Did she tell you why she didn't want you to convey those results?

A   She said that she wanted to wait for the results of the confirmation samples before the       10:37:46 results were presented.

Q   Did you ever talk to Ms. Stephens about the instructions you received from Ms. Raming not to discuss the dioxin results in the meeting with the regulators?       10:37:59

Page 29

A    Yes.

Q    And what did you tell Ms. Stephens?

A    Exactly what I told you.

Q    Was Ms. Stephens upset when you told her that?                                                      10:38:06

MS. MORTIMER:  Calls for speculation.

THE WITNESS:  I don't know if she was upset.  It was a telephone call.

BY MR. BLUM:

Q    Did you ever talk to her again about that?   10:38:13 Ms. Stephens.  Did you ever talk to Ms. Stephens again about that issue?

A    I don't recall.

Q    The -- did you follow Ms. Raming's instructions and not disclose the dioxin results at   10:38:31 the meeting where the regulators were presents?

A    Yes.

Q    Did you tell them that -- now let me back up.

Up until that point in time, the motus   10:38:41 operandi, or the practice had been for you to disclose all results that were obtained in the 30-day period.  Correct?

A    That's the best of my recollection, yes.

Q    And did you tell them, when you had the   10:38:53

Page 30

meeting where these dioxin results were not

disclosed, that you were varying from your standard

practice?

A    I don't think we did.

Q    Do you know whether or not the impression    10:39:08

was created that what you were conveying was all the

results rather than just part of them?

MS. MORTIMER:  Calls for speculation, vague

and ambiguous.

BY MR. BLUM:                                         10:39:20

Q    I'm asking if you know.

A    If I know?

Q    Never mind.  I withdraw the question.

Do you know how long it was between the

time that you first learned of the dioxin results    10:39:34

until the dioxin results were actually reported to

the regulators?

MS. MORTIMER:  Vague and ambiguous as to

"dioxin results."

THE WITNESS:  It might have been several    10:39:46

months.

BY MR. BLUM:

Q    Other than that one discussion you had with

Ms. Raming where she told you not to report the

results to the regulators, did you have any other    10:39:57

Page 31

# EXHIBIT 4

Page 312

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA


GEORGIA-PACIFIC, LLC,

        Plaintiff,

      vs.                CIVIL ACTION

OFFICEMAX INCORPORATED, et    FILE NO.

al.,                     3-12-CV-02797-RS

         Defendants.    Volume II

_____


Continued Videotaped Deposition of ROGER J.

"CHIP" HILARIDES, taken at 1180 West Peachtree

Street, Suite 2900, Atlanta, Georgia, commencing

at 9:00 a.m., Thursday, March 6, 2014, before

Regina W. Hollis, CCR-B-2306.


JOB No. 1820529

PAGES 312 - 601

APPEARANCES OF COUNSEL:


On behalf of the Plaintiff:

BY: DOUGLAS M. GARROU, Esq.

Hunton & Williams

Riverfront Plaza, East Tower

951 East Byrd Street

Richmond, Virginia  23219

804-788-8200

dgarrou@hunton.com


BY: JOHN E. BURGESS, Esq.

Chief Counsel - Litigation

Georgia-Pacific Law Department

133 Peachtree Street, N.E.

Atlanta, Georgia 30303

404-652-2612

jeburges@gapac.com

Page 314

On behalf of OfficeMax, Incorporated:

BY: R. GAYLORD SMITH, Esq.

Lewis Brisbois Bisgaard & Smith, LLP

701 B. Street

Suite 1900

San Diega, California   92101

619-699-4975

bob.smith@lewisbrisbois.com

On behalf of Louisiana-Pacific Corp.:

BY: TARA SKY WOODWARD, Esq.

Bradley Arant Boult Cummings, LLP

1615 L Street, NW

Suite 1350

Washington, D. C.   20036

202-719-8214

swoodward@babc.com

BY: APRIL A. INGRAM, Esq.

LP Associate General Counsel

414 Union Street

Suite 2000

Nashville, Tennessee 37219

615-986-5691

april.ingram@lpcorp.com

Page 315

On behalf of the City of Fort Bragg:

     BY: FRED M. BLUM, Esq.

     Bassi Edlin Huie & Blum, LLP

     500 Washington Street

     Suite 700

     San Francisco, California  94111

     415-403-4421

     fblum@behblaw.com


Also Present:


     Scott A. Campbell, Paralegal

     Georgia-Pacific


     James De Leon, Paralegal

     Bassi Edlin Huie & Blum


     Spencer Bush, Legal Video Technician


     Gene Ritti, via Telephone

Page 395

A.   Again, speaking as the company, we were certainly aware of dioxins.  We have been dealing with dioxins since the 80s, and generally we were probably a little more focused on our pulp mills, our bleached pulp mills, as being a primary source of dioxins, but there was a realization that it could be in ash under certain circumstances.  And so there was an awareness of that.

However, we had a formal process to designate what we call beneficial reuse of those types of materials, and all of our experts had evaluated that they could be safely reused.  So we felt like while there were dioxins present, they were at a level that was safe for beneficial reuse.  So, therefore, you wouldn't expect them to be a clean-up driver at a site that was already beneficially reusing these materials.

Q.   Let me see if I can sort of take this piece by piece.  By the mid 1980s, GP had knowledge that processes such as the boilers at the Fort Bragg facility could produce dioxins as a byproduct, correct?

A.   That's a fair statement, yes.

Q.   Okay.  And they were -- Fort Bragg was aware that the dioxins could have been in the fly

-- a good source for me.

Q.    Who is that?

A.    Stewart Holm.

Q.    Okay.

A.    And because I've been an environmental engineer starting in 1998 with the company and worked with closely dioxins, I'm relying on a lot of personal knowledge that I had acquired over the years to form the basis of my testimony.

Q.    And would you agree with me that at least the regulatory community considers dioxin to be something that needs to be controlled and regulated?

A.    Yes.

Q.    And -- all right.  In the -- in the title when you started out with Mr. Smith, your title has the word "ethics" in it.  I'm just curious, what does that mean, what part of your job is dealing with ethics?

A.    So I'm the compliance and ethics officer for the company.  So ethics, we have a code of conduct that the company publishes and holds our employees accountable to.  Our code of conduct encompasses a lot of ethical decision making and ethical behaviors that we expect from employees, so that's primarily reference to that.

Page 400

Q.    How long has this code of conduct been in place?

A.    So the current code of conduct we just issued an amendment to it a couple of months ago.  We republished one two years ago.  We've had one in place for many years.  Certainly since Koch Industries we've had a code of conduct.  GP had a code of conduct before that.  I haven't studied the full history of our codes of conduct.

Q.    Does the code of conduct have -- say anything about lies by omission?  You know what I mean by lies by omission?

A.    I'm familiar with the phrase.  I'm trying to think of our code whether it has any specific reference to that.  I don't believe it does.

Q.    In your mind -- well, does the code of conduct have anything where it discusses lying to the public or to regulators?

A.    It talks about integrity and being truthful with things you say and generally talks about those types of things, yes.

Q.    Would a lie by omission violate the code of conduct?

A.    Again, it's not specifically discussed the way you said.  We talk about obligation of employees

Page 401

to report things that they think are not in

compliance with our code of conduct and not reporting

is a violation of the code of conduct.  That gets a

little bit, I think, what you're saying.

Q.    Well, let me be blunt.  If somebody makes

a statement to a regulator that constitutes a lie by

omission, does that violate the GP code of conduct?

A.    Certainly a behavior that we don't

tolerate as a company.

Q.    That may be true, but does it violate GP's

code of conduct?

A.    I believe as you read through certain

sections of the code of conduct, it would cover that

type of behavior.

Q.    And is there an expect -- has that always

been true since at least the mid '90s?  Has it always

been true since you've been at GP?

A.    Our code of conduct is much more detailed,

has been in the probably last 6 or 8 years than it

was before that.  I think from an integrity and

ethics standpoint, the company has always aspired to

be truthful in our dealings, certainly with the

government.

Q.    And since you've been at GP, has the code

of conduct of GP ever allowed lies by omission?

Page 402

A.    Wouldn't be something that a code of conduct would say is okay.  That's never been in a code of conduct that says that would be okay.

Q.    Was it -- since you've been at GP, has the code of conduct always prohibited lies by omission to regulators?

A.    Again, it's -- I don't believe it's ever been phrased that way in our code of conduct, at least not that I'm familiar with, but the context and the intent of the code would not allow that.

Q.    Okay.  Is there an expectation that if somebody violates the code, that there will be repercussions?

A.    Yeah.  That's part of my job is to make sure that we do act on things that we think violate the code of conduct, yes.

Q.    Okay.  And since you've been at GP, has that always been your understanding?

A.    It is.

Q.    If, indeed, Julie Raming told Mohammed specifically not to include dioxins in the Phase I investigation, would that have violated the code of conduct?

A.    Well, you certainly need to understand the exact context of the situation.  I can imagine

scenarios that play out there that there could be misunderstandings amongst people.  There could be -- I don't know the details of what happened in there. So it's certainly possible that something happened that wasn't appropriate, but I can think of a lot of reasons why he didn't understand what she was doing or vice versa, and so I can't answer your question the way you've stated it.

Q.    Well, let's assume there's no misunderstanding.  Let's assume that what Mohammed said was correct, that she was specifically instructed by Julie Raming not to include dioxins in the Phase I, and it's also assumed that there was no exclusion in the Phase I that stated that dioxins were excluded.  Would that have violated the code of conduct?

MR. GARROU:  Objection, hypothetical, calls for speculation.  You can go ahead.

A.    Yeah, I mean, it's very difficult.  You've laid out very simplistic statements.

Q.    If you don't know, that's an okay answer, I don't know.

MR. GARROU:  You need to let the witness answer the question.  He had not concluded his answer.

MR. BLUM:  Sure.

A.    Your hypothetical, to me, oversimplifies what was, I'm sure, a very complex situation.  So I can't just give you a flat answer that it would or wouldn't violate the code of conduct.  I would need to know a lot more about the situation to be able assess whether it does or doesn't.

Q.    Like what?

A.    Well, what were the communications that were shared, what was the context, what was the purpose of the Phase I, you know, who determined the scope, how was it determined.  I mean, there's just so many details in there to know whether there was some -- some direction given.

There is some judgment involved in a Phase I assessment as to what needs to be looked at and what does not.  You typically rely on a consultant to help you make sure you have a comprehensive view.  So I would be surprised if there was direction to omit something that a consultant thought would be appropriate.  That would surprise me.

Q.    Why?

A.    That's the purpose of a Phase I is to understand the site.

Q.    And are you aware that the Phase I is

mid '90s through the appeals and other things.

Q.   Okay.  From 1990 until 2002, what, if anything, did GP do to investigate the potential for dioxin contamination to be present at the Fort Bragg mill site?

A.   So the date you are looking for, 1990, you said, to 2002?

Q.   To 2002, when it closed.

A.   So, again, I reviewed a number of different documents.  We had an ongoing program of beneficial reuse of our ash.

Q.   Uh-huh.

A.   There was regular testing of our ash.  It was being used in a number of locations.  During that time period it was -- the ash we were collecting on site was going to a place called McGuire's Ranch for beneficial reuse.  We had data that was documenting the dioxin concentrations of that.  We had water board discharge permits that allowed us to do that.

So that was probably the primary focus of our dioxin analysis.  I am not aware of any specific additional testing that was done.  Our understanding was the dioxins were in the ash and we were collecting and managing it.

Q.   Okay.  And at least one or two of the

Page 444

from the County of Mendocino Air Pollution Control District, and it's to Ralph Sholders at the GP facility.  And it's Bates stamped AQMD9658 through -- I'm sorry, 9658 through 59.

In preparing for this deposition, did you review this document?

A.   I don't recall seeing this document, no.

Q.   Have you seen it prior to today?

A.   I don't think so, no.

Q.   Okay.  All right.  Let's go to the next one.  All right.  Now, if you go to the next paragraph on the dioxin talking points, it says there is another type of dioxin compound on site which was created by burning municipal wood, wood waste from land fills, like demolition debris.  Now, what is it about -- I'm sorry.  Let me back up.  Back to the document.

GP burned municipal wood in its boiler for a limited time prior to closure of the mill that generated additional power for the state's grid.  You would agree with that, correct?

A.   Yes.

Q.   Okay.  And, now, is there something about burning municipal wood that causes a greater concentration of dioxins to be produced?

Page 445

A.    So in general, again, it depends on the combustion equipment that you have.  In the case of the Fort Bragg boilers, if you have contaminants, in particular, you have things like plastics, things that contain chlorine or chlorides, they have the potential in the combustion to form more dioxins, more complex dioxins than you would otherwise generate.

Q.    And has this been well known for a while?

A.    Certainly within the -- yes, well known, yes.

Q.    Since at least the mid '90s?

A.    I believe so, yes.

Q.    What is it about plastics that are -- that could lead to higher dioxin levels?

A.    Well, you basically need to have the -- if you have the materials present during the combustion process or in the flute, as they exit the combustion process, you have more of the right components, chemistry there that can form these dioxin or furan compounds.  Happens more readily than it does if they're not present.

Q.    Now, what steps, if any, did GP take to make sure that the urban waste that had burned during the time period that you talked about didn't contain

Page 534

Q.   Prior to the mill closing, did Georgia-Pacific conduct any analysis of the environmental impact that would result from the disposal of its ash that might contain dioxin?

MR. GARROU:  Objection, vague.  Go ahead.

A.   So, I mean, as we were conducting our -- what I call our beneficial reuse projects, that included internal review of the proposal.  So certainly when I joined the company in the late '90s, it was a beneficial reuse approval that was needed from corporate.  I don't recall seeing the results of that in the documents I reviewed, but that would have been the practice at the time, and that would have included assessing just an appropriate reuse, were there any contaminants in here that would prevent us from wanting to pursue that beneficial reuse.  I've not seen that analysis for Fort Bragg, but that was the practice at the time.

Q.   And when was that -- when was that reuse analysis done?

A.   When was it implemented?

Q.   Yes.

A.   It was certainly in place in 1998 when I joined the company because I submitted several to the corporation for Bellingham, Washington.  I don't know

when it was instituted.

Q. And that process would have looked at what in relation to environmental effects of the ash?

A. So you would basically analyze the proposal, so using the example of ash as a soil amendment, the facility would have provided information on the ash, what its content was, any analysis they had done of contaminants, what the use was, and an analysis of any risks associated with that. Would have had experts in our corporate offices evaluate that and approve it for beneficial reuse. So that would have been our practice at the time.

Q. I'm sorry. I know you said, but you said and I forgot. When was this done?

A. Again, what I said was I knew that this requirement was in place in the company in 1998 when I joined the company. I've not actually seen one that was completed for Fort Bragg, but it certainly would have been the company expectation.

Q. Okay. Now, number 71 of the deposition notice says -- one of the categories is any analysis or investigation that was in GP's possession prior to 2002, regardless of who the author was, regarding any environmental or health -- or human health dangers

Page 536

posed by exposure to dioxin.  Is it your testimony that that issues would have been looked at in the beneficial reuse analysis for Fort Bragg?

A.    That analysis would have considered all relevant information, if there was toxicity data for the contaminants a concern, and the potential uses, that would have been evaluated.  Depending on who was doing it, they may -- they may have used regulatory criteria as part of their assessment, as well as any other knowledge the company had relative to it.  I'm not sure I would call it a health assessment, be more of a risk assessment.

Q.    Would that beneficial reuse analysis have looked at dioxins at the facility and any environmental or human health risks posed by that, the presence of dioxin?

A.    That specific question?

Q.    Generally that question.

A.    I don't know.

Q.    Okay.  Number 70 is any analysis or investigation that was in GP's possession prior to 2002, regardless of who the author was, concerning the presence of dioxin at any of the facilities that GP operated in the United States.  Would the beneficial reuse analysis have looked -- would the

Page 537

beneficial reuse analysis looked at whether or not dioxins were present at the facility in Fort Bragg?

A.    It should have, based on my understanding of that process, and the reason I say that is I looked at disposal of byproducts from Bellingham, including ash, and we concluded that it was not suitable for beneficial reuse and we didn't -- we disposed of it in a landfill.

MR. BLUM:  Do you want to explain to me, Doug, why we never saw it, then, or he's not prepared to testify as to those two issues?

MR. GARROU:  The document you are talking about, I don't know whether it exists or not.

MR. BLUM:  Well, I would expect you to go find out.  I mean, I'm either going to make a motion or you're going to find out voluntarily, so.

MR. GARROU:  I mean, obviously we'll go find out.

BY MR. BLUM:

Q.    The Bellingham, the one on Bellingham, you don't -- when did you do the one for Bellingham?

A.    It would have been in 1998 or 1999, that time period.

Q.    And is it a paper document, is it one done

Page 538

on the computer, how is it done?

A.    It's a paper document.

Q.    And what do you do with it?

A.    So once you've completed it, you submit it to our corporate environmental affairs for review. You would then get confirmation that it was authorized, you retain it in your files for appropriate period of time while you are carrying out the beneficial reuse activity.

Q.    Okay.  And it's your understanding based on corporate policy that that would have been done for the Fort Bragg facility?

A.    I would have expected that to be done, yes.

Q.    Okay.  Is there a reason why you didn't ask to see whether or not there was a beneficial reuse analysis for Fort Bragg?

A.    I honestly didn't think of it until you and I started talking about it right now.

Q.    Okay.  In relation to category 70 and 71 that we just talked about, what documents did you review?

A.    I'm sorry.  Restate the question, please.

Q.    The two categories we just talked about, one on presence of dioxins and the environmental and

Page 580

Q.   Do you recall anybody ever telling the mill or any facility that GP operated be careful when burning material that's been on the bottom of your piles for a long time because it may have a negative result on dioxin formation?

A.   I've not seen any correspondence to that effect or warnings to that effect.

Q.   Generally -- and this is then I'm done. Generally how was information that the corporate environmental department gained communicated to the mills?

MR. GARROU:  Objection, lacks a time frame.

Q.   In the 1990s or year 2001 and 2.

A.   Yeah, so late '90s or 2000, if there was a significant learning, a memorandum potentially would have been sent from our environmental office to appropriate facilities.  So there certainly -- we used to have, and still do, what we call an environmental alert.  So one could have been created had someone identified this as a risk that needed to be broadly communicated.

Q.   Did you see such an alert?

A.   I don't recall seeing any such alert, no.

Q.   Well, have you seen anything that created

# EXHIBIT 5

# EXHIBIT K

**30(b)(6) Deposition Preparation Notes**
*Former Fort Bragg Mill Site, Fort Bragg, CA*

Subject 52: *Any excavation or dredging of the mill ponds, including but not limited to Ponds 4, 5, 7, 8, and 9.*

GP Position

- Between 1996 and 2002 both Ponds 4 and 7 were dredged once or twice a year and the dredge material was placed in the former ash pile area.[1]  In the fall of 2006 the ash pile was excavated and disposed of offsite at the "Allied Waste Services, Keller Canyon Landfill in Pittsburg, California".[2]

- Deposition testimony suggests that Pond 8 was historically dredged because Union Lumber Company used the pond for log storage and debris and bark would come off the logs and accumulate at the bottom of the pond.[3]

- GP at this time has not uncovered information on any dredging related to Ponds 5 or 9.

---

[1] Arcadis, Preliminary Site Investigation Work Plan, Operable Unit E - Onsite Ponds, December 2007, p. 2-4; Deposition of Richard Benedetti, January 23, 2014, p. 87, Lines 7-21.
[2] Arcadis, Construction Completion Report for Foundation and Ash Pile Removal Projects, Former Georgia-Pacific Wood Products Facility, April 2007, p. 34.
[3] Deposition of Richard Benedetti, January 23, 2014, p. 94, Lines 10-13 & 15-22.



1

29073.000398 EMF_US 49535330v2

# EXHIBIT N

## 30(b)(6) Deposition Preparation Notes
### *Former Fort Bragg Mill Site, Fort Bragg, CA*

<u>Subject 80</u>: *GP costs to investigate or remediate any contamination in the Glass Beach area.*

<u>Georgia-Pacific Position on Costs for Beaches</u>:

- Because invoices from vendors working on the Mill Site reflected response costs incurred for various activities being conducted concurrently, the majority of the invoices submitted do not break out costs by OU and/or sub-areas such as the Glass Beach areas. Therefore, it is not possible for GP to provide an exact cost for the investigation and/or cleanup of the Glass Beaches area.

- GP estimates that its expenditures to investigate and cleanup contamination in the glass beach areas totals approximately $400K.

- This issue is the subject of expert analysis and further refinement and the totals will be presented in forthcoming expert reports.

<u>Georgia-Pacific Position on Costs Associated with OU-A</u>:

- Because invoices from vendors working on the Mill Site reflected response costs incurred for various activities being conducted concurrently, the majority of the invoices submitted do not break out costs by OU and/or sub-areas such as the Glass Beaches areas. Therefore, it is not possible for GP to provide an exact cost for the investigation and/or cleanup of the Glass Beach area and OU-A.

- GP estimates that its expenditures to investigate and cleanup contamination in OU-A (excluding the Glass Beach area) totals approximately $8.4M.

- The issue of cost allocation is the subject of expert analysis. The allocation of response costs for the Glass Beach area and OU-A will be presented in forthcoming expert reports.

1



DEFENDANT'S
EXHIBIT
787
PENGAD 800-631-6989

# EXHIBIT O

**30(b)(6) Deposition Preparation Notes**
*Former Fort Bragg Mill Site, Fort Bragg, CA*

<u>Subject 23</u>: *Any materials from mill site operations that went into the mill ponds.*

<u>GP Position</u>

- Steam vat wastewater from the plywood plant, which operated from 1969 to 1977, was discharged to the Mill Pond (Pond 8).[1]

- Water used to sprinkle the plywood logs during plywood plant operations (1969 to 1977) drained into the Mill Pond.[2]

- Stormwater from the City of Fort Bragg, as well as the Mill Site, drained into the Mill Pond.[3]

- "Roundhouse / Former Mobile Equipment Shop Wastewater" appears to have been diverted to onsite storm drains that discharged to the Mill Pond.[4]

- "Cat Shop Wastewater" appears to have been discharged directly to the Mill Pond.[5]

- "Truck Wash Pond Wastewater" appears to have been diverted to onsite storm drains that discharged to the Mill Pond.[6]

- Water from Pudding Creek, which received stormwater flow from the City of Fort Bragg, was pumped (via Pond 5) to the Mill Pond to maintain water level during the summer and fall months.[7]

- From 1954 until 1971 hydraulic log debarker effluent discharged directly into the Pacific Ocean.[8] After 1971 "screening devices" were installed "to remove the fibrous material".[9] This water then flowed into the Mill Pond after passing through the North Settling Pond, then the South Settling Pond, then Pond 7, which was pumped to the south settling ponds, Pond 1 (pre 1996) or Pond 4 (post 1996).[10] However, as of 1973, a portion of this effluent still flowed into the Pacific Ocean via a "gully" after passing through the North and South Settling Ponds.[11]

- Boiler blowdown water was discharged directly into the Mill Pond as of 1973, and presumably prior to 1973.[12] However, the January 1973 Waste Discharge Technical Report indicated that this effluent <u>would be</u> discharged to the on-site settling ponds prior to being discharged to the Mill Pond at some point after this report was issued.[13] This is confirmed by later reports.[14]

- From 1972 until 1981 waste effluent from the power plant wet scrubbers that contained fly ash and cyanide was discharged to the South Settling Pond prior to being pumped to the fly ash dewatering slabs, which then flowed into Pond 7 and was pumped to settling Pond 1 and then discharged to the Mill Pond (Pond 8).

- After 1981, when use of the South Settling Pond ceased, this water went directly to dewatering slabs.[15] Fly ash that was piped into the two dewatering slabs was then "placed in a dump hopper for removal and placement at an offsite location."[16] Any

1



DEFENDANT'S EXHIBIT

additional process water flowed to Pond 7, and thence to the southern settling ponds (Ponds 1, 2, and 3).[17] Fly ash in this water would have settled out in Pond 7 or Pond 1.

* In 1996 a fly ash reinjection system was installed which eliminated the use of the dewatering slabs; therefore, process water from the boilers was conveyed directly into Pond 7.[18] At this time Pond 4 was created to receive this process water.[19] Water from Pond 4 drained into Pond 1, which ultimately drained back to the Mill Pond (Pond 8).[20]

* Sand and fine carbon from the power plant boiler stack clarifiers[i] flowed into the Mill Pond.[21] The 1973 EPA Industrial Discharge Survey indicated that this effluent flowed with the boiler blowdown water and, as of 1973, flowed directly into the Pacific Ocean.[22]

* Water plant filter backwash was first identified in the 2001 RWQCB order as a discharge source to the Mill Pond.[23]

---

[1] RWQCB Order 75-12, April 21, 1975; Waste Discharge Technical Report, January 15, 1973, p. 2 and 5; and EPA, Industrial Discharge Survey, January 10, 1973, p. 3.
[2] Waste Discharge Technical Report, January 15, 1973, p. 5.
[3] Waste Discharge Technical Report, January 15, 1973, p. 1 and 5; EPA, Industrial Discharge Survey, January 10, 1973, p. 3; RWQCB Order 79-94, July 26, 1979; RWQCB Order 84-89, July 26, 1984; RWQCB Order 89-66, September 21, 1989; RWQCB Order 94-110, September 22, 1994; RWQCB Order 2001-22, March 22, 2001; Arcadis, Mill Pond Storm Water Sampling Report, Former Georgia-Pacific Wood Products Facility, April 2012, p. 2-1 – 2-3, Figure 1-2.
[4] Arcadis, Data Summary Report for OU-E Pond Sediment, Former Georgia-Pacific Wood Products Facility, May 2009, and Figure 2-2.
[5] Arcadis, Data Summary Report for OU-E Pond Sediment, Former Georgia-Pacific Wood Products Facility, May 2009, and Figure 2-2.
[6] Arcadis, Data Summary Report for OU-E Pond Sediment, Former Georgia-Pacific Wood Products Facility, May 2009, and Figure 2-2.
[7] Waste Discharge Technical Report, January 15, 1973, p. 1; and EPA, Industrial Discharge Survey, January 10, 1973, p. 2; Winzler & Kelly, Storm Drainage Master Plan, City of Fort Bragg California, October 2004, pp. 3 & 13; ARCADIS, Preliminary Site Investigation Work Plan Operable Unit E - Ponds, Former Georgia-Pacific Wood Products Facility, December 2007, p.2-2, Figure 2-2.
[8] Waste Discharge Technical Report, January 15, 1973, p. 7.
[9] Waste Discharge Technical Report, January 15, 1973, p. 7; EPA, Industrial Discharge Survey, January 10, 1973, p. 3.
[10] ARCADIS, Preliminary Site Investigation Work Plan Operable Unit E - Ponds, Former Georgia-Pacific Wood Products Facility, December 2007, p.2-2 & 2-4.
[11] EPA, Industrial Discharge Survey, January 10, 1973, p. 3; Arcadis, Data Summary Report for OU-E Pond Sediment, Former Georgia-Pacific Wood Products Facility, May 2009, p. 2-2, Figure 2-2.
[12] Waste Discharge Technical Report, January 15, 1973, p. 7; EPA, Industrial Discharge Survey, January 10, 1973, p. 3; RWQCB Order 79-94, July 26, 1979; RWQCB Order 84-89, July 26, 1984; RWQCB Order 89-66, September 21, 1989; RWQCB Order 94-110, September 22, 1994; RWQCB Order 2001-22, March 22, 2001.
[13] Waste Discharge Technical Report, January 15, 1973, p. 7.
[14] Arcadis, Data Summary Report for OU-E Pond Sediment, Former Georgia-Pacific Wood Products Facility, May 2009, p. 2-2 & 2-4, Figure 2-2.
[15] Arcadis, Data Summary Report for OU-E Pond Sediment, Former Georgia-Pacific Wood Products Facility, May 2009, p. 2-2, Figure 2-2; ARCADIS, Preliminary Site Investigation Work Plan Operable Unit E - Ponds, Former Georgia-Pacific Wood Products Facility, December 2007, p.2-2, Figure 2-2;

---

[i] The document says "classifiers" but it seems as if it should read "clarifiers".

2

BBL/Arcadis, Current Conditions Report, former Georgia-Pacific Wood Products Manufacturing Facility, December 11, 2006, p. 6-7.

[16] BBL/Arcadis, Current Conditions Report, former Georgia-Pacific Wood Products Manufacturing Facility, December 11, 2006, p. 2-2; California Regional Water Quality Control Board internal Memorandum from Kor, B. to Johnson C, Reichmuth, F., Warner, S., and Tancreto, B., Re: Georgia-Pacific Fort Bragg Ash Problems, October 18, 1985.

[17] Arcadis, Preliminary Site Investigation Work Plan, Operable Unit E - Onsite Ponds, December 2007, p. 2-2 & 2-4, Figure 2-2.

[18] ARCADIS, Preliminary Site Investigation Work Plan Operable Unit E - Ponds, Former Georgia-Pacific Wood Products Facility, December 2007, p.2-2 & 2-4.

[19] BBL/Arcadis, Current Conditions Report, former Georgia-Pacific Wood Products Manufacturing Facility, December 11, 2006, p. 2-2 and 6-3; Arcadis, Final Remedial Investigation Report Operable Unit E, Former Georgia-Pacific Wood Products Facility, January 2013, p. 3-6 – 3-7, and Figure 2-1; Arcadis, Data Summary Report for OU-E Pond Sediment, Former Georgia-Pacific Wood Products Facility, May 2009, p. 2-2 – 2-3; Arcadis, Construction Completion Report for Foundation and Ash Pile Removal Projects, Former Georgia-Pacific Wood Products Facility, April 2007, p. 8 – 9.

[20] Arcadis, Preliminary Site Investigation Work Plan, Operable Unit E - Onsite Ponds, December 2007, Figure 2-2.

[21] Waste Discharge Technical Report, January 15, 1973, p. 7.

[22] EPA, Industrial Discharge Survey, January 10, 1973, p. 3.

[23] RWQCB Order 2001-22, March 22, 2001.

3

# EXHIBIT P

## 30(b)(6) Deposition Preparation Notes
### *Former Fort Bragg Mill Site, Fort Bragg, CA*

Subject 3: *All evidence or other information that GP has regarding the location, scope and nature of the disposal of hazardous substances by Union Lumber, OfficeMax, LP and/or CFB at the former Fort Bragg lumber mill site.*

Office Max

- A chronology of events from 1969 to 1974 points to concerns by the RWQCB about the nature of Boise Cascade's discharges to the Pacific Ocean during its ownership period, including concerns about glue waste, debarker water, and boiler blow down water discharges.[1]

- Analytical data from 1971 points to contaminants in Boise Cascade's discharges, including acidic conditions, volatile solids, grease, and phenols.[2]

- The January 1973 Waste Discharge Technical report, prepared by Boise Cascade, includes data collected prior to GP's ownership period. This data identified grease and oil, acidic conditions, and phenolic compounds in "Barker Settling Ponds Effluent" (p. 9 of 16). Boiler water blow down water had a pH of 11 (p. 10 of 16). Mill pond discharge water contained grease and oil, arsenic, and lead (p. 11 of 16).[3]

- Waste from plywood plant steam vats and glues were discharged to Pond 8 and to the Pacific Ocean during Office Max's ownership period.[4]

- Fly ash and clinkers generated from the wood fired boilers and wood burn areas at the site would have contained dioxins and metals. A review of aerial photographs indicates that historically there were areas of land disturbance at the site, including the southern portion of the site (near the blow hole), southwest of Pond 8, along the southwest coastline, and along the north west coast, indicative of filling at the site during the period when Office Max predecessors were operating the plant.[5]

- Historical operations at the plant would have included the use of hazardous materials, including fuel oils, lubricating oils, solvents, leaded gasoline, and PCB oils in transformers. Accidental discharges, spills, and/or releases of these materials would have occurred.

- Further details about this disposal of hazardous substances is being developed by experts retained by GP.

- Hazardous substances, pollutants, and contaminants would have been disposed of in connection with machine operations, lubrication, and cleaning, vehicle operation and maintenance, tool and equipment part manufacturing, and vehicle and railroad operations and maintenance.

Louisiana Pacific

- Analytical data from 1971 points to contaminants in plywood plant vat discharges that contain volatile solids, grease, and phenols.[6] While this data is from the period before LP owned the plant, the operations were the same in 1971 as they were during LP's time period.

1

DEFENDANT'S
EXHIBIT
157
PENGAD 800-631-6989

- The RWQCB Order Number 75-12 indicates that "The discharge of effluent waste resulting from the production of plywood to the waters of the Pacific Ocean or a waste stream which discharges to the Pacific Ocean is prohibited" and that LP had until March 1, 1976 to comply with this prohibition.[7] This discharge consisted of plywood block conditioning wastes, as described above, which discharged to the Mill Pond.[8]

- An April 1976 letter from the RWQCB to LP indicates that plywood vat liquors were continuing to be discharged to the mill pond in violation of the prohibition outlined in RWQCB Order Number 75-12.[9]

- Substances found in plywood plant discharges would have included dissolved and suspended solids, phenols, and acidic solutions.[10] In addition, glues used in the veneer and plywood industry include phenolic formaldehyde resin, urea formaldehyde, and protein glue, which would have contained solvents and caustic sodas.[11]

- LP's operations would have included the use of contaminants such as fuel oils, lubricating oils, solvents, leaded gasoline, and PCB oils in transformers. Accidental discharges, leaks spills, and/or releases of these materials would have occurred.

- The contaminant summary table prepared for OU-D identifies contaminants found in the areas owned and operated by LP, including Metals, PAHs, PCBs, TPH, Dioxins/ Furans, and VOCs.

- Further details about this disposal of hazardous substances is being developed by experts retained by GP.

- Hazardous substances, pollutants, and contaminants would have been disposed of in connection with machine operations, lubrication, and cleaning, vehicle operation and maintenance, tool and equipment part manufacturing, and vehicle and railroad operations and maintenance.

City of Fort Bragg

- The City of Fort Bragg dump was located in the Glass Beaches area of the site and was used for waste disposal sometime between circa 1942 and 1967.[12] The City dumps accepted municipal solid waste and other wastes such as appliances, automobile parts, etc. in these areas.[13] Some of this waste was burned in open pits on the bluffs prior to burial.[14]

- Storm water from the City flowed into Pond 5 until 2013. Pond 5 received City storm water that discharged into Pudding Creek and was pumped into Pond 5 until early 2013 when this practice was discontinued.[15] The City's storm water also drains directly into Pond 5 via surface flow.[16] This pond was historically used as a backup source of water to Pond 8.[17]

- Pond 8 receives storm water discharges from the City via two outfall pipes (from City drainage basins C and D)[18] that account for 54.5% of the drainage area into Pond 8.[19] Sampling of this storm water in 2011 revealed the presence of metals, petroleum products, and dioxins/furans.[20] Upon review of this data, the mass loading of dioxins/furans identified in storm water flowing into Pond 8 from the City accounted for 94% to 99% of mass contribution during the two storm events sampled in 2011.[21]

2

Similarly, drainage from the City accounted for 86% to 93% of the total metals loading to Pond 8 during the same two storm events in 2011.[22]

---

[1] RWQCB, Chronology of Events – Georgia-Pacific Sawmill, Ft. Bragg, August 25, 1969 – December 3, 1974.

[2] Letter from Ecklund, B.A. (Columbia Research and Testing Corporation) to Tallman, K. (Boise Cascade Corporation) Re: Analysis of Water Samples Collected from Mill Pond, September 13, 1971, October 6, 1971.

[3] Tallman, K., Technical Report – Sections I & II, Waste Discharge to the Pacific Ocean, Boise Cascade Corporation, Fort Bragg Plant Operation, January 15, 1973, pp. 9 – 11.

[4] US EPA, Surveillance & Analysis Division, Region IX, Industrial Discharge Survey, Boise Cascade Corp, Union Lumber Division, January 10, 1973, p.2-3; Letter from Ecklund, B.A. (Columbia Research and Testing Corporation) to Tallman, K. (Boise Cascade Corporation) Re: Analysis of Water Samples Collected from Mill Pond, September 13, 1971, October 6, 1971.

[5] Aerial Photography from 1948, 1956, 1957, 1963, 1970,

[6] Letter from Ecklund, B.A. (Columbia Research and Testing Corporation) to Tallman, K. (Boise Cascade Corporation) Re: Analysis of Water Samples Collected from Mill Pond, September 13, 1971, October 6, 1971.

[7] California Regional Water Quality Control Board, North Coast Region, Order No. 75-12, Waste Discharge Requirements for Georgia-Pacific Corporation/Louisiana-Pacific Corporation, April 21, 1975, p.2.

[8] California Regional Water Quality Control Board, North Coast Region, Order No. 75-12, Waste Discharge Requirements for Georgia-Pacific Corporation/Louisiana-Pacific Corporation, April 21, 1975, p.1.

[9] Letter from Reichmuth, F. (RWQCB) to Stalker, A.K. (Louisiana-Pacific Corporation), Re: Inspection of Louisiana-Pacific Corporation's Plywood Mill, April 1, 1976.

[10] US EPA, Development Document for Proposed Effluent Limitations Guidelines and New Source Performance Standards for the Plywood, Hardboard, and Wood Preserving Segment of the Timber Products Processing Point Source Category, December 1973, p. 73.

[11] US EPA, Development Document for Proposed Effluent Limitations Guidelines and New Source Performance Standards for the Plywood, Hardboard, and Wood Preserving Segment of the Timber Products Processing Point Source Category, December 1973, p. 78 and 80-81.

[12] Garcia and Associates, Transitions Over Time: A Chronologic Perspective of the Union Lumber Company Lumber Mill, Fort Bragg, Mendocino County, California, July, 2008, p. 83; RWQCB, Waste Discharge Requirements for William J. Blinn Trust, Glass Beach Property (Former Fort Bragg Dump) Clean Closure of the Solid Waste Disposal Site, Order No. RI-2002-0099, p.1; Summary Table, References to the Dump from City Council Minutes, Dated 1949-1970; Fort Bragg Chamber of Commerce, Glass Beach – From Trash to Treasure (http://www.fortbragg.com/explore/glass-beach/); Aerial photographs from 1942, 1948 and 1957.

[13] Garcia and Associates, Transitions Over Time: A Chronologic Perspective of the Union Lumber Company Lumber Mill, Fort Bragg, Mendocino County, California, July, 2008, p. 83.

[14] TRC, Phase I Environmental Site Assessment, Georgia Pacific, California Wood Products Manufacturing Division, March 2004, pp. 16-17.

[15] ARCADIS, Preliminary Site Investigation Work Plan Operable Unit E - Ponds, Former Georgia-Pacific Wood Products Facility, December 2007, p.2-2 – 2-4; Winzler & Kelly, Storm Drainage Master Plan, City of Fort Bragg California, October 2004, pp. 3 & 13; personal communication with ARCADIS personnel.

[16] ARCADIS, Mill Pond Storm Water Sampling Report, Former Georgia-Pacific Wood Products Facility, April 2012, Figure 1-2.

[17] ARCADIS, Preliminary Site Investigation Work Plan Operable Unit E - Ponds, Former Georgia-Pacific Wood Products Facility, December 2007, p.2-2, Figure 2-2.

[18] ARCADIS, Mill Pond Storm Water Sampling Report, Former Georgia-Pacific Wood Products Facility, April 2012, p.2-1 – 2-2, Figure 1-2.

[19] ARCADIS, Mill Pond Storm Water Sampling Report, Former Georgia-Pacific Wood Products Facility, April 2012, p. A-4 – A-5.

3

[20] ARCADIS, Mill Pond Storm Water Sampling Report, Former Georgia-Pacific Wood Products Facility, April 2012, Tables 3-4 and 3-5.

[21] ARCADIS, Mill Pond Storm Water Sampling Report, Former Georgia-Pacific Wood Products Facility, April 2012, Tables 3-4 and 3-5.

[22] ARCADIS, Mill Pond Storm Water Sampling Report, Former Georgia-Pacific Wood Products Facility, April 2012, Tables 3-4 and 3-5.

# EXHIBIT Q

## 30(b)(6) Deposition Preparation Notes
### Former Fort Bragg Mill Site, Fort Bragg, CA

<u>Subject 59</u>: *All areas of the mill site that GP alleges City stormwater flowed onto.*

<u>GP Position</u>

- Storm water from the City of Fort Bragg ("City") flowed into Pond 5 until 2013. Pond 5 received City storm water that discharged into Pudding Creek and was pumped into Pond 5 until early 2013 when this practice was discontinued.[1]

- City storm water from areas adjacent to the pond also drains into Pond 5 via surface flow.[2] This pond was historically used as a backup source of water to Pond 8.[3]

- Pond 8 receives storm water discharges from the City via two outfall pipes. This stormwater originates from City drainage basins C and D.[4] The City's flow from drainage basins C and D account for 54.5% of the total drainage area discharging into Pond 8.[5]

---

[1] ARCADIS, Preliminary Site Investigation Work Plan Operable Unit E - Ponds, Former Georgia-Pacific Wood Products Facility, December 2007, p.2-2 – 2-4; Winzler & Kelly, Storm Drainage Master Plan, City of Fort Bragg California, October 2004, pp. 3 & 13; personal communication with ARCADIS personnel.
[2] ARCADIS, Mill Pond Storm Water Sampling Report, Former Georgia-Pacific Wood Products Facility, April 2012, Figure 1-2.
[3] ARCADIS, Preliminary Site Investigation Work Plan Operable Unit E - Ponds, Former Georgia-Pacific Wood Products Facility, December 2007, p.2-2, Figure 2-2.
[4] ARCADIS, Mill Pond Storm Water Sampling Report, Former Georgia-Pacific Wood Products Facility, April 2012, p.2-1 – 2-2, Figure 1-2.
[5] ARCADIS, Mill Pond Storm Water Sampling Report, Former Georgia-Pacific Wood Products Facility, April 2012, p. A-4 – A-5.



DEFENDANT'S
EXHIBIT
_180_

PENGAD 800-631-6989

# EXHIBIT 6

                    UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF CALIFORNIA


GEORGIA-PACIFIC, LLC,            )

        Plaintiff,              )

vs.                            )Case No: 3-12-CV-02797-RS

OFFICEMAX INCORPORATED,         )

et al.,                        )

        Defendants             )

                               )

----------------------------)

AND RELATED COUNTER AND CROSS

CLAIMS


          VIDEOTAPED DEPOSITION OF MICHAEL DAVIS

                        VOLUME I

                    February 26, 2014

                       9:11 a.m.

             Lewis Brisbois Bisgaard & Smith

               1180 Peachtree Street, NE

                      Suite 2900

                   Atlanta, Georgia

             Marsi Koehl, CCR, CCR-B-2424


   PAGES 1 - 289

                                                    Page 1

APPEARANCES OF COUNSEL


On behalf of the Plaintiff:

DOUGLAS M. GARROU

JEFFREY N. Martin

Attorneys at Law

HUNTON & WILLIAMS

Riverfront Plaza

East Tower

951 East Byrd Street

Richmond, Virginia   23219

(804) 788-8200

dgarrou@hunton.com

jmartin@hunton.com

-- and --

JOHN E. BURGESS

CHRISTOPHER R. GRAHAM

Attorneys at Law

GEORGIA-PACIFIC LAW DEPARTMENT

133 Peachtree Street, NE

Atlanta, Georgia   30303

(404) 652-2612

jeburges@gapac.com

chris.graham@gapac.com

Page 2

APPEARANCES OF COUNSEL CONTINUED

On behalf of OfficeMax, Incorporated:

R. GAYLORD SMITH

Attorney at Law

LEWIS BRISBOIS BISGAARD & SMITH, LLP

701 B Street

Suite 1900

San Diego, California  92101

(619) 699-4975

bob.smith@lewisbrisbois.com

On behalf of the City of Fort Bragg:

FRED M. BLUM

Attorney at Law

BASSI EDLIN HUIE & BLUM, LLP

500 Washington Street

Suite 700

San Francisco, California  94111

(415) 403-4421

fblum@behblaw.com

Page 3

APPEARANCES OF COUNSEL CONTINUED


On behalf of Louisiana-Pacific:

SKY WOODWARD

Attorney at Law

BRADLEY ARANT BOULT CUMMINGS, LLP

1615 L. Street, NW

Suite 1350

Washington, DC  20036

(202) 719-8214

swoodward@babc.com

-- and --

APRIL A. INGRAM

Attorney at Law

LP ASSOCIATE GENERAL COUNSEL

414 Union Street

Suite 2000

Nashville, Tennessee  37219

(615) 986-5691

april.ingram@lpcorp.com


Also present:

Scott A. Campbell, Paralegal

Spencer Bush, Videographer


Page 4

A.   Sure.

Q.   Are those just copies?

A.   Yes, yes.

Q.   Okay.  Well, why don't we, first of all --
is this intended to be one exhibit with multiple
pages?

A.   Correct.

MR. SMITH:  Let's make this 152 and pass
these out and let everybody take a quick
look.

THE WITNESS:  Certainly.

(Defendants' Exhibit 152 was marked for
identification.)

BY MR. SMITH:

Q.   Have you brought anything else to the
deposition to give to me today?

MR. GARROU:  We've got -- as I mentioned
before we staged the deps.  For individual
topics, he has summary sheets.  So to the
extent he's questioned about those and needs
a sheet, you'll get those when you question
him.

MR. BLUM:  You said in your E-mail you
were going to provide these to us at the
beginning of the depo.

Page 26

MR. GARROU:   At the beginning?

MR. BLUM:   Yes.   That's what you said in your E-mail.

MR. GARROU:   I don't actually recall that, but it doesn't really matter to me.   I don't think we're obliged to give you sheets about stuff that you don't ask him questions about.   I mean...

MR. SMITH:   I can short circuit it. We're going ask a quick question on each of the topics --

MR. GARROU:   That's fine.

MR. SMITH:   -- at the beginning. Because I just want to get everything on the table right away.

THE WITNESS:   Sure.

BY MR. SMITH:

Q.   With regard to the topic No. 2, Mr. Davis, have you brought any sheets or materials for us to look at?

A.   Yes.

MR. SMITH:   I'm going to mark that as Exhibit 153.

(Defendants' Exhibit 153 was marked for identification.)

Page 27

BY MR. SMITH:

Q.  What is Exhibit 153?

A.  This is in response to your question concerning the amount of cost GP seeks to recover our claim.  This is simply laying out claim for past cost.  It's approximately $37,395,608.

Q.  Who -- okay.  Go ahead.  I didn't mean to cut you off.

A.  No.  And that's -- there's a statement here about prejudgment interest, 282,674.

Q.  Who prepared Exhibit 153?

A.  It was prepared by Hunton & Williams.

Q.  Did you have any involvement in the preparation of Exhibit 153?

A.  In the sense that I reviewed it and then looked -- I have looked at the back-up documentation for the figure, yes, I have reviewed that.  But this was prepared and then I reviewed it.

Q.  Where is the back-up documentation for the figure?

A.  We have --

MR. GARROU:  I've got some of it with me to the extent he has referred to it.

BY MR. SMITH:

Q.  Well, have you referred --

Page 28

burning of plastics can create dioxins?

A. I have heard that that's true. Again, Mr. Hilarides would have better information on that specific topic.

Q. Are you aware that that was an allegation as it relates to the district attorney's complaints against GP?

A. I knew that we were alleged to have burned plastics within that -- that wood. Yes.

Q. And your understanding is GP did burn plastics?

A. My understanding was that it was possible that we had burned plastics. There were a number of contaminants contained within the waste stream. And so once that -- I forgot exactly how that was discovered. But once it was discovered, then the practice was stopped and we were fined.

Q. How was it discovered?

A. Again, I don't recall whether we -- whether there was an inspector on site who saw it or whether there was someone internal that saw it and realized there was a problem and disclosed it. I just know it was discovered and disclosed.

Q. Are you aware that fly ash from the time that the municipal waste was burned was sent to

Page 267

McGuire Ranch?

A.   I knew that -- yes, the fly ash from -- the fly ash at that time that we were generated, all of that was going to McGuire.

Q.   Does -- is GP aware that when they later tested that fly ash, that it had had, what the water board called, inordinate -- an inordinate level of dioxins?

A.   Yes.

Q.   Okay.  And is GP -- does GP admit that the burning of that municipal waste generated fly ash with high dioxin levels?

A.   I don't see how we can deny it.  I mean, the evidence is there both in the ash pile that was onsite and the ash that we later investigated at McGuire's.

Q.   And I don't mean to be coy here.  When you say, I don't know how we can deny it, that means you admit it.

A.   I will admit that there were elevated levels of dioxin in the fly ash pile that was on site that was generated as a result of the 2000-2002 burning of municipal wood.

Q.   All right.  And that -- that elevated level of dioxin in the fly ash, some of it made it into the

Veritext National Deposition & Litigation Services
866 299-5127

ponds; correct?

A.    Yes.

Q.    So some of it made it onto McGuire Ranch?

A.    Yes.

Q.    And some of it was released into the air?

A.    Most likely.

Q.    Okay.  Now, was that the only time during the -- during GP's operation of the mill site that fuel with plastics was burned?

A.    According to the documents that are here, there are other times when there was -- I'm trying to remember.  I'm not sure.  I don't believe GP has information regarding other times when those specific materials were burned.  I do notice it's noted here that the plastic -- plastic and rubber were found in the wood waste fuel piles.

Q.    And that was wood waste fuel piles during the time GP operated the site; correct?

A.    Correct.

Q.    And was that in the same -- was that in the 2000-2002 time period?

A.    Correct.

Q.    What -- what, if any, processes were in place before 2000 to make sure that the material burned didn't contained non-authorized materials?

Page 269

# EXHIBIT 7



**ARCADIS**

Infrastructure  Water  Environment  Building

Mr. Thomas P. Lanphar
Senior Hazardous Substances Scientist
California Environmental Protection Agency
Department of Toxic Substances Control
700 Heinz Avenue, Suite 100
Berkeley, California 94710

Mr. Craig Hunt
North Coast Regional Water Quality Control Board
5550 Skylane Boulevard, Suite A
Santa Rosa, California 95403

Subject:
Storm Water Sampling Report
Former Georgia-Pacific Wood Products Facility
Fort Bragg, California

Dear Mr. Davis:

ARCADIS U.S., Inc. (ARCADIS) has prepared this Storm Water Sampling Report
(report) on behalf of Georgia-Pacific LLC (G-P) for the Former G-P Wood Products
Facility (Site) located at 90 West Redwood Avenue, in the City of Fort Bragg (City),
Mendocino County, California (Figure 1). This report presents the details of surface
water sampling completed during a rain event on November 18th and 19th, 2013,
along with a summary of constituent concentrations in surface water entering the Mill
Site from City storm drains.

**Background Information**

Drainage basins were delineated for the drainage area on and surrounding the G-P
property (ARCADIS 2012). Figure 2 illustrates drainage basin delineation and
sampling locations. The locations selected for sampling during this event represent
runoff from outside the Mill Site property boundary.

The City lies between the Pudding Creek watershed to the north and the Noyo River
confluence with the Pacific Ocean to the south. Residential developments adjacent to
Pudding Creek and the Noyo River tend to discharge toward those two natural
features (Figure 1). The more densely developed center of the City is comprised of

ARCADIS U.S., Inc.
2999 Oak Road
Suite 300
Walnut Creek
California 94597
Tel 925 274 1100
Fax 925 274 1103
www.arcadis-us.com

ENVIRONMENT

Date:
March 17, 2014

Contact:
Jeremie Maehr

Phone:
415.432.6918

Email:
Jeremie.Maehr@arcadis-us.com

Our ref:
B0066139.0001

Imagine the result

GP FM Mill SW Rpt Final 03-17-2014

ARC06204971

**ARCADIS**

Mr. Thomas Lanphar
Mr. Craig Hunt
March 17, 2014

two watershed units: Basin C, Maple Creek, and Basin D, Alder Creek. These watershed units convey storm water runoff and base flow to the site and into Mill Pond via piped drainages.

Two sampling locations were chosen to evaluate the water quality of off-site water that drains onto the Site from Basins C and D. At the property boundary approximately 100 feet south of the intersection of Maple Street and Main Street, three metal drain pipes discharge onto the property without a flow contribution from the Mill Site and form a creek that eventually flows into a drain pipe that empties into Pond 8. The two northern drain pipes are 18 inches in diameter; the southern drain pipe is 30 inches in diameter. A sampling location was set approximately 8 feet west of the Site boundary fence, hereby denoted as the "Maple sampling location". Another sampling location (hereby denoted "Alder sampling location") was selected in order to monitor the water quality of inflow from Basin D. The Alder sampling location is a culvert approximately 70 feet north of Mill Pond and 300 feet west of the Site boundary. The metal drain pipe has a circular diameter of 30 inches and is located approximately 10 feet below ground surface. This pipe directly feeds into Pond 8 from Basin D without a flow contribution from the Mill Site (Figure 2).

**Sampling Event**

A pre-event site visit was conducted to install a temporary flow meter in the drain pipe at the Alder sampling location. A HACH Sigma 910 flow meter was installed in the upstream channel of the drain pipe at the Alder sampling location on November 13, 2013. The flow meter was programmed to collect water level, velocity, and flow at 15 minute intervals.

ARCADIS staff mobilized to the Site on November 18, 2013 prior to a forecast storm event. An additional HACH Sigma 910 flow meter was temporarily installed at the Maple sampling location for use during the event. Samples at this location were collected directly from the creek using a clean polyethylene sample bottle. At the Alder sampling location, samples were collected using a peristaltic pump and new clean tubing installed in the drain pipe.

ARCADIS staff performed on-location observation at each sampling location during the storm event. Rainfall and surface water runoff was monitored in coordination with watching a live weather feed from the National Oceanic and Atmospheric Administration (NOAA). A total of 8 samples were collected from 23:00 on November 18 to 05:15 on November 19, 2013 at approximately 45 minute intervals. A total of 7

ARC06204972

**ARCADIS**

Mr. Thomas Lanphar
Mr. Craig Hunt
March 17, 2014

samples (4 from Alder sampling location and 3 from Maple sampling location) were chosen for dioxin/furan analysis and 6 samples (3 from Alder and 3 from Maple) were chosen for polycyclic aromatic hydrocarbons (PAHs), total petroleum hydrocarbons (TPHs), total and dissolved metals, and general chemistry parameters (hardness and pH) analysis based on visual observations and alignment with the hydrograph from the storm event. Figure 3 displays a hydrograph that represents data collected from November 13 through December 4, 2013 for the Alder sampling location, with corresponding data available in Attachment A.  Figures 4 and 5 present a hydrograph for Alder and Maple sampling locations during the storm event, respectively. As shown in Figure 4, the Alder Creek hydrograph water level and corresponding flow rate measurements track together and begin to rise around 19:00 on November 18, reaches maximum peak around 02:30 on November 19. As shown in Figure 5, the hydrograph at Maple Creek fluctuates and flow rate and water level track less closely due to greater irregularity in the geometry of the surface water channel and greater quantity of debris observed. Flow meter data for Maple Creek during the storm water event is available in Attachment B. Samples for analysis were chosen based the hydrographs.

**Results**

Pace Analytical Laboratories (Pace), a California certified laboratory, analyzed storm water samples for one or more of the constituents outlined below using the indicated methods. Copies of analytical reports are provided in Attachment C.

The storm water samples were analyzed for the following physical and chemical parameters:

- Total and dissolved metals – United States Environmental Protection Agency (USEPA) Methods 6020/7470A
- TPHs as diesel, gasoline, and motor oil – USEPA Method 8015B
- Dioxins and furans – USEPA Method 8290
- PAHs – USEPA Method 8270 SIM
- Hardness – USEPA Method 130.1
- pH

Seven samples were analyzed for dioxins and furans. Six samples were analyzed for PAHs, TPHs, total and dissolved metals, and general chemistry parameters (hardness and pH). Analytical results are presented in Tables 1 and 2.

GP TM MILSW Rpt Fmat 03-17-2014

ARC06204973

**ARCADIS**

Mr. Thomas Lanphar
Mr. Craig Hunt
March 17, 2014

Pace noted the following items outside of quality control limits:

- USEPA Method 8270 SIM: Surrogate recoveries associated with two samples were reported as low due to emulsion.
- USEPA Method 8270 SIM: Matrix spike and matrix spike duplicate recoveries exceeded the quality control limits and were outside the calibration range for Naphthalene in one quality control batch. The batch was accepted based on laboratory control sample (LCS) recovery.
- USEPA Method 8015B: TPHd and TPHmo were detected in blanks associated with one quality control batch. Detections were below the reporting limit.
- USEPA Method 6020: Matrix spike and matrix spike duplicate recoveries exceeded quality control limits for calcium, magnesium, potassium and sodium for one quality control batch. The batch was accepted based on laboratory control sample (LCS) recovery.

Additional details and data flags are presented in the laboratory reports and Table 1.

Please do not hesitate to contact Jeremie Maehr at 415-432-6918 with questions, or for additional information.

Sincerely,

ARCADIS U.S., Inc.

Jeremie Maehr, PE
Principal Engineer, Certified Project Manager

Copies:
Denise Tsuji – DTSC
Vivian Murai – DTSC
Linda Ruffing – City of Fort Bragg
Michael Davis – Georgia-Pacific, LLC
Dave Massengill – Georgia Pacific, LLC

Page:
4/5

GP FM MWSW Rpt Fnun 03-17-2014

ARC06204974

**ARCADIS**

Mr. Thomas Lanphar
Mr. Craig Hunt
March 17, 2014

Enclosures:

| | |
|---|---|
| Table 1 | PAHs, TPHs, Total and Dissolved Metals, and General Chemistry Parameters Analytical Results, Storm Water Sampling Report |
| Table 2 | Dioxins and Furans Analytical Results, Storm Water Sampling Report |
| Figure 1 | Site Location |
| Figure 2 | Sampling Locations |
| Figure 3 | Alder Creek Comprehensive Hydrograph |
| Figure 4 | Alder Creek Sampling Duration Hydrograph |
| Figure 5 | Maple Creek Sampling Duration Hydrograph |
| Attachment A | Alder Creek Flow Meter Data |
| Attachment B | Maple Creek Flow Meter Data |
| Attachment C | Laboratory Analytical Results |

References:

ARCADIS U.S., Inc. 2012. Mill Pond Storm Water Sampling Report. Former Georgia-Pacific Wood Products Facility. Fort Bragg, Mendocino County, California. April.

GP FM Mill SW Rpt Final 03-17-2014

ARC06204975

Re:    **Georgia-Pacific, LLC v. OfficeMax Incorporated, Louisiana-Pacific Corporation, And The City Of Fort Bragg**
**United States District Court, Northern District Case No. 3:12-cv-02797-WHO**

### PROOF OF SERVICE – ELECTRONIC TRANSMISSION

STATE OF CALIFORNIA/COUNTY OF San Francisco

I am a citizen of the United States and an employee in the County of San Francisco. I am over the age of eighteen (18) years and not a party to the within action. My business address is BASSI, EDLIN, HUIE & BLUM LLP, 500 Washington Street, Suite 700, San Francisco, California 94111.

On the date executed below, I electronically served the document(s) via ECF Northern District website*s*, described below, on the recipients designated on the Transaction Receipt located on the ECF Northern District website.

**DECLARATION OF MY-LINH T. LE IN SUPPORT OF THE CITY OF FORT BRAGG'S CHALLENGES TO GEORGIA-PACIFIC'S RESPONSES TO THE CITY'S SECOND SET OF DISCOVERY REQUESTS**

On the following parties:

   PLEASE SEE SERVICE LIST PROVIDED BY ECF NORTHERN DISTRICT WEBSITE

I declare under penalty of perjury that the foregoing is true and correct and that this document is executed on August 21, 2014, at San Francisco, California.


                              /s/ ALISHA C. PEMBER
                              _____
                              ALISHA C. PEMBER

949924

1

PROOF OF SERVICE