Hunton & Williams LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| GEORGIA-PACIFIC LLC,<br>Plaintiff,<br>v.<br>OFFICEMAX INCORPORATED, LOUISIANA-PACIFIC CORPORATION, AND THE CITY OF FORT BRAGG,<br>Defendants. | CASE NO.:  12-02797-WHO<br><br>**DECLARATION OF HARRY M. JOHNSON, III FOR LETTER BRIEF OF THE CITY OF FORT BRAGG REGARDING RESPONSES TO SET 2 OF WRITTEN DISCOVERY** |
| AND RELATED COUNTERCLAIMS AND CROSSCLAIMS | **Complaint Filed: May 31, 2012**<br>**Amd. Comp. Filed: June 4, 2012**<br>**2nd Amd. Comp. Filed: May 21, 2013**<br>**3P Comp. Filed: August 30, 2012**<br>**1st Amd. 3P Comp. Filed: October 31, 2012** |

DECLARATION OF HARRY M. JOHNSON, III
CASE NO. 12-02797-WHO

## DECLARATION OF HARRY M. JOHNSON, III

I, Harry M. Johnson, III, declare and state as follows:

1.     I am a partner in the law firm of Hunton & Williams LLP, counsel of record for Georgia-Pacific LLC ("Georgia-Pacific"). I make this declaration in support of Georgia-Pacific's opposition to the City of Fort Bragg's ("CFB") motions regarding Georgia-Pacific's responses to CFB's second set of written discovery. I have personal knowledge of the following facts and, if called and sworn, could competently testify as follows.

2.     I have reviewed CFB's "Statement Regarding the Dispute," as provided in Ms. Le's letter to Georgia-Pacific's counsel on August 11, 2014, regarding Georgia-Pacific's Responses to Set Two of CFB's Request for Production of Documents (attached as Exhibit A). It contains demonstrably false and misleading statements in connection with Georgia-Pacific's privilege log and alleged "failure to produce documents."

3.     CFB states that "[t]o date, GP has not produced any of the documents that were requested, nor any privilege log for materials that were withheld as privileged." *See* Ex. A at 1-2 & n.2. This statement is false for three reasons: (a) as a result of the meet and confer process, Georgia-Pacific agreed to and did provide Codes of Conduct that were responsive to the requests[1]; (b) Georgia-Pacific specifically identified in its written responses the documents that had previously been produced in response to the requests (*see, e.g.,* Response to RFP Request No. 66 (attached as Exhibit B); and (c) Georgia-Pacific had already produced its final privilege log and confirmed with opposing counsel that the log is final. CFB's statement is misleading because it fails to mention that Georgia Pacific had objected on grounds that it had already produced tens of thousands of documents previously that might be responsive.

[1] Counsel for Georgia-Pacific had advised counsel for CFB that it would produce those specific documents, and the documents were produced before Ms. Le sent her letter.

Hunton & Williams LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

4.     Attached hereto as Exhibit B is a true and correct copy of the relevant portion of the deposition of Roger Hilarides, taken on July 29, 2014.

5.     Attached hereto as Exhibit C is a true and correct copy of the relevant portion of the deposition of Michael Davis, taken on February 26, 2014.

6.     I have reviewed the rough transcript of the City of Ft. Bragg's designated witness, Dave Goble, on issues related to stormwater. Mr. Goble testified that he was aware of no documents, survey or otherwise, to support the City's contention that the City of Ft. Bragg owned only those portions of the stormwater pipes located in the public rights of way.

7.     As reflected in the rough transcript, Mr. Goble further testified that he did not know who paid for and installed the portions of the stormwater pipes that carried water from the public right of ways to the mill site. Mr. Goble testified that the City of Fort Bragg inspected and maintained the drainage boxes that connected and directed  stormwater pipes from the public right of ways to the mill site, and that there was no outlet for the stormwater that originated in certain drainage basins within the City of Fort Bragg except through the drainage boxes and onto the mill site. Mr. Goble additionally testified that the City directed stormwater onto the mill site and provided no evidence to suggest that the City owns only those portions  of the storm water pipes located within the public right of ways.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 18th day of August, 2014.

Harry M. Johnson, III

Hunton & Williams LLP
550 South Hope Street, Suite 2000
Los Angeles, California 90071-2627

073.000398 EMF_US 52031257v1

DECLARATION OF HARRY M. JOHNSON

# Georgia-Pacific's

# EXHIBIT A

# BASSI EDLIN
# HUIE & BLUM LLP

www.behblaw.com

500 WASHINGTON STREET, SUITE 700
SAN FRANCISCO, CA 94111
TEL 415-397-9006
FAX 415-397-1339

333 S. HOPE STREET, 35TH FLOOR
LOS ANGELES, CA 90071
TEL 213-412-2661
FAX 213-652-1992

MAIN OFFICE

August 11, 2014

Via E-mail
Jeffrey N. Martin, Esq.
Ann Marie Mortimer, Esq.
Harry M. Johnson, Esq.
Hunton & Williams LLP
2200 Pennsylvania Ave. NW
Washington, DC 20037

Re:    *Georgia-Pacific, LLC v. OfficeMax Incorporated, Louisiana-Pacific Corporation, And The City Of Fort Bragg*
United States District Court Northern District Case No. 3:12-cv-02797-WHO
Our Client:   The City of Fort Bragg

Counsel:

Pursuant to the Magistrate's Order, and after the parties met and conferred on August 4 on the parties' dispute as to Georgia-Pacific's ("GP")' responses to the City of Fort Bragg ("the City") Interrogatories, Set Two ("Interrogatories")[1] the City provides it's arguments and evidence regarding the issues that could not be resolved as follows:

## I.    CITY'S STATEMENT REGARDING THE DISPUTE

Interrogatories 17 and 18 ask GP to identify all facts supporting GP's contention that the City has ownership over or interest in the two outfall pipes referred to as Pipe 1 and Pipe 2 ("the Pipes"). (Le Decl., Exh. 1 at Nos. 17-18.) GP did not identify any facts supporting its contention, claiming that it "lacks sufficient information and knowledge to opine as to when or whether the City had ownership, legal or otherwise, of [Pipe 1 or 2]." However, this clearly contradicts GP's responses to the City's Second Set of Requests for Admissions ("RFA") Nos. 146, 147, 148, and 149. The RFAs asked GP to admit that the

---

[1] The responses to the Interrogatories are attached as Ex. 2 to the Le Declaration ("Le Decl.").

945012

Jeffrey Martin, Ann Marie Mortimer, Harry Johnson
August 11, 2014
Page 2

City did not have any ownership over or easements for the Pipes. GP's response to each of the four RFAs was an absolute denial. (Le Decl., Exh. 4, at Nos. 146, 147, 148, and 149.) Assuming that GP had any good faith bases for denying the RFAs, its interrogatory responses are deficient and therefore improper.

Who owns the Pipes is a critical issue in this action. The bulk of GP's $38 million dollar claim against the City is attributed to the City's alleged contamination of the portion of the Mill Site known as Operable Unit E ("OU-E"), specifically Pond 8. GP alleges that the City's stormwater contained hazardous substances and that the stormwater was released into Pond 8 via two outfall pipes, Pipe 1 and Pipe 2. In a report recently submitted to the DTSC, GP contended that the vast majority of the contamination currently flowing into Pond 8 is conveyed via the Pipes.[2]

The City's stormwater flows through a network of pipes comprising the City's stormwater system, eventually leading into two different natural channels known as Alder Creek and Maple Creek (the "Creeks"), both of which historically and naturally flowed, unimpeded, out to the Pacific Ocean. After the Mill Pond was created by one of the previous owners, the water from both Creeks went, instead, into the Mill Pond for use in the Mill's operations as GP's industrial water supply. GP's own on-site conduit system picks up the stormwater at some point after the stormwater enters the Creeks, and then deliberately pumps the stormwater into Pond 8 through Pipe 1 (at the northeastern corner of the pond) and Pipe 2 (at the southeastern corner of the pond). Although the City owns the pipes comprising the City's stormwater system, this ownership does not extend to the pipes located on GP's site. In other words, the City does not own or control any of the pipes on GP's property that convey water into the Mill Pond.

Despite the significance of the issue, GP has not put forth any evidence supporting its contention that the City owned or operated either of the Pipes 1 and 2. GP's claim that the "release" of City stormwater into Pond 8 depends on the issue of who owned or controlled the two pipes from which the water is discharged. GP's excuse for failing to provide the evidence requested by the Interrogatories is that GP does not have any information or knowledge as to when or whether the City had ownership, legal or otherwise, of [Pipe 1 or 2]. However, when asked to admit that the City does not have any ownership interest in (or easements for) Pipe 1 or Pipe 2, GP denied the requests

---

[2] A relevant portion of the report, prepared by Arcadis, is attached as Ex. 12 to the Le Decl.

Jeffrey Martin, Ann Marie Mortimer, Harry Johnson
August 11, 2014
Page 3

---

without any restriction or qualification. Because GP has sufficient information upon which to wholly deny the RFAs, GP must provide the City with the information supporting its denials, pursuant to the City's Interrogatories Nos. 17 and 18.

Very truly yours,

BASSI, EDLIN, HUIE & BLUM LLP

MY-LINH T. LE

Enclosure

# Georgia-Pacific's

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

GEORGIA-PACIFIC, LLC,

Plaintiff,

NO.

vs.                                              C 12-02797 WHO (LB)

OFFICEMAX, INC., et al.,

Defendants.

_____

VIDEOTAPED 30(b)(6) DEPOSITION OF

ROGER HILARIDES

ON BEHALF OF GEORGIA-PACIFIC, LLC

9:26 a.m.

Tuesday, July 29, 2014

1180 Peachtree Street

Atlanta, Georgia

Anthony D. Lorenz, Certified Court Reporter

RDR, CRR; CCR-B-2022

Page 1

MR. BLUM: The beneficial reuse criteria that was written down and prepared in 1998. That's never been produced.

MR. GARROU: It has nothing to do with the site.

Well, I mean we'll have to go and look at your request. I -- it doesn't strike me that the mid to late '90s document dealing with programs that would have come online at other sites, and not in use at Fort Bragg, would be relevant or responsive.

Q. (By Mr. Blum) Well, let me -- did the program apply to Fort Bragg?

A. In this case, the analysis had already been done previously, and so they were not required to fulfill the beneficial use process that we had in place at the time. So no, it didn't apply.

Q. If there was a new use at Fort Bragg for a product that had not been done prior to the initiation of the program, would Fort Bragg have to comply with the criteria established in the beneficial reuse analysis program?

A. Yeah, if there was a new use that hadn't been done before.

Q. Okay. If you change the fuel source --

Page 22

Q.   Okay.  Since the last deposition, has your job changed at all?

A.   No.

Q.   Okay.  Have you had any significant educational experiences since then in the environmental field?

A.   No.

MR. BLUM:  Okay.  The -- just to be clear, Counsel, the order -- the April 17 order dealt with issues that Mr. Hilarides and Mr. Davis had testified to.  And I assume Mr. Hilarides will be discussing all of the issues raised in the order.

MR. GARROU:  Except for the ESI, which is Mr. Kirby later this week.

MR. BLUM:  Okay.  Yeah, I assumed that.

MR. GARROU:  Right.

MR. BLUM:  And that's, I think, on Thursday.

MR. GARROU:  I think that's right.

MR. BLUM:  Okay.  Great.

Q.   (By Mr. Blum) The one thing I will repeat is the things we need to do to keep the court reporter's life easier, because while it may not seem that, he's probably the most person important in the

Page 6

room, because if he doesn't get it correct, we've wasted our time.

And most of those issues relate to forgetting how we speak in our ordinary everyday conversation, particularly two things. One is, we were just talking before the deposition, and it if it was transcribed, I doubt it if anybody would have finished a sentence, but we have to do that in the deposition. Do you recall that?

A.    I do.

Q.    So if I inadvertently interrupt you, just tell me and I'll stop. And even though you know what my question's going to be, can you let me finish the whole question?

A.    I will.

Q.    The other thing is, things like "uh-huh" or "uh-uh" or nods of the head don't get down on the transcript, so when you say "uh-huh" -- because every witness does -- when I remind you, "Is that 'yes' or 'no,'" please don't take it personally, okay?

A.    I understand.

Q.    All right. Let's get going so we can all get out of here.

Sir, there are -- my understanding is

Page 7

there's four topics generally that you're going to be testifying to, and I want to go over them so everybody's on the same page.

The first one relates to the original notice, Topics 67, 70 and 71, which generally refer to the knowledge that GP had relating to dioxins and the risks and health risks related to dioxins, specifically as they relate to a beneficial reuse analysis. Okay? Is that an issue you're prepared to talk about?

A.    Yes.

Q.    Okay.  The second one is Topics 25 and 29, which generally relate to suppliers of the urban or municipal waste that was used as a fuel source at the Fort Bragg facility.  Is that an issue you're ready to talk about today?

A.    Yes.

Q.    The third one is Topic 50, which is discussions between GP and TRC relating to the Phase I and Phase II.  Is that a topic you're available -- you're ready to talk about?

A.    Yes.

Q.    And the last one is Topic 9, which is the reserves that were set -- the environmental reserves that were set for the remediation and other

Page 8

actions at the site.  Is that a topic you're ready to speak about today?

A.    Yes.

Q.    All right.

MR. GARROU:  And I'll just say that to the extent that description is more expansive than what's in the order, we think the order controls.

MR. BLUM:  That as -- I will say that that as modified or clarified in the subsequent order from the court.

MR. GARROU:  I don't know what that means, but please --

MR. BLUM:  The discovery -- the meet and confer -- not a meet and confer.  The hearing that we had before the judge, I believe was Friday.

MR. GARROU:  Yes.

MR. BLUM:  That's the one I'm talking about.

MR. GARROU:  I understand that completely.  Yes.  Fine.

Q.    (By Mr. Blum) Let's go to the first one, which is Topics 67, 70 and 71, which I'm going to refer to just generally as "beneficial reuse."

Page 9

What, if anything, did you do to prepare to discuss that issue?

A.    So in my prior testimony, I talked about uncertainty about whether a formal beneficial reuse analysis had been done, as I understood it, in the late '90s.  So I talked to people who would be familiar with that.

I then reviewed all the documents related to the beneficial reuse analysis work that was done by the company starting in the mid to late '80s, and am generally familiar with that body of work and what exists and what doesn't exist.

Q.    Who did you talk to?

A.    So I talked to Traylor Champion, who's our VP of environmental affairs.

Q.    Could you spell "Traylor" for me?

A.    T-R-A-Y-L-O-R.

Q.    And Champion as it's spelled?

A.    Yeah, C-H-A-M-P-I-O-N.

Q.    Okay.  And what's his position?

A.    Vice president, environmental affairs.

Q.    Why did you talk to him?

A.    He's been in our environmental affairs -- in the corporate environmental affairs since the mid '90s, and he's responsible for all

Page 10

those programs today.

So I wanted to talk to him about what our policies and procedures would have been at the time, if any of this information existed, where would it be, who would I talk to.

And then once I had done all my research on it, I bounced what I thought I'd collected off of him to make sure it made sense with his understanding of how the company would have handled such a thing.

Q.    When you say "those programs," what do you mean, "those programs"?

A.    So in particular -- and I talked about this a little bit in my last deposition.  Starting in the mid '90s, GP had hired some new people to come in and help us really bolster our environmental programs.

Lee Thomas, former EPA administrator; Susan Moore, assistant air administrator for EPA. And so I was familiar with in particular the beneficial reuse analysis, which was required starting I believe in the late '90s, that was part of those new programs that were being implemented, so that's what I'm referring to.

Q.    Okay.  And besides Mr. Champion, who

Page 11

else did you talk to?

A.    I talked to Michael Curtis.

Q.    C-U-R-T-I-S?

A.    C-U-R-T-I-S.

Q.    And Michael he's spelled the usual way?

A.    Yes.

Q.    Okay.  And who is Mr. Curtis?

A.    He's one of our directors of technical services in our environmental affairs department.

Q.    Okay.  What is technical services?

A.    So that is the group that currently oversees our current beneficial reuse program.  So he has the technical resources with the knowledge to assess beneficial reuse projects that the company may be considering.

Q.    When you say "he has the resources," what kind of resources?

A.    People -- people resources, and knowledge.

Q.    What types of fields of expertise does he have access to?

A.    So there are engineers, scientists, people who have knowledge of wastewater treatment systems, waste management.  So RCRA, CERCLA, general knowledge around the regulations, our operations, and

Page 12

those types of -- that type of information.

Q.    Toxicologists, do you have access to?

A.    Our toxicologists do not report in directly to Michael, but we do have toxicologists that are available, a separate part of our environmental affairs group.

Q.    So would part of the technical services relate to EISs? -- environmental impact statements?

A.    So an environmental impact statement is typically associated with a project, whether it's a construction project or environmental project that has some implementation aspect to it.  Some of those resources may or may not be involved in those.

Q.    Other than dealing with beneficial reuse analysis, what else does the technical services department do?

A.    Beneficial reuse is probably a small part of what they do.  They're wastewater experts, so the company has dozens and dozens of wastewater treatment systems that we own and operate as part of our pulping operations.

And so though we have people who are expert in how to construct and operate those systems, to assist our facilities when they have questions or issues that need to be resolved.

Page 13

Q.    Okay.  And when did the -- when did this department get authority or get responsibility for the beneficial reuse analysis?

A.    Again, in talking to them, it started in the late '90s, is when they started -- again, there was a more formal approach to beneficial reuse analysis.

Q.    Okay.  Anybody else you talked to?

A.    Saul Furstein.

Q.    S-A-U-L?

A.    Yes.

Q.    And how do you spell Furstein?

A.    F-U-R-S-T-E-I-N.

Q.    And who is Mr. Furstein?

A.    He's one of our solid and hazardous waste experts in the company.

Q.    RCRA, basically?

A.    RCRA, yes.

Q.    Okay.  Other than RCRA, any other regulatory schemes he would deal with?

A.    I mean he's familiar with NPDS, and -- very knowledgeable in a lot of different areas, but he focuses in the RCRA area.

Q.    Does he also deal with state equipment RCRA statutes?

Page 14

A.    Yes.

Q.    So would he be the person who would be like, for instance the expert in the California Hazardous Waste Control Act?

A.    He would be very knowledgeable in that, yes.

Q.    All right.  And what department is Mr. Furstein in?

A.    He reports to Mr. Curtis.

Q.    Okay.  What's his expertise, Mr. Furstein?

A.    Again, RCRA, solid waste --

Q.    No, I'm sorry.  Is he an engineer? toxicologist?  What . . .

A.    I guess I don't know what his educational background is off the top of my head.

Q.    How about Mr. Curtis?

A.    I believe he's an engineer.

Q.    Do you know what the type of engineer?

A.    I don't, no.

Q.    And how about Mr. Champion?

A.    I'm not sure what his degree is.

Q.    Okay.  Anybody else you spoke to?

A.    Rest of it was primarily reviewing documents.

Page 15

Q.    Okay.    What did Mr. Champion tell you?

A.    Well, what we talked about was, you know, was there a beneficial reuse study done.    In talking with he, Mr. Curtis, Mr. Furstein, we determined that there was not a formal, as I described, beneficial reuse analysis.

What we did talk about, though, was during that time period when we implemented these programs, if we had existing beneficial reuse going on.    And in this case, there was a -- you know, a water board permit.    There had been appropriate due diligence done on it.

We didn't require the facilities to go through and do -- redo the beneficial reuse analysis. So it was not documented using the form and the procedures I described to you, because it had been going on for over 10 years, and his -- he didn't remember dealing with this specifically, but his recollection was that at the time, an existing use like that would have been grandfathered as an appropriate continuing reuse, because it had gone through such thorough analysis before then.

Q.    Okay.    So when did the GP first have a requirement for a beneficial reuse analysis?

A.    I wasn't able to get a specific date.

Page 16

It started in the mid to late '90s.

Q.    Now, before that, was there any similar analysis that required that might have been called something else?

A.    We didn't have a formal name for it, but there was an expectation that you do due diligence if you're going to do those types of things.

Q.    What do you mean, "those types of things"?

A.    Reuse of byproducts from our operations.  That was a -- it was a general practice. We formalized it to make sure that none of them slipped through the cracks once we kind of bolstered our programs over the years.

Q.    Is there actually a document that describes this program?

A.    There is.  We have environmental protocols that would have been in place again in the late '90s, that talk about -- describe what a facility needs to do if they have a beneficial reuse they want to pursue.

Q.    And what's the document called, or documents called?

A.    "Environmental Protocol" and

Page 17

"Beneficial Reuse."

Q.    Okay.  Now, when you say "the mid '90s," can you be any more specific?

A.    I didn't try to ascertain the exact date that that program was effective.  I just know that it went into effect sometime in the late '90s.

Q.    Okay.  Is the mid '90s or late '90s?

A.    I don't have an exact date.

Q.    All right.  Can you give me an estimate?

MR. GARROU:  Objection.  Lack of foundation.

Go ahead.

THE WITNESS:  The only thing I can tell is you when I joined the company in 1998, the requirement was in place.

Q.    (By Mr. Blum) Okay.

A.    And my understanding is we had just spent several -- couple years implementing these advanced protocols.  That's the best I can do.

Q.    In 1998, if the GP facility at Fort Bragg wanted to use fly ash as a soil amendment -- if this was the first time they were going to use it, would a beneficial reuse analysis be required?

A.    For a new use that hadn't occurred

Page 18

already?

Q.    Yes.

A.    Yes.

Q.    And the -- what type of things were -- would have been looked at within that analysis?

A.    Yeah.  So the analysis would have you describe what the proposed use is.  It would require some analysis of what the material is: chemical and/or other analysis.

And identification of potential risks associated with what's in the material and how it's being proposed to be used.  Whether there's any regulatory requirements that govern its reuse.

And then a general assessment of that, and then that would be reviewed by our technical resources to either approve or disapprove or ask additional questions, if necessary.  That's what it -- that process accomplishes.

Q.    Now, was there a policy as to why GP would even have such a requirement to do such an analysis?

MR. GARROU:  Object to the form of the question.

Q.    (By Mr. Blum) Let me rephrase it.  Do you know what the thought was as to why a beneficial

Page 19

reuse analysis was done by GP?

MR. GARROU:  Objection.  Vague.

Go ahead.

THE WITNESS:  Well, in general, I mean, industry in general had -- there were lots of examples where sites -- well-meaning sites might think there's an appropriate use, but they don't have the technical knowledge or the expertise to really understand the risks, especially with evolving regulations.

So this is really kind of a check step to make sure the right resources look at it with the right acknowledge to assess whether it's appropriate and would -- you know, it's a risk-management technique that the company's using.

Q.    (By Mr. Blum) The idea being that even well-meaning people making mistakes?

A.    Yes.

MR. GARROU:  Objection.  Argumentative.

Q.    (By Mr. Blum) Now, the -- would one of the issues be, if you wanted to use a fly ash as a soil amendment be, what was the fuels that were used in creating the fly ash?

A.    Yeah.  You would -- you would try to

Veritext National Deposition & Litigation Services
866 299-5127

assess fuels, you'd assess the characteristics of the ash as burned, look at the contaminants that you'd be familiar with, whether it's metals or other contaminants. The type of fuel would likely be a consideration in that.

Q. Now, in determining whether or not to do -- well, let me ask the question: Was there a criteria that was set out that determined when a reuse analysis would be required?

MR. GARROU: Objection. Vague as to time.

Q. (By Mr. Blum) In 19- -- when it started, was there a criteria?

MR. GARROU: Same objection.

MR. BLUM: Well, let me ask, the problem is, since there is a document, and we've never seen the document, and it's been requested, we have no other choice. One of the issues here is why don't I have that document.

MR. GARROU: What document?

MR. BLUM: The exact criteria that the witness just talked about, which has not been produced, Doug.

MR. GARROU: Exact criteria for --

Page 21

MR. BLUM:  The beneficial reuse criteria that was written down and prepared in 1998.  That's never been produced.

MR. GARROU:  It has nothing to do with the site.

Well, I mean we'll have to go and look at your request.  I -- it doesn't strike me that the mid to late '90s document dealing with programs that would have come online at other sites, and not in use at Fort Bragg, would be relevant or responsive.

Q.   (By Mr. Blum) Well, let me -- did the program apply to Fort Bragg?

A.   In this case, the analysis had already been done previously, and so they were not required to fulfill the beneficial use process that we had in place at the time.  So no, it didn't apply.

Q.   If there was a new use at Fort Bragg for a product that had not been done prior to the initiation of the program, would Fort Bragg have to comply with the criteria established in the beneficial reuse analysis program?

A.   Yeah, if there was a new use that hadn't been done before.

Q.   Okay.  If you change the fuel source --

Page 22

in other words, if you're burning X, and you now decide to burn Y, you just assume that the old beneficial reuse applies, or do you have to look to see whether or not that new fuel source changes anything?

A.    Yeah.  You're relying on the facility to identify that as an issue that would require a new analysis.

Q.    And how does the facility know whether or not a new analysis needs to be done?

A.    That's -- we try to put -- train people in the facility to recognize those kinds of risks.

Q.    If the -- if the facility is going to burn fuel outside the permit at the time, where they need to go to the regulatory agency and get a new permit, is that the type of circumstances that requires a new beneficial reuse analysis?

MR. GARROU:  Objection to the form. Compound and vague.

THE WITNESS:  Our program's not that specific about the implementation, so it doesn't lay out all these scenarios and talk about when to do it.

It just generally talks about when you have a new beneficial reuse, we require you to

Page 23

go through this analysis.

Q.      (By Mr. Blum) Okay.  Did you see any documents or talk to anybody that indicated whether or not, at the time that the facility at Fort Bragg decided to use urban waste as a fuel source, whether there was even any thought as to whether or not a beneficial reuse analysis had to be done?

A.      I saw no documentation that indicated that anyone did that analysis, or asked that question.

Q.      Did you see any -- did anybody you talked to tell you anything about whether or not there was even a thought of a beneficial reuse analysis, at the time it was decided to use urban waste as a new fuel source?

A.      No.

Q.      Based upon your knowledge of the criteria, if you were at Fort Bragg at the time that the decision was made to seek a new permit from the air board to use urban waste as a fuel source, would you have done a beneficial reuse analysis, prior to allowing the resulting fly ash to be used as a soil amendment?

A.      I don't know that it would have been necessary to do the beneficial reuse analysis -- the

Page 24

formal GP process, given the fact that you're going through a regulatory agency and getting a permit.

So those are examples where we don't necessarily require that same rigor, because you're doing it with a regulatory agency.

Were there no regulatory agency involved, yes. Because there's a regulatory agency involved, I think that was within the discretion of our environmental affairs to use that as the process to approve the use.

Q.    When you talk about discretion, does discretion presume that you need to look at the issue and make a decision one way or another as to whether or not to use the criteria?

A.    I mean, we expect our environmental contacts to try to think of -- to try to think of these types of risks and manage them the best they can.

Q.    Okay. Now, how is the -- in the mid '90s, or the late '90s, when the beneficial reuse program was put into place, how was the requirements of the program communicated to facilities such as Fort Bragg?

A.    Well, we would -- I mean, the programs -- the requirements were promulgated.

Page 25

Facilities would have a binder, that was our GP protocols, because there's a number of different protocols that lay out kind of basic requirements. And so facilities were required to do -- periodically do self-assessment, where you assess your program against the requirements.

Q.     I've not seen any of that information on Fort Bragg, but I'm familiar.  That -- that would be how we would implement that program generally, across the company.

Q.     Through -- can we -- I'm sorry.

MR. BLUM:  Can you read his answer back?

(The answer referred to was read back by the reporter as follows:

"ANSWER:  Well, we would -- I mean, the programs -- the requirements were promulgated. Facilities would have a binder, that was our GP protocols, because there's a number of different protocols that lay out kind of basic requirements.

"And so facilities were required to do -- periodically do self-assessment, where you assess your program against the requirements.

"I've not seen any of that information on Fort Bragg, but I'm familiar.  That -- that would be how we would implement that program generally, across the company.")

Q.    (By Mr. Blum) Let me try to break it down.  When a new program in the environmental area is -- was instituted in the late '90s, was there something sent to the facility saying, "Hey, guys, we got a new program you need to know about"?

A.    Yeah.  There would be some kind of communication if there was a new requirement.  That was generally how it was done.

I'm only directly familiar with what I saw at a pulp mill.  These programs were already largely implemented when I joined; but if there were updates, there would be a communication, either written or e-mail, that would communicate a new requirement that was out, and facilities would need to incorporate that into their program.

Q.    Was it expected that the facility would be aware of these new programs, and implement them?

A.    Yeah.  That was the expectation.

Q.    Now, you talked about self-assessments. What are those?

A.    A self-assessment is where a facility

Page 27

on their own just spends time -- you carve out time to look at all the requirements that are there, and how you are implementing them at your facility.  So you'll typically allocate some facility resources to do that type of assessment.

In the case of a small facility like a sawmill, you might have one of the regional environment people come assist with the self-assessment.  We call it a "self-assessment" to differentiate it from an audit, where you're bringing in either a third party or corporate resources to do an independent audit.  We did those as well.  But a self-assessment is a -- more of a local activity.

Q.    And how often were they done in the mid -- in the '90s?

A.    I'm not sure what the requirements were in the sawmills.  I know in the pulp mill, we did them annually.

Q.    Have you seen any self-assessments that were done for the Fort Bragg facility?

A.    I've not seen any in my review of the documents.

Q.    Did you ever look for them?

A.    Not specifically, no.

Q.    Did you ask somebody if those were

Page 28

done?

A.    I did not.

Q.    What types of issues would the self-assessments deal with?

A.    Generally looking at all the regulatory requirements that might exist.  So if the facility has a Title V air operating permit, if you've got an NPDS permit, stormwater, sort of the gamut of environmental regulations and issues, as well as our own internal standards, like the beneficial reuse, you would assess whether you've been following that guidance, whether you're meeting your permit requirements.  Just a general assessment of the health of compliance at the facility.

Q.    So, for instance, if your air permit prohibited you from burning things such as plastics or rubber, would a self-assessment look to determine whether you have complied with those requirements?

A.    Again, the self-assessment has general requirements to assess against.  It's really up to the people doing the assessment as to how much detail they go into when they do the self-assessment.

But it sort of forces facility personnel to -- to actually look at all the requirements, and assess whether they're being

Page 29

followed.  But it's really up to those individuals how good a job they do with that.

Q.    And is there a specific document that describes what a self-assessment consists of?

A.    At the time, I do recall us having a self-assessment document that lays out all the different areas that should be assessed as part of it.  Yes.

Q.    And what's that called?

A.    "Environmental self-assessment," I believe is what it was called.  But I actually don't recall exactly what its name was.

Q.    Can you -- do you know how many pages it was?

A.    I don't recall.  It was a substantial document.

Q.    Now, within a facility, is there supposed to be a binder that for instance has the rules relating to self-assessment, beneficial reuses analysis, and other types of rules that GP has for environmental issues?

A.    A facility's required to follow good recordkeeping practices, so it may not all be in a binder, but there should be a system at the facility with file cabinets and binders where the

Page 30

information's organized.  But there's not specific criteria, an exact format that has to be followed.

Q.    Well, for instance, I think Doug Heitmeyer came in as the environmental director in the late '90s at the GP facility.

Would there be some criteria or methods that GP would require for him to learn the rules that GP has relating to environmental monitoring and similar uses at the facility?

A.    I don't know specifically what was done for Doug.  I mean it's just good practice -- we would probably have the regional person, and if he was relieving somebody, you'd have a turnover period that you'd expect them to talk about what are the compliance issues, what are the permit requirements, kind of describe what the day-to-day activities are and show where the information is.  But there's not a strict procedure we followed for that.

Q.    Okay.  As it relates to the beneficial reuse issue, what documents did you review?

A.    So I reviewed dozens of -- dozens of documents, really looked at everything related to ash disposal and the beneficial reuse that was done, again starting in the mid to late '80s, late '80s, into the '90s.

Page 31

So I looked at water board permits, communications related to that; internal analysis done by GP, regional and/or corporate people who provided input on the beneficial reuse.

We had to do studies, so there's analytical data, that bioaccumulation testing that was done in response to water board and others' questions. So I reviewed lots of documents associated with that whole time period and worked to beneficially reuse the ash at Little Valley and McGuire's Ranch and other places.

Q. In conducting the beneficial reuse analysis, is this basically, you do the analysis and you're done, or is it something where you need to relook at the issue as time progresses?

MR. GARROU: Objection. Vague, including as to time.

Go ahead.

Q. (By Mr. Blum) '90s.

MR. GARROU: Same objection.

THE WITNESS: I don't recall there being any strict review requirements that delineate some periodic review. I don't recall that being part of the requirements.

Q. (By Mr. Blum) Is there a best practices

Page 32

policy?  What's the best practice, even though it may not be required?

MR. GARROU:  Same objection.

THE WITNESS:  I mean, if there's a substantial change in what the -- either the material or where you're sending it, that's probably appropriate to evaluate whether that requires further review or not.

Q.    (By Mr. Blum) Okay.  When you say "a substantial change in the material," what material are we talking about?

A.    Well, again, whatever you're beneficially reusing.  So if you think there's a change that would alter the analysis that was done, then that should be reassessed.

Q.    How do you know if there's a change that is going to alter the analysis?

MR. GARROU:  Objection.  Vague.

Go ahead.

THE WITNESS:  Again, the facility's the one that's doing the beneficial reuse, so it's up to the operational environmental people at the facility to recognize that there's a -- there's a change, and we have to rely on them to identify those.

Page 33

Q.    (By Mr. Blum) Okay.  In the last deposition, one of the things we talked about was the knowledge that GP had relating to the formation of dioxins.  Do you recall that?

A.    Generally, yes.

Q.    And one of the things we talked about was when GP became aware of the effect of burning things like plastics on the creation of dioxins.  Do you recall that?

A.    Generally.

Q.    Do you recall whether or not that knowledge was ever communicated down to facilities such as Fort Bragg?

MR. GARROU:  Objection.  It's beyond the scope of the order.

You can go ahead.

THE WITNESS:  I don't recall any specific communications that happened.  In my review of communications and records around Fort Bragg, I didn't see any communications to that effect.  So I don't know if the people at the facility have that knowledge or not.

Q.    (By Mr. Blum) Would you have expected that the people at the facility would have known, in year 2000, that when you burn plastics, that it could

Page 34

affect the level of dioxins and the resulting ash?

MR. GARROU:  Same objection.  Lacks foundation, calls for speculation.

You can go ahead.

THE WITNESS:  I don't know if they did.

Q.    (By Mr. Blum) Well, my question is would you have expected them to know.

MR. GARROU:  Same objection.

THE WITNESS:  I don't have any basis to tell you what my expectations are.  I just don't know.

Q.    (By Mr. Blum) Well, given the beneficial reuse analysis criteria that was established by GP in the year 2000, if a facility was deciding whether or not to use materials that contained plastics as a fuel source, should a beneficial reuse analysis have been done prior to using the resulting ash as a soil amendment?

MR. GARROU:  Objection.  Asked and answered.

You can go ahead.

THE WITNESS:  Well, in this case, everything I reviewed indicated that they were expecting to burn lumber ends and agricultural wood waste, and none of the permit

Page 35

applications or any of the analysis I saw did they anticipate there being plastics in this.

So I think as they entered into this project, there wasn't an expectation that they would burn things like plastic or rubber. Unfortunately, they did discover at one point that some of that material was making it into the feed stock.

Q.    (By Mr. Blum) Okay.  All right.  I understand that.  But my question was, in the year 2000, if a -- if GP in Fort Bragg was knowingly burning material that contained plastics as a fuel source, prior to using the resulting fly ash as a soil amendment, should a beneficial reuse analysis have been done?

MR. GARROU:  Same objection.

THE WITNESS:  And in this case, I don't know that we've ever evaluated burning plastics.  It's not something that we did.  So I'm not sure that anyone had thought about it, or -- there's probably a few people with some knowledge who would have said, "That's probably worth taking more of a look at."  But that's probably not widely known across the company, certainly not at Fort Bragg.

Page 36

Q.      (By Mr. Blum) Why wouldn't it be widely known?

A.      I think our understanding of dioxin formation evolved over 30 years, so I -- in 1998 or 2000, or 2001, you know, we're trying to apply knowledge we have today at 2014 to what was known at that time.  I honestly don't know what those people understood about that at that time.

Q.      Well, didn't you testify in your last deposition that by -- I think it was the mid '80s, GP understood that burning plastics would create a fly ash that contained increased levels of dioxins?

MR. GARROU:  Objection.  It's beyond the scope of the order.

Q.      (By Mr. Blum) Was that your testimony back then?

A.      I don't recall.

MR. GARROU:  Objection.  It's beyond the scope of the order.

You can go ahead.

Q.      (By Mr. Blum) Is that a correct statement, by the mid '80s, it was known that when you burn plastics, you create a higher level of dioxins?

MR. GARROU:  Same objection.  It's got

Page 37

nothing to do with the beneficial reuse study.

THE WITNESS:  I don't recall what I testified to.

Q.    (By Mr. Blum) Okay.  Let's assume that by the -- at least by the mid '90s, it was known that when you burn plastics, you create higher levels of dioxins than nonplastic fuels.  Given that knowledge, and given the knowledge, and assume that GP at Fort Bragg had the knowledge that they were actually burning plastics in their fuel source, should a beneficial reuse analysis have been done, prior to using the resulting fly ash --

MR. GARROU:  Objection.

Q.    (By Mr. Blum) -- as a soil amendment?

MR. GARROU:  Objection.  It's compound and vague.

Go ahead.

THE WITNESS:  Well, I mean, the reality is, it appears that the ash we did generate from that time period did create elevated dioxins.  That material was sent to McGuire's Ranch.  And so with hindsight, absolutely, we should have reevaluated that beneficial reuse, yes.

Q.    (By Mr. Blum) Isn't the whole idea

Page 38

behind the beneficial reuse analysis, to make sure that problems that you had at McGuire Ranch, didn't occur?

A.    That was the intent, yes.

Q.    All right.  And doesn't -- in order for the reuse analysis to work, don't the people at the facility at least have to ask the question, "Hey, do I need to do one?"

A.    Yeah.  They, and/or -- we do -- provide a regional resource there that is also supposed to be there to provide some -- some backup and ask those questions.  So yes, we do need them to have some knowledge.

Q.    Okay.  What training was in place to help people at facilities such as Fort Bragg be able to ask that question?

MR. GARROU:  Objection.  It's beyond the scope of the order.

You can go ahead.

THE WITNESS:  Yeah, I haven't reviewed what our exact training program was at that time period.  I do recall there being environmental training being given.  I don't recall whether it would have prepared them for this or not.

Page 39

Q.      (By Mr. Blum) Okay.  Now, what did you find when you looked for the documents relating to beneficial reuse analysis, or similar-type things that occurred in the late '80s or '90s relating to the use of fly ash as a soil amendment?

A.      So what documents did I see?

Q.      Yes.  Yes.

A.      So I saw all the communications with the water board; I saw laboratory analyses; I saw some internal analyses that were being done, responding to water board requests for information; again bioaccumulation studies, chemical -- you know, analytical data, approvals, actual orders.  Those are the types of things I looked at.

Q.      Do you have an understanding why, in the late '80s or early '90s, the water board would even be concerned about dioxins and what levels the fly ash might contain of dioxins?

A.      I'm -- I can't -- I don't know what the water board was thinking or why.  At that time, there was kind of a general awareness of dioxins as a potential issue.  So I assume that's what they were doing, but I don't know.

Q.      Well, is it your understanding, in the late '80s and '90s, it was understood that dioxin can

Page 40

have a -- can create a risk to human health, or the environment?

A.    I would say in the '80s, that was becoming more well known, yes.

Q.    Okay.  Do you know what the risks were? -- what was understood that the risks would be?

MR. GARROU:  Objection.  It's beyond the scope of the order.

You can go ahead.

THE WITNESS:  Yeah.  I'm generally familiar.  Most of the effects -- human health effects are based on acute studies, so there had been -- Subiaco, Italy; Times Beach, Missouri, experience with Agent Orange and exposure to those chemicals that indicate -- chloracne is probably the most acute effect.

There was probably research starting to come out at that time that showed it had impacts on the Ah receptor in human cells, and people were trying to understand that.

Most of the screening levels and criteria were based on animal studies; so in particular, guinea pigs are highly sensitive to dioxins.  Other species, less so.

All that body of information and

Page 41

research was kind of growing at the time, and so there was a lot of questions about the toxicity of dioxins, and the other effect is it's potentially bioaccumulative, was becoming known probably about that time.

So that all led to general concern about dioxins at certain levels, and the regulatory community was trying to figure out what was a level of concern and what isn't.

Q.    (By Mr. Blum) Okay.  In determining whether or not to do a beneficial reuse analysis, is the toxicity of the chemical or compound that you're worried about, a criteria?

MR. GARROU:  Objection.  Vague as to time.

You can go ahead.

Q.    (By Mr. Blum) Let's talk about the late '90s, early 2000s?

A.    Yeah.  I mean, anytime you're looking at risk, it's toxicity, concentration, exposure pathways.  It all rolls up into a risk profile.  So it's not necessarily the -- you can have something that's technically toxic at a certain concentration, and then at other concentrations, it has no measurable effects, and so you have to put it all

Page 42

together.  But you are going to focus on compounds that are known to be toxic at some level.

Q.     Let me see if I can rephrase the question to make it actually a better question.

In determining whether or not to even do the beneficial reuse analysis, is one of the issues is what chemical or compound you're dealing with?

For instance, if you're dealing with something that you have to have a huge exposure to be a problem, you might do it one way, but if you're dealing with something that you need a very small exposure, maybe you do the risk analysis, or the risk -- beneficial risk analysis?

MR. GARROU:  Objection.  Vague and compound, including as to time.

Go ahead.

Q.     (By Mr. Blum) Same time period: late '90s, early 2000s.

A.     Yeah.  I mean -- well, I'm not sure my answer changes.  You know, if you have -- you need to characterize whatever the material is to understand whether there's anything in it that could be toxic at some level and understand what concentration it is, how it's going to be used, whether there's a risk

Page 43

pathway that's created by that use.

All of that have feeds into an analysis of, you know, whether a beneficial reuse needs -- you know, how much analysis needs to be done to assess the risk.

Q.    Okay.  Did Doug Heitmeyer have the technical background to know those issues and, do anything about those issues?

A.    I don't know what Doug's state of knowledge was at the time.

Q.    Well, do you know whether or not GP had any programs in place to make sure that the people that were making the decisions about whether or not to do a beneficial reuse analysis, had the requisite knowledge -- technical knowledge, to make a proper analysis?

MR. GARROU:  Objection.  Vague as to time.

Q.    (By Mr. Blum) Again, late '90s, early 2000s.

A.    Again, I've not seen any records of our training program that was used with Mr. Heitmeyer, so my experience is related to other facilities.  I know we generally had training programs and we provided layers of technical support to the facilities.  I

Page 44

can't tell you whether it was adequate or not.

MR. BLUM: Okay. Let's take a five-minute break.

THE WITNESS: Okay.

THE VIDEOGRAPHER: This is the end of Video 1. We are going off the record at 10:09 a.m.

(A short recess was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER: This is the beginning of Video 2. We are back on the record at 10:22 a.m.

Q. (By Mr. Blum) All right. Mr. Hilarides, you talked something -- somewhat about whether or not the use that was being -- taking place at the Fort Bragg facility for fly ash in a soil amendment was grandfathered in when the beneficial reuse analysis program was put into place.

Does the criteria that you talked about discuss when something is grandfathered in?

A. I use that phrase just as a term, again, in talking to Mr. Champion and Mr. Curtis. They talked about the fact that an existing use that a permit, they would not have required it to go through a new beneficial reuse analysis.

Page 45

Q.    Was there anything that you saw that told the facilities when something was or was not grandfathered in?

A.    Not aware of any formal documentation, no.

Q.    Did you see any documentation where there was any communications between the Fort Bragg facility and anybody else relating to whether or not the use of fly ash as a soil amendment was grandfathered in to the beneficial reuse program?

A.    I did not see any documentation, no.

Q.    Did you see any documentation that showed that anybody at the Fort Bragg facility even considered whether or not they had to do a beneficial reuse analysis for the use of fly ash as a soil amendment?

A.    No.

Q.    Do you know whether or not anybody at the Fort Bragg facility ever considered whether or not there was a requirement to do a beneficial reuse analysis for the use of the fly ash as a soil amendment at any time?

A.    I don't know.

Q.    Okay.  From your reading of the program, in order for a facility to determine that

Page 46

something they're presently doing was grandfathered in, was there a requirement that the question be asked?

MR. GARROU:  Objection.  Vague.

Go ahead.

Q.    (By Mr. Blum) Again, after the --

A.    I don't know if that requirement exists, no.

Q.    Well, is it assumed -- did the program assume that somebody was going to at least ask the question, "Is this a grandfathered use?"

A.    Again, I don't know if that's the exact phrase that was used.  But the assumption was yeah, if you are sending materials off-site, that there is at some point either the regional or the facility people would say, "Is this an authorized reuse?"

And in this case, again, I've not seen any documentation.  This is based on conversations with people who are familiar with the program.  There likely was a conversation, and they said -- it would have looked at the permits that were in place and all the analysis that was done, and would have allowed that reuse to continue based on that.  That would have been the practice, at the time.

Q.    Okay.  When you say "likely," did

Page 47

anybody tell you that likely that type of questions were asked relating to the Fort Bragg facility?

A.    I did not find anyone who was familiar with that exact question, that time frame.

Q.    Okay.  Now, Mr. Champion, he was -- how long had he been in his position?

A.    So he's been our VP of environmental affairs for five and a half years.

Q.    Okay.  In the late '80s and '90s, who was the VP for environmental affairs?

A.    That would have been Susan Moore.

Q.    Is she with the company anymore?

A.    No.

Q.    Do you know if she's alive?

A.    I don't know that she's not alive.  I don't know.

Q.    Okay.  Now, Mr. Curtis, how long had he been the director for technical services?

A.    He's been in that specific role for about four years.

Q.    In the late '80s and early '90s, who was -- who had that job?

A.    I believe it would have been Keith Bentley.

Q.    Did you talk to Mr. Bentley about

Page 48

whether or not there was any beneficial reuse analysis at the Fort Bragg facility?

A.    I did not.  I believe he works for Georgia Department of Lands, at this point.

Q.    Okay.  Did you find any paperwork whatsoever that showed that anybody at the Fort Bragg facility in the late '90s or early 2000s, ever considered whether or not they needed to do a beneficial reuse analysis for the use of fly ash as a soil amendment?

A.    No.

MR. GARROU:  Objection.  Asked and answered.

You can go ahead.

Q.    (By Mr. Blum) If indeed that question had been asked and the decision had been made that they don't need to do it, would you have expected somebody to have written that down somewhere?

MR. GARROU:  Objection.  Calls for speculation.

Go ahead.

THE WITNESS:  Not necessarily.  It wasn't -- I'm not aware of any requirement to write it down, or to document it.  It would have been just part of the communication at

Page 49

the facility as to what the requirements and expectations were.

Q.    (By Mr. Blum) Okay.  Now, do you have any reason to believe that there was even -- that there was an analysis done to determine whether or not there was a need to do a beneficial reuse analysis for the use of fly ash as a soil amendment in late '90s, early 2000s?

A.    Again, based on my -- my reading of the permit they got to burn the wood, and what I saw in the documentation, I think their belief was this was going to be a high-quality fuel.  In fact, it was going to burn better than the wood they normally used.

And so while I didn't see any specific references to beneficial reuse analysis, I think the belief was, this was a good thing to burn this wood; that the boilers would operate more efficiently, and they were going to actually get more steam per bone-dry ton of wood.

So I think -- and with all the permit requirements that were in there, including the testing that was required, again, based on my knowledge of what a beneficial reuse analysis would do, that would appear to me to be adequate

Page 50

assessment.

I don't know whether those are the exact thoughts that went through people's heads or not, but I did see communications that would indicate that's what they believed at the time.

Q.    And these were communications based on using fuel consistent with what the air board was permitting, correct?

A.    Correct.

Q.    Okay.  Was there -- did you see anything, or do you have any reason to believe that there was any analysis of what would be the effect on the fly ash, and whether or not a beneficial reuse analysis was needed, if they deviated from the permit?

A.    I saw no communications or anything that indicated that they thought they were going to burn anything but exactly what was in the permit.

Q.    Did you see anything that indicated that they knew they were burning plastics?

A.    Not until the -- the circumstances around the violation that we ended up -- there's a lot of communication around the violation and the settlement.

So as soon as that all occurred, my

Page 51

remediation projects such as Fort Bragg?

A.    No.

Q.    Have you ever had a meeting with anybody at Koch Industries about the reserves at Fort Bragg?

A.    Not that I'm aware of, no.

Q.    Have you ever had any -- any communications with anybody at Koch Industries with regard to the urban waste wood burning or judgment at the Fort Bragg site?

MR. GARROU:  Objection.  It's beyond the scope.

Go ahead.

THE WITNESS:  I'm not aware of any conversations or discussions, no.

Q.    (By Mr. Smith) Who at Fort Bragg, if anyone, made the decision that the use of fly ash, as a soil amendment, did not have to comply with GP's beneficial reuse policy?

A.    I'm not aware of any conscious decisions or discussions that occurred about whether that was or wasn't required.  I don't -- I didn't see any documentation of that.

Q.    Did Georgia-Pacific, in the year 2000 or 2001, have any policies in place against burning

Page 124

# Georgia-Pacific's

# EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GEORGIA-PACIFIC, LLC,                )

    Plaintiff,                       )

vs.                                  ) Case No: 3-12-CV-02797-RS

OFFICEMAX INCORPORATED,              )

et al.,                              )

    Defendants                       )

                                      )

----------------------------)

AND RELATED COUNTER AND CROSS

CLAIMS

VIDEOTAPED DEPOSITION OF MICHAEL DAVIS

VOLUME I

February 26, 2014

9:11 a.m.

Lewis Brisbois Bisgaard & Smith

1180 Peachtree Street, NE

Suite 2900

Atlanta, Georgia

Marsi Koehl, CCR, CCR-B-2424

PAGES 1 - 289

Page 1

A.   Sure.

Q.   Are those just copies?

A.   Yes, yes.

Q.   Okay.  Well, why don't we, first of all --
is this intended to be one exhibit with multiple
pages?

A.   Correct.

MR. SMITH:  Let's make this 152 and pass
these out and let everybody take a quick
look.

THE WITNESS:  Certainly.

(Defendants' Exhibit 152 was marked for
identification.)

BY MR. SMITH:

Q.   Have you brought anything else to the
deposition to give to me today?

MR. GARROU:  We've got -- as I mentioned
before we staged the deps.  For individual
topics, he has summary sheets.  So to the
extent he's questioned about those and needs
a sheet, you'll get those when you question
him.

MR. BLUM:  You said in your E-mail you
were going to provide these to us at the
beginning of the depo.

Page 26

MR. GARROU:  At the beginning?

MR. BLUM:  Yes.  That's what you said in your E-mail.

MR. GARROU:  I don't actually recall that, but it doesn't really matter to me.  I don't think we're obliged to give you sheets about stuff that you don't ask him questions about.  I mean...

MR. SMITH:  I can short circuit it. We're going ask a quick question on each of the topics --

MR. GARROU:  That's fine.

MR. SMITH:  -- at the beginning. Because I just want to get everything on the table right away.

THE WITNESS:  Sure.

BY MR. SMITH:

Q.  With regard to the topic No. 2, Mr. Davis, have you brought any sheets or materials for us to look at?

A.  Yes.

MR. SMITH:  I'm going to mark that as Exhibit 153.

(Defendants' Exhibit 153 was marked for identification.)

Page 27

BY MR. SMITH:

Q. What is Exhibit 153?

A. This is in response to your question concerning the amount of cost GP seeks to recover our claim. This is simply laying out claim for past cost. It's approximately $37,395,608.

Q. Who -- okay. Go ahead. I didn't mean to cut you off.

A. No. And that's -- there's a statement here about prejudgment interest, 282,674.

Q. Who prepared Exhibit 153?

A. It was prepared by Hunton & Williams.

Q. Did you have any involvement in the preparation of Exhibit 153?

A. In the sense that I reviewed it and then looked -- I have looked at the back-up documentation for the figure, yes, I have reviewed that. But this was prepared and then I reviewed it.

Q. Where is the back-up documentation for the figure?

A. We have --

MR. GARROU: I've got some of it with me to the extent he has referred to it.

BY MR. SMITH:

Q. Well, have you referred --

Page 28

A. The summary -- the invoices that provide the backup, all of those -- it's been my understanding have been provided to you previously.

Q. I'm perfectly fine with identifying things in the record. I just need to do it.

So you mentioned you have consulted with some of the backup. Tell me what you've consulted with?

A. The invoices from the various consultants who worked on the project.

Q. And what sheets do you have here that refer to that?

A. These are -- these are summary sheets listing invoice by invoice the cost for each invoice and the consultant that provided the service.

MR. SMITH: Great. Let's mark those as exhibits. Let me take a look at them, so I can figure out the best way to mark those.

(Mr. Garrou and witness confer.)

BY MR. SMITH:

Q. So these are two documents?

A. Yes.

Q. One is ARCADIS -- a summary of ARCADIS invoices; is that correct?

A. That's correct.

Page 29

MR. SMITH: And that's going to be Exhibit 154.

(Defendants' Exhibit 154 was marked for identification.)

MR. GARROU: We have the one copy. Otherwise, I'd have 9 boxes of stuff.

MR. SMITH: Okay. If your paralegal can E-mail that to me, I can burn off copies.

MR. GARROU: I don't know that we're prepared to do that.

Is that going to be doable, Scott?

MR. CAMPBELL: (In audible response.)

MR. SMITH: If you can work on that, that would be fabulous.

MR. GARROU: We'll see what we can do.

MR. SMITH: I'm going to be able to ask questions. I'm just going to have a lot of disappointed people around the table.

MR. GARROU: I understand. And were going through the logistics of this while we were doing the prep, and, unfortunately, we'd have a wall of documents if we copied everything he might want to refer to, so...

MR. SMITH: Let's get the official sticker on that.

Page 30

BY MR. SMITH:

Q.   And then 155 will be the other vendors' invoice summaries; is that correct?

A.   That's correct.

(Defendants' Exhibit 155 was marked for identification.)

BY MR. SMITH:

Q.   Do you have any other backup or sheets to refer to with regard to topic No. 2, the cost?

A.   Yeah.   These are the -- this is the summary of the future cost estimate.

MR. SMITH:  We're going to call this will 155.

(Defendants' Exhibit 156 was marked for identification.)

BY MR. SMITH:

Q.   And who prepared 155?

THE REPORTER:   156.

BY MR. SMITH:

Q.   I'm sorry, 156.   156 is the summary of future costs.   Who prepared this document?

A.   Hunton & Williams.

Q.   Do you know who at Hunton & Williams prepared it?

A.   Specifically, no, I do not.

Page 31

Q.   Have you talked to anybody at ARCADIS about the numbers on Exhibit 156?

A.   Right.   We have reviewed those numbers with ARCADIS and with our internal remediation team and that's who provided the backup for those specific numbers.

Q.   Who at your -- in your internal remediation team have you discussed the numbers in Exhibit 156?

A.   That would have been Dave Massengill, M-A-S-S-E-N-G-I-L (sic), who is in charge of our internal remediation team.

Q.   When did you speak with him about those numbers?

A.   The last time we spoke probably would have been -- specifically about those numbers probably would have been about a month ago.

Q.   Are these numbers, to your personal knowledge, budgeted for -- at Georgia-Pacific?

A.   I'm not sure when you say "budgeted" --

Q.   Have you put the future remediation numbers in some kind of reserve --

A.   Into a reserve?   There is a reserve for this site.   And I believe Mr. Hilarides has more direct information about that and he'll be testifying about that.

Page 32

Q.   Right.   I'm only asking from your personal knowledge.   What do you know --

A.   My understanding is, yes, there is a reserve.   Now, whether it reflects -- what of those numbers it reflects, I can't tell you off the top of my head.   I don't know.

Q.   As the assistant GC for environmental matters, are you asked to give input on reserves for future remediation costs at the Fort Bragg lumber site?

A.   I sit in when there is a review of the numbers with our management team.   Yes.

Q.   When did that last happen?

A.   Last Fort Bragg meeting was -- I cannot recall.   There may have been one last month.   I was not in attendance at that meeting.   Prior to that, it would have been sometime last fall.

Q.   Were the numbers discussed last fall the same numbers as we see on Exhibit 156?

A.   I believe they were.

Q.   Do you have any other documents or backup that you've accessed to give your opinions on subject 2, cost?

A.   Again, all of the invoices from the various vendors, yes.

Page 33

Q.   Did you actually look at individual invoices from vendors in preparing for today's testimony?

A.   I have not been through every single invoice.  I have gone through a random selection looking at them to see if the numbers we had matched up with the numbers that were there and the work items.  Yes.  I've done some of that, but I cannot tell you that I've looked at every single invoice.

Q.   Were there particular vendors that you concentrated on in checking the numbers?

A.   I was much more focused on the ARCADIS numbers.

Q.   Was this on the ARCADIS professional services or did that include subcontractors that ARCADIS engaged as well?

A.   Generally more the ARCADIS-provided services, not the subs.

Q.   Has there been any litigation between GP and ARCADIS over their -- its work with regard to the Fort Bragg project?

A.   Not that I'm aware of, no.

Q.   Any arbitrations?

A.   I don't believe so.

Q.   Has ARCADIS provided any money or credits to GP on account of any errors in its professional

Page 34

services rendered on this project?

A.   Yes.

Q.   How much has it provided in terms of money or credits?

A.   It's somewhat complicated.  But the base answer is this, that there was a consolidation cell constructed on the property to manage some of the docks and contaminated soil generated in the cleanup of OU-A which was the parcel next to the Pacific Ocean that was being conveyed to the City of Fort Bragg.

We constructed the consolidation cell. ARCADIS designed and constructed it.  We had issues over a couple of seasons with infiltration by storm water.  And it was determined that the most effective course of action was to remove the consolidation cell from the property and dispose of the contents offsite.

The reason for constructing the consolidation cell was it would save approximately -- I think the estimate about a million dollars over offsite disposal.  ARCADIS agreed that what they would do is provide services to us that would in effect make us whole for the removal so that our cost at the end of the day for the final offsite disposal

Page 35

of the material for the consolidation cell was no more than we would have paid had we originally taken the stuff -- taken the soil offsite for disposal and not built the consolidation cell.

Q. Do you have any paperwork for the computation of the monetary value of that --

A. I do not.

Q. Disposition has been determined?

A. I do not have that. No.

Q. Who made the call at Georgia-Pacific to accept that resolution from ARCADIS?

A. That ultimately would have been made -- I think Mr. Hilarides may have had the final, final say on that as he was in charge of the remediation group. If it wasn't Mr. Hilarides -- I don't think this would have gotten to our CEO level, but...

THE REPORTER: But what?

THE WITNESS: I'm sorry. I'm sorry. I don't know whether it would have gotten to our CEO level or not.

THE REPORTER: Thank you.

BY MR. SMITH:

Q. Who was the CEO at the time?

A. Jim Hannon.

Q. Is he still the CEO?

Page 36

A.   Yes.  He is.

Q.   Has he been the CEO since Koch bought the company?

A.   No.  He was not.  He was president, I think, for the first year and then subsequently moved to the CEO position.  That's my recollection.  I may not be completely accurate.

Q.   Have you reported to Mr. Hannan from time to time regarding the Fort Bragg site?

A.   I have been involved in updates that we provide to Mr. Hannan on the status of Fort Bragg as well as other remediation sites.  Yes.

Q.   Has the environmental department, to your knowledge, also provided updates or reports to Mr. Hannan?

A.   Yes.  They are involved in those meetings. That's correct.

Q.   I digressed.  I was asking you about the documents that you relied upon to assist you in testifying today on subject No. 2.  The last item you gave me was Exhibit 156, the overall summary of future costs.

Are there any other documents or schedules that you've relied upon to assist you in your testimony on subject 2?

Page 37

**Re**:    <u>**Georgia-Pacific, LLC v. OfficeMax Incorporated, Louisiana-Pacific Corporation,**</u>
<u>**And The City Of Fort Bragg**</u>
**United States District Court, Northern District Case No. 3:12-cv-02797-WHO**

### <u>PROOF OF SERVICE – ELECTRONIC TRANSMISSION</u>

STATE OF CALIFORNIA/COUNTY OF San Francisco

I am a citizen of the United States and an employee in the County of San Francisco. I am over the age of eighteen (18) years and not a party to the within action. My business address is BASSI, EDLIN, HUIE & BLUM LLP, 500 Washington Street, Suite 700, San Francisco, California 94111.

On the date executed below, I electronically served the document(s) via ECF Northern District website*s*, described below, on the recipients designated on the Transaction Receipt located on the ECF Northern District website.

**DECLARATION OF HARRY M. JOHNSON, III FOR LETTER BRIEF OF THE CITY OF FORT BRAGG REGARDING RESPONSES TO SET 2 OF WRITTEN DISCOVERY**

On the following parties:

PLEASE SEE SERVICE LIST PROVIDED BY ECF NORTHERN DISTRICT WEBSITE

I declare under penalty of perjury that the foregoing is true and correct and that this document is executed on August 21, 2014, at San Francisco, California.

/s/ ALISHA C. PEMBER
_____
ALISHA C. PEMBER

949924

1

PROOF OF SERVICE