

www.behblaw.com

500 WASHINGTON STREET, SUITE 700                    333 S. HOPE STREET, 35TH FLOOR
SAN FRANCISCO, CA 94111                                     LOS ANGELES, CA 90071
TEL 415-397-9006                                                   TEL 213-412-2661
FAX 415-397-1339                                                  FAX 213-652-1992

MAIN OFFICE

August 21, 2014

***Via E-File***
Hon. Laurel Beeler
United States District Court
Northern District of California
450 Golden Gate Avenue
San Francisco, California 94102

   Re: ***Georgia-Pacific, LLC v. OfficeMax Incorporated, Louisiana-Pacific***
     ***Corporation, And The City Of Fort Bragg***
     United States District Court Northern District Case No. 3:12-cv-02797-WHO
     Our Client: The City of Fort Bragg

Dear Magistrate Beeler:

   The City of Fort Bragg ("City") and Georgia-Pacific LLC ("GP"), after meeting
and conferring by phone[1], submit the following Joint Discovery Letter Brief regarding
the parties' dispute as to GP's responses to the City's Requests for Admissions, Set Two
("the RFAs") (Exh. 1), pursuant to the August 14, 2014 Standing Order:

## I. RFA NO. 30

**THE CITY'S POSITION:**  RFA No. 30 asks GP to admit that it was sued for dioxin
contamination at another site in 1991.  GP objects to RFA No. 30 as "not relevant to any
claim or defense in this action, nor reasonably calculated to lead to the discovery of
admissible evidence. . ."  (Exh. 1 at No. 30.)  Contrary to GP's objections, the
information requested is relevant to several issues in the litigation.

One of the chief contaminants at the Mill Site is dioxins.  They were created chiefly as a
result of GP's illegal burning of unpermitted urban waste and the spread of the resulting
fly ash through a significant part of the facility.  The Court recently allowed the City to
amend its counter claim and answer to allege that GP fraudulently concealed the dioxin
contamination.  (Le Decl., Exh. 2.)  A partial basis for the ruling was that GP's fraudulent

---

[1] The parties could not confer in person because counsel for GP do not live in the Bay Area.  (Le Decl., ¶
4.)

Magistrate Beeler
August 21, 2014
Page 2

concealment of the dioxin issue was also relevant to the defense of GP's CERCLA claim. (Le Decl., Exh. 2 at 10.)  The fact that GP was sued in 1991 for dioxin contamination would inform the City as to when GP became aware of the harmful effects of dioxins on human health and/or the environment.  Furthermore, prior lawsuits filed against GP for dioxin contamination, which would expose GP to the kinds of regulatory and public relations ("PR") issues that complicate remediation and sales of contaminated property, may shed light on GP's motives for committing the fraud.

**GP'S RESPONSE:**  CFB's motion to compel further responses to its second set of RFAs is indicative of its approach to discovery in this case.  CFB asserts trivial and often flatly incorrect complaints to manufacture "disputes" that it can present to the Court.  This motion is another example of CFB wasting the Court's time with immaterial nitpicking that has no bearing on the merits of the case.

This request seeks an admission about a lawsuit against a Georgia-Pacific facility unrelated to the Fort Bragg Mill.  *See, e.g.,* Exh. 1, RFA No. 30.  Georgia-Pacific properly objected to this request on grounds it is irrelevant to operations or contamination at the Mill Site, is overly broad, and is unduly burdensome.  In fact, CFB's only claim to relevance is that the information "would inform the City as to when Georgia-Pacific became aware of the harmful effects of dioxins on human health and/or the environment."[2]  However, Georgia-Pacific has *already* acknowledged that point in detail:

> Again, speaking as the company, we were certainly aware of dioxins.  We have been dealing with dioxins since the 80s, and generally we were probably a little more focused on our pulp mills, our bleached pulp mills, as being a primary source of dioxins, but there was a realization that it could be in ash under certain circumstances. And so there was an awareness of that.

*See* Le Decl., Ex. 4 at 395; *see also id.* at 395-99 (explaining Georgia-Pacific's dioxin experience in detail).  Thus, this request is not only irrelevant, but also cumulative and unnecessary.

## II.    RFA NO. 33

**THE CITY'S POSITION:**  RFA No. 33 refers to Exhibit E of the RFAs, a letter from GP to the California Regional Water Quality Control Board ("RWQCB"), and asks GP to admit the truth of the statements contained therein.  (Exh. 1 at No. 33.)  The correspondence is dated June 28, 1990 and attaches a report which addresses various methods for disposal or use of the fly ash generated at the Mill Site.  Out of 10 pages of statements, GP denies the truth of two statements which pertain to the rates of ash generated on the Site in 1990 because "current [2014] rates of ash generation . . . are not 1,400 cubic yards per month." (Exh. 1 at No. 33.)  The RFA does not ask about GP's "current" rates of ash generation,

---

[2] CFB makes a number of accusations about dioxin and Georgia-Pacific's "motives for committing fraud " with no factual basis whatsoever.  Not surprisingly, CFB provides no citations to any evidence even though CFB has taken the depositions of the individuals involved in the alleged "fraud."  Indeed, CFB's own 30(b)(6) designee on this issue, Linda Ruffing, could not point to *any* evidence when asked to cite it during CFB's deposition two days *after* CFB's counsel served its insert for this letter brief.

Magistrate Beeler
August 21, 2014
Page 3

which would be none since GP had ceased operations on the Site for several years before responding to the request.  Rather, the request regards the generation of fly ash at the time the statements were made, in 1990.  Furthermore, GP neither admits nor denies the remaining statements contained in Exhibit E.  GP's failure to answer the RFA should be itself deemed an admission.  Fed. R. Civ. P. 36.

**GP'S RESPONSE:**  There is nothing incorrect or defective about Georgia-Pacific's proper objection and denial of this request.  CFB is quibbling with a response that it does not like.  As an initial matter, Georgia-Pacific properly objected that the request did not identify the specific "statements pertaining to the amount of fly ash" to which CFB was referring.  Georgia-Pacific then reasonably interpreted the request to refer to the two statements in the document regarding rates of ash generation.[3]  And, because Georgia-Pacific concluded that the two statements are incorrect *as phrased* in the present tense, it denied them.  CFB's motion must be denied on this RFA.

### III.    RFA NOS. 65, 66, 93, 94, 123 through 132, and 135 through 142

**THE CITY'S POSITION:**  RFA Nos. 65, 66, 93, 94, 123 through 132, and 135 through 142 refer to RFA Exhibits K, N, O, P and Q which are the deposition summary sheets prepared by GP's outside counsel, Hunton & Williams LLP, that were brought to GP's 30(b)(6) depositions as summary notes for the witnesses to refer to when answering questions about the topics designated by the Defendants.  The deposition summary sheets were produced at, and made exhibits to, the deposition.  (Le Decl., ¶ 8, Exh. 5.)

RFA 65, for example asks GP to admit that Exhibit K was prepared by Hunton & Williams.  GP objected on the grounds that such information was privileged and irrelevant.  GP's response to RFA 65 (and similarly RFA Nos. 93, 139, and 141) is improper for several reasons.  First, the Exhibits are relevant to the litigation as they summarize the evidence supporting GP's claims against the Defendants, form the basis for the majority of GP's 30(b)(6) testimony, and pertain to the contamination of the Site.  Second, answering the requests as to who prepared the Exhibits would not convey any privileged information.  Regardless, such claims of privilege or protection are waived because GP's own 30(b)(6) witness already testified that GP's outside counsel, Hunton & Williams, prepared the Exhibits, and that the witness relied upon the deposition summary sheets as his source of information for the topics on which he was deposed.  (Le Decl., Ex 6 at 26:17-22 and 28:11-18.)

GP also tries to sidestep its obligations to admit that the statements in the deposition summary sheets prepared by their own counsel are true.  For example, RFA 66 asks GP to admit the truth of the statements contained in Exhibit K.  GP admitted only that "at the time Exhibit K was prepared, GP believed the statements made in Exhibit K to be true . . . at that time," and then denied the request "except as specifically admitted."  GP's

---

[3] At no time has CFB ever explained what *other* "statements pertaining to the amount of fly ash" that it wants Georgia-Pacific to admit.  Even in its letter briefing, CFB does not identify the other "statements."  Rather, it refers only to "10 pages of statements" without any citation and without attaching any of the "statements" to the letter brief.

Magistrate Beeler
August 21, 2014
Page 4

ambiguous response to RFA 66 (and similarly RFA Nos. 94, 123 through 132, 135 through 138, and 142) must be supplemented because GP fails to answer the substance of the matter.  The requests do not seek information about what GP believed at the time the Exhibits were prepared.  Rather, the City requests GP to admit the truth of the Exhibits which were also testified to by GP's 30(b)(6) witnesses.  GP's general denial seems to imply that although the statements were believed to be true at the time the Exhibits were generated, at least some of the statements contained therein are no longer true.  If that is indeed the case, GP needs to admit those statements in the Exhibit which are true, and state with specificity which of the statements are no longer believed to be true.  Fed. R. Civ. P. 36.

**GP's RESPONSE:**  CFB's complaint about these responses is not only trivial but also misplaced.  To facilitate the Georgia-Pacific 30(b)(6) deposition, the witnesses brought summaries of the voluminous information sought in the Defendants' list of 112 topics for examination.  As fully explained in the depositions, the witnesses were provided the summary sheets by Hunton & Williams, and the summaries were made exhibits.  G-P 30(b)(6) Dep. 26:17-22 (Davis) (attached as Exh. C to Johnson Decl.)  CFB now seeks a series of admissions that Hunton & Williams "prepared" the summaries and that all the statements in the summaries are "true."  As shown below, Georgia-Pacific's objections and responses are proper and in full compliance with the rules.

*Who* prepared the summaries is utterly irrelevant to the issues in the case – it is their *contents* that are relevant.  CFB and OMX fully explored the contents at the depositions, as well as the underlying source material.[4]  *See, e.g.,* G-P 30(b)(6) Dep. 27-37 (Davis) (attached as Exh. C to Johnson Decl.).  Indeed, if CFB believes the summaries are in any way incorrect or incomplete, they can point that out regardless of who prepared them.  Moreover, Georgia-Pacific properly objected that Hunton & Williams' role in "preparing" the summaries is not only irrelevant, it is also privileged.  Hunton & Williams provided the summaries to the witnesses, but how the documents were compiled is privileged.  This is similar to an attorney's comments on a client's contract – no privilege attaches to the final version that is shared with the other party, but the attorney's role in drafting the contract is privileged.  *Muller v. Walt Disney Prods.*, 871 F. Supp. 678, 682 (S.D.N.Y. 1994).  Thus, CFB's motion must be denied as to all the RFAs seeking an admission that Hunton &Williams "prepared" the summaries (RFA Nos. 65, 93, 139, 141).

The other RFAs in this group seek admissions that "statements contained in [the summaries] are true."[5]  *See* RFA Nos. 66, 94, 123-132, 135-138, 140, 142.  Review of Georgia-Pacific's individual responses reveals that, in each instance, Georgia-Pacific carefully parsed the RFA to admit where appropriate, to deny where appropriate, and to state it could not admit or deny where appropriate.  For instance, RFA 94 seeks an

---

[4] The summaries have full citations to the record to show the sources of the information contained therein. *See, e.g.,* Exhibit K attached to Le Decl. Ex. 5.

[5] In many cases, CFB did not specify which statements it was referring to, so Georgia-Pacific was forced to object that the RFA was vague and ambiguous before proceeding to provide a substantive response. *See, e.g.,* RFA 94.

Magistrate Beeler
August 21, 2014
Page 5

admission about a summary of Georgia-Pacific's cost information concerning two specific areas of the Site.  Georgia-Pacific admitted that, when prepared, the summary accurately portrayed Georgia-Pacific's knowledge about costs as to the "Glass Beaches" area, but Georgia-Pacific denied the remainder.  The denial is proper because, as CFB is well-aware and as the summary expressly states, the costs in the summary were "estimates" and are subject to expert review and opinion.  After providing the specific estimate of costs, the summary itself explained:  "Because invoices from vendors working on the Mill Site reflected response costs incurred for various activities being conducted concurrently, the majority of the invoices submitted do not break out costs by OU ["operable unit"] and/or sub-areas such as the Glass Beaches areas.  Therefore, it is not possible for Georgia-Pacific to provide an exact cost for the investigation and/or cleanup of the Glass Beach area and OU-A….  The issue of cost allocation is the subject of expert analysis.  The allocation of response costs for the Glass Beach area and OU-A will be presented in forthcoming expert reports."  Ex. 1, Ex. N.  Georgia-Pacific's other RFA responses likewise carefully answer the RFA as posed, and nothing in them justifies any further response.

**THE CITY'S REPLY:**  GP concedes that the facts contained in the deposition summaries are relevant; so too is the source of these facts relevant.  Issues such as the hearsay exception, authorized admissions, and relevancy of the documents hinge on the source of the information.  Who prepared the documents is also relevant to show subject matter waiver for privilege claims.  Furthermore, if GP's response to RFA 94 is based on the claim that the costs in the summary were "estimates," which is included in the Exhibit, then GP could have admitted that the statements contained in the Exhibit are true.

## IV.    RFA NO. 99

**THE CITY'S POSITION:**  RFA No. 99 asks GP to admit that it had knowledge that its burning of municipal wood waste generated high concentrations of dioxins at the time it burned such wastes.  GP's response states that it does not know what it knew at that time, and needs an expert in order to answer the request.  GP's claim of ignorance is contradicted by their own 30(b)(6) witness, Roger Hilarides, who on behalf of GP testified "since at least the mid '90s' it was "well known" that burning municipal wood caused greater concentration of dioxins to be produced.  (Le Decl., Exh. 4 at 445:1-13.)

GP's burning of municipal wood waste occurred between 2000 and 2002.  Because the request goes to GP's own knowledge about its own actions, such an answer is unacceptable, especially when read in conjunction with GP's response to RFA No. 103, in which GP "ADMITS that there were elevated levels of dioxin in a fly ash pile that was generated on the Mill Site as a result of the burning of demolition wood waste . . ." GP cannot then hide behind its claim that it requires an expert to answer the request, or that it has insufficient information as to its own knowledge, and must therefore admit or deny the request.

**GP's RESPONSE:**  Once again, CFB is distorting the RFA itself and Georgia-Pacific's response.  The RFA actually asks for an admission that Georgia-Pacific's burning of municipal wood at the Mill Site "generated *inordinately high* concentrations of dioxins."

Magistrate Beeler
August 21, 2014
Page 6

(Emphasis added.)  Nowhere does CFB define the inflammatory and subjective term "inordinately high."[6]  There is no reference to any specific regulatory level or other objective standard, so Georgia-Pacific properly objected to the term as vague and ambiguous.  At that point, Georgia-Pacific could have reasonably stopped with its objection to the poorly-drafted RFA.  But, subject to the objections, it responded that dioxin concentrations from burning of wood waste is a subject of expert testimony, that it lacked sufficient information to admit or deny the request, and that it denied the remainder.  As with the other RFA responses, this response is appropriately-tailored to the request *as drafted*, and Georgia-Pacific should not be compelled to respond further.

**THE CITY'S REPLY:**  GP's 30(b)(6) witnesses used or responded to language such as "elevated levels" and "inordinate levels" in reference to the level of dioxins generated by the burning of municipal waste.  (Le Decl., Exh. 6 at 267:24-268:23.)  Also, GP could have referenced Webster-Merriam's Dictionary, which defines "inordinate" to mean "going beyond what is usual, normal, or proper."  If GP found the term "inordinately high" to be inexact, GP could have responded by striking the word "inordinately" by specifying the exact level in each instance, and/or by using its own definition of "inordinately high," e.g., a substantial deviation from the level of dioxins found in other wastes GP burned.  See e.g. S.A. Healy Co./Lodigiani USA, Ltd. v. United States, 37 Fed. Cl. 204, 206 (Fed. Cl. 1997).

## V.    REQUESTS FOR COSTS

**GP'S RESPONSE:**  Georgia-Pacific requests its reasonable fees and costs under Rule 37(a)(5)(B) for defending against CFB's motion, which is not substantially justified.

**THE CITY'S REPLY:**  The City has had to bring many motions throughout the discovery process due to GP's inappropriate conduct which hinders the City's ability to discover the information necessary for its defense against GP's $38 million claim.  GP dismisses these issues as "trivial" because GP can afford to.  The City, on the other hand, cannot continue to engage in GP's games, not only because they are expensive and burdensome, but also because discovery cut-off is a month away.  Even so, the City has until now refrained from asking for costs in order to avoid additional discord.  The City is still reluctant to do so, but because GP is seeking costs, the City feels that it has no choice but to do the same.

---

[6]  CFB conveniently omits the word "inordinately" in its letter brief.  Even now, it cannot offer any framework  to determine the level at which CFB considers a dioxin concentration to be "inordinately high."

Magistrate Beeler
August 21, 2014
Page 7

---

Respectfully submitted,


*/s/ Fred M. Blum*                          */s/ Harry M. Johnson*
Fred M. Blum of                             Harry M. Johnson of
BASSI EDLIN HUIE & BLUM, LLP                HUNTON & WILLIAMS LLP



Encl:  Exhibits
cc:        Counsel of Record

Re:    **Georgia-Pacific, LLC v. OfficeMax Incorporated, Louisiana-Pacific Corporation, And The City Of Fort Bragg**
**United States District Court, Northern District Case No. 3:12-cv-02797-WHO**

## PROOF OF SERVICE – ELECTRONIC TRANSMISSION

STATE OF CALIFORNIA/COUNTY OF San Francisco

I am a citizen of the United States and an employee in the County of San Francisco. I am over the age of eighteen (18) years and not a party to the within action. My business address is BASSI, EDLIN, HUIE & BLUM LLP, 500 Washington Street, Suite 700, San Francisco, California 94111.

On the date executed below, I electronically served the document(s) via ECF Northern District website*s*, described below, on the recipients designated on the Transaction Receipt located on the ECF Northern District website.

**DEFENDANT THE CITY OF FORT BRAGG'S JOINT LETTER BRIEF RE GEORGIA-PACIFIC'S RESPONSES TO THE CITY'S REQUESTS FOR ADMISSIONS, SET TWO**

On the following parties:

PLEASE SEE SERVICE LIST PROVIDED BY ECF NORTHERN DISTRICT WEBSITE

I declare under penalty of perjury that the foregoing is true and correct and that this document is executed on August 21, 2014, at San Francisco, California.

/s/ ALISHA C. PEMBER

ALISHA C. PEMBER

949924

1

PROOF OF SERVICE