# EXHIBIT 1

# THE CITY OF FORT BRAGG'S REQUESTS FOR ADMISSIONS TO GEORGIA-PACIFIC, LLC, SET TWO

NOEL EDLIN, ESQ. (SBN 107796)
nedlin@behblaw.com
FRED M. BLUM, ESQ. (SBN 101586)
fblum@behblaw.com
FARHEENA A. HABIB, ESQ. (SBN 243405)
fhabib@behblaw.com
MY-LINH T. LE, ESQ. (SBN 287351)
mtle@behblaw.com
BASSI, EDLIN, HUIE & BLUM LLP
500 Washington Street, Suite 700
San Francisco, CA 94111
Telephone:    (415) 397-9006
Facsimile:    (415) 397-1339

Attorneys for Defendant and Counter-Defendant
THE CITY OF FORT BRAGG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGIA-PACIFIC LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>OFFICEMAX INCORPORATED, LOUISIANA-PACIFIC CORPORATION, AND THE CITY OF FORT BRAGG,<br><br>Defendants. | Case No. 3:12-cv-02797-WHO<br><br>**THE CITY OF FORT BRAGG'S REQUESTS FOR ADMISSIONS TO PLAINTIFF GEORGIA-PACIFIC, LLC, SET TWO**<br><br><br>Trial Date: October 27, 2014<br><br>Second Amended Complaint Filed:  May 20, 2013<br>First Amended Third-Party Complaint Filed: October 31, 2012 |

776397

1

CITY OF FORT BRAGG'S REQUEST FOR ADMISSIONS TO GEORGIA-PACIFIC, SET TWO

PROPOUNDING PARTY:      City of Fort Bragg

RESPONDING PARTY:       Georgia-Pacific, L.L.C.

SET NO.:                Two

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, defendant and counter-claimant the CITY OF FORT BRAGG (the "CITY") hereby requests that plaintiff and counter-defendant, GEORGIA-PACIFIC, LLC ("GEORGIA-PACIFIC") answer the following requests separately, fully, in writing and under oath, and serve the responses within thirty (30) days.

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, each of the following requests is deemed to be continuing to the date of trial. If GEORGIA-PACIFIC or its counsel learns that any answer is inaccurate or incomplete, or if an answer becomes incomplete by reason of a development occurring after these answers are signed, GEORGIA-PACIFIC is under an obligation to promptly supplement each inaccurate or incomplete response.

## DEFINITIONS

1.     "AGENCY" shall mean any and all regulatory or oversight agencies currently or formerly involved with the MILL SITE, including but not limited to Department of Toxic Substances Control ("DTSC"), the North Coast Regional Water Quality Control Board ("RWQCB"), the Mendocino County Air Quality Management District ("AQMD"), the California Coastal Commission ("CCC"), the U.S. Environmental Protection Agency ("EPA"), the CITY and any of its agencies or divisions, any agency or division of Mendocino County, and any other agency with oversight authority for any portion of the MILL SITE.

2.     "APPLICATION" shall mean the act of laying, placing, putting, spreading on, in, or under, or spilling, discarding, or any act that constitutes a "release" as defined in CERCLA section 101(22), 42 U.S.C. § 9601(22).

3.     "CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act set forth at §§ 42 U.S.C. 9601, *et seq*.

4.     "CITY" shall refer to the defendant and counter-claimant in the above-captioned matter, the City of Fort Bragg.

776397

2

5.    "COMMUNICATIONS" means any form of communication, whether verbal, telephonic, written, electronic, recorded or otherwise.

6.    "COMPLAINT" means GEORGIA-PACIFIC's Second Amended Complaint against OFFICEMAX, LOUISIANA-PACIFIC CORPORATION, and the CITY OF FORT BRAGG filed in the above-captioned matter on May 20, 2013.

7.    "DISPOSAL" shall have the meaning provided in CERCLA section 101(29), 42 U.S.C. § 9601(29).

8.    "DOCUMENTS" means all "writings and recordings" and photographs" as defined by Rule 1001 of the Federal Rules of Evidence; the term includes the original, all drafts, and any and each copy bearing notations or marks not found on the original or draft, of any written, recorded or graphic matter, however produced or reproduced, including, but not limited to, any typed or printed matter, microfilm, photographs, pictures and films, maps, correspondence, letters, faxes, interoffice and interstate communications, licenses, permits, advertisements, brochures, circulars, pamphlets, diaries, calendars, memoranda, insurance policies, contracts or agreements, checks, statements of account, receipts, summaries, indices, data sheets, notes, papers, files, assignments, books, records, telegrams, messages (including email, text messages, and instant messages), reports, tables, graphs, computer printouts, tape recordings, transcripts, charts, logs, accounts, ledgers, surveys, blueprints, engineering or architectural drawings or diagrams, sketches, studies, manuals, appraisals, consultant's or expert's reports, resumes and curriculum vitae, exhibits, notices, instructions, minutes, purchase orders, financial records, statements, bills, accounting records, tax records, accounting or tax work sheets, magnetic tapes and any other data compilations from which information can be obtained or translated.

"DOCUMENTS" also includes all electronic media on which responsive information is stored or recorded, including, but not limited to, all computer databases, indices, computers, servers, backup storage media, CD-ROMs, DVDs, e-mails, word processing documents, computer spreadsheets, graphic files, data compilations, voicemails, magnetic media, tapes, optical disks, hard drives, removable storage devices, and floppy disks.

776397

3

CITY OF FORT BRAGG'S REQUEST FOR ADMISSIONS TO GEORGIA-PACIFIC, SET TWO

9.      "ENTITY" shall mean any natural PERSON or business entity.

10.      "ENVIRONMENT" shall have the meaning used in CERCLA section 101(8), 42 U.S.C. § 9601(8)

11.      "FLY ASH" shall mean any residue or byproduct from burning wood or combustion that rises with the flue gases, regardless of whether or not it is released into the atmosphere or captured and stored, including but not limited to wood waste ash or wood ash.

12.      "HAZARDOUS SUBSTANCE" shall have the meaning provided in the definition set forth in 42 U.S.C. § 9601(14).

13.      "LOUISIANA-PACIFIC" shall mean defendant Louisiana-Pacific Corporation in the above captioned matter, and includes its parents, subsidiaries, corporate predecessors, successors, and any other affiliated entities; its officers, directors, employees, agents, members, and representatives; and, any and all other natural PERSONS, business or legal entities, acting or purporting to act on its behalf.

14.      "MILL POND" shall refer to POND 8 on the MILL SITE, also known as the Log Pond.

15.      "MILL SITE" or "MILL" means the real property and all associated improvements located at and around 90 West Redwood Avenue, Fort Bragg, Mendocino County, California, consisting of approximately 415 acres along the Pacific Ocean, and defined as the "Site" in the COMPLAINT.

16.      "MUNICIPAL WOOD" or "MUNICIPAL WOODWASTE" shall have the same meaning imparted to the term "municipal wood" referenced by ARCADIS in its Data Summary Report Operable Unit E Pond Sediment and as referenced in "Exhibit No. 214" to Roger J. Hilarides' deposition taken on Wednesday, March 5, 2014, and the terms "urban wood waste" and "demolition wood waste" as referenced in the Feb. 1, 2002 letter from F. Denney to C.D. Woldbach, attached hereto as Exhibit A.

17.      "OFFICEMAX" means defendant OfficeMax Incorporated in the above captioned matter, and includes its parents, subsidiaries, corporate predecessors, successors, and any other affiliated entities; its officers, directors, employees, agents, members, and representatives; and,

776397

4

any and all other natural PERSONS, business or legal entities, acting or purporting to act on its behalf.

18.   "OWNER" or "OPERATOR" shall have the meaning set forth in CERCLA section 101(20), 42 U.S.C. § 9601(20).

19.   The term "PERSON" or "PERSONS" means any legal entity or entities, including, without limitation, any individual firm, corporation, partnership, limited partnership, organization, unincorporated association, public agency or body, governmental agency, authority or body, trust, joint venture, business organization or arrangement, and/or any other juridical entity.

20.   "PIPE 1" refers to the pipe located on the MILL SITE that runs directly to the northeastern corner of the MILL POND, as depicted and highlighted in Figure 1-2 of the Mill Pond Storm Water Sampling Report by ARCADIS, attached hereto as Exhibit B.

21.   "PIPE 2" refers to the pipe located on the MILL SITE that runs directly to the southeastern corner of the MILL POND, as depicted and highlighted in Figure 1-2 of the Mill Pond Storm Water Sampling Report by ARCADIS, attached hereto as Exhibit C.

22.   "POND" or "PONDS" refers to the industrial ponds on the MILL SITE.

23.   "REFER TO," "RELATE TO" or "RELATING TO" means that which constitutes, contains, supports, modifies, contradicts, criticizes, discusses, mentions, describes, records, reports, reflects or which pertains to the subject matter specified, including that which was prepared in connection with, arises from, or is or has been collected, recorded, examined, or considered by YOU in connection with the subject matter specified.

24.   "RELEASE" shall have the meaning provided in CERCLA section 101(22), 42 U.S.C. § 9601(22).

25.   "REMEDIAL ACTION" shall have the meaning provided in CERCLA section 101(24), 42 U.S.C. § 9601(24)

26.   "RESPONSE COST" shall have the same meaning as attributed to the term by CERCLA under 42 U.S.C. § 9607.

776397

CITY OF FORT BRAGG'S REQUEST FOR ADMISSIONS TO GEORGIA-PACIFIC, SET TWO

27.  "SAND" shall refer to the substance "sand" described in the letter sent by YOU to the Air Quality Management District ("AQMD"), attached hereto as Exhibit D,

28.  "WASTE OIL" shall refer to any petroleum based or synthetic oil that has been used and thereby contaminated by physical or chemical impurities.

29.  "WASTE STREAM" shall mean a run or flow of either, or a combination of, cooling water, hydraulic barker effluent, boiler blow down water, log sprinkling runoff, or any other kind of water or effluent that comes from the operations of the MILL.

30.  "WATER OUTFALL SYSTEM" shall mean the "OUTFALL SYSTEM" referred to in YOUR January 15, 1973 Technical Report to the California Regional Water Quality Control Board.

31.  "YOU" and "YOUR" shall refer to plaintiff GEORGIA-PACIFIC in the above-captioned matter and includes its parents, subsidiaries, corporate predecessors, successors, and any other affiliated entities; its officers, directors, employees, agents, members, and representatives; and, any and all other natural PERSONS, business or legal entities, acting or purporting to act on its behalf.  The defined term YOU and YOUR also shall be construed to include all technical or expert consultants or contractors retained or hired by YOU in RELATION TO the MILL SITE.

## REQUESTS FOR ADMISSION

**REQUEST NO. 24:**

Admit that, from 1973 to 2002, YOUR operations on the MILL SITE generated dioxins on the MILL SITE.

**REQUEST NO. 25:**

Admit that, from 1973 to 2002, YOUR operations on the MILL SITE generated furans on the MILL SITE.

**REQUEST NO. 26:**

Admit that, by 1988, YOU had knowledge that YOUR operations on the MILL SITE generated dioxins on the MILL SITE.

776397

6

**REQUEST NO. 27:**

Admit that, by 1988, YOU had knowledge that YOUR operations on the MILL SITE generated furans on the MILL SITE.

**REQUEST NO. 28:**

Admit that, at some point from 1973 to 1991, YOU had knowledge of harmful effects on human health posed by exposure to dioxins.

**REQUEST NO. 29:**

Admit that, at some point from 1973 to 1991, YOU had knowledge of harmful effects of dioxins on the environment.

**REQUEST NO. 30:**

Admit that, by 1991, YOU were sued for contaminating a river in Mississippi with dioxin.

**REQUEST NO. 31:**

Admit that, prior to July of 2002, YOU took no actions at the MILL SITE to investigate the existence or extent of dioxin contamination that might be in any of the PONDS on the MILL SITE.

**REQUEST NO. 32:**

Admit that, prior to July of 2002, YOU took no REMEDIAL ACTIONS at the MILL SITE to remediate any dioxin contamination that might be in any of the PONDS at the MILL SITE.

**REQUEST NO. 33:**

Admit that YOUR statements to the California Regional Water Quality Control Board ("RWQCB"), attached hereto as Exhibit E, pertaining to the amount of FLY ASH that YOU generated on the MILL SITE, are true.

**REQUEST NO. 34:**

Admit that by November 22, 1987, YOU had knowledge that FLY ASH generated on the MILL SITE contained dioxin.

776397

CITY OF FORT BRAGG'S REQUEST FOR ADMISSIONS TO GEORGIA-PACIFIC, SET TWO

**REQUEST NO. 60:**

Admit that, from the mid-1970s to 1996, water from POND 7 flowed into POND 1.

**REQUEST NO. 61:**

Admit that, from the mid-1970s to 1996, water from POND 1 flowed into POND 3.

**REQUEST NO. 62:**

Admit that, from the mid-1970s to 1996, water from POND 3 flowed into POND 8.

**REQUEST NO. 63:**

Admit that, from 1996 to 2002, the scrubber water from YOUR boilers on the MILL SITE was conveyed directly into POND 7.

**REQUEST NO. 64:**

Admit that, from 1996 to 2002, water from POND 7 flowed into POND 4.

**REQUEST NO. 65:**

Admit that the document attached hereto as Exhibit K was prepared by YOUR attorneys at Hunton & Williams.

**REQUEST NO. 66:**

Admit that the statements contained in Exhibit K are true.

**REQUEST NO. 67:**

Admit that, between 1996 and 2002, YOU dredged POND 7 one to two times a year.

**REQUEST NO. 68:**

Admit that, between 1996 and 2002, the dredge material from YOUR dredging of POND 7, was placed in a FLY ASH stockpile located in Parcel 7 on the MILL SITE.

**REQUEST NO. 69:**

Admit that, between 1996 and 2002, YOU dredged POND 4 one to two times a year.

**REQUEST NO. 70:**

Admit that, between 1996 and 2002, the dredge material from YOUR dredging of POND 4, was placed in a FLY ASH stockpile located in Parcel 7 on the MILL SITE.

776397

11

CITY OF FORT BRAGG'S REQUEST FOR ADMISSIONS TO GEORGIA-PACIFIC, SET TWO

**REQUEST NO. 87:**

Admit that YOU used as an unpermitted dump the portion of the MILL SITE which YOU refer to as "the Glass Beaches area."

**REQUEST NO. 88:**

Admit that YOU burned waste on the portion of the MILL SITE that YOU refer to as "the Glass Beaches area."

**REQUEST NO. 89:**

Admit that YOU burned wood waste containing HAZARDOUS SUBSTANCES on the portion of the MILL SITE that YOU refer to as "the Glass Beaches area."

**REQUEST NO. 90:**

Admit that YOU burned fuel oil on the portion of the MILL SITE that YOU refer to as "the Glass Beaches area."

**REQUEST NO. 91:**

Admit that YOU burned coal containing HAZARDOUS SUBSTANCES on the portion of the MILL SITE that YOU refer to as "the Glass Beaches area."

**REQUEST NO. 92:**

Admit that, prior to 2002, YOU had knowledge that residents of the City of Fort Bragg dumped or placed waste on the portion of the MILL SITE that YOU refer to as "the Glass Beaches area."

**REQUEST NO. 93:**

Admit that the document attached hereto as Exhibit N was prepared by YOUR attorneys at Hunton & Williams.

**REQUEST NO. 94:**

Admit that the statements contained in the document attached hereto as Exhibit N are true.

**REQUEST NO. 95:**

Admit that YOUR response costs for the portion of the MILL SITE that YOU refer to as "the Glass Beaches area" are between $400,000 to $500,000.

776397

14

**REQUEST NO. 96:**

Admit that YOU completed, by 2011, the remediation of the portion of the MILL SITE that YOU refer to as "the Glass Beaches area."

**REQUEST NO. 97:**

Admit that, from approximately 2000 to 2002, YOU burned MUNICIPAL WOOD in a boiler on the MILL SITE that was used to generate electricity for MILL SITE operations.

**REQUEST NO. 98:**

Admit that the MUNICIPAL WOOD that you burned in a boiler on the MILL SITE from approximately 2000 to 2002, contained materials that you were not permitted to burn.

**REQUEST NO. 99:**

Admit that, at the time you burned MUNICIPAL WOOD on the MILL SITE, YOU had knowledge that the burning of MUNICIPAL WOOD generated inordinately high concentrations of dioxins.

**REQUEST NO. 100:**

Admit that, on August 9, 2001, the AQMD issued to YOU a notice of violation of your Title V Permit to Operate, specifically Chapter 3 Section V, Special Conditions for Fuel Limitations in response to YOUR burning of MUNICIPAL WOOD on the MILL SITE.

**REQUEST NO. 101:**

Admit that, after receiving the AQMD's August 9, 2001 notice of violation of your Title V Permit to Operate, YOU continued to burn MUNICIPAL WOOD on the MILL SITE until some time in 2002.

**REQUEST NO. 102:**

Admit that, at some point from 1973 to 2002, YOU burned plastic material on the MILL SITE.

**REQUEST NO. 103:**

Admit that, at some point from 1973 to 2002, YOUR burning of plastic material on the MILL SITE generated dioxins on the MILL SITE.

776397

15

**REQUEST NO. 122:**

Admit that, at some point from 1973 to 2002, wastewater which YOU discharged into the MILL POND contained cyanide.

**REQUEST NO. 123:**

Admit that, at some point from 1973 to 2002, steam vat wastewater from the plywood plant discharged to the MILL POND, as stated in Exhibit O.

**REQUEST NO. 124:**

Admit that water used to sprinkle the plywood logs during plywood plant operations discharged to the MILL POND, as stated in Exhibit O.

**REQUEST NO. 125:**

Admit that onsite storm drains discharged to the MILL POND, as stated in Exhibit O.

**REQUEST NO. 126:**

Admit that stormwater from the MILL SITE discharged to the MILL POND, as stated in Exhibit O.

**REQUEST NO. 127:**

Admit that wastewater from the Former Mobile Equipment Shop was diverted to onsite storm drains, as stated in Exhibit O.

**REQUEST NO. 128:**

Admit that wastewater from the Former Mobile Equipment Shop flowed into the MILL POND, as stated in Exhibit O.

**REQUEST NO. 129:**

Admit that Cat Shop Wastewater discharged into the MILL POND, as stated in Exhibit O.

**REQUEST NO. 130:**

Admit that Truck Wash Pond Wastewater discharged to the MILL POND, as stated in Exhibit O.

776397

18

**REQUEST NO. 131:**

Admit that hydraulic log debarker effluent discharged into the MILL POND, as stated in Exhibit O.

**REQUEST NO. 132:**

Admit that boiler blowdown water discharged into the MILL POND, as stated in Exhibit O.

**REQUEST NO. 133:**

Admit that waste effluent from the power plant wet scrubbers contained FLY ASH.

**REQUEST NO. 134:**

Admit that waste effluent from the power plant wet scrubbers contained cyanide.

**REQUEST NO. 135:**

Admit that waste effluent from the power plant wet scrubbers entered the MILL POND, as stated in Exhibit O.

**REQUEST NO. 136:**

Admit that, at some point from 1973 to 2002, SAND from the power plant boiler stack clarifiers discharged into the MILL POND, as stated in Exhibit O.

**REQUEST NO. 137:**

Admit that, at some point from 1973 to 2002, fine carbon from the power plant boiler stack clarifiers discharged into the MILL POND, as stated in Exhibit O.

**REQUEST NO. 138:**

Admit that water plant filter backwash was discharged to the MILL POND, as stated in Exhibit O.

**REQUEST NO. 139:**

Admit that the document attached hereto as Exhibit P was prepared by YOUR attorneys at Hunton & Williams.

**REQUEST NO. 140:**

Admit that the statements contained in Exhibit P are true.

776397

CITY OF FORT BRAGG'S REQUEST FOR ADMISSIONS TO GEORGIA-PACIFIC, SET TWO

**REQUEST NO. 141:**

Admit that the document attached hereto as Exhibit Q was prepared by YOUR attorneys at Hunton & Williams.

**REQUEST NO. 142:**

Admit that the statements contained in Exhibit Q are true.

**REQUEST NO. 143:**

Admit that the location of PIPE 1 in relation to the MILL POND as depicted in Exhibit B is accurate.

**REQUEST NO. 144:**

Admit that the location of PIPE 2 in relation to the MILL POND as depicted in Exhibit C is accurate.

**REQUEST NO. 145:**

Admit that PIPE 1 and PIPE 2 are the only pipes that convey CITY stormwater directly into the MILL POND.

**REQUEST NO. 146:**

Admit that the CITY does not have any ownership interest in PIPE 1.

**REQUEST NO. 147:**

Admit that the CITY does not have any ownership interest in PIPE 2.

**REQUEST NO. 148:**

Admit that the CITY does not have an easement for PIPE 1.

**REQUEST NO. 149:**

Admit that the CITY does not have an easement for PIPE 2.

Date:   April 25, 2014              BASSI, EDLIN, HUIE & BLUM LLP


                                    By: _____
                                        MY-LINH T. LE
                                        Attorneys for Defendant
                                        THE CITY OF FORT BRAGG

776397

20

# EXHIBIT E
# TO THE CITY OF FORT BRAGG'S SPECIAL
# REQUESTS FOR ADMISSIONS, SET TWO



**Georgia-Pacific Corporation** *Eastern Wood Products*
*Manufacturing Division*
*P.O. Box 105603*
*Atlanta, Georgia 30348*
*Telephone (404) 521-4000*
*Teletype (810) 751-1000*

June 28, 1990

Mr. Benjamin D. Kor
Executive Officer
California Regional Water Quality
   Control Board
North Coast Region
1440 Guerneville Road                                    CERTIFIED MAIL
Santa Rosa, CA  95403                                    NO. P317694311

RE:   Alternative Disposal Methods Report
            Georgia-Pacific Corporation
            Fort Bragg, CA

Dear Mr. Kor:

As required by Waste Discharge Requirements Order No. 90-32, we
are enclosing our Alternative Feasibility Study which addresses
various methods for disposal on use of the ash generated at
Georgia-Pacific's sawmill located in Fort Bragg, CA.  These
alternative methods, of course, are in lieu of the present method
of soil amending.

This report was prepared, with our review by Mr. Dave Modi of our
Washington, DC government affairs office.

It is certainly our desire that the Board can agree that the
practice of soil amending is the most beneficial ash and will
grant our request to re-commence this activity.

Please let me know if there are any questions or if further
information is needed.

Very truly yours,

GERALD W. TICE
CHIEF ENVIRONMENTAL ENGINEER
WOOD PRODUCTS MANUFACTURING DIVISION

GWT/pcw

Enclosure

cc:   Messrs.  K. C. Mayer
               D. Whitman

RWOCR0028673

## ALTERNATIVE FEASIBILITY STUDY

This is submitted pursuant to the Waste Discharge Requirements Order 90-32 for Georgia-Pacific's soil amendment project at its Fort Bragg mill. Order 90-32 requires that Georgia-Pacific submit a study on alternatives to soil amending. We have done a preliminary analysis on four different options: (1) landfilling on our own site; (2) landfilling at a county or municipal landfill; (3) stop generating ash altogether; and (4) using the ash as a hydromulch on Georgia-Pacific timber lands.

### 1. Landfilling on Our Own Site

The Georgia-Pacific Fort Bragg mill owns and operates a landfill near the mill. It is a Class III landfill and is permitted to receive "non-hazardous solid woodwaste consisting of saw dust, wood chips woodwaste, bark, bark and soil." It is not permitted to receive ash. The landfill permits specify that the fill is prohibited from accepting waste for which it is not approved. Therefore, to deposit ash at the site, we would need to obtain new landfill permits.

The fly ash in question has heretofore been determined by the Department of Health Services to be non-hazardous. In its current classification, therefore, the ash is eligible for disposal in a Class III landfill.

RWOCR0028674

2

Requirements for permitting Class III landfills can be found in Section 2533 under Article 2 of Subchapter 15. The most important consideration seems to be to prevent "impairment of beneficial uses of surface water or of groundwater beneath or adjacent to the landfill." The landfill must be sited so as to achieve this goal. Section 2530(c) of Article 3 stipulates that any new landfill be sited at least 5 feet above the highest anticipated elevation of underlying ground water. In some situations it may be necessary to construct an elevated area with berms to achieve this separation. Sites whose geologic setting does not ensure isolation of landfill leachate from groundwater must install a single clay liner (at least one foot thick) with a maximum permeability. These sites must also install a leachate collection and removal system (LCRS).

We have not attempted to site a landfill for purposes of this report, nor have we done the engineering and other work necessary to determine if our current landfill site would be suitable as an ash fill. Such work could take up to twelve months to complete, assuming an appropriate site could be located, and cost $60,000-80,000 for the required geological and hydrological characterizations. However, we can make some generalizations about a potential site based on known geology and hydrology.

RWOCR00028675

3

If we were to site the fill closer to the coast, we would likely encounter the geologic formation known as "marine terrace." Marine terrace is characterized by generally higher water tables and sandy soil.  If we were to site our fill over marine terrace we may need to install a composite liner (one foot clay), a synthetic liner and the LCRS.

If we were to site the fill further inland, we could encounter the Franciscan geologic formations.  Franciscan formations generally have lower water tables and less sandy soils than do marine terrace areas.  Depending on how permeable the formation may be, we may not need to install the liners and the LCRS for an ash landfill located over this formation.

If we had to construct and permit a new landfill for the ash, we would plan for that fill to have a useful life of twenty (20) years.  With that in mind, we estimate that we would need to construct a landfill area of between 7 and 24 acres, based on current rates of ash generation (1,400 cubic yards per month). The smaller figure, 7 acres, assumes a single, 40 ft. deep, canyon-like fill area located over a Franciscan formation.  The larger figure assumes 42 separate but adjacent disposal cells, each 10 ft. deep, 50 ft. wide and 500 ft. long, located over either marine terrace or Franciscan formation.  With this type of cell landfill the actual land area required to site the landfill

RWOCR0028676

4

will be about 48 acres when the space occupied by earth dividers between cells and buffer areas around the landfill are allowed for.

We estimate that the cost of construction of a new landfill, with the liners and the LCRS would be approximately $65,000 an acre, with additional costs of $5,000-10,000 per acre for permitting, engineering and reporting. For a 7 acre site, total costs would run between $490,000 and $525,000. A 24 acre site would cost between $1.68 and $1.8 million. These figures do not include the costs of elevating the site if elevation is required nor do they include the $60,000 - $80,000 for the geological and hydrological characterizations mentioned above.

Construction and permitting of a Class III landfill without the clay liners and without the LCRS (highly unlikely in our opinion) would be about $20,000 per acre. For a 7 acre site, total costs would be about $140,000; a 24 acre site would cost $480,000.

We understand that the Board is undergoing a review of fly ash and may designate it as a "designated waste." If the ash is classified as a "designated waste" rather than a "nonhazardous solid waste", then disposal must be to a Class II waste management unit, and not a Class III unit. The requirements for a Class II unit are generally more stringent than those for a

RWOCR0028677

5

Class III unit.  The clay liner and the LCRS would both probably be required, at a minimum.  Siting criteria are more stringent for class II facilities than for Class III facilities.  Costs of construction of a Class II facility would be at least $65,000 per acre and would likely be more.

Maintenance costs for a landfill, either Class II or III, would be substantial.  Background and downgradient monitoring of both surface and groundwater would be required.  Unsaturated zone monitoring may also be required.  We estimate the cost of installation of a groundwater monitoring system to be between $20,000 and $40,000.

Once a landfill has been sited, we estimate that the minimum time required to gain the necessary regulatory approval for a new landfill would be 12 months, and that construction time would take about 12 months after that.  Thus, something in excess of at least two years would elapse before any ash could be deposited.

2.  <u>Landfilling At a County or Municipal Landfill</u>

A second option is to take the ash waste to a municipal landfill. This is an option employed by other sawmills in the Region.

We have written a letter to the municipal landfill in Willits asking for permission to dispose of our waste there,  but have

RWQCB0028678

6

not received a response as of this date. We estimate that disposal would cost between $20 and $25 per yard at most public landfills. We generate 1,400 yards of ash a month, so disposal costs would be between $28,000 and $35,000 a month, or $336,000-420,000 per year. Of course, any public landfill which accepts our ash will have to comply with the same regulations that Georgia-Pacific would to landfill on its own land. Mendocino County landfills are not equipped with disposal cell base liners or leachate collection and recovery systems. For this reason, Mendocino County landfills may not be interested in accepting our ash.

According to State estimates, there is in 1990 about 700,000 tons of landfill capacity remaining in Mendocino County. This figure is expected to drop to less than 500,000 tons in 1996. About 34,000 tons per year are currently disposed of in Mendocino County landfills, and this is expected to rise to about 37,000 tons in 1996. Our 1,400 yards/month of ash corresponds to 16,800 yards/year, or about 11,000 tons/year (assuming an ash density of about 1,400 pounds per cubic yard). If this waste were deposited in a county landfill it, would represent about a 33% increase in the total waste landfilled in the County over 1990 levels (by weight).

RWQCB0028679

7

A factor that may make landfilling in a municipal landfill (and for that matter in our own landfill) even less attractive relates to a technical problem at the mill's boiler. Currently we re-inject the ash into the boiler after the first burning. The ash has sufficient fuel value after the first burning to justify this re-injection. However, the re-injected ash has a lot of sand mixed in with it. The sand is very abrasive on the boiler tubes. We have experienced many more boiler tube failures since we began re-injecting the ash. If we continue to find abnormal wear on the tubes, we may have to modify our re-injection program. This could substantially increase the volume of ash to be disposed. (We would not expect this to be a problem for soil amending. If the volume of ash to be amended were to increase, we would continue to follow sound best management practices (BMP) for soil amending and would simply increase the number of acres amended.)

### 3. Stop Generating the Ash Altogether

If we were to stop burning bark in the boiler, we would stop generating the ash altogether.

The boilers burn some fuel oil as well as wood waste. However, oil is burned only during start ups and shut downs, when the wood waste is too wet to get a good burn, or when wood waste may be unavailable. Fuel oil represents about 1% of the total fuel for the mill. Switching to 100% fuel oil would be extremely expensive. A truck load of oil (6,400 Gal.) costs about $3,940.

RWOCR0028680

8

We estimate we would need about 165 loads a month (from the current 2 a month) to provide 100% of our energy needs, costing about $650,000 a month, or about $7.8 million a year. In addition, the boilers are not capable of burning fuel oil only. To convert them would require such a major revision that we would probably need to build a new power plant. At any rate, we would have the problem of disposing of the woodwaste that is now burned in the boiler since this woodwaste is generated from the mill operation. We estimate that there would be about 22 million cubic feet of woodwaste per year, requiring a landfill over 1,600 acres in size for disposal. Increasing the burning of fuel oil would also dramatically increase the emissions of sulfur dioxide from the power plant. Finally, by burning the woodwaste, we are consuming a potential waste product. It would not make energy or environmental sense to switch to an alternative fuel. For these reasons, we do not believe that this is a very viable option.

4.    Using the Ash as Hydromulch on Georgia-Pacific Owned Timber Lands

Within 30 miles of the Fort Bragg mill, Georgia-Pacific owns over a hundred thousand acres of timber land. Much of this timber is harvested and new seedlings planted. Since the ash is non-hazardous and has good nutrient value, it would make an excellent mulch for the new seedlings. It could also be used as a mulch along the roadways on Georgia-Pacific timber lands.

RWQCB0028681

9

According to a Resource Conservation Service Feasibility study in Maine, a ton of ash has nutrient and fertilizer value of over $17.00. And according to the mid-March 1990 issue of Farm Journal, a program of distributing ash to farmers in Alabama has met with widespread acceptance by farmers and environmentalists. For farmers, ash sweetens acidic soil at a lower cost than lime.

For environmentalists, the program returns natural products to the land and saves on valuable landfill space. Using the ash as mulch would return to the environmental nutrients in the same concentration as when they were removed. It would enhance mineral cycling, and would increase soil stabilization, thereby enhancing revegetation and reducing the impact of rainfall on the harvested areas. We expect that more seedlings would survive with an ash mulch covering.

Currently we are not using mulch either along the roadways or on harvested areas. Hence, we do not have a data base upon which to specifically measure performance, and we do not view this option as a near-term solution. We recognize additional study would be necessary before we could begin hydromulching, but theoretically we believe it has merit.

RWQCB0028682

10

## Conclusions and Recommendations

The fly ash in question is generated by the burning of redwood and douglas fir bark and sawdust in the power plant at the Georgia-Pacific sawmill in Fort Bragg. There is nothing added to this woodwaste. The ash is no different from ash generated by forest fires or generated in thousands of wood burning stoves and fireplaces throughout the State.

It seems that we can narrow the options for ash disposal into two simple ones: we can landfill it, or we can use it for something beneficial. With precious landfill space dwindling, and with the current national emphasis on beneficial re-use of waste material, it seems highly preferable that the fly ash be used for something beneficial. A goal of the "California Integrated Waste Management Act of 1989" is to encourage beneficial re-use of potential waste products rather than disposal.

We have identified two beneficial re-use options; soil amending, for which we are currently seeking approval, and hydromulching, discussed earlier in this report. Our preference is soil amending. Soil amending is a beneficial use; it sweetens the amended soil, and it returns nutrients to the land, thereby increasing biomass yield on amended plots.

RWOCR0028683

# EXHIBIT K
# TO THE CITY OF FORT BRAGG'S SPECIAL
# REQUESTS FOR ADMISSIONS, SET TWO

## 30(b)(6) Deposition Preparation Notes
### Former Fort Bragg Mill Site, Fort Bragg, CA

Subject 52: *Any excavation or dredging of the mill ponds, including but not limited to Ponds 4, 5, 7, 8, and 9.*

GP Position

- Between 1996 and 2002 both Ponds 4 and 7 were dredged once or twice a year and the dredge material was placed in the former ash pile area.[1] In the fall of 2006 the ash pile was excavated and disposed of offsite at the "Allied Waste Services, Keller Canyon Landfill in Pittsburg, California".[2]

- Deposition testimony suggests that Pond 8 was historically dredged because Union Lumber Company used the pond for log storage and debris and bark would come off the logs and accumulate at the bottom of the pond.[3]

- GP at this time has not uncovered information on any dredging related to Ponds 5 or 9.

---

[1] Arcadis, Preliminary Site Investigation Work Plan, Operable Unit E - Onsite Ponds, December 2007, p. 2-4; Deposition of Richard Benedetti, January 23, 2014, p. 87, Lines 7-21.
[2] Arcadis, Construction Completion Report for Foundation and Ash Pile Removal Projects, Former Georgia-Pacific Wood Products Facility, April 2007, p. 34.
[3] Deposition of Richard Benedetti, January 23, 2014, p. 94, Lines 10-13 & 15-22.

1

29073.000398 EMF_US 49535330v2

177

# EXHIBIT N
# TO THE CITY OF FORT BRAGG'S SPECIAL
# REQUESTS FOR ADMISSIONS, SET TWO

**30(b)(6) Deposition Preparation Notes**
*Former Fort Bragg Mill Site, Fort Bragg, CA*

Subject 80: *GP costs to investigate or remediate any contamination in the Glass Beach area.*

Georgia-Pacific Position on Costs for Beaches:

- Because invoices from vendors working on the Mill Site reflected response costs incurred for various activities being conducted concurrently, the majority of the invoices submitted do not break out costs by OU and/or sub-areas such as the Glass Beach areas. Therefore, it is not possible for GP to provide an exact cost for the investigation and/or cleanup of the Glass Beaches area.

- GP estimates that its expenditures to investigate and cleanup contamination in the glass beach areas totals approximately $400K.

- This issue is the subject of expert analysis and further refinement and the totals will be presented in forthcoming expert reports.

Georgia-Pacific Position on Costs Associated with OU-A:

- Because invoices from vendors working on the Mill Site reflected response costs incurred for various activities being conducted concurrently, the majority of the invoices submitted do not break out costs by OU and/or sub-areas such as the Glass Beaches areas. Therefore, it is not possible for GP to provide an exact cost for the investigation and/or cleanup of the Glass Beach area and OU-A.

- GP estimates that its expenditures to investigate and cleanup contamination in OU-A (excluding the Glass Beach area) totals approximately $8.4M.

- The issue of cost allocation is the subject of expert analysis. The allocation of response costs for the Glass Beach area and OU-A will be presented in forthcoming expert reports.



29073.000398 EMF_US 49548897v1

**EXHIBIT O
TO THE CITY OF FORT BRAGG'S SPECIAL
REQUESTS FOR ADMISSIONS, SET TWO**

**30(b)(6) Deposition Preparation Notes**
*Former Fort Bragg Mill Site, Fort Bragg, CA*

<u>Subject 23</u>: *Any materials from mill site operations that went into the mill ponds.*

<u>GP Position</u>

- Steam vat wastewater from the plywood plant, which operated from 1969 to 1977, was discharged to the Mill Pond (Pond 8).[1]

- Water used to sprinkle the plywood logs during plywood plant operations (1969 to 1977) drained into the Mill Pond.[2]

- Stormwater from the City of Fort Bragg, as well as the Mill Site, drained into the Mill Pond.[3]

- "Roundhouse / Former Mobile Equipment Shop Wastewater" appears to have been diverted to onsite storm drains that discharged to the Mill Pond.[4]

- "Cat Shop Wastewater" appears to have been discharged directly to the Mill Pond.[5]

- "Truck Wash Pond Wastewater" appears to have been diverted to onsite storm drains that discharged to the Mill Pond.[6]

- Water from Pudding Creek, which received stormwater flow from the City of Fort Bragg, was pumped (via Pond 5) to the Mill Pond to maintain water level during the summer and fall months.[7]

- From 1954 until 1971 hydraulic log debarker effluent discharged directly into the Pacific Ocean.[8] After 1971 "screening devices" were installed "to remove the fibrous material".[9] This water then flowed into the Mill Pond after passing through the North Settling Pond, then the South Settling Pond, then Pond 7, which was pumped to the south settling ponds, Pond 1 (pre 1996) or Pond 4 (post 1996).[10] However, as of 1973, a portion of this effluent still flowed into the Pacific Ocean via a "gully" after passing through the North and South Settling Ponds.[11]

- Boiler blowdown water was discharged directly into the Mill Pond as of 1973, and presumably prior to 1973.[12] However, the January 1973 Waste Discharge Technical Report indicated that this effluent <u>would be</u> discharged to the on-site settling ponds prior to being discharged to the Mill Pond at some point after this report was issued.[13] This is confirmed by later reports.[14]

- From 1972 until 1981 waste effluent from the power plant wet scrubbers that contained fly ash and cyanide was discharged to the South Settling Pond prior to being pumped to the fly ash dewatering slabs, which then flowed into Pond 7 and was pumped to settling Pond 1 and then discharged to the Mill Pond (Pond 8).

- After 1981, when use of the South Settling Pond ceased, this water went directly to dewatering slabs.[15] Fly ash that was piped into the two dewatering slabs was then "placed in a dump hopper for removal and placement at an offsite location."[16] Any

1


DEFENDANT'S
EXHIBIT

additional process water flowed to Pond 7, and thence to the southern settling ponds (Ponds 1, 2, and 3).[17] Fly ash in this water would have settled out in Pond 7 or Pond 1.

- In 1996 a fly ash reinjection system was installed which eliminated the use of the dewatering slabs; therefore, process water from the boilers was conveyed directly into Pond 7.[18] At this time Pond 4 was created to receive this process water.[19] Water from Pond 4 drained into Pond 1, which ultimately drained back to the Mill Pond (Pond 8).[20]

- Sand and fine carbon from the power plant boiler stack clarifiers[i] flowed into the Mill Pond.[21] The 1973 EPA Industrial Discharge Survey indicated that this effluent flowed with the boiler blowdown water and, as of 1973, flowed directly into the Pacific Ocean.[22]

- Water plant filter backwash was first identified in the 2001 RWQCB order as a discharge source to the Mill Pond.[23]

---

[1] RWQCB Order 75-12, April 21, 1975; Waste Discharge Technical Report, January 15, 1973, p. 2 and 5; and EPA, Industrial Discharge Survey, January 10, 1973, p. 3.

[2] Waste Discharge Technical Report, January 15, 1973, p. 5.

[3] Waste Discharge Technical Report, January 15, 1973, p. 1 and 5; EPA, Industrial Discharge Survey, January 10, 1973, p. 3; RWQCB Order 79-94, July 26, 1979; RWQCB Order 84-89, July 26, 1984; RWQCB Order 89-66, September 21, 1989; RWQCB Order 94-110, September 22, 1994; RWQCB Order 2001-22, March 22, 2001; Arcadis, Mill Pond Storm Water Sampling Report, Former Georgia-Pacific Wood Products Facility, April 2012, p. 2-1 – 2-3, Figure 1-2.

[4] Arcadis, Data Summary Report for OU-E Pond Sediment, Former Georgia-Pacific Wood Products Facility, May 2009, and Figure 2-2.

[5] Arcadis, Data Summary Report for OU-E Pond Sediment, Former Georgia-Pacific Wood Products Facility, May 2009, and Figure 2-2.

[6] Arcadis, Data Summary Report for OU-E Pond Sediment, Former Georgia-Pacific Wood Products Facility, May 2009, and Figure 2-2.

[7] Waste Discharge Technical Report, January 15, 1973, p. 1; and EPA, Industrial Discharge Survey, January 10, 1973, p. 2; Winzler & Kelly, Storm Drainage Master Plan, City of Fort Bragg California, October 2004, pp. 3 & 13; ARCADIS, Preliminary Site Investigation Work Plan Operable Unit E - Ponds, Former Georgia-Pacific Wood Products Facility, December 2007, p.2-2, Figure 2-2.

[8] Waste Discharge Technical Report, January 15, 1973, p. 7.

[9] Waste Discharge Technical Report, January 15, 1973, p. 7; EPA, Industrial Discharge Survey, January 10, 1973, p. 3.

[10] ARCADIS, Preliminary Site Investigation Work Plan Operable Unit E - Ponds, Former Georgia-Pacific Wood Products Facility, December 2007, p.2-2 & 2-4.

[11] EPA, Industrial Discharge Survey, January 10, 1973, p. 3; Arcadis, Data Summary Report for OU-E Pond Sediment, Former Georgia-Pacific Wood Products Facility, May 2009, p. 2-2, Figure 2-2.

[12] Waste Discharge Technical Report, January 15, 1973, p. 7; EPA, Industrial Discharge Survey, January 10, 1973, p. 3; RWQCB Order 79-94, July 26, 1979; RWQCB Order 84-89, July 26, 1984; RWQCB Order 89-66, September 21, 1989; RWQCB Order 94-110, September 22, 1994; RWQCB Order 2001-22, March 22, 2001.

[13] Waste Discharge Technical Report, January 15, 1973, p. 7.

[14] Arcadis, Data Summary Report for OU-E Pond Sediment, Former Georgia-Pacific Wood Products Facility, May 2009, p. 2-2 & 2-4, Figure 2-2.

[15] Arcadis, Data Summary Report for OU-E Pond Sediment, Former Georgia-Pacific Wood Products Facility, May 2009, p. 2-2, Figure 2-2; ARCADIS, Preliminary Site Investigation Work Plan Operable Unit E - Ponds, Former Georgia-Pacific Wood Products Facility, December 2007, p.2-2, Figure 2-2;

---

[i] The document says "classifiers" but it seems as if it should read "clarifiers".

2

---

BBL/Arcadis, Current Conditions Report, former Georgia-Pacific Wood Products Manufacturing Facility, December 11, 2006, p. 6-7.

[16] BBL/Arcadis, Current Conditions Report, former Georgia-Pacific Wood Products Manufacturing Facility, December 11, 2006, p. 2-2; California Regional Water Quality Control Board internal Memorandum from Kor, B. to Johnson C, Reichmuth, F., Warner, S., and Tancreto, B., Re: Georgia-Pacific Fort Bragg Ash Problems, October 18, 1985.

[17] Arcadis, Preliminary Site Investigation Work Plan, Operable Unit E - Onsite Ponds, December 2007, p. 2-2 & 2-4, Figure 2-2.

[18] ARCADIS, Preliminary Site Investigation Work Plan Operable Unit E - Ponds, Former Georgia-Pacific Wood Products Facility, December 2007, p.2-2 & 2-4.

[19] BBL/Arcadis, Current Conditions Report, former Georgia-Pacific Wood Products Manufacturing Facility, December 11, 2006, p. 2-2 and 6-3; Arcadis, Final Remedial Investigation Report Operable Unit E, Former Georgia-Pacific Wood Products Facility, January 2013, p. 3-6 – 3-7, and Figure 2-1; Arcadis, Data Summary Report for OU-E Pond Sediment, Former Georgia-Pacific Wood Products Facility, May 2009, p. 2-2 – 2-3; Arcadis, Construction Completion Report for Foundation and Ash Pile Removal Projects, Former Georgia-Pacific Wood Products Facility, April 2007, p. 8 – 9.

[20] Arcadis, Preliminary Site Investigation Work Plan, Operable Unit E - Onsite Ponds, December 2007, Figure 2-2.

[21] Waste Discharge Technical Report, January 15, 1973, p. 7.

[22] EPA, Industrial Discharge Survey, January 10, 1973, p. 3.

[23] RWQCB Order 2001-22, March 22, 2001.

**EXHIBIT P
TO THE CITY OF FORT BRAGG'S SPECIAL
REQUESTS FOR ADMISSIONS, SET TWO**